**2022-1298**

In The

# United States Court of Appeals
# for the Federal Circuit

CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED
CORPORATION, DATONG JUQIANG ACTIVATED CARBON CO., LTD.,
BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD.,
NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD.,
NINGXIA MINERAL & CHEMICAL LIMITED,
SHANXI SINCERE INDUSTRIAL CO., LTD.,

Plaintiffs-Appellants,

v.

UNITED STATES, CALGON CARBON CORPORATION,
CABOT NORIT AMERICAS, INC.,

Defendants-Appellees.

Appeal from the United States Court of International Trade in
Case No. 20-cv-00007, Chief Judge Mark A. Barnett

## NONCONFIDENTIAL OPENING BRIEF FOR PLAINTIFFS-APPELLANTS

Francis J. Sailer
Jordan C. Kahn
Dharmendra N. Choudhary

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

*Counsel to Plaintiffs-Appellants*

Dated: April 7, 2022

**FORM 9. Certificate of Interest**

Form 9 (p. 1)
**July 2020**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number**  22-1298

**Short Case Caption**  Carbon Activated Tianjin Co., Ltd. v. US

**Filing Party/Entity**  Carbon Activated Tianjin Co., Ltd., Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd., Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Ningxia Mineral & Chemical Limited, Shanxi Sincere Industrial Co., Ltd.

---

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: <u>4/7/2022</u>

Signature:  /s/ Francis J. Sailer

Name:  Francis J. Sailer

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Carbon Activated Tianjin Co., Ltd. | | |
| Carbon Activated Corporation | | |
| Datong Juqiang Activated Carbon Co., Ltd. | | |
| Beijing Pacific Activated Carbon Products Co., Ltd. | | |
| Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. | | |
| Ningxia Mineral & Chemical Limited | | |
| Shanxi Sincere Industrial Co., Ltd. | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable       ☐     Additional pages attached

| | | |
|---|---|---|
| Brandon M. Petelin | | |
| Elaine F. Wang | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐     None/Not Applicable       ☐     Additional pages attached

| | | |
|---|---|---|
| Carbon Activated Tianjin Co., Ltd. v. United States, U.S. Court of International Trade Case No. 21-00131 MAB | Carbon Activated Tianjin Co., Ltd. v. United States, U.S. Court of International Trade Consol. Case No. 22-00017 MAB | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable       ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ..................................................................ix

JURISDICTION...................................................................................................1

INTRODUCTION ...............................................................................................2

ISSUES PRESENTED FOR REVIEW ...............................................................2

STATEMENT OF THE CASE.............................................................................2

STATEMENT OF FACTS ..................................................................................3

    A.    AR11 Initiation Through *Preliminary Results*.............................3

    B.    Case Briefing Through *Final Results*.................................................10

    C.    *CA I*.................................................................................................14

    D.    *CA II* ..............................................................................................18

SUMMARY OF ARGUMENT ..........................................................................18

ARGUMENT .....................................................................................................20

    I.    STANDARD OF REVIEW .........................................................20

    II.    COMMERCE UNLAWFULLY VALUED COAL TAR PITCH ......22

        A.    Commerce Contradicts AR10 and AR12 Findings .................22

        B.    HTS 2706.00 Compelled by tariff language and ENs .............28

        C.    Malaysian Import Data Are Unreliable ...................................32

        D.    Russian HTS 2706.00 Affords the Most Reliable SV .............35

    III.    COMMERCE UNLAWFULLY VALUED BITUMINOUS COAL .37

        A.    Bituminous Coal Having Unknown Calorific Value...............38

        B.    Bituminous Coal Having Known Calorific Value....................47

    IV.    COMMERCE UNLAWFULLY SELECTED MALAYSIA AS THE SURROGATE COUNTRY FOR CHINA .........................................50

        A.    Criteria for Surrogate Country Selection ..................................50

        B.    Romania Provides Superior Data Quality.................................51

        C.    Commerce's New Bases To Favor Malaysia Are Without Merit ..............................................................................................55

CONCLUSION ..................................................................................................64

# CONFIDENTIAL MATERIAL DELETED

The confidential material deleted from pages 6-7, 10, 22, 26-28, 45, 52, and 59 consists of business proprietary information submitted to, or released by, the U.S. Department of Commerce under administrative protective order, Appxi-iv, the disclosure of which is protected by statute, 19 U.S.C. § 1677f.

# TABLE OF AUTHORITIES

## Cases

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
  179 F.Supp.3d 1256 (2016), *aff'd after remand*, 236 F.Supp.1352 (2017) .........33

*Ancientree Cabinet Co. v. United States*, 532 F.Supp.3d 1241 (CIT 2021)...........54

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962)......................21

*Calgon Carbon Corp. v. United States*, 443 F.Supp.3d 1334 (CIT 2020) ... 4, 24, 41

*Calgon Carbon Corp. v. United States*, 2017 WL 384685 (Jan. 27, 2017).............35

*Calgon Carbon Corp. v. United States*, 145 F.Supp.3d 1312 (CIT 2016) .............43

*Calgon Carbon Corp. v. United States*, 35 CIT 234 (2011)....................................46

*Carbon Activated Tianjin Co. v. United States*, 503 F.Supp.3d 1278 (CIT 2021)
  ....................................................................................................... passim

*Carbon Activated Tianjin Co.*, CIT Slip Op. 21-149 (CIT Oct. 22, 2021) ..... passim

*Chevron U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837 (1984).........58

*Clearon Corp. v. United States*, 2013 Ct. Intl. Trade LEXIS 27 (2013)................49

*Deckers Corp. v. United States*, 532 F.3d 1312 (Fed. Cir. 2008)............................29

*Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015)
  ...................................................................................................... 20, 44

*Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) ..21

*Gerson Co. v. United States*, 898 F.3d 1232 (Fed. Cir. 2018).......................... 30, 39

*Globe Metallurgical Inc. v. United States*, 781 F.Supp.2d 1340 (CIT 2011) .........64

*Jacobi Carbons AB v. United States*, 619 Fed. Appx. 992 (Fed. Cir. 2015)...........62

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*,
  322 F.Supp.3d 1308, 1324 (CIT 2018) ...............................................................31

*Jiaxing Brother Fastener Co v United States*, 11 F.Supp.3d 1326 (CIT 2014),
  *aff'd*, 822 F.3d 1289 (Fed. Cir. 2016). ......................................................... 52-53

*Jinan Farmlady Trading Co. v. United States*, 228 F.Supp.3d 1351 (CIT 2017) ...48

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009)............. 28, 42

*Mid Continent Steel & Wire, Inc. v. United States*, 321 F.Supp.3d 1313 (CIT 2018)
  ..............................................................................................................41

*Micron Tech., Inc. v. United States*, 31 CIT 2031 (2007) .......................................30

*N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292 (1939)...... 21, 26

*Otter Products, LLC v. United States*, 834 F.Supp.3d 1369 (Fed. Cir. 2016).........29

*Otter Products, LLC v. United States*, 70 F.Supp.3d 1281 (CIT 2015) ............ 31-32

*Peer Bearing Co.-Changshan v. United States*, 804 F.Supp.2d 1337 (CIT 2011)
  ..............................................................................................................49

*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ................... 25, 54

*SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216 (Fed. Cir. 2018)........44

*Tianjin Wanhua Co. v. United States*, 253 F.Supp.3d 1318 (CIT 2017)................53

# TABLE OF AUTHORITIES - Continued

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951) .....................................21
*Xiping Opeck Food Co. v. United* States, 2021 WL 5985587 (CIT Dec. 17, 2021) ...................................................................................................................30

## Statutes

19 U.S.C. § 1516a ................................................................................1, 21
19 U.S.C. § 1677b .................................................................................... passim
19 U.S.C. § 1677m ........................................................................ 63, 64
28 U.S.C. § 1295 .........................................................................................1
28 U.S.C. § 1581 ....................................................................................1, 3
28 U.S.C. § 2645 .........................................................................................2

## Rules

Fed. Rule Evid. 201 .......................................................................... 43, 60
FRAP 4 .........................................................................................................1

## Regulations

19 C.F.R. § 351.301 ...................................................................................63
19 C.F.R. § 351.408 .............................................................................5, 54

## Administrative Decisions

*Activated Carbon from China*, 86 Fed. Reg. 10,539 (Feb. 22, 2021) (final results) ...........................................................................................................25
*Activated Carbon from China*, 84 Fed. Reg. 68,881 (Dec. 17, 2019) (final results) ..................................................................................................... passim
*Activated Carbon from China*, 84 Fed. Reg. 27,758 (June 14, 2019) (preliminary results) ................................................................................ passim
*Activated Carbon from China*, 83 Fed. Reg. 53,214 (Oct. 22, 2018) (final results) ...................................................................................................5, 39
*Activated Carbon from China*, 78 Fed. Reg. 70,533 (Nov. 20, 2013) (final results) .........................................................................................................68
*Activated Carbon from China*, 75 Fed. Reg. 70,208 (Nov. 17, 2010) (final results) .........................................................................................................51
*Activated Carbon from China*, USITC Pub. 4797 (June 2018) ...............67
*Activated Carbon from China*, USITC Pub. 3913 (Apr. 2007) ...............67

## TABLE OF AUTHORITIES - Continued

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (May 19, 1997) ...................................................................................................................34
*Artist Canvas from China*, 77 Fed. Reg. 16,116 (Mar. 22, 2006) ..........................33
*Cased Pencils from China*, 78 Fed. Reg. 42,932 (July 18, 2013) ..........................53
*Diamond Sawblades from China*, 85 Fed. Reg. 78,827 (Dec. 7, 2020) ..................60
*Diamond Sawblades from China*, 79 Fed. Reg. 40,062 (July 11, 2015) ................60
*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 Fed. Reg. 26,258 (June 6, 2018) ........................................................................3
*Mattresses China*, 84 Fed. Reg. 56,761 (Oct. 23, 2019) (final determination) .......29
*Mobile Access Equipment from China*, 87 Fed. Reg. 9,576 (Feb. 22, 2022) ..........44
*Silicomanganese from China*, 65 Fed. Reg. 31,514 (May 18, 2000) (final results) ................................................................................................................ 49-50
*Silicon Metal from China*, 76 Fed. Reg. 3084 (Jan. 19, 2011) (final results) ...........7
*Steel Nails from China*, 78 Fed. Reg. 16,651 (Mar. 18, 2013) (final results) .........52
*Steel Propane Cylinders China*, 83 Fed. Reg. 66,675 (Dec. 27, 2018) (preliminary determination) ................................................................................57
*Xanthan Gum from China*, 82 Fed. Reg. 11,434 (Feb. 23, 2017) (final results) .....43

## Miscellaneous Authorities

U.S. Department of Commerce Policy Bulletin No. 04.1 (Mar. 1, 2004) ........ 51, 56
World Customs Organization Harmonized System of Nomenclature Explanatory Notes ......................................................................................... 31, 32
WorldTariff ................................................................................................... 29, 32

## STATEMENT OF RELATED CASES

No appeal in or from the same proceeding in the lower court was previously before this or any other appellate court. The only cases known to counsel that could directly affect or be directly affected by this Court's decision in this appeal are:

1. *Carbon Activated Tianjin Co. v. United States*, Ct. Int'l Trade Case No. 21-cv-00131-MAB – challenges the twelfth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China, which immediately follows the eleventh administrative review challenged in this appeal; and

2. *Carbon Activated Tianjin Co. v. United States*, Ct. Int'l Trade Consol. Case No. 22-cv-00017-MAB – challenges the thirteenth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China.

2022-1298

IN THE

# United States Court of Appeals
# for the Federal Circuit

---

CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED
CORPORATION, DATONG JUQIANG ACTIVATED CARBON CO., LTD.,
BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD.,
NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD.,
NINGXIA MINERAL & CHEMICAL LIMITED,
SHANXI SINCERE INDUSTRIAL CO., LTD.,

*Plaintiffs-Appellants,*

v.

UNITED STATES, CALGON CARBON CORPORATION,
CABOT NORIT AMERICAS, INC.,

*Defendants-Appellees.*

---

Appeal from the United States Court of International Trade in
Case No. 20-cv-00007, Chief Judge Mark A. Barnett

---

**NONCONFIDENTIAL OPENING BRIEF FOR PLAINTIFFS-APPELLANTS**

---

## JURISDICTION

Plaintiffs-Appellants appeal from a final judgment of the U.S. Court of

International Trade ("CIT"), entered on October 22, 2021. Appx1-2. The CIT had

jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c).

Appx39. This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(5),

granting the right to appeal from final CIT judgments. Plaintiffs-Appellants timely

filed a notice of appeal on December 22, 2021, of the CIT's final judgment.

Appx182; 28 U.S.C. § 2645(c); FRAP 4.

1

**INTRODUCTION**

Plaintiffs-Appellants contest their antidumping duty ("ADD") rates assigned by the U.S. Department of Commerce ("Commerce" or "Department"), in the eleventh administrative review ("AR11") of the ADD order on activated carbon from the People's Republic of China ("China"). The AR11 period of review ("POR") spanned April 1, 2017 through March 31, 2018. Commerce's AR11 ADD rates are neither supported by substantial evidence nor in accordance with law.

**ISSUES PRESENTED FOR REVIEW**

1.    Whether Commerce unlawfully valued coal tar pitch in AR11.

2.    Whether Commerce unlawfully valued bituminous coal in AR11.

3.    Whether Commerce unlawfully selected Malaysia as the primary surrogate country in AR11.

**STATEMENT OF THE CASE**

This case appeals Commerce's ADD rates in AR11 of the ADD order on activated carbon from China, initially assigned in *Activated Carbon from China*, 84 Fed. Reg. 68,881 (Dec. 17, 2019), Appx37-39 ("*Final Results*"). Commerce's rationale was set forth in the Issues and Decision Memorandum ("IDM") (Dec. 11, 2019), Appx3-36. Plaintiffs-Appellants sought judicial review by the CIT of the *Final Results* pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), as CIT No. 20-00007.

This appeal comes to this Court after the CIT affirmed Commerce's

redetermined AR11 ADD rates. The CIT in April 2021 ordered remand for

Commerce to reconsider the ADD rates assigned in AR11. *Carbon Activated*

*Tianjin Co. v. United States*, 503 F.Supp.3d 1278 (CIT 2021), Appx77-92 ("*CA*

*I*"). Commerce subsequently revised its ADD rates assigned in AR11 in its Final

Results of Redetermination (July 1, 2021), Appx93-135 ("Remand"). The CIT in

October 2021 affirmed Commerce's redetermination. *Carbon Activated Tianjin*

*Co.*, CIT Slip Op. 21-149 (CIT Oct. 22, 2021), Appx136-159 ("*CA II*").

## STATEMENT OF FACTS

### A.    AR11 Initiation Through *Preliminary Results*

Commerce in June 2018 initiated AR11 of the ADD order on activated

carbon from China for sales including those of Plaintiff-Appellants: Carbon

Activated Tianjin Co., Ltd., and its U.S. affiliate Carbon Activated Corporation

(collectively, "CA"); and Datong Juqiang Activated Carbon Co., Ltd. ("DJAC").

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83

Fed. Reg. 26,258, 26,260-63 (June 6, 2018), Appx183-188. Commerce in July

2018 selected CA and DJAC (collectively, "Respondents") as mandatory

respondents for individual examination in AR11. Commerce Memorandum (July 3,

2018), Appx193-198.

Commerce's Office of Policy ("OP") in September 2018 provided a list of

potential surrogate countries for China to value factors of production ("FOP")

when constructing normal value ("NV"). Commerce Preliminary Decision Memorandum ("PDM") (June 10, 2019), at 4, Appx4458. The OP list included Romania and Malaysia among "countries that are at the same level of economic development as China." *Id*. § 1677b(c)(4)(A); Commerce Letter to Interested Parties (Sept. 14, 2018), Appx294-295 ("SC Memo"), Attachment: Commerce Memorandum, Appx296-302 ("OP List").

Respondents in October 2018 informed Commerce that Romania was a "significant producer{} of comparable merchandise," 19 U.S.C. § 1677b(c)(4)(B): "Romania has significant domestic production of activated carbon and comparable merchandise," as shown by "the 2017 financial statement of Romcarbon SA" – a Romanian producer of activated carbon, *inter alia*. Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt ("GDLSK") to Commerce (Oct. 12, 2018), Appx344-382 ("SC Comments"), at 3, Appx346. Indeed, Commerce used the 2016 Romcarbon financial statements in the preceding tenth administrative review ("AR10"). 19 C.F.R. § 351.408(c)(2); *Activated Carbon from China*, 83 Fed. Reg. 53,214 (Oct. 22, 2018) (final results), IDM at 28 ("Romcarbon's financial statements are the best available information"); *Calgon Carbon Corp. v. United States*, 443 F.Supp.3d 1334, 1352 (CIT 2020).

Respondents thereafter reported their material inputs, including coal tar pitch and bituminous coal. DJAC Section D Questionnaire Response (Sept. 7, 2018),

Appx250-293 ("DJAC DQR"), Part 1 Exhibits D-1 & D-5, Appx252-270,

Appx277-278, Part 2 Exhibits D-1 & D-5, Appx281-293; CA Section D

Questionnaire Response, Part I (Sept. 28, 2018) Appx303-343 ("CA DQR I"),

Attachment B, Exhibits D-1 & D-5, Appx306-316, Attachment C Exhibits D-1 &

D-5, Appx317-327, Attachment D, Exhibits D-1 & D-5, Appx329-334, Appx338-

343; CA Section D Questionnaire Response Part II (Oct. 22, 2018), Appx383-414

("CA DQRII"), Attachment A, Exhibits D-1 & D-5, Appx389-399, Attachment B

Exhibits D-1 & D-5, Appx403-414; CA Section D Questionnaire Response Part III

(Nov. 1, 2018), Appx415-429, Attachment A Exhibits D-1 & D-5, Appx419-429.

Respondents in November 2018 submitted surrogate values ("SV"),

including import data from various countries and the 2017 Romcarbon financial

statements. Letter from GDLSK to Commerce (Nov. 9, 2018) ("First SV

Submission"), Exhibits 1-4, Appx430-439, Exhibit 9, Appx1018-1253. This

submission contained extensive background on the critical coal tar pitch FOP

(a/k/a coal tar) – "*i.e.*, coal tar that is utilized to produce pitch" – used in activated

carbon production. *Id*. Exhibits 5A–5K, Appx439-1017; Case Brief of

Respondents (Oct. 7, 2019), Appx5288-5338 ("Case Brief") at 29, Appx5324.

Subsequently, Respondents distinguished coal tar pitch from pitch,

explaining that "while pitch is the single most predominant constituent of coal tar

(a/k/a, coal tar pitch), it is not identical to coal tar, which is comprised of several

other impurities." Letter from GDLSK to Commerce (May 29, 2019), Appx4436-4454 ("Pre-Prelim Comments") at 15, Appx4450. When reporting this input, Respondents described it as "coal tar pitch." DJAC DQR, Part 2 Exhibits D-1 & D-5, Appx281-293; CA DQRII, Attachment A Exhibits D-1 & D-5, Appx389-399, Attachment B Exhibits D-1 & D-5, Appx403-414.

Respondents in February and March 2019 responded to Commerce's requests concerning particular FOPs. They submitted evidence that DJAC and CA's suppliers utilized coal tar pitch with pitch concentrations of [ # ]% and [ # ]%, respectively. *Id*.; DJAC Supplemental Questionnaire Response (Feb. 12, 2019), Appx1515-1541 ("DJAC SDQR"), at 32, Appx1519, Exhibit SD-53, Appx1533-1536; CA Response to Section D Part I Supplemental Questionnaire (Feb. 21, 2019), Appx1542-1552 ("CA SDQR I"), Exhibit SD-6, Appx1547-1548.

For the most significant FOP, bituminous coal,[1] DJAC reported with supporting evidence that: "The gross calorific value of the bituminous coal DJAC purchased is approximately [     #s     ] Kcal/Kg. . . . To the best of [ company name                                                                 ]

---

[1]     Bituminous coal constituted [ # ]% of DJAC's NV. Memorandum of Law (June 24, 2020), Addendum, Appx5384. For CA, this input constituted [     #     ]% of NV, but was critical as a component of mixture ([ # ]% of NV) and the underlying raw material for the carbonized materials FOPs ([ # ]% of NV). Appx5385. As such, the total impact of bituminous coal on CA's NV was [ # ]%.

knowledge, the gross calorific value of the non-coking bituminous coal it purchased is approximately [    #s    ] Kcal/Kg." DJAC SDQR, at 8, 32, Appx1518-1519, Exhibits SD-12–13, Appx1524-1529, SD-56, Appx1537-1541. Similarly, CA reported with evidence that, for one of its suppliers, "[ company name         ] bituminous coal's test reports provid{ing} . . . its heat value works out to be [  #  ] Kcal/Kg."[2] Case Brief at 28, Appx5323 (citing CA Response to Section D Parts II and III Supplemental Questionnaire (Mar. 15, 2019), Appx1553-1568 ("CA SDQR II/III"), Exhibit SD-15, Appx1566-1568).

CA was unable to report the calorific value of the bituminous coal utilized by its supplier, [ company name        ] ("Supplier C"), or that utilized by [ company name                        ] to produce activated material sent to [ company name                 ], a supplier of subject merchandise to CA. *See* CA SDQR II/III at 2-3, Appx1557-1558; Case Brief at 28, Appx5323.

In their May 2019 SV submission, Respondents provided SV data from Romania for virtually every FOP – including bituminous coal, the most significant input (note 1, *supra*). Letter from GDLSK to Commerce (May 13, 2019) ("Final

---

[2]     This calculation used an empirical formula previously employed by Commerce. Case Brief at 28 n.42, Appx5323 (citing *Silicon Metal from China*, 76 Fed. Reg. 3084 (Jan. 19, 2011) (final results), IDM Comment 6).

SV Submission"), Exhibits 1-2B, Appx1666-1817. The import data provided for

Romania and other countries pertained precisely to the 12-month AR11 POR, but –

due to the automatically programmed Trade Data Monitor ("TDM") allowing

downloads of the raw data (only in batches of three consecutive years ) which was

then sorted through a "macro" (limited to the POR) – was presented as in the table

below, with the "2016-2018" span referencing the initial three year download and

"2018" as the year in which the POR concluded and to which the underlying data –

Value (USD), Quantity (KG), Unit Value (USD/KG) – pertained:

| Year Ending: March, 2016 - 2018 | | | | |
|---|---|---|---|---|
| | | 2018 | | |
| Partner | Unit | Value (USD) | Quantity (KG) | Unit Value (USD/KG) |

*Id*. Exhibit 2, Appx1675-1817; Comments in Opposition to Remand (July 30,

2021), Appx5500-5516 ("Remand Comments"), at 10, Appx5509.

In their May 2019 comments, Respondents requested that Commerce:

- select Romania over Malaysia as the primary surrogate country;

- use Harmonized Tariff Schedule ("HTS" or "HS") 2701.19 to value bituminous coal with calorific value less than 5,833 kcal/kg, and reject the aberrational Malaysian HTS 2702.12 import data; and

- value coal tar pitch, their second most significant input (Appx5384-5385), using import data under HTS 2706.00 ("Tar distilled from coal, from lignite or from peat") and – with the absence of Romanian HTS 2706.00 data – use Russian HTS 2706.00 data, Final SV Submission Exhibit 2B, Appx4376-4378.

Pre-Prelim Comments at 2-18, Appx4437-4453.

Commerce in June 2019 preliminarily calculated Respondents' ADD rates. *Activated Carbon from China*, 84 Fed. Reg. 27,758, 27,759 (June 14, 2019), Appx5285-5287 ("*Preliminary Results*"). The weighted-average thereof was assigned as the "separate rate" for exporters including those participating as Plaintiffs-Appellants. Commerce preliminarily "selected Malaysia as the primary surrogate country, and Romania as the secondary surrogate country for purposes of valuing the financial ratios." PDM at 16, Appx4470. Commerce found that Romania was: economically comparable to China; and a significant producer of merchandise comparable to activated carbon. *Id*. at 13-14, Appx4467-4468. Commerce preliminarily employed Malaysian SVs to calculate Respondents' ADD margins, but calculated ratios using 2017 Romcarbon data, not Malaysian financial statements submitted by Defendants-Appellees Calgon Carbon Corporation and Cabot Norit Americas, Inc. (collectively, "Petitioners"):

> . . . the petitioners provided audited 2017 financial statements for two Malaysian companies that produce identical or comparable merchandise . . . . However, **these financial statements lack usable financial data in that neither of them have separate line items breaking down the cost of raw materials and energy**. Therefore, although Commerce has a strong preference to value all FOPs in a single surrogate country, **Commerce preliminarily determines that the audited 2017 financial statements from the Romanian company Romcarbon, are the only remaining financial statements on the record suitable for use** in calculating surrogate financial ratios.

PDM at 15-16, Appx4469-4470 (emphases added) (footnotes omitted).

- 9 -

Commerce preliminarily valued all bituminous coal using Malaysian import data under HTS 2701.12. Commerce Memorandum (June 10, 2019), Appx4489-5284 ("Prelim SV Memo"), at 4, Appx4492, Attachment 1, Appx4502. Commerce further preliminarily valued all coal tar pitch – referred to as both "coal tar pitch" and "coal tar" – using Malaysian import data under HTS 2706.00.[3] *Id*. at 5, Attachment 1, Appx4432, Appx4502.

### B.  Case Briefing Through *Final Results*

In October 2019, Respondents requested that Commerce select Romania and not Malaysia as China's primary surrogate country. Case Brief at 1-9, 36-37, Appx5296-5304, Appx5331-5332. Respondents further asked that, irrespective of the surrogate country selected, bituminous coal – the most significant FOP (note 1, *supra*) – reported as having a calorific value of [    #s    ] kcal/kg should be valued under HTS 2701.19, covering "Other Coal," as opposed to HTS 2701.12 covering "Bituminous coal" in accordance with Subheading Note 2 to HTS Chapter 27. *Id*. at 26-28, Appx5321-5323. To value bituminous coal with unknown

---

[3]  Commerce preliminarily referred to "coal tar" and "coal tar pitch" interchangeably, indicating valuation of coal tar under HTS 2706.00 and coal tar pitch under HTS 2708.10. Prelim SV Memo at 5, Appx4493. Yet the accompanying spreadsheet only referenced "coal tar" as a FOP valued under HTS 2706.00. *Id*. Attachment 1, Appx4502. Commerce in the *Final Results* confirmed that, "for the *Preliminary Results*, only HS Code 2706.00 was used to value coal tar pitch for both" Respondents. IDM at 18 n.106, Appx20.

calorific value, Respondents requested averaging Romanian HTS 2701.12 and 2701.19 data. *Id*. at 28, Appx5323. Respondents also demonstrated the unreliability of Malaysian HTS 2701.12 import data. *Id*. at 9-16, Appx5304-5311.

Respondents further emphasized that Commerce should value their coal tar pitch under HTS 2706.00 instead of 2708.10 ("Pitch from coal and other mineral tars").[4] *Id*. at 29-30, Appx5234-5325. Respondents also demonstrated that, because the average unit value ("AUV") of Malaysian HTS 2706.00 import data used to value coal tar pitch was anomalous in relation to the AUV of pitch reported in Malaysian HTS 2708.10, the preliminary SV for coal tar pitch was unreliable. *Id*. at 21-24, Appx5316-5319. Further, because there was no import data reported in Romanian HTS 2706.00, Respondents requested valuation of their coal tar pitch using Russian HTS 2706.00. *Id*.

Commerce in December 2019 assigned the following final ADD rates: $1.02/kg for CA; $0.86/kg for DJAC; and the $0.89/kg weighted-average separate rate. Appx38. Commerce kept Malaysia as the primary surrogate country, but reversed its preliminary position in finding that Romania was not a significant

---

[4]      Respondents inadvertently challenged coal tar pitch being valued under HTS 2708.10 and requested valuation under 2706.00. Case Brief at 21-22, Appx5316-5317; note 3, *supra*. Respondents reported only "coal tar pitch" that Commerce preliminarily valued correctly under HTS 2706.00. IDM at 18 n.106, Appx20. Respondents' premature request for a switchover from HTS 2708.10 to 2706.00 did not affect their coal tar pitch argument for the *Final Results*.

producer of comparable merchandise. IDM at 5-9, Appx7-11. Accordingly, Commerce dismissed Respondents' demonstration of Romanian SV data superiority as "moot." *Id*. at 8, Appx10.

Commerce nevertheless employed Romanian data to value both bituminous coal and surrogate financial ratios. *Id*. at 9-16, 20-23, Appx11-18, Appx22-24. Commerce Memorandum (Dec. 11, 2019), 5374-5380 ("Final SV Memo") at 2, Attachment 1, Appx5375, Appx5376-5380. Commerce employed the Romanian HTS 2701.12 import data – as submitted by Respondents – to value all bituminous coal. *Id*. n.\*, Appx5378. Commerce, however, rejected Respondents' request to use HTS 2701.19 for the bituminous coal having a calorific value less than 5,833 kcal/kg, claiming a lack of evidence supporting Respondents' preferred HTS 2701.19, but agreeing that Malaysian HTS 2701.12 import data were unusable:

> With regards to the alleged aberrancy of the Malaysian import data under HS 2701.12, **we agree with the mandatory respondents that the reliability of the Malaysian data under HS 2701.12 is called into question by the corresponding import data reported under HS 2701.12 from other OP List countries**.

IDM at 14-16, Appx16-18 (emphasis added) (footnotes omitted).

Commerce further finalized its use of Romcarbon data and found that coal tar pitch was essentially pitch meriting classification under HTS 2708.10, valued using Malaysian import data. *Id*. at 16, Appx18; Final SV Memo at 2, Attachment

1, Appx5375-5378. In doing so, Commerce ignored Respondents' demonstration

as to Malaysian HTS 2706.00 import data unreliability:

> {CA} stated in its response that the coal tar pitch that its supplier used
> to produce the subject merchandise during the POR "is commonly
> known as 'pitch' in the industry, which is solid at normal
> temperatures." Additionally, for those producer-suppliers that used
> binder materials, both {DJAC} and {CA} reported the input as "coal
> tar pitch," not "coal tar." Also, record evidence indicates that coal tar,
> through the fractionated distillation process, yields two different types
> of coal tar pitch: binder and impregnating grade. **There is no
> information on the record that substantiates the mandatory
> respondents' assertion that HS 2708.10 covers 100 percent pure
> pitch distilled in a tar workshop.** Therefore, upon reconsideration
> for these final results, we find that imports under the subheading HS
> 2706.00 do not represent the best available information for valuing
> coal tar, because **the record evidence supports a conclusion that HS
> 2706.00 covers coal tar, which is a by-product of the coke
> production process, whereas HS 2708.10 covers pitch, a product
> of the coal tar distillation process. Accordingly, the mandatory
> respondents' argument that the Malaysian SV under HS 2706.00
> is anomalous** because it is higher than the Malaysian AUV under HS
> 2708.10 (*i.e.*, the more value-added product) **is moot, because we are
> not using HS 2706.00** to value the respondent's coal tar pitch input
> for the final results.
>
> Therefore, for these final results, we find that the **Malaysian import
> data under HS 2708.10, constitute the best available information
> on the record to value the coal tar pitch** . . . , because HS 2708.10 is
> product-specific in that it is a provision for "Pitch from Coal and
> Other Mineral Tars."[5]

IDM at 19, Appx21 (emphases added) (footnote omitted).

---

[5]      As in the *Preliminary Results*, the *Final Results* referred to "coal tar" and
"coal tar pitch" interchangeably. *See Final SV Memo* at 2 (referencing "coal tar"),
Attachment 1 (referencing "coal tar pitch") Appx5375, Appx5378.

## C.  *CA I*

Respondents appealed the *Final Results* to the CIT in January 2020, and the Plaintiffs-Appellants assigned the separate rate were authorized to intervene. Summons (Jan. 14, 2020); Order (Jan. 24, 2020). Appx173-174. The CIT in April 2021 remanded several issues. The choice of primary surrogate country was remanded becauset Commerce "failed to adequately explain or support with substantial evidence its selection of Malaysia and rejection of Romania as the primary surrogate country." Appx84. The CIT also remanded Commerce's valuation of bituminous coal without regard to Subheading Note 2 to HTS Chapter 27, in contravention of agency practice that recognizes such notes apply universally to all countries. Appx87.

The CIT did, however, affirm Commerce's valuation of coal tar pitch using Malaysian HTS 2708.10 data, conceding that the "issue presents a close call." Appx88-89. The CIT, acknowledging "that the agency had departed from its treatment of coal tar pitch in AR10," nonetheless affirmed the rationale that because "coal tar pitch is referred to as 'pitch' in common parlance, Commerce was within its discretion to identify HS 2708.10 instead of HS 2706.00 as the best available information." Appx88. Finally, the CIT found that Respondents failed to exhaust administrative remedies for arguments based on "the ENs to HS 2706" and

"aberrancy of Malaysian import data under HS 2708.10 based on the predominance of Spanish exports in the average unit values." Appx88.

Commerce in May 2021 issued its Draft Results of Redetermination (May 28, 2021), Appx5386-5406 ("Draft Remand"). Respondents filed comments thereon. Letter from GDLSK to Commerce (June 8, 2021), Appx5407-5431 ("Draft Remand Comments"). Commerce – over Respondents' objection – twice rejected and required resubmission redacting references to prior Commerce and U.S. International Trade Commission ("ITC") actions, claimed to constitute untimely new factual information. Letters from GDLSK to Commerce (June 14 & 23, 2021), Appx5434-5458, Appx5469-5493; Letter from GDLSK to Commerce (June 15, 2021), Appx5460-5464 ("Request for Reconsideration"); Letter from Commerce to GDLSK (June 23, 2021), Appx5469-5493 ("Reconsideration Denial").

Commerce in July 2020 issued its Remand. For bituminous coal, Commerce reconsidered its initial valuation of Romanian HTS 2701.12 data by recognizing the universality of Subheading Note 2 to HTS Chapter 27. Remand at 3-8, Appx95-100. Consequently, for the bituminous coal input used by DJAC, DJAC's supplier, and one of CA's suppliers for which record evidence demonstrated heat values below 5,833 kcal/kg, Commerce determined a SV "using import data reported under Malaysian HS subheading 2701.19." *Id*. at 7, Appx99. For the

bituminous coal of unknown heat value, Commerce "continue{d} to use Romanian import data reported under HS 2701.12." *Id*. Commerce denied Respondents' requests to: use Romanian HTS 2701.19 to value bituminous coal having both a known and unknown calorific value; or, alternatively, use Romanian HTS 2701.19 to value bituminous coal having known calorific value and use an average of the data under Romanian HTS 2701.12 and 2701.19 for bituminous coal having unknown calorific value. *Id*. at 24-30, Appx116-122.

Commerce kept Malaysia as the primary surrogate country, despite conceding that Romania was a significant producer of comparable merchandise. *Id*. at 10-16, Appx102-107. Commerce found that both countries offered quality data but favored Malaysia, notwithstanding reliance on Romanian financial data and Romanian HTS 2701.12 for the most significant material input – bituminous coal (with unknown calorific value). In addition, to support Malaysia, Commerce found that for carbonized material, Malaysia alone afforded product-specific SV:

> The record contains complete, publicly-available, contemporaneous, and input-specific Malaysian data for nearly all of the inputs . . . including the bituminous coal input used to produce nearly the entire production volume of the subject merchandise reported in both mandatory respondents' respective FOP databases – with the exception of the financial ratios . . . . Further, **the record also contains complete, publicly-available, and contemporaneous and input-specific Romanian data for nearly all of the inputs used by the two mandatory respondents to produce the subject merchandise during the POR**.

We have considered the quality of data on the record and find that, on the basis of input specificity of the available data, the Malaysian SV data are superior to those of Romania. **Malaysia is one of only a small number of countries with an HS subheading that includes a tariff classification at the ten-digit level that is specific to coconut-shell charcoal (*i.e.*, HTS subheading 4402.90.1000), a direct material that is consumed in significant quantities in the production of subject merchandise by the mandatory respondents.** On the other hand, Romania only provides a six-digit basket category HS subheading, 4402.90, which covers wood-based charcoal and also includes nut-based charcoal, which is an input not used by the mandatory respondents. Further, although Malaysia provides multiple financial statements from producers of identical (and thus comparable) merchandise which are representative of the experience of the mandatory respondents, they do not provide breakouts for raw material, labor, and energy. In contrast, **the one Romanian financial statement on the record provides the specificity needed to calculate the financial ratios because it provides breakouts for these categories of expenses**. Therefore, we continue to select Malaysia as the primary SC for these final results of redetermination, because it provides the best available information from which to value the mandatory respondent's FOPs. . . .

{W}e continue to use the Romcarbon financial statements for the calculation of the surrogate financial ratios, as they are the only financial statements on the record which present the financial data in a manner that is feasible for the calculation of these ratios.

Remand at 15-16, Appx107-08 (emphases added).

To support Malaysia, Commerce for the first time questioned the contemporaneity of Respondents' Romanian data. According to Commerce, "the Romanian import data that the Respondents placed on the record is not POR-specific because the data cover the period 2016-2018, whereas the Malaysian data under HS 2701.19 is contemporaneous with the POR (*i.e.*, April 2017-March

2018)." *Id*. at 38, Appx130. Yet the Draft Remand had not questioned the contemporaneity of Respondents' Romanian data, asserting that the record contained "contemporaneous . . . Romanian data for nearly all of the inputs used by the two mandatory respondents." Draft Remand at 14-15, Appx5399-4000.

### D.    *CA II*

The CIT in October 2021 affirmed Commerce's Remand, rejecting all of Respondents' challenges (Appx141-159),[6] and finding proper valuation of bituminous coal with unknown calorific value using Romanian HTS 2701.12, and with known calorific value under Malaysian HTS 2701.19. Appx142-150. The CIT further affirmed surrogate selection, noting "Commerce has provided a reasoned explanation as to why it selected Malaysia as the primary surrogate country: the specificity of the HS number for a known input (coconut-shell charcoal) and data that was more contemporaneous with the POR." *Id*. at 17-21, Appx152-156. Commerce in November 2021 assigned the following redetermined ADD rates: $0.94/kg for CA; $0.55/kg for DJAC; and the $0.61/kg weighted-average separate rate. Appx161. This appeal followed. Appx182.

### SUMMARY OF ARGUMENT

1.    Commerce's AR11 valuation of coal tar pitch as pitch is unlawful. Its

---

[6]    Although Respondents challenged financial ratios in the Remand, those issues are not being appealed.

nomenclature-based rationale contrasts with CIT findings in AR10 and Commerce's findings in the twelfth administrative review ("AR12"), both properly focusing on the input's essential character. Commerce's AR11 deviance ignored the input's essential character by misplacing reliance on the distillation process common to coal tar pitch and pitch. Respondents' input is at most partially distilled coal tar specifically covered in HTS 2706.00, and Commerce's valuation of it as pure pitch (HTS 2708.10) included an unlawful disjunctive analysis contradicted by both the complete tariff language and Explanatory Notes – sources of which this Court should take judicial notice in properly interpreting subheading HTS 2706.00.

Malaysian import data are unreliable under both HTS 2706.00 and 2708.10. Pitch is a value-added product of coal tar pitch, yet is less than half of its value – evidencing distortion likely due to the Spanish imports having been incorrectly recorded in both of the subheadings. This data demonstration is not barred by the exhaustion doctrine, as Commerce confused this issue by misstating the input in its preliminary valuation. Commerce should have used Russian import data, per its tie-breaking practice using data from the country with the most exports.

2.     Commerce unlawfully valued bituminous coal by valuing different types using different countries. For the input having unknown calorific value, Commerce improperly applied a contorted analysis of tariff terms and relied on an incomplete description of covered goods. Commerce impermissibly speculated as to the heat

value to favor one subheading over the other when it was compelled to average values per agency precedent when more than one applies. The impropriety of Commerce using one subheading to value this bituminous coal is confirmed by its not having requested such information and findings in prior reviews. For the input having known calorific value, Commerce should not have used Malaysian data given: the recognized aberrancy of a related subheading; and the distortion resulting from mixing country data, in contravention of agency regulation.

3.      Commerce unlawfully selected Malaysia as the primary surrogate country. Romania proffers superior data quality for bituminous coal and viable financial data unavailable in Malaysia, which controls surrogate country selection per Commerce policy. Commerce inexplicably deviated from its practice by declining to credit both datasets, notwithstanding their outsized impact on NV. Instead, after the CIT invalidated the original basis for Malaysia, Commerce advanced meritless bases to retain that selection. Despite Commerce's strained suggestions, Romanian data are contemporaneous, and coconut-shell charcoal does not favor Malaysia.

## ARGUMENT

### I.      STANDARD OF REVIEW

This Court reviews decisions of the CIT *de novo*, applying anew the same standard used by the CIT. *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1373 (Fed. Cir. 2015). In appeals of final ADD determinations, this

Court holds unlawful and remands any administrative determination by Commerce that is "unsupported by substantial evidence on the record or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951). It must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In making the evidentiary judgment, this Court "reviews the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence" and determines "whether the evidence and reasonable inferences from the record support {the agency's} finding." *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (internal quotation marks & citation omitted). Commerce must provide a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

Commerce by statute, "in valuing {FOPs} . . . **shall utilize, to the extent possible**, the prices or costs of {FOPs} in **one or more market economy countries** that are – (A) at a level of economic development comparable to that of the nonmarket economy; and (B) **significant producers of comparable**

**merchandise**." *Id.* (emphases added). 19 U.S.C. § 1677b(c)(4) (emphasis added).

Such "valuation . . . **shall be based on the best available information** regarding

the values of such factors in a market economy country or countries." *Id.*

§ 1677b(c)(1)(B) (emphasis added).

## II.    COMMERCE UNLAWFULLY VALUED COAL TAR PITCH

The *Final Results* improperly determined that Respondents' coal tar pitch

([  #  ]% pitch content) was pitch and valued it based on Malaysian import data

under HTS 2708.10 ("Pitch from coal and other mineral tars"). IDM at 18-19,

Appx20-21. As set forth below: (a) Commerce's choice contradicts its selection of

HTS 2706.00 in both AR10 and AR12, as well as record evidence; (b) the

language of Malaysian HTS 2706.00 and Harmonized System of Nomenclature

("HSN") Explanatory Notes ("EN") specifically covering the input are judicially

noticeable; (c) Malaysian import data under both HTS 2706.00 and 2708.10 are

unreliable; and (d) Russian import data under HTS 2706.00 should be used to

value Respondents' coal tar pitch.

### A.    Commerce Contradicts AR10 and AR12 Findings

Commerce's choice of HTS 2708.10, diametrically opposite its AR10 and

AR12 choices of HTS 2706.00, is premised mainly on the name of the input used

by Respondents and commercial parlance, and secondarily, upon the mere

commonality of distillation processes it shares with pitch.

### 1.    Nomenclature is not controlling

Commerce treated coal tar pitch as pitch by underscoring the "name" of the input, as used by Respondents and in commercial parlance. Specifically, Commerce emphasized Respondents' description of "the input as 'coal tar pitch,' not 'coal tar'" alongside CA's statement that coal tar pitch was "commonly known as 'pitch' in the industry." IDM at 19, Appx21. However, Commerce's conclusory findings that coal tar pitch was synonymous with pitch under HTS 2708.10 ignored the input's essential character, while misconstruing CA's caution that coal tar pitch becomes **conflated** with pitch in commercial parlance. CA SDQR II/III at 4, Appx1559.

The CIT echoed Commerce's parlance-based rationale – "given that coal tar pitch is referred to as 'pitch' in commercial parlance" – to improperly affirm that "Commerce was within its discretion to identify HS 2708.10 instead of HS 2706.00 as the best available information." Appx88. Yet this rationale directly contradicts the CIT's AR10 findings on a similar record, which refuted that the input's common name is dispositive for classification and affirmed Commerce's choice of HTS 2706.00 for the identical input (with comparable pitch content):

> Respondents' filings with Commerce use inconsistent terminology to describe **coal tar—interchangeably referred to as "coal tar pitch"—as distinct from pitch**. . . . Respondents explained in their case brief that coal tar with . . . pitch content is "crude coal tar," not pitch. . . .

- 23 -

> {S}ubstantial evidence supports the agency's conclusion that **coal tar and pitch are distinct inputs notwithstanding Respondents' inconsistent use of terminology**. . . . **Commerce identified substantial evidence upon which to support its conclusion that Respondents consumed coal tar (e.g., coal tar pitch)** and pitch as separate inputs. . . .
>
> The court discerns from Commerce's discussion that the **separate inputs of coal tar and pitch reflect what the "inputs actually were," based on pitch content of the input material and not simply the label Respondents attached to the input**.

*Calgon*, 443 F.Supp.3d at 1343-44 (emphases added) (citations omitted). (AR10, unlike AR11, also involved a separate FOP for pitch). The CIT's AR11 affirmance thereby cannot be reconciled with its prior contrary AR10 findings.

Commerce's parlance-based analysis is also misleading, as evidenced by its own inconsistent description of the input – sometimes as "coal tar pitch" and at other times as "**coal tar**" – while valuing it, both preliminarily under HTS 2706.00 and under HTS 2708.10 in the *Final Results*. Prelim SV Memo at 5, Attachment 1 (emphasis added), Appx4493, Appx4502; Final SV Memo at 2, Attachment 1, Appx5375, Appx5378. Applying Commerce's parlance-based rationale to its own nomenclature, Respondents' coal tar pitch would be considered coal tar. Therefore, the input's name *per se* – whether coal tar, coal tar pitch, or pitch – is not determinative of its classification; instead, it should be determined "**based on pitch content** of the input material **and not simply the label Respondents attached** to the input." *Calgon*, 443 F.Supp.3d at 1344 (emphases added).

Commerce in AR11 also directly contradicted its subsequent AR12 finding that "for these final results, we have continued to value the coal tar pitch input used by both of the mandatory respondents based on the Malaysian import data under HS 2706.00." *Activated Carbon from China*, 86 Fed. Reg. 10,539 (Feb. 22, 2021) (final results), IDM Comment 3. Therefore, Commerce's AR11 choice of HTS 2708.10 presents an unlawful, unexplained departure from the agency's regular choice of HTS 2706.00 for coal tar pitch. *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently").

### 2.   Commerce ignored the input's essential character

Commerce unpersuasively equated coal tar pitch with pitch under HTS 2708.10 by conflating (a) "coal tar, through the fractionated distillation process, yield{ing} two different types of coal tar pitch" with (b) "HS 2708.10 cover{ing} pitch, a product of the coal tar distillation process." IDM at 19, Appx21. Using distillation as a strawman, Commerce equates coal tar pitch with pitch while rejecting the argument "that HS 2708.10 covers 100% pure pitch distilled in a tar workshop." *Id*. In other words, citing distillation as a common intervening step underlying production of coal tar pitch and pitch, Commerce classified coal tar pitch under the HTS subheading for pitch – *i.e.*, 2708.10.

Conversely, Commerce rejected HTS 2706.00 by isolating coal tar pitch

from coal tar "because the record evidence supports a conclusion that HS 2706.00 covers coal tar." *Id.* Commerce's decision was unlawful because the agency must "do more than create a suspicion of the existence of the fact to be established." *Columbian Enameling*, 306 U.S. at 300. Commerce's choice of HTS 2708.10 is also inconsistent with the essential character of coal tar pitch, which at most is a partially distilled coal tar – containing [   #s   ]% pitch – [ comparison        ] than the 60% pitch content in undistilled coal tar (Case Brief at 29-30 & nn.47-48, Appx5324-5325), and far from 100% pitch.

The CIT improperly endorsed rejection of HTS 2706.00 since "coal tar generally has a lower pitch content than coal tar pitch consumed by Respondents." Appx88. Specifically, the test reports on the record detract from that finding by prescribing the minimum pitch content is less than 60% for use in Respondents' production. DJAC SDQR Exhibit SD-53, Appx1533-1536; CA SDQR I Exhibit SD-6, Appx1547-1548. Because to produce subject merchandise, undistilled coal tar (<60% pitch), is equally suitable as coal tar pitch ([   #s   ]% pitch), Commerce's rejection of coal tar pitch as being comparable with coal tar under HTS 2706.00 – while equating it with pitch under HTS 2708.10 – is unsupported by substantial evidence. HTS 2708.10 is also inconsistent with Commerce's choice of HTS 2706.00 for the same input with comparable pitch content in AR10 and AR12.

### 3.    Commerce's disjunctive analysis is unlawful

Commerce's choice of HTS 2708.10 is further unsupported because it lacked

a comparative side-by-side evaluation of competing HTS subheadings:

- 2706.00 - Tar distilled from coal, from lignite or from peat; and

- 2708.10 - Pitch from coal and other mineral tars.

These subheadings should have been compared in relation to the input: coal tar

pitch containing [  #s  ]% pitch content. Coal tar is indisputably qualified by its

pitch concentration: "Since pitch constitutes over 50% of crude tar, its utilization

has a major effect on the economics of tar processing." Respondents' First SV

Submission Exhibit 5G: Scientific Encyclopedia at 681, Appx834. Coal tar pitch

can contain up to 60% pitch. *Id*., Exhibit 5K at 13, Appx922.

Coal tar pitch ([  #s  ]% pitch) is therefore comparable, in terms of pitch

content, to coal tar (60% pitch) under HTS 2706.00. With the record lacking

evidence that pitch in HTS 2708.10 is anything other than 100% pure pitch, coal

tar pitch merits coverage in HTS 2706.00 otherwise the same discrete input – *i.e.*,

coal tar/coal tar pitch (<100% pitch content) – would be covered simultaneously

under both HTS 2706.00 and 2708.10. This cannot be the intended outcome for a

common input. Commerce presents a disjunctive analysis, through its subsidiary

rationale that "there is no information on the record that substantiates the

mandatory respondents' assertion that HS 2708.10 covers 100% pure pitch distilled

- 27 -

in a tar workshop." IDM at 19, Appx21. This rationale is both impermissibly

speculative, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir.

2009), and incorrect. Section II.B, *infra*.

### B.    HTS 2706.00 Is Compelled By Tariff Language and ENs

Coal tar pitch ([   #s   ]% pitch) could be either an undistilled coal tar or a

partially distilled coal tar. Under its plain language, HTS 2706.00 **specifically**

covers both products, a fact confirmed by the publicly-available and judicially

noticeable Malaysian HTS. The HTS 2706.00 description, as publicly accessible

from the Malaysian Customs website,[7] provides as follows:[8]

| HEADER | SUB | ITEM | FULL HS | DESCRIPTION |
|---|---|---|---|---|
| 2706 | 00 | 0000 | 2706000000 | **Tar** distilled from coal, from lignite or from peat, and other mineral tars, **whether or not** dehydrated or **partially distilled**, including reconstituted tars. |

(Emphases added).

Identical scope language in Malaysian HTS 2706.00 is provided in

---

[7]     Available at: http://mysstext.customs.gov.my/tariff/home.

[8]     This result is obtained using the following search terms:
- Tariff Type : MPCEPA or MJEPA or MNZFTA or MICECA or MCFTA or MAFTA or MTFTA
- Search Criteria: HS Code
- Keyword: 2706

WorldTariff,[9] a subscription-based database that Commerce considers publicly-available. *See Mattresses from China*, 84 Fed. Reg. 56,761 (Oct. 23, 2019) (final determination), IDM Comment 7 (Commerce considers a subscription service publicly-available when "{t}here is no evidence on the record indicating that the subscription service is not available to the public at large"). The accuracy of the subheading language is corroborated by identical language in the 6-digit HTS of the United States ("HTSUS") subheading 2706.00,[10] also judicially noticeable.

Therefore, the HTS 2706.00 language plainly establishes that coal tar pitch "is properly classified under subheading {2706.00}, HTSUS, because the goods indisputably fit within the plain language of that unambiguous subheading." *Deckers Corp. v. United States*, 532 F.3d 1312, 1318 (Fed. Cir. 2008). This Court has determined that interpretation of tariff provisions is a question of law:

> Classifying articles under the HTSUS is a two-step process. A court first determines the proper meaning of specific terms in the tariff provisions, which is a question of law that we review without deference. *Otter Prods.*, 834 F.3d at 1375. Next, the court determines under which subheading the subject merchandise is most appropriately classified, which is a question of fact that we review for clear error. *Id.* But when, as here, there is no dispute as to the nature of the merchandise, the two-step classification analysis "collapses entirely into a question of law." *Id.*

---

9      WorldTariff, available at www.worldtariff.com, is a global online database for Harmonized System classification numbers and tariff descriptions covering over 208 countries.

10     Available at: https://hts.usitc.gov/current.

*Gerson Co. v. United States*, 898 F.3d 1232, 1235 (Fed. Cir. 2018)

Thus, whether HTS 2706.00 covers coal tar pitch is a question of law since there is no dispute about the essential material facts of the input. Commerce, using a truncated description of HTS 2706.00, reached an incorrect and unlawful finding that conflated "Tar distilled from coal, from lignite or from peat" with "Tar distilled from coal, from lignite or from peat, and other mineral tars, whether or not dehydrated or partially distilled, including reconstituted tars."

Precedent supports taking judicial notice of the publicly-available tariff provisions to arrive at the correct classification. In *Xiping Opeck Food Co. v. United States*, where Commerce similarly based its findings on a truncated HTS subheading description, the CIT supported its findings by taking judicial notice of the full description:

> {B}ecause in the Final Results Commerce provided only a narrative description of the products TARIC subheading 0306.39.10 . . . covers, the determination was unsupported by substantial evidence. . . .
>
> It is well established that courts may take judicial notice of the texts of statutes both domestic and foreign. *See, e.g., Micron Tech., Inc. v. United States*, 31 C.I.T. 2031, 2038 n.9, 535 F. Supp. 2d 1336, 1343 n.9 (2007) (taking judicial notice of Korean law). The court, having done so, finds that Commerce's claims of the contents of the products described by TARIC subheading 0306.39.10 . . . are supported by substantial evidence.

2021 WL 5985587, *7-8 (CIT Dec. 17, 2021) (footnote omitted). The CIT

undertook steps to access the online TARIC Database.[11]  HTS 2706.00, available

on the Malaysian Customs website, is likewise judicially noticeable.[12]

Additional support for the classification of coal tar pitch under HTS 2706.00

is provided by the publicly-available and judicially noticeable HSN EN: "**The**

**heading also includes dehydrated or <u>partially distilled tars</u>**." World Customs

Organization HSN ENs,[13] HTS 2706.00 (emphasis added). Yet CIT rejected

Respondents' demonstration of ENs to HTS 2706.00 as "precluded by the doctrine

of administrative exhaustion." Appx89. This determination is wrong because ENs

are judicially noticeable as a cognizable "legal reference" akin to "judicial

precedent." *Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 322

F.Supp.3d 1308, 1324 (CIT 2018). Respondents properly cited the HSN ENs as

"an international legal reference essential to the proper interpretation of" HTS

2706.00 to "draw on information in the public realm to highlight any perceived

inaccuracies in" the AR11 IDM. *Id.* at 1323-25; *ADDs; Countervailing Duties*, 62

Fed. Reg. 27,296, 27,332 (May 19, 1997) (final rule); *see Otter Products, LLC v.*

---

[11]      *Xiping*, 2021 WL 5985587, *5 & n.17
("https://ec.europa.eu/taxation_customs/dds2/taric/taric_consultation.jsp?Lang=en
(change reference date to September 1, 2017; then retrieve measures for goods
code '0306'; then click 'Frozen' and 'Live, Fresh or Chilled' under the '0306'
heading; and then click '0306 19' and '0306 39')").

[12]      The website and steps to follow are set forth in nn.8, *supra*.

[13]      Available at: http://harmonizedsystem.wcoomdpublications.org/.

*United States*, 70 F.Supp.3d 1281, 1287 (CIT 2015) ("court may look to the {ENs} to help construe the relevant chapters where appropriate").

In sum, proper tariff interpretation is a question of law; this Court should take judicial notice of the full language of Malaysian HTS 2706.00 in the Malaysian Customs and Worldtariff databases, as well as relevant HSN ENs, to invalidate Commerce's choice of HTS 2708.10 to value coal tar pitch.

### C.    Malaysian Import Data Are Unreliable

Respondents established that the $1,629.50/MT coal tar average unit value ("AUV") from Malaysian HTS 2706.00 is anomalous and unreliable because it significantly exceeds the $722.87/MT AUV of the value-added pitch product reported in Malaysian HTS 2708.10. Case Brief at 21-22, Appx5316-5317. The *Final Results* bypassed this demonstration, reasoning that "the mandatory respondents' argument . . . **is moot, because we are not using HS 2706.00** to value the respondent's coal tar pitch input." IDM at 19, Appx21 (emphasis added). Commerce summarily concluded "the Malaysian import data under HS 2708.10, constitute the best available information on the record to value the coal tar pitch." *Id*.

Commerce's classification under HTS 2708.10, besides being contradicted by the plain terms of HTS 2706.00 (Section II.B, *supra*), is neither supported by substantial evidence nor the best available information.

Although pitch in HTS 2708.10 is a value-added product of coal tar in HTS 2706.00, the Malaysian HTS 2708.10 AUV is less than half of the 2706.00 AUV, Petitioners' SV Submission (Nov. 9, 2018), Attachment 1, Appx1416-1417 – rendering both datasets potentially distorted and unreliable. Distortion is likely due to the interchangeably-referenced products being conflated and entered under incorrect HTS subheadings. Therefore, Commerce's choice of HTS 2708.10, which is undermined by the HTS 2706.00 AUV, is unsupported by substantial evidence. This choice is also inconsistent with agency precedent declining to employ SVs where values are demonstrably unreasonable in relation to other record data. *See, e.g., Artist Canvas from China*, 77 Fed. Reg. 16,116 (Mar. 22, 2006), IDM Comment 4 (Commerce declines aberrational SV data where unbleached canvas prices were higher than bleached canvas prices); *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 179 F.Supp.3d 1256, 1275 (2016), *aff'd after remand*, 236 F.Supp.1352, 1356-57 (2017) (Commerce on remand eliminates aberrational rice husk SV exceeding the value of rice).

The aberrant nature of SVs in Malaysian HTS 2708.10 (and 2706.00) is corroborated by an overwhelming majority of imports under both HTS subheadings originating from the same country, Spain. The chart below provides a breakout of the value, quantity and AUV of total imports and Spanish imports under Malaysian HTS 2708.10 and 2706.00.

| | HTS 270810 | | | HTS 270600 | | |
|---|---|---|---|---|---|---|
| | Value (RM) | Qty (kg) | AUV (RM/kg) | Value (RM) | Qty (kg) | AUV (RM/kg) |
| Total Usable Import data | 15843541 | 5285434 | 3.00 | 770668 | 112176 | 6.87 |
| Spanish portion | 13724909 | 4368820 | 3.14 | 579044 | 108000 | 5.36 |
| Spanish imports as % of Total | 86.63% | 82.66% | | 75.14% | 96.28% | |

*See* Prelim SV Memo, Exhibit 1, Appx4512-4513.

Because Spanish exports contributed predominantly to Malaysian imports under both HTS headings (75% to 96%), the Malaysian import AUVs for coal tar and pitch essentially mirror Spanish export AUVs for coal tar and pitch. Without evidence that pitch in Spain was being sold for less than coal tar, Spanish data reported under Malaysian HTS 2708.10 (and 2706.00) are unreliable.

The CIT nonetheless affirmed Commerce, reasoning that Respondents "failed to exhaust their arguments regarding the aberrancy of Malaysian import data under HS 2708.10 based on the predominance of Spanish exports in the average unit values." Appx89. Because Commerce selected HTS 2708.10 for the first time in the *Final Results*, Respondents' aberrancy arguments are not barred by exhaustion. This Court should not credit the CIT's strawman argument that "Respondents' administrative case brief presented arguments against the use of HS 2708.10 based on Respondents' understanding that Commerce had preliminarily

used that subheading to value {CA}'s coal tar pitch." *Id*. The *Preliminary Results* did not use HTS 2708.10, despite stating it did. Prelim SV Memo at 5, Attachment 1, Appx4493, Appx4502; IDM at 18 n.106, Appx20. Given the confusion caused by Commerce, the agency must correct its input misclassification and use of aberrant SV.

### D.    Russian HTS 2706.00 Affords the Most Reliable SV

Respondents established that for coal tar pitch, Russian HTS 2706.00 afforded the most reliable SV ($163/MT), since that AUV satisfied the criterion of the largest quantity of imports under Commerce's tie-breaking methodology for selecting the best alternative SV from a secondary surrogate country. Case Brief at 22-24, Appx5317-5319; *Calgon Carbon Corp. v. United States*, 2017 WL 384685, *2 (Jan. 27, 2017) (approving Commerce's tie-breaking methodology for selecting SVs with most imports). This AUV is also consistent with the Russian HTS 2708.10 AUV ($433.95/MT). Case Brief at 23-24, Appx5318-5319.

Remand is warranted because Commerce – and CIT – failed to address this argument. When the primary surrogate country does not afford a reliable SV, Commerce selects SVs based on the most imports under the applicable HTS subheading from a secondary surrogate country, as it did in AR10 when valuing coal tar under HTS 2706.00 using Mexican data when the primary surrogate country was Thailand. *Activated Carbon from China*, 83 Fed. Reg. 53,214 (Oct.

22, 2018) (final results), IDM Comment 2 ("Mexican imports represent the largest

volume").

Russia reported the largest quantity of imports under HTS 2706.00 in AR11,

as shown below for such import data from all potential surrogate countries.

| Country | Value ($) | Qty (kg) | AUV ($/kg) |
|---------|-----------|----------|------------|
| Brazil | 84,890 | 89,925 | 0.94401 |
| Kazakhstan | 4,800 | 21,700 | 0.2212 |
| Malaysia | 182,791 | 112,176 | 1.6295 |
| Mexico | 228,942 | 727,130 | 0.31486 |
| Russia | 8,512,499 | 52,117,211 | 0.16333 |

Respondents' Final SV Submission Exhibit 2B, Appx1707-1817 (no imports in

Romania).

The $163/MT Russian AUV represents the broadest market average **and**

affords the most probative, reliable SV. Further, Russia is on the OP List and

undeniably economically comparable to China. OP List, Appx298. Russia is also a

significant producer of activated carbon, with total domestic production of

11,425,000 kg in 2017 and 14,285,000 kg in 2018. Final SV Submission Exhibit

12 at 12-14, Appx4312-4314. Thus, the reliable and corroborated $163/MT

Russian coal tar AUV represents the proper SV for coal tar pitch.

## III.    COMMERCE UNLAWFULLY VALUED BITUMINOUS COAL

Commerce initially valued all bituminous coal under Romanian HTS 2701.12, agreeing with Respondents "that the Malaysian bituminous coal value under HS code 2701.12 . . . is aberrational." IDM at 14, Appx16. Commerce on remand recognized the universality of the harmonized "Thai Note 2 to Chapter 27 {which} explains {that} 'bituminous coal' means coal having a volatile matter limit (on a dry, mineral-matter-free basis) exceeding 14 percent and a calorific value limit equal to or greater than 5,833 kcal/kg)", and concluded, "we now find that Malaysian {or Romanian} HS subheading 2701.19 covers the same merchandise as Thai HS subheading 2701.19." Remand at 7, Appx99.

Accordingly, Commerce recognized that: "bituminous coal" in HTS 2701.12 described coal fulfilling the criteria of, *inter alia*, a calorific value ≥5,833 kcal/kg; and, conversely, technical grade bituminous coal having a calorific value <5,833 kcal/kg merited valuation under HTS 2701.19 for "Other Coal." Remand at 3-7, Appx95-99. Commerce thereafter "use{d} import data reported under Malaysian HS subheading 2701.19 to value the bituminous coal input" with heat value <5,833 kcal/kg. *Id*. at 3, Appx95. Yet for bituminous coal with unknown heat value, Commerce "continue{d} to use Romanian import data reported under HS 2701.12." *Id*. at 4, Appx96.

As shown below, bituminous coal: (a) having unknown heat value should be valued based either by averaging Romanian HTS 2701.12 and 2701.19 data, or exclusively with Romanian HTS 2701.19; and (b) with known heat value <5,833 kcal/kg should be valued using Romanian HTS 2701.19 data.

## A.    Bituminous Coal Having Unknown Calorific Value

To value "bituminous coal {having unknown heat value} used by {CA}'s other supplier, Supplier C, and by {CA}'s uncooperative supplier," Commerce unlawfully "continue{d} to use Romanian import data reported under HS 2701.12." Remand at 4, Appx96.

### 1.    Commerce unlawfully interpreted HTS 2701.12 and 2701.19

Commerce first reasoned that "while we have now applied the Thai HS subheading notes to the Malaysian {or, Romanian} HS 2701.12 for {the Remand}, we still lack record evidence to depart from using HS 2701.12 to value the bituminous coal used by Supplier C and the uncooperative supplier." Remand at 28, Appx120. Conversely, Commerce rejected HTS 2701.19, claiming it "cannot consider the application of HS 2701.19 with the description 'Other Coal,' without record evidence to demonstrate that the coal input the mandatory respondents identify as 'bituminous coal' is actually of the kind and grade that is more appropriately classified under HS 2701.19 (Other Coal)." *Id*.

Commerce's interpretation of HTS 2701.12 and 2701.19 should be rejected

as unlawful. As this Court held in *Gerson*:

> Classifying articles under the HTSUS is a two-step process. A court
> first determines the proper meaning of specific terms in the tariff
> provisions, which is a question of law that we review without
> deference.

898 F.3d at 1235.

The language of all three harmonized HTS subheadings under HTS 2701 is:

- 2701.11 – Anthracite coal

- 2701.12 – Bituminous coal

- 2701.19 – Other coal

CAC SDQR I at 19, Exhibit SD-27, Appx1546, Appx1552.

Given that "bituminous coal" for purposes of HTS 2701.12 indisputably

means **only** such coal that, *inter alia*, satisfy the criteria of heat value ≥5,833

kcal/kg, "Other coal" in HTS 2701.19 encompasses <u>all other</u> types and grades of

coal except two discrete categories: (i) anthracite coal; and (ii) "bituminous coal"

as defined in Subheading Note 2 having heat value ≥5,833 Kcal/Kg.

Commerce recognized the restrictive nature of "Note 2 {which} **limits** HS

2701.12, *inter alia*, to bituminous coal with 'a calorific value limit equal to or

greater than 5,833 kilocalorie (kcal)/kilogram (kg).'" Remand at 2, Appx94

(emphasis added). Commerce nevertheless for coal with indeterminate heat value

improperly "continue{d} to use Romanian import data reported under HS 2701.12"

– reasoning that it "d{id} not have record evidence, such as test reports for the bituminous coal input used by these suppliers, that would support valuing this input using imports under subheading 2701.19." Remand at 7, Appx99.

Commerce's analysis is contorted. In contrast to "Bituminous coal" in HTS 2701.12, which is circumscribed by the heat value range ≥5,833 Kcal/Kg, no such condition attaches to "other coal" in HTS 2701.19. Yet Commerce misconstrued Subheading Note 2 by engrafting an analogous restrictive stipulation to HTS 2701.19 ("Other coal"), and improperly requiring evidence of heat value of coal <5,833 Kcal/Kg. Commerce's claim that it "lack{ed} record evidence to depart from using HS 2701.12," Remand at 28, Appx120, is also erroneous – there is no basis for that subheading to be the default for coal described technically as bituminous coal, but lacking heat value information.

As its second rationale for HTS 2701.12, Commerce underscores the "plain reading of the HS descriptions," reasoning that "the plain language description of the {Global Trade Atlas ('GTA')} data for HS 2701.12 (Bituminous Coal, Not Agglomerated) matches the mandatory respondents' description of their input (*i.e.*, bituminous coal) and supports Commerce's decision to rely on this HS category for the input." *Id*. By divorcing the HTS 2701.12 description – "bituminous coal" – from its integrally appended Subheading Note 2, which prescribes the calorific value attribute of input as ≥5,833 Kcal/Kg, Commerce impermissibly detached an

essential product specificity attribute of coal categorized in HTS 2701.12.

Consequently, its interpretation of HTS 2701.12 is distorted by reliance on an

incomplete description. Since the coal input lacking evidence of heat value fails the

threshold calorific value criteria, it *ipso facto* cannot be classified under HTS

2701.12; instead, such indeterminate heat value coal would be automatically

categorized under the residual "catch-all" subheading HTS 2701.19. Thus,

Commerce's selection of HTS 2701.12 for unknown heat value coal is unlawful;

the correct classification must be "**based on {heat value}** of the {coal} input

material **and not the label Respondents attached** to the input." *Calgon*, 443

F.Supp.3d at 1344 (emphases added).

The CIT likewise erred in endorsing Commerce's "rel{iance} on the plain

meaning of HS descriptions" based on "*Mid Continent Steel & Wire, Inc. v. United

States*, . . . 321 F.Supp.3d 1313, 1325 ({CIT} 2018) (sustaining use of a {SV}

based on the HS description that best matched the description provided by the

respondent)." Appx146. *Mid Continent* involved two HTS headings with complete

descriptions not requiring Chapter notes for proper interpretation. 321 F.Supp.3d at

1324-25. Here, HTS 2701.12 cannot be properly interpreted without considering

Subheading Note 2. Moreover, *Mid Continent* involved an input with two product

attributes described in different HTS headings, and Commerce selected the one

describing the more significant attribute. *Id. Mid Continent's* matching

methodology is inapposite here since comparing the input's name – *i.e.*, bituminous coal (with unknown heat value) – with the descriptions in HTS 2701.12 (overlooking Note 2) and 2701.19, favors HTS 2701.12, which, as demonstrated *supra*, is an unlawful SV choice.

### 2.    HTS 2701.12 alone is unlawful

Commerce's choice of HTS 2701.12 alone impermissibly presumes that all unknown heat value coal had calorific content $\geq 5,833$ Kcal/Kg. This choice is both unsupported by substantial evidence and undermined by all determinate calorific values of coal being invariably $<5,833$ Kcal/Kg, which Commerce valued under HTS 2701.19.

The CIT rejected Respondents' arguments, reasoning that "any basis for Commerce to apply HS 2701.19 was **equally speculative**." Appx145 (emphasis added). Thus, CIT acknowledged Commerce's choice of HTS 2701.12 was speculative. "**It is well established that speculation does not constitute substantial evidence**." *Lucent*, 580 F.3d at 1327 (emphasis added). Therefore, CIT's conclusion "that substantial evidence supports Commerce's decision to value bituminous coal of unknown calorific value under HS 2701.12" is internally inconsistent and irreconcilable. Appx145.

On this record, Commerce should lawfully value bituminous coal through:

1. a simple average of AUVs in HTS 2701.12 and 2701.19, as the record does not favor one HTS classification over the other. Specifically,

having correctly found Malaysian HTS 2701.12 data unreliable (IDM at 14, Appx16), Commerce should average AUVs from Romanian HTS 2701.12 and 2701.19 because averaging Romanian HTS 2701.12 and Malaysian HTS 2701.19 AUVs introduces distortions by mixing SVs for two grades of the same input from different countries; or

2. the residual catch-all subheading HTS 2701.19. Commerce's rationale that classification under HTS 2701.19 requires evidence of heat value <5,833 kcal/kg is baseless and unsupported by Subheading Note 2. Section III.A.1, *supra*.

Employing an averaging methodology is supported by applicable precedent. Where the specificity attribute necessary to pinpoint the precise HTS classification for an input is lacking due to potential classification under multiple HTS subheadings, Commerce averages data under those multiple HTS codes to obtain a more representative and reliable SV. *Xanthan Gum from China*, 82 Fed. Reg. 11,434 (Feb. 23, 2017) (final results), IDM Comment 11; Draft Remand Comments at 9-10 & nn.19-20, Appx5415-5416 (providing agency precedent).[14]

Commerce's choice of HTS 2701.12 is premised on its misguided goal for **only one** best HTS subheading for the input, consistent with the General Interpretive Rules that "a classification system must associate each individual product with a single heading (and, . . . , subheading), to which that product can be

---

[14]    Commerce improperly required redaction of these references to avoid consideration of adverse precedent. Reconsideration Denial, Appx5467-5468. As such documents "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," they are judicially noticeable. Fed. Rule Evid. 201(b)(2); *Calgon Carbon Corp. v. United States*, 145 F.Supp.3d 1312, 1327 (CIT 2016).

simply and unequivocally assigned." Remand at 6, Appx98. However, Commerce erroneously conflated its core task of accurately valuing the input with classification. *See Downhole*, 776 F.3d at 1379 ("Commerce was not required to engage in a classification analysis . . . ; rather, it was required to determine which of the competing subheadings constituted the best available information for valuing the . . . input."); *SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1224 (Fed. Cir. 2018).

Unlike classification requiring the single best HTS subheading for determining the duty rate, Commerce's valuation is unconstrained from using multiple subheadings if an input is potentially covered by more than one. Indeed, Commerce recently valued an input averaging two HTS subheadings covering parts of the input. *Mobile Access Equipment from China*, 87 Fed. Reg. 9,576 (Feb. 22, 2022) (final determination), IDM Comment 6 ("because HTS subheading 8501.32 encompasses both of the applicable HTS eight-digit subheadings …, we continue to find that HTS subheading 8501.32 is the most representative and accurate AUV. . . . {P}etitioner's suggested HTS subheading encompasses only one of the features").

Thus, absent the calorific value attribute of coal, Commerce's sole reliance on HTS 2701.12 instead of 2701.19 (exclusively or by averaging) is unsupported by substantial evidence.

### 3. Commerce's remaining rationales are meritless

Commerce unpersuasively claims that unknown heat value coal "comprises a small percentage of the volume of subject merchandise reported in {CA's} FOP database." Remand at 28, Appx120. There is no *de minimis* exception permitting Commerce to ignore the statutorily mandated best available information standard in favor of a speculative and potentially distortive SV choice. Moreover, Supplier C purchased [    #    ] MT of bituminous coal during the POR, a significant volume. CA DQR I Attachment D Exhibit D-5, Appx339. Further, a distortive SV for Supplier C's unknown heat value coal also impacted CA's uncooperative supplier, whose FOPs were valued using Supplier C data.

Commerce mischaracterizes the record in claiming that "Respondents also failed to provide any evidence to support their alternative claim" to average HTS 2701.12 with HTS 2701.19. Remand at 29, Appx121. Commerce specifically required only DJAC and [ name ] to provide bituminous coal calorific value information; those respondents evidenced their heat value as <5,833 kcal/kg. DJAC SDQR at 7-8 (Q.15), 32 (Q.58), Exhibits SD-12–13 (Q.15), SD-53 (Q.58), SD-56 (Q.58), Appx1517-19, Appx1524-29, Appx1535, Appx1537-41. Conversely, Commerce never asked CA's Supplier C to provide calorific value for its bituminous coal input. CA SDQR I at 19 (Q.29), Appx1546. Commerce acknowledges asking Supplier C to provide supporting documentation for only

"smoke coal," which evidences calorific value as <5,833 kcal/kg. *Id*.; Remand at 26, Appx118.

Commerce thereafter improperly relied on the absence of Supplier C's bituminous coal calorific value to value the input under HTS 2701.12. Remand at 7, 26-27, Appx99, Appx118-119. Without asking Supplier C to evidence bituminous coal's calorific value, and record evidence showing the input's known heat values are consistently below the HTS 2701.12 threshold, Commerce is precluded from – as the CIT stated when remanding the first review ("AR1") – "**impos{ing} a de facto adverse facts available rate**." *Calgon Carbon Corp. v. United States*, 35 CIT 234, 244 (2011) (emphasis added). While Commerce distinguishes AR1 based on its verification context, it recognized that "Commerce had an obligation to treat the other respondent fairly by giving it a similar opportunity." Remand at 27, Appx119. Here, Commerce did not afford Supplier C a "similar opportunity" to evidence that its bituminous coal calorific value was <5,833 kcal/kg. *Id*.; *Calgon*, 35 CIT at 244. The CIT's retort that "{u}nlike the respondent in {AR1}, {CA} had an opportunity to substantiate its claim that smoke coal and bituminous coal had similar calorific values, but failed to do so" ignores that Commerce chose not to ask this of Supplier C. Appx146.

Commerce's strained reliance on the second review ("AR2") to support the Remand's speculative valuation of bituminous coal of unknown heat value is

unavailing. Remand at 8 n.30, 30 n.128, Appx100, Appx122. AR2 is

distinguishable as involving two different types of SV sources to value steam coal:

Coal India Limited ("CIL") data; and Indian HTS 2701.19.20. *Activated Carbon*

*from China*, 75 Fed. Reg. 70,208 (Nov. 17, 2010) (final results), IDM at 17-19.

Commerce there valued coal with specific heat values using CIL data and

unknown heat values using HTS 2701.19.20. Without any request to value

unknown heat value by averaging CIL and HTS 2701.19.20 data, the issue of

averaging two data sources was not presented in AR2. Indeed, the choice of HTS

2701.19.20 for unknown heat value coal in AR2 supports using the 6-digit HTS

2701.19 for valuing Supplier C's bituminous coal with unknown heat value.

Ultimately, Commerce ignored the lack of heat value evidence to support

one HTS subheading over the other; averaging HTS 2701.12 and 2701.19 is

required to achieve the best available information.

### B.    Bituminous Coal Having Known Calorific Value

Commerce improperly used Malaysian HTS 2701.19 to value bituminous

coal having known calorific value. Remand at 7, Appx99. Having found Malaysian

HTS 2701.12 "aberrant and unreliable," *id*. at 26, Appx118, Commerce should be

skeptical of Malaysian HTS 2701.19 covering the same input of lower heat value.

Commerce reasoned that "the AUV under Malaysian HS subheading

2701.19 is reliable, as there is no indication that the AUV is unusable as a result of

being, for example, aberrantly high or based on a limited amount of imports." *Id*. at

7, Appx99. The CIT disfavored discarding Malaysian HTS 2701.19 data "simply

because the agency separately found Malaysian HS 2701.12 data to be distorted."

Appx149. Such rationale, however, ignores Commerce's statutory mandate to

select the best available information rather than relying on data simply because it

was not disqualified as aberrant. Given the likelihood of Malaysian importers

conflating HTS 2701.12 and 2701.19 when entering bituminous coal of different

heat values, there is high risk that the HTS 2701.12 distortion permeated 2701.19.

The CIT also improperly cited "*Jinan Farmlady Trading Co. v. United

States*, . . . 228 F. Supp. 3d 1351, 1356–57 ({CIT} 2017) (finding Commerce's

determination that data was not aberrational reasonable when respondent had not

provided demonstrative evidence)." Appx149. *Jinan* is distinguishable since it

involved a different issue, *i.e.*, whether a partner country's AUV was unreliable

when it was significantly higher or lower than the overall AUV. *Jinan*, 228

F.Supp.3d at 1356-57. Moreover, that record had only one HTS choice for the

input, whereas this record proffers an alternative choice – Romanian HTS 2701.19.

For HTS 2701.19 SV data, Romania proffers a qualitatively superior choice

compared to Malaysia because – unlike Malaysian HTS 2701.12 – Romanian HTS

2701.12 data are undistorted. Moreover, Commerce acknowledged that **Romanian

data are necessary to value bituminous coal**. Remand at 7, Appx99. Commerce

should therefore have valued **<u>all</u>** bituminous coal using Romanian data in accordance with its policy underlying surrogate valuation to minimize distortion occurring when using data from multiple countries. *Clearon Corp. v. United States*, 2013 Ct. Intl. Trade LEXIS 27, *21 (Feb. 10, 2013); *Peer Bearing Co.-Changshan v. United States*, 804 F.Supp.2d 1337, 1353 (CIT 2011).

Commerce's choice of Malaysian HTS 2701.19 contradicts its single country regulatory preference by **using data from multiple countries to value the same input**. 19 C.F.R. § 351.408(c)(1). Commerce explained years ago: "unless the record convincingly demonstrates that factor values are unreliable, the Department generally prefers to stay within the same country for factor valuation wherever possible because it leads to more consistent results than picking and choosing factor values from different countries." *Silicomanganese from China*, 65 Fed. Reg. 31,514 (May 18, 2000) (final results), IDM § A.5. The record "conclusively demonstrates" that Malaysian HTS 2701.12 bituminous coal data are "unreliable," without any concerns for Romanian data. *Id*.; Remand at 7, 26, Appx99, Appx118.

Therefore, Commerce has no basis to employ data from different countries to value the two types of bituminous coal, given the indisputably reliable Romanian data under both HTS 2701.12 and 2701.19 – which also make Romania the superior primary surrogate country. Section IV, *infra*.

## IV.   COMMERCE UNLAWFULLY SELECTED MALAYSIA AS THE SURROGATE COUNTRY FOR CHINA

Commerce initially selected Malaysia as the primary surrogate country for China in AR11 based on Romania's supposed lack of significant production. IDM at 7-8, Appx9-10. After this flawed rationale was rejected by the CIT, Commerce conceded Romania satisfied all statutory criteria but retained Malaysia, claiming superior data quality. Appx84-86, Remand at 11-15, Appx103-107. However, as set forth below, Commerce unlawfully retained Malaysia because: (1) its policy prefers the country having the best data; (2) Romania clearly provided superior data; and (3) the new bases espoused on remand are meritless.

### A.   Criteria for Surrogate Country Selection

Commerce's surrogate country selection policy underscores the fundamental objective: to most accurately value FOPs "based on the **best available information**." Commerce Policy Bulletin No. 04.1 (Mar. 1, 2004), Appx71-75 ("Policy 04.1") (quoting 19 U.S.C. § 1677b(c)(1)(B)) (emphasis added). Data considerations are Commerce's stated fundamental policy goal behind the selection of a surrogate country. *Id*., Appx74 ("the country with the best factors data is selected as the primary surrogate country. Even if no issues arise regarding economic comparability and significant production, **data quality is a critical consideration affecting surrogate country selection**.") (Emphasis added).

Therefore, the most accurate SV data are the paramount objective behind identifying a primary surrogate country. At the outset of AR11, Commerce accordingly sought the following information beyond the statutory criteria: "availability and quality of data for the major {FOPs}"; and "availability and quality of financial statements." SC Memo at 1-2, Appx294-295. Such solicitation confirms that data quality for major input SVs and financial statements is key when selecting surrogate country.

### B.    Romania Provides Superior Data Quality

Commerce recognized that "the three Malaysian financial statements . . . lack usable financial data in that none of them have separate line items breaking down the cost of raw materials and energy." Remand at 15, Appx107. Commerce thus continued using Romcarbon financial data, but nevertheless selected Malaysia because that country provides "data for **nearly all** of the inputs used by the two mandatory respondents to produce the subject merchandise during the POR – **including the bituminous coal input** used to produce nearly the entire production volume of the subject merchandise reported in both mandatory respondents' respective FOP databases – **with the exception of the financial ratios**." *Id*. at 14, Appx106 (emphases added).

Commerce's bituminous coal rationale is contradicted by the record.

**Commerce rejected the unreliable Malaysian HTS 2701.12 data** for valuing

higher calorific value (≥5,833 kcal/kg) bituminous coal. IDM at 14, Appx16.
Consequently, Commerce acknowledges the continued necessity of using
Romanian HTS 2701.12 to value the significant volume of Supplier C's and CA's
uncooperative supplier of bituminous coal. Remand at 7, Appx99; Section III.A,
*supra*. Because Malaysia, unlike Romania, demonstrably fails to afford a reliable
SV for both grades of the most significant input – bituminous coal – the inaccurate
valuation distorted ADD margins.

Beyond bituminous coal, financial ratios represent [ # ]% of both
Respondents' NV. Memorandum of Law (June 24, 2020), Addendum, Appx5384-
5385. This outsized impact on NV must be considered when selecting surrogate
countries per Commerce's court-affirmed practice. *See, e.g.*, *Steel Nails from
China*, 78 Fed. Reg. 16,651 (Mar. 18, 2013) (final results), IDM Comment 1D;
*Jiaxing Brother Fastener Co. v. United States*, 11 F.Supp.3d 1326, 1333 (CIT
2014), *aff'd*, 822 F.3d 1289, 1297 (Fed. Cir. 2016). Commerce unpersuasively
distinguishes this precedent by tying its basis for surrogate country selection to
"the main input: steel," rather than financial statements. Remand at 37, Appx129.
Yet based on this rationale, only Romania qualifies as the surrogate country
because it alone affords usable and reliable SV data for "the main input:"
bituminous coal. *Id*.; Memorandum of Law Addendum, Appx5384-5385 ([ # ]%
for DJAC and [ # ]% for CA, *supra* n.1).

Moreover, Commerce has relied solely on financial statements in selecting

surrogate countries because overhead, SG&A, and profit ratios – applied to the

total cost of material, labor and energy – represent three expenses invariably

driving NV. *Cased Pencils from China*, 78 Fed. Reg. 42,932 (July 18, 2013), IDM

Comment 1 ("in evaluating the two countries for purposes of selecting a primary

surrogate, we have relied on data availability as the deciding factor. . . . {T}he

**Philippines is the better choice because of the superiority of the Philippine**

**financial data** for deriving surrogate financial ratios") (emphasis added).

Commerce's practice to select surrogate countries based on financial statements

has been affirmed. *Tianjin Wanhua Co. v. United States*, 253 F.Supp.3d 1318,

1324 (CIT 2017) ("Relying on a 'preference for selecting the financial

statements of a producer of identical merchandise over a producer of comparable

merchandise,' Commerce . . . selected Indonesia as the primary surrogate country .

. . . The court therefore sustains Commerce's selection of Indonesia"). In a mirror

image scenario, the CIT recently affirmed Commerce's selection of Romania based

solely on superior financial data:

> . . . the court concludes that **Commerce acted within its discretion**
> **when selecting the single, superior Romanian financial statement**
> **to the three Malaysian statements. While there are three**
> **Malaysian financial statements, as Commerce noted, none of them**
> **segregate energy costs** and all of them ambiguously account for
> overhead expenses. . . . Meanwhile, Sigstrat's financial statement has
> a line item for "production overhead" and an itemized expense for
> energy costs. . . . Commerce acted based on substantial evidence and

> within its discretion to determine that the **Romanian financial statement was superior** to the Malaysian financial statements **for purposes of surrogate country selection**.

*Ancientree Cabinet Co. v. United States*, 532 F.Supp.3d 1241, 1258 (CIT 2021) (emphases added).

Likewise here, unlike Romcarbon, all three Malaysian "financial statements lack usable financial data since {none} of them have separate line items breaking down the cost of raw materials and energy." PDM at 16, Appx4470. Thus, compelling precedent supports selecting Romania as the primary surrogate country in AR11. Given longstanding precedent supporting selection of a surrogate country based on the availability of superior financial statements, Commerce fails to support choosing Malaysia without such data. "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF*, 263 F.3d at 1382.

The CIT endeavored to minimize this extensive administrative and judicial precedent, asserting the lack of "authority indicating that Commerce must base the selection of a primary surrogate country on the quality of financial data." Appx156. Rather than advance such an absolutist view, Respondents submit that in this case Commerce was required to explain its deviation from practice – given the ample precedent where "the source of financial ratios {is used} to determine the primary surrogate country," as well as where "a production input's outsized impact

on {NV} led Commerce to prioritize that input in selecting a surrogate country." Appx154-155. While material inputs may not be the same as financial data, given their "outsized impact" on NV in AR11 and Commerce's routine reliance on financial data to justify its surrogate country, the selection of Malaysia in AR11 is unsupported by substantial evidence.

By contrast with Malaysia's lack of viable financial information, data considerations do not disqualify Romania. Indeed, Commerce acknowledges Romania's superiority: "**the record also contains complete, publicly-available contemporaneous, and input-specific Romanian data for nearly all of the inputs used by the two mandatory respondents** to produce subject merchandise during the POR." Remand at 14-15, Appx106-107 (emphasis added). Coal tar pitch, the only input for which Romanian data are unavailable, does not support Malaysia because Russian data should be used as the SV. Section II, *supra*.

In sum, because Malaysia manifestly provides inferior SV data, its selection was not "based on the best available information" as required by statute and Commerce policy. 19 U.S.C. § 1677b(c)(1)(B); Policy 04.10, Appx71.

### C.    Commerce's New Bases To Favor Malaysia Are Without Merit

The entirely new bases that Commerce developed in its strained effort to salvage its selection of Malaysia do not withstand scrutiny.

### 1.    Romanian data are contemporaneous

First, Commerce incorrectly claims that "the Romanian import data . . .

Respondents placed on the record is not POR-specific because the data cover . . .

2016-2018, whereas the Malaysian data under HS 2701.19 is contemporaneous

with the POR (*i.e.*, April 2017-March 2018)." Remand at 36, Appx128 (footnote

omitted). Respondents did in fact submit POR-specific data, although the auto-

generated heading was titled "2016-2018" because the data source is programmed

to automatically download three years of data before a "macro" is used to filter

POR-specific data. Final SV Submission Exhibit 2A-B, Appx1673-1817; Remand

Comments at 10, Appx5509. The CIT affirmed Commerce because this

explanation "is not part of the administrative record." Appx154.

This Court should reject Commerce's contemporaneity finding. That

**Commerce used Respondents' Romanian HTS 2701.12 data** is fatal to the claim

that they are not from the POR. Final SV Memo, Attachment 1 n.\*, Appx5378.

Moreover, Commerce practice uses GTA data to corroborate TDM data:

> {B}ecause neither the petitioners nor the respondents submitted data
> using Commerce's preferred {GTA} source in providing import data
> to the record for potential surrogates (instead providing info from
> {TDM} for Malaysia . . .), we have downloaded data for the identical
> HTS subcategories to corroborate the Malaysian data submitted, and
> used the GTA data for the purposes of this preliminary determination.

*Steel Propane Cylinders China*, 83 Fed. Reg. 66,675 (Dec. 27, 2018) (preliminary

determination), PDM Comment VI.B.

Commerce accordingly downloaded GTA Romania HTS 2701.12 import data used in the *Final Results*. Final SV Memo at 2, Appx5375. The GTA AUV of $136.51/MT corroborates the TDM AUV of $136.1/MT, Respondents' Final SV Submission Exhibit 2A, Appx1676, thereby undermining Commerce's rationale. Notably, neither Commerce nor Petitioners at any point before the Remand questioned the POR-specific nature of the Romanian data. *See* Draft Remand at 8-15, Appx5394-5400. The explanation is not part of the record because Commerce never questioned the data during the administrative process.

Beyond being unfair, Commerce's newfangled and *post-hoc* contemporaneity rationale violates the statutory prohibition against making adverse findings in response to a "request for information" based on a perceived deficiency without providing notice and an opportunity to cure. 19 U.S.C. § 1677m(d). The CIT erroneously found that the statute does not apply because SV "data is submitted to Commerce on a party's own initiative, not in response to a request by Commerce." Appx154. Yet Commerce routinely uses SV data provided by parties to calculate ADD margins, as it did in AR11, and recognizes SV data as a distinct category of factual information. 19 C.F.R. § 351.301(c)(3)(iv). The SV solicitation in AR11, SC Memo, Appx294-295, constituted "a request for information" under the plain statutory intent. 19 U.S.C. § 1677m(d); *see Chevron U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837, 842-45 (1984).

Moreover, it is unreasonable for Commerce to avoid its statutory obligation by styling its SV data requests as mere voluntary solicitation. *Id*. The statute protects against Commerce taking adverse action because of perceived deficiencies in critical information submitted by parties without providing an opportunity to explain or cure – as occurred with the Romanian data in AR11. Since these data were submitted well before the *Preliminary Results*, there is no statutory basis to excuse Commerce from failing to "inform" Respondents that the data were perceived to be "deficient{}" and "provide an opportunity to remedy or explain." 19 U.S.C. § 1677m(d). Commerce's use of the data reveals the absence of any real concern; the finding instead constitutes a pretext to retain Malaysia.

### 2.    Coconut-shell charcoal does not provide a basis to favor Malaysia

The other *post-hoc* rationalization advanced by Commerce is similarly without merit:

> Malaysia is one of only a small number of countries with an HS . . . ten-digit level that is specific to **coconut-shell charcoal** (*i.e.*, HTS subheading 4402.90.1000), **a direct material that is consumed in significant quantities in the production of subject merchandise by the mandatory respondents**. . . . Romania only provides a six-digit basket category HS subheading, 4402.90, which covers wood-based charcoal and also includes nut-based charcoal, which is an input not used by the mandatory respondents.

Remand at 15, Appx107 (emphasis added). Record evidence refutes Commerce's claim.

The CIT correctly concluded that "{CA}'s suppliers do not use coconut shell charcoal." Appx152-153. CA used significant amounts of coal-based carbonized material, accounting for [ # ]% of its NV. Memorandum of Law Addendum, Appx5385. In contrast, DJAC's coconut-shell charcoal consumption accounted for [    #    ]% of its NV. *Id.*, Appx5384. Thus, SV of the major input, coal-based carbonized material, not minor input coconut-shell charcoal, should drive the surrogate country selection.

Coal-based carbonized material significantly differs from coconut-shell charcoal in terms of properties and cost. In CA's sales database, several customers are [ description        ] companies – *e.g.,* [ company names      ]. CA Third Supplemental Section C Questionnaire Response (Apr. 5, 2019) Exhibit 3SC-4, Appx1588-1657. As detailed *infra*, ITC reports confirm that coal-based charcoal, not coconut-shell charcoal, are suitable and cost-effective for water purification. Commerce incorrectly asserts that Malaysian HTS 4402.90.1000 for coconut-shell charcoal affords greater product specificity compared with Romanian HTS 4402.90, which encompasses coconut-shell charcoal and wood charcoal. Remand at 15, Appx107. To the contrary, Romanian HTS 4002.90 is a superior SV for all of CA suppliers' coal-based carbonized material.

First, the ITC explains that coconut-shell charcoal is a very different input from coal-based carbonized material. Commerce improperly required that Respondents' Draft Remand Comments redact ITC publication references. Reconsideration Denial, Appx5469-5493. But they not only "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," they are relied upon by the Department itself when not on the record because they "can be accessed directly" from the ITC website. Fed. Rule Evid. 201(b)(2); *Diamond Sawblades from China*, 85 Fed. Reg. 78,827 (Dec. 7, 2020), IDM n.13; *Diamond Sawblades from China*, 79 Fed. Reg. 40,062 (July 11, 2015), IDM n.8. In its 2018 sunset review, the ITC noted the differences between coconut-shell and coal-based activated carbon:

> Coal is the primary raw material for activated carbon in both the United States and China. Coal-based activated carbon is used widely by municipal water treatment authorities to remove undesirable tastes and odors from drinking water and to eliminate contaminants from industrial waste water. . . . Coconut-based activated carbon is used primarily in the gold mining and cigarette filter industries, as well as being a price premium product for home water filters. . . .
>
> Other common raw materials for making activated carbon are wood . . . .
>
> **Certain activated carbon made from coconut shells typically has different properties from certain activated carbon made from coal.** Specifically, coconut-based activated carbon usually has greater hardness and smaller pore sizes than coal-based activated carbon. These differences may make coconut-based carbon better than coal based carbon for certain applications, such as gold mining and manufacturing filters for cigarettes.

*Activated Carbon from China*, USITC Pub. 4797 (June 2018), at 9, I-10–12

(emphasis added).

The chart below summarizes the fundamental dissimilarities:

| Coconut-shellbased charcoal | Coal-based charcoal |
|---|---|
| Greater hardness | Lower hardness |
| Smaller pore sizes | Larger pore sizes |
| Different pore distribution ||
| Uses: Cigarette filters, home water filters, gold mining | Uses: Processing drinking water, filtering air and gases |

*Id.*; *Activated Carbon from* China, USITC Pub. 3913 (Apr. 2007), at 26-27 ("there

is **very little interchangeability between coal-based and coconut-based**

**activated carbon**. . . . **The limited interchangeability of coconut-based and**

**coal-based activated carbons** is further confirmed by record evidence indicating a

lack of customer overlap for the two products. . . . This shows that coconut- and

coal-based activated carbons are being sold to different markets, demonstrating

limited substitutability between the two") (emphasis added). Given such

fundamental dissimilarities, coconut-shell charcoal is unsuitable for valuing coal-

based carbonized material.

Second, Commerce has accepted that wood and nut charcoal can be used to

produce activated carbon: "**Petitioners correctly state that activated carbon may**

**be manufactured from wood or nut charcoal**, in addition to coal." *Activated*

*Carbon from China*, 78 Fed. Reg. 70,533 (Nov. 20, 2013) (final results), IDM

Comment 6 (emphasis added) (footnotes omitted). Therefore, both wood- and nut-

based charcoal can be used as carbonized materials to produce subject

merchandise.

In the fourth administrative review ("AR4"), Commerce valued coal-based

carbonized materials using HTS 4402 (averaging both wood and nut-based and

coconut shell-based charcoal) – a decision affirmed by this Court:

> **Wood charcoal is also a type of charcoal and can also be used to create the subject merchandise.** . . .
>
> **Commerce's past practice does not demonstrate that coconut shell charcoal is a better match for coal-based carbonized material than the broader Philippine import data category, which includes wood charcoal and coconut shell charcoal**. . . .

*Jacobi Carbons AB v. United States*, 619 Fed. Appx. 992, 999 (Fed. Cir. 2015)

(nonprecedential) (emphasis added). Therefore, this Court in AR4 affirmed

Commerce's decision that: (a) wood charcoal could be used to produce the subject

merchandise; and (b) between wood charcoal and coconut-shell charcoal, the latter

is **<u>not</u>** more comparable to coal-based carbonized materials.

The AR11 record does not contain any evidence detracting from this

conclusion. Therefore, as compared to the Malaysian HTS 4402.90.1000 data for

coconut-shell charcoal only, the choice of Romanian HTS 4402.90 – which

encompasses both coconut-shell charcoal and wood- and nut-based charcoal –

affords a more reliable, representative and undistorted SV for all of CA's suppliers' coal-based carbonized material.

Third, Romanian HTS 4402.90 provides vastly superior data quality than Malaysian HTS 4402.90.1000. Romanian HTS 4402.90 import data are based on imports from 23 partner countries with a total quantity of 27,152,840 kg. Final SV Submission Exhibit 2A, Appx1680. Malaysian HTS 4402.90.1000 import data are based on imports from only four partner countries with a total quantity of merely 336,395 kg. Petitioners' SV Submission, Attachment 1, Appx1418. Therefore, the Romanian data are 81 times more representative of a broad market average.

In sum, Romanian HTS 4402.90 is vastly superior to Malaysian HTS 4402.90.1000 for valuing a major input, coal-based carbonized material.

The CIT erroneously supported Malaysia "because Commerce needed to value coconut shell charcoal for at least one of the respondents, and because Malaysia – and not Romania – was able to provide data at that level of specificity." Appx153. A more specific Malaysian SV for a minor input does not compel selection of Malaysia – inferior in overall SV data quality – as the primary surrogate country; at most, Malaysia could be a secondary surrogate.

As such, the Remand's reliance on an additional metric – carbonized material SV – to support maintaining Malaysia as the primary surrogate country is demonstrably misguided and undermined by both record evidence **and**

- 63 -

longstanding precedent. It cannot be said that Malaysian data constitute "**the best available information**" in AR11. 19 U.S.C. § 1677b(c)(1)(B) (emphasis added). Given the lack of Malaysian data for surrogate financial ratios (that account for a large portion of NV) and a portion of the bituminous coal, "a reasonable mind" could not conclude that Malaysia is an appropriate primary surrogate country for AR11. *Globe Metallurgical Inc. v. United States*, 781 F.Supp.2d 1340, 1348 (CIT 2011) (quotation omitted).

## CONCLUSION

Based on the foregoing, Plaintiff-Appellants respectfully request that the CIT's judgment be reversed and remanded.

Respectfully submitted,

/s/ Francis J. Sailer
Francis J. Sailer
Jordan C. Kahn
Dharmendra N. Choudhary

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW
Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel to Plaintiffs-Appellants*

Dated: April 7, 2022

**2022-1298**

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitations of Federal Rule

of Appellate Procedure 32(a)(7)(B) because it contains less than 14,000 words.

This brief contains 13,869 words, excluding the parts exempted by Federal Rule of

Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.      This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of

Appellate Procedure 32(a)(6) because it has been prepared in a proportionally

spaced typeface using Microsoft Office Word in Times New Roman 14-point font.


Dated:  April 7, 2022                                    /s/ Francis J. Sailer

FORM 30. Certificate of Service

Form 30
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

| | |
|---|---|
| **Case Number** | 22-1298 |
| **Short Case Caption** | Carbon Activated Tianjin Co., Ltd. v. US |

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on __04/07/2022__

by ☐ U.S. Mail ☐ Hand Delivery ☑ Email ☐ Facsimile
☐ Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Mollie Lenore Finnan | PO Box 480 Ben Franklin Station Washington, DC 20044 mollie.l.finnan@usdoj.gov |
| Ashlande Gelin | 900 7th Street SW Washington, DC 20024 ashlande.gelin@trade.gov |
| John M. Herrmann | 3050 K Street, NW Washington, DC 20007 JHERRMANN@KELLEYDRYE.COM |
| Melissa M. Brewer | 3050 K Street, NW Washington, DC 20007 mbrewer@kelleydrye.com |
| Robert Alan Luberda | 3050 K Street, NW Washington, DC 20007 aluberda@kelleydrye.com |

☐ Additional pages attached.

Date: __04/07/2022__

Signature: /s/ Francis J. Sailer

Name: Francis J. Sailer

**FORM 31. Certificate of Confidential Material**

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 22-1298                                              ⊞

**Short Case Caption:** Carbon Activated Tianjin Co., Ltd. v. US

> **Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:
>
> - Only count each unique word or number once (repeated uses of the same word do not count more than once).
>
> - For a responsive filing, do not count words marked confidential for the first time in the preceding filing.
>
> The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains ___50___ number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 04/07/2022          Signature: /s/ Francis J. Sailer

Name: Francis J. Sailer

# **<u>Addendum</u>**

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION, AND DATONG JUQIANG ACTIVATED CARBON CO., LTD., <br><br>        Plaintiffs, <br><br>   and <br><br> BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., NINGXIA MINERAL & CHEMICAL LIMITED, AND SHANXI SINCERE INDUSTRIAL CO., LTD., <br><br>        Plaintiff-Intervenors, <br><br>   v. <br><br> UNITED STATES, <br><br>        Defendant, <br><br>   and <br><br> CALGON CARBON CORPORATION AND CABOT NORIT AMERICAS, INC., <br><br>        Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge <br><br> Court No. 20-00007 |

### <u>JUDGMENT</u>

This case having been duly submitted for decision, and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

Court No. 20-00007                                                        Page 2

    **ORDERED** that the U.S. Department of Commerce's final results in the eleventh

administrative review of the antidumping duty order on certain activated carbon from the

People's Republic of China, *see Certain Activated Carbon From the People's Republic*

*of China*, 84 Fed. Reg. 68,881 (Dep't Commerce Dec. 17, 2019) (final results of

antidumping duty admin. review; 2017–2018), as amended by the Final Results of

Redetermination Pursuant to Court Remand, ECF No. 68-1, are **SUSTAINED**; and it is

further

    **ORDERED** that the subject entries must be liquidated in accordance with the

final court decision, including all appeals, as provided for in section 516A(e) of the Tariff

Act of 1930, as amended, 19 U.S.C. § 1516a(e) (2018).


                                           /s/     Mark A. Barnett
                                           Mark A. Barnett, Chief Judge


Dated: October 22, 2021
       New York, New York

Barcode:3919699-01 A-570-904 REV - Admin Review 4/1/17 - 3/31/18

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-904
POR:  4/01/17-3/31/18
**Public Document**
E&C/Office VIII:  MJA, RJP

December 11, 2019

**MEMORANDUM TO:**     Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance

**FROM:**     James Maeder
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

**SUBJECT:**     Certain Activated Carbon from the People's Republic of China:
Issues and Decision Memorandum for the Final Results of the
Eleventh Antidumping Duty Administrative Review

---

## I.  SUMMARY

The Department of Commerce (Commerce) analyzed the comments submitted by the petitioners,[1] the mandatory respondents,[2] and a China-wide rate company, Tancarb,[3] in this administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China (China).  Following the *Preliminary Results*[4] and based on the analysis of the comments received, we made changes to the margin calculations for the final results.  We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.  Below is the list of the issues in this administrative review for which we received comments from interested parties:


Comment 1:   Selection of the Primary Surrogate Country
Comment 2:   Bituminous Coal Surrogate Value
Comment 3:   Coal Tar Surrogate Value
Comment 4:   Calculation of Surrogate Financial Ratios
Comment 5:   Application of Adverse Facts Available for Merchandise Produced by Certain
                     Suppliers of Carbon Activated
Comment 6:   Selection of Appropriate Factors of Production Database for Carbon Activated
Comment 7:   Correction of Preliminary Results Calculation Error
Comment 8:   Treatment of Tancarb Activated Carbon Co., Ltd.

---

[1] Calgon Carbon Corporation and Cabot Norit Americas, Inc. (collectively, the petitioners).
[2] Datong Juqiang Activated Carbon Co., Ltd. (Datong Juqiang) and Carbon Activated Tianjin Co., Ltd. (Carbon Activated) (collectively, the mandatory respondents).
[3] Tancarb Activated Carbon Co., Ltd. (Tancarb).
[4] *See Certain Activated Carbon from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*, 84 FR 27758 (June 14, 2019) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).

Filed By: Jinny Ahn, Filed Date: 12/12/19 10:40 AM, Submission Status: Approved

INTERNATIONAL
T R A D E
ADMINISTRATION

## II. BACKGROUND

On June 14, 2019, Commerce published the *Preliminary Results* of this administrative review. On October 7, 2019, the petitioners, the mandatory respondents, and Tancarb timely submitted case briefs.[5] On October 15, 2019, the petitioners and Carbon Activated submitted rebuttal briefs.[6]

## III. SCOPE OF THE ORDER

The merchandise subject to the order is certain activated carbon. Certain activated carbon is a powdered, granular, or pelletized carbon product obtained by "activating" with heat and steam various materials containing carbon, including but not limited to coal (including bituminous, lignite, and anthracite), wood, coconut shells, olive stones, and peat. The thermal and steam treatments remove organic materials and create an internal pore structure in the carbon material. The producer can also use carbon dioxide gas ($CO_2$) in place of steam in this process. The vast majority of the internal porosity developed during the high temperature steam (or $CO_2$ gas) activated process is a direct result of oxidation of a portion of the solid carbon atoms in the raw material, converting them into a gaseous form of carbon.

The scope of the order covers all forms of activated carbon that are activated by steam or $CO_2$, regardless of the raw material, grade, mixture, additives, further washing or post-activation chemical treatment (chemical or water washing, chemical impregnation or other treatment), or product form. Unless specifically excluded, the scope of the order covers all physical forms of certain activated carbon, including powdered activated carbon (PAC), granular activated carbon (GAC), and pelletized activated carbon.

Excluded from the scope of the order are chemically activated carbons. The carbon-based raw material used in the chemical activation process is treated with a strong chemical agent, including but not limited to phosphoric acid, zinc chloride, sulfuric acid or potassium hydroxide that dehydrates molecules in the raw material, and results in the formation of water that is removed from the raw material by moderate heat treatment. The activated carbon created by chemical activation has internal porosity developed primarily due to the action of the chemical dehydration agent. Chemically activated carbons are typically used to activate raw materials

---

[5] *See* Petitioners' Letter, "Activated Carbon from People's Republic of China," dated October 7, 2019 (Petitioners' Case Brief); Mandatory Respondents' Letter, "Case Brief of Datong Juqiang Activated Carbon Co., Ltd., Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation in the Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China (A-570-904)," dated October 7, 2019 (Respondents' Case Brief); Tancarb's Letter, "Activated Carbon from the People's Republic of China - Case Brief," dated October 7, 2019 (Tancarb's Case Brief); and Jacobi Carbons AB's (Jacobi's) Letter, "Jacobi's Letter In Lieu of Case Brief, Certain Activated Carbon from China (A-570-904, POR 11: 04/01/17-03/31/18)," dated October 7, 2019 (wherein Jacobi concurred with, and incorporated by reference, the arguments made by the mandatory respondents).

[6] *See* Petitioners' Letter, "Certain Activated Carbon from the People's Republic of China," dated October 15, 2019 (Petitioners' Rebuttal Brief); and Carbon Activated's Letter, "Rebuttal Brief of Carbon Activated in the Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China (A-570-904)," dated October 15, 2019 (Carbon Activated's Rebuttal Brief).

-2-

with a lignocellulosic component such as cellulose, including wood, sawdust, paper mill waste and peat.

To the extent that an imported activated carbon product is a blend of steam and chemically activated carbons, products containing 50 percent or more steam (or $CO_2$ gas) activated carbons are within the scope, and those containing more than 50 percent chemically activated carbons are outside the scope.  This exclusion language regarding blended material applies only to mixtures of steam and chemically activated carbons.

Also excluded from the scope are reactivated carbons.  Reactivated carbons are previously used activated carbons that have had adsorbed materials removed from their pore structure after use through the application of heat, steam and/or chemicals.

Also excluded from the scope is activated carbon cloth.  Activated carbon cloth is a woven textile fabric made of or containing activated carbon fibers.  It is used in masks and filters and clothing of various types where a woven format is required.

Any activated carbon meeting the physical description of subject merchandise provided above that is not expressly excluded from the scope is included within the scope.  The products subject to the order are currently classifiable under the Harmonized Tariff Schedule of the United States (HSUS) subheading 3802.10.00.  Although the HSUS subheading is provided for convenience and customs purposes, the written description of the scope of the order is dispositive.

## IV. CHANGES SINCE THE *PRELIMINARY RESULTS*

Based on our review and analysis of the comments received from the interested parties, we made certain changes to our margin calculations for Carbon Activated, Datong Juqiang, and the separate rate companies.[7]  Specifically, we:

1. revised the bituminous coal surrogate value (SV),[8]
2. revised the coal tar SV,[9]
3. revised the financial ratio SVs,[10]
4. applied adverse facts available (AFA) in valuing the merchandise produced by Carbon Activated's unaffiliated supplier, Supplier X,[11] and

---

[7] *See* Memoranda, "Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China:  Final Results Calculation Memorandum for Carbon Activated" (Carbon Activated's Final Calculation Memorandum); and "Antidumping Duty Administrative Review of Certain Activated Carbon the People's Republic of China:  Final Results Margin Calculation for Datong Juqiang Activated Carbon Co., Ltd." (Datong Juqiang's Final Calculation Memorandum), both dated concurrently with this memorandum; *see also* Memorandum, "Eleventh Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Values for the Final Results," dated concurrently with this memorandum (Final SV Memorandum).
[8] *See* Comment 2.
[9] *See* Comment 3.
[10] *See* Comment 4.
[11] *See* Comment 5; Supplier X's name is business proprietary information (BPI).  *See* Carbon Activated's Final Calculation Memorandum for this supplier's full name.

5.  corrected certain errors in Datong Juqiang's margin calculation program.[12]

## V.  DISCUSSION OF THE ISSUES

## Comment 1:  Selection of the Primary Surrogate Country

*Respondents' Comments:*

- Commerce should select Romania as the primary surrogate country for the final results because it provides the best and most reliable SV for bituminous coal (Harmonized Schedule (HS) subheading 2701.12) and financial ratios.  Romania also affords reliable SVs for all other material and non-material inputs (except coal tar, which should be valued based on Russian import data in HS 2706.00).[13]
- In evaluating the comparative quality of SV data available from two or more countries, Commerce's established practice is to weigh the merits of SVs for principal material inputs and financial ratios that account for a significant proportion of the normal value (NV).[14]
- Applying this principle confirms that as compared to Malaysia, Romania affords a vastly superior surrogate country choice.[15]
- Bituminous coal is one of the most significant inputs consumed in the production of subject merchandise; as such, it predominantly contributes towards the NV build up and the resulting dumping margin.  The Malaysian SV based on import data under HS 2701.12 (*i.e.*, $511 U.S. dollar (USD)/metric ton (MT)) is aberrantly high, unreliable and contradicted by record evidence.[16]
- All three Malaysian financials statements that are currently on the record are insufficiently disaggregated and fail to yield accurate financial ratios.
    - In the *Preliminary Results*, Commerce valued financial ratios based on Romanian company Romcarbon SA (Romcarbon), stating that the other financial statements considered for the preliminary results (financial statements from the two Malaysian companies Century Chemical Works' and Ten Meng Keong) failed to itemize the cost of raw materials and energy.
    - In their final SV submission (dated May 13, 2019), the petitioners submitted the financial statements of an additional Malaysian company, Bravo Green Sdn. Bhd. (Bravo Green).  However, like the financial statements from the other two Malaysian companies, Bravo Green's financial statements fail to itemize the cost of raw materials, labor and energy.
- Romania provides superior quality and more reliable data for bituminous coal and financial statements, as well as for all other inputs.  First, the Romanian bituminous coal ( > = 5833 kilocalorie (kcal)/kilogram (kg)) SV of $136 USD/MT under HS subheading 2701.12 is

---

[12] *See* Comment 7.
[13] *See* Respondents' Case Brief at 1-3.
[14] *Id.* at 5 (citing *Certain Steel Nails from the People's Republic of China; Final Results of Third Antidumping Duty Administrative Review; 2010-2011*, 78 FR 16651 (March 18, 2013); *Jiaxing Brother Fastener Co. v United States*, 11 F. Supp. 3d 1326 (CIT 2014); and *Tri Union Frozen Prods. v. United States*, 163 F. Supp. 3d 1255 (CIT 2016)).
[15] *Id.* at 7.
[16] For discussion of our selection of the bituminous coal surrogate value, *see* Comment 2, *infra*.

reliable and corroborated by SV data from all other countries listed on the OP List[17] (varying in the range $96-144 USD/MT). Also, the Romcarbon financial statements provide discrete breakouts for all of the important cost elements including raw materials, energy and labor.

- The petitioners did not object to the choice of Romania in their SV rebuttal submission and pre-preliminary comments. Therefore, Commerce should select Romania as the primary surrogate country.

***Petitioners' Rebuttal Comments:***

- For the *Preliminary Results*, Commerce correctly selected Malaysia as the primary surrogate country, because Malaysia provides the best and most reliable SVs for principal inputs and financial ratios. Malaysia also satisfies each of the three statutory criteria: (1) it is at the same level of economic development as China, (2) it is a significant producer of identical merchandise, and (3) it provides quality and complete information to value the mandatory respondents' factors of production (FOP).
- Commerce correctly used the Malaysian import value for HS subheading 2701.12 (bituminous coal) to value the bituminous coal used by the mandatory respondents for the *Preliminary Results.[18]*
- If Commerce does not rely on the Malaysian import value under HS 2701.12 to value bituminous coal, it should rely on Brazilian imports under 2701.12, because Brazilian import volume exceeds the combined import volume of all five other OP List countries.
- As Malaysia is a major producer of activated carbon (as reflected in both its trade statistics and the presence of multiple significant producers of activated carbon), and a coconut charcoal import value is available only for Malaysia, the use of Malaysian SVs for all but HS 2701.12 would conform with Commerce's practice.[19]
- That Commerce chose to depart from Malaysia for one SV, financial ratios, does not demonstrate that Malaysia is not the best surrogate country. In past instances, like in the *Preliminary Results*, Commerce has chosen a primary surrogate country and relied on information from a secondary country for one or two surrogate values.[20]

**Commerce's Position:** As discussed in the *Preliminary Results*, when Commerce investigates imports from a non-market-economy (NME) country, section 773(c)(1) of the Tariff Act of 1930, as amended (the Act), directs it to base NV, in most circumstances, on the basis of the value of the FOPs utilized in producing the merchandise. The valuation of the FOPs shall be based on the best available information regarding the values of such factors in a market-economy (ME) country or countries considered to be appropriate by Commerce. In accordance with section 773(c)(4) of the Act, in valuing the FOPs, Commerce shall utilize, to the extent possible, the prices or costs of FOPs in one or more ME countries that are: (1) at a level of economic

---

[17] *See* Commerce's Letter, "Certain Activated Carbon from the People's Republic of China (China): Request for Comments re: (1) Economic Development, (2) Surrogate Country, and (3) Surrogate Value Information," dated September 14, 2018 (OP List).

[18] For discussion of our selection of the bituminous coal surrogate value, *see* Comment 2, *infra*.

[19] *Id.*

[20] *See* Petitioners' Rebuttal Brief at 26 (citing *Freshwater Crawfish Tail Meat from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Rescission of New Shipper Review; 2015–2016*, 82 FR 47469 (October 12, 2017), explaining that Commerce selected Thailand as the primary surrogate country and used financial statements from a South African producer).

-5-

development comparable to that of the NME country; and (2) significant producers of comparable merchandise.[21]  As a general rule, Commerce selects a surrogate country that is at the same level of economic development as the NME country, unless it is determined that none of the countries are viable options because either (a) they are not significant producers of comparable merchandise, (b) do not provide sufficient reliable sources of publicly available SV data, or (c) are not suitable for use based on other reasons.[22]  Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development.[23]  To determine which countries are at the same  level of economic development, Commerce generally relies on Gross National Income (GNI) data from the World Bank's World Development Report.[24]  Further, Commerce normally prefers to value all FOPs from a single surrogate country because deriving surrogate data from one surrogate country limits the amount of distortion introduced into the calculations in that a domestic producer would be more likely to purchase a product available in the domestic market.[25]

Based on the foregoing criteria, in the *Preliminary Results*, we selected Malaysia as the primary surrogate country.  However, we used Romanian financial statements for the purpose of calculating the financial ratios because the 2017 financial statements from the Romanian company Romcarbon are the only financial statements on the record suitable for use in calculating surrogate financial ratios.[26]  As detailed below, we continue to find that Malaysia is the appropriate primary surrogate country in this review.

*Economic Comparability*

Malaysia and Romania are both economically comparable to China, as both countries are on the OP List, and are therefore determined, based on per capita GNI, to be at the same level of economic development as China.[27]

*Significant Producer of Comparable Merchandise*

Section 773(c)(4)(B) of the Act states that Commerce shall value FOPs, to the extent possible, in a surrogate ME country that is a significant producer of comparable merchandise.  Neither the statute nor Commerce's regulations provide further guidance on what may be considered comparable merchandise.  Given the absence of any definition in the statute or regulations, Commerce looks to other sources such as the Policy Bulletin for guidance on defining comparable merchandise.  The Policy Bulletin states that "in all cases, if identical merchandise is

---

[21] *See* Policy Bulletin 04.1, Non-Market Economy Surrogate Country Selection Process, dated March 1, 2004 (Policy Bulletin 04.1).
[22] *Id.*
[23] *See* OP List.
[24] *Id.*
[25] *See* 19 CFR 351.408(c)(2); *see also Clearon Corporation and Occidental Chemical Corp. v. United States*, Slip Op. 13-22, at 12-14 (CIT 2013).
[26] *See Preliminary Results* PDM at 115-16.
[27] *See* OP List.

Barcode:3919699-01 A-570-904 REV - Admin Review 4/1/17 - 3/31/18

produced, the country qualifies as a producer of comparable merchandise."[28]  Therefore, if the record contains a producer of identical merchandise, the requirement of comparable merchandise under section 773(c)(4) of the Act is satisfied.  There is no need to look further at countries with only comparable merchandise.

Further, the Act does not define the phrase "significant producer."  However, the statute grants Commerce discretion to examine various data sources to determine the best available information.[29]  Legislative history suggests that Commerce may consider a country to qualify as a "significant producer" if, among other things, it is a "net exporter" of identical or comparable merchandise.[30]  However, that text does not define the phrase "net exporter" or explain whether a potential surrogate country must constitute a net exporter in terms of quantity, value, or both to fit the example provided in the legislative history.[31]  Moreover, while the legislative history provides that the term "significant producer" includes any country that is a significant "net exporter,"[32] it does not preclude Commerce from relying on additional or alternative metrics.  It is Commerce's practice to evaluate whether production is significant based on characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics).[33]  In this case, none of the countries in the OP List are net exporters of subject merchandise.[34]  Further, production data of comparable merchandise are not available on the record.  Therefore, we analyzed exports of comparable merchandise from the six OP List countries, as a proxy for production data.

The mandatory respondents have argued that Commerce should select Romania as the primary surrogate country, questioning the reliability of Malaysian import data for certain inputs and the Malaysian financial statements on the record.  Specifically, the record contains financial statements of three Malaysian companies (*i.e.*, Century Chemical Works Sendirian Berhad, Tan Meng Keong Sdn. Bhd., and Bravo Green Sdn. Bhd.).  All three Malaysian financial statements indicate that their principal business activity is the manufacture of activated carbon, which is identical to the subject merchandise in this proceeding.  Accordingly, for the final results of this proceeding segment, we find that Malaysia provides the best available information on the record

---

[28] *See* Policy Bulletin 04.1.

[29] *See* Section 773(c) of the Act; *see also Nation Ford Chem. Co. v. United States*, 166 F. 3d 1373, 1377 (Fed. Cir. 1999).

[30] *See* H.R. Rep. No. 100-576, at 590, 1988 U.S.C.C.A.N. 1547, 1623 (1988).

[31] *Id.*

[32] *Id.*

[33] *See Xanthan Gum from the People's Republic of China:  Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 78 FR 2252 (January 10, 2013), and accompanying PDM at 4-7 (unchanged in *Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013)).

[34] On the record, we have export data from the Global Trade Atlas (GTA) for entries made under the HS subheading 3802.10, covering the subject merchandise.  *See* Mandatory Respondents' Letter, "DJAC and Carbon Activated Surrogate Country Comments:  Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China," dated October 12, 2018 at Exhibit 1.  The export volumes for the OP List countries are:  16,475,976 kg (Malaysia); 1,308,800 kg (Brazil); 8,778,259 kg (Mexico); 849,850 kg (Russia); 612,474 kg (Kazakhstan); and 34,000 kg (Romania).  The import volumes for the OP List countries are:  32,892,163 kg (Malaysia); 14,854,141 kg (Russia); 14,449,228 kg (Mexico); 5,797,030 kg (Brazil); 2,004,526 kg (Kazakhstan); and 1,106,000 kg (Romania).

75

because it satisfies the statutory requirements for selection as a surrogate country and it provides stronger evidence of production of the subject merchandise in the form of multiple financial statements. The record contains information from multiple countries that are at the same level of economic development, and are also exporters of activated carbon. However, because there are multiple Malaysian financial statements on the record, all of which contain evidence of production of identical merchandise, there is more direct evidence on the record that Malaysia is a significant producer of identical merchandise. There is no equivalent information on the record with respect to Romanian production, and therefore the record in this case does not support a finding that Romania satisfies section 773(c)(4)(B) of the Act, which requires Commerce to value FOPs, to the extent possible, in a surrogate country that is a significant producer of comparable merchandise. With respect to Romanian surrogate values on the record, there is only one financial statement on the record from a Romanian company, Romcarbon. While Romcarbon's profit center no.2 includes an "Active Coal Workshop," which is dedicated to the production of activated carbon, its financial statements indicate that its principal activities are the manufacture of polyethylene, polypropylene, polyvinyl chloride, polystyrene processing, filters and protective materials.[35] We find that this is not evidence of "significant production," especially as compared to the three financial statements from Malaysian activated carbon producers on the record. Accordingly, because there is record evidence indicating that Malaysia has domestic production of identical merchandise, in the form of multiple financial statements from activated carbon producers, we determine that Malaysia provides the best available information on the record because it is the only country on the OP List that is a significant producer of identical merchandise.

*Data Availability*

If more than one potential surrogate country satisfies the statutory requirements for selection as a surrogate country, Commerce selects the primary surrogate country based on data availability and reliability.[36] The record contains complete, publicly-available, contemporaneous, and specific Malaysian data for nearly all of the inputs used by the two mandatory respondents to produce the subject merchandise during the period of review (POR).[37] Additionally, as discussed above, we do not reach the analysis of data reliability with respect to Romania in this review. Because, as discussed above, the record does not contain sufficient evidence demonstrating that Romania provides the best available information on the record any arguments pertaining to the reliability of the Romanian data for the purpose of the selection of the primary surrogate country are moot.

Given the above facts, we continue to use Malaysia as the primary surrogate country for the final results. Malaysia is at the same level of economic development as China, a significant producer of identical merchandise, and generally has reliable data with which to value the mandatory

---

[35] *See* Respondents' Letter, "First Surrogate Value Comments by DJAC and CA Tianjin: Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China," dated November 9, 2018 (Respondents' November 9, 2018 Surrogate Value Submission) at Exhibit 9 pdf page 1303 (Romcarbon's profit center no. 2 includes a "Workshop of Active Carbon").
[36] *See* Policy Bulletin 04.1.
[37] *See* Petitioners' Letter, "Certain Activated Carbon from the People's Republic of China – Petitioners' Submission of Surrogate Values," dated November 9, 2018.

respondents' FOPs. However, although Commerce generally has a preference for valuing all factors from a single surrogate country, as discussed below in Comment 2, we have determined that the Malaysian data for bituminous coal is not appropriate for use in the final results. Additionally, as we found in the *Preliminary Results*, while the Malaysian financials provide evidence that Malaysia is a producer of identical merchandise, the only financial statements on the record which are usable for the calculation of the surrogate financial ratios are the Romcarbon statements from Romania.[38]

## Comment 2:  Bituminous Coal Surrogate Value

### *Respondents' Comments:*

- Malaysian HS 2701.12, preliminarily used to value bituminous coal input, is unrepresentative of the type of bituminous coal input utilized by the mandatory respondents because it is a category covering high heat value (*i.e.*, same or higher than 5,833 kcal/kg) bituminous coal, inapplicable to the bituminous coal with a lower heat value (*i.e.*, less than 5,833 kcal/kg) used by the mandatory respondents. Therefore, for the final results, Commerce should use HS 2701.19 to value bituminous coal input (*i.e.*, $100 USD/MT).[39]

- HS 2701 provides three breakouts at the 6-digit HS level, as follows:  2701.11 (Anthracite coal), 2701.12 (Bituminous coal), and 2701.19 (Other Coal).[40]

- Sub-heading Note 2 to Chapter 27 defines bituminous coal under HS 2701.12 as follows - "For the purposes of sub-heading 2701.12, "bituminous coal" means coal having a volatile matter limit (on a dry, mineral-matter-free basis) exceeding 14 percent and a calorific value limit (on a moist, mineral-matter-free basis) equal to or greater than 5,833 kcal/kg. Consequently, all other bituminous coal, whose calorific value is less than 5,833 kcal/kg, are classified under HS 2701.19.[41]

- Record evidence confirms that during the POR, Datong Juqiang, Datong Juqiang's supplier,[42] and certain suppliers to Carbon Activated utilized bituminous coal with a heat value less than the threshold limit of 5,833 kcal/ kg.[43]  The test report and the sworn-in declarations of the managers of Datong Juqiang and its supplier, provided in the responses, confirm that the bituminous coal utilized by Datong Juqiang and its supplier has a gross calorific value below this threshold.[44]  Further, one of Carbon Activated's suppliers' test report provides the chemical composition including ash and moisture content of bituminous coal, based on which the mandatory respondents were able to calculate its heat value, which works out to be

---

[38] *See* Comment 4, below.

[39] *See* Respondents' Case Brief at 26-27.

[40] *Id.* (citing Carbon Activated's Letter, "Carbon Activated Response to Section D Supplemental Questionnaire (Part I)," dated February 21, 2019 (Carbon Activated's FebSuppDQR Part I) at 19.  The mandatory respondents stated, "Although these breakouts were indicated in the context of Thai tariff, the Malaysian tariff (and, other country's tariff as well) contain identical breakouts since the WCO tariff classification is harmonized at 6-digit HS level. Further, on account of harmonization, notes to Chapter 27 in the Thai and the Malaysian tariffs are identical.").

[41] *Id.*

[42] *See* Datong Juqiang's Final Calculation Memorandum.

[43] *See* Respondents' Case Brief at 27.

[44] *Id.* (citing to Datong Juqiang's Letter, "DJAC Supplemental D response," dated February 12, 2019 (Datong Juqiang's FebSuppDQR) at 8 and 32 and Exhibits SD-12, SD-13, and SD-56.  These were test result reports that do not demonstrate the calorific value, and sworn-in testimonies by the General Managers of the respondent company, Datong Juqiang and its supplier.)

below the kcal/kg threshold.[45]  Therefore, for the final results, irrespective of its choice of surrogate country, Commerce should value bituminous coal input based on HS 2701.19 for Datong Juqiang, Datong Juqiang's supplier and this supplier of Carbon Activated.

- With regard to bituminous coal used by Carbon Activated's other supplier, Supplier C,[46] there is no record information about the heat content of coal.  Accordingly, the most reasonable option to value such bituminous coal is to apply a simple average of surrogate value from HSHS 2701.12 and HSHS 2701.19.  Further, since Commerce applied Supplier C's FOP data to compute the NV for an excused supplier, the same simple average surrogate value should be applied to value the underlying bituminous coal in the activated material produced by this excused supplier.[47]

- Even if HS 2701.12 was applicable, the Malaysian import value of $511 USD/MT under HS 2701.12, used in the *Preliminary Results* to value bituminous coal, is demonstrably unreliable and impeached by substantial record evidence.

- The preponderant proportion of imports (750,000 kg out of 896,711 kg, *i.e.*, 84 percent of total imports) reported in Malaysian HS 2701.12 originated from the Philippines.[48] Moreover, according to the Trade Data Monitor (TDM) data submitted by the mandatory respondents, during the period between 2010-2018, imports from Philippines under HS 2701.12 to Malaysia were recorded in only one month, August 2017.[49]  This fact raises the possibility of an incorrect reporting of the description of goods on account of a misclassification.  Also, a letter from the Philippine Department of Energy evidences that there were no exports of coal from the Philippines to Malaysia during the POR.[50]  Further, a letter from the Philippine Statistics department containing 2017-2018 export data for goods from Chapter 27 of the Philippine tariff schedule shows that there were no exports of coal to Malaysia during the POR.[51]

- The Malaysian domestic market price data for bituminous coal for the POR, obtained from the Malaysian Energy Commission, also demonstrates that the Malaysian import data under HS 2701.12 is aberrational.[52]  While these price data are expressed in units of energy, they enable derivation of the price in USD/MT value for an equivalent grade of bituminous coal with an average heat content of 5200 kcal/MT, which is comparable to the heat value of the bituminous coal used by Datong Juqiang, Datong Juqiang's supplier and Supplier C.[53]

---

[45] *Id.* at 27-28 (citing *Silicon Metal From the People's Republic of China:  Final Results and Partial Rescission of the 2008-2009 Administrative Review of the Antidumping Duty Order*, 76 FR 3084-01 (January 19, 2011), and accompanying Issues and Decision Memorandum (IDM) at Comment 6 ("UHV = 8900 - 138 (A + M), where A is ash percentage and M is moisture percentage.")  Mandatory respondents stated that the formula that they used was as follows:  8900 – 138*(ash % + Moisture %) = 8900 – 138*(10.76 + 14.25) = 5448.6 kcal/kg.).

[46] The identity of this supplier is business proprietary.  For Supplier C's identity, *see* Carbon Activated's Final Calculation Memorandum.

[47] *See* Respondents' Case Brief at 27-28.

[48] *Id.* at 9 (citing Mandatory Respondents' Final Surrogate Comments, dated May 13, 2019 (Respondents' Final SV Submission), at Exhibit 2B).

[49] *Id.* at 9-10 (citing Respondents' Final SV Submission at Exhibit 3A).

[50] *Id.* at 10 (citing Respondents' Final SV Submission at Exhibit 3B).

[51] *Id.* at 10 (citing Respondents' Final SV Submission at Exhibit 3C).

[52] *Id.* (citing Respondents' Final SV Submission at Exhibit 3K).

[53] *Id.* (In Exhibit 3K to the Respondents' Final SV Submission, mandatory respondents provided a conversion chart demonstrating how they derived the USD/MT values from the domestic bituminous coal price that they received from the Malaysian Energy Commission, which was in RM/MMBTU values.  For this calculation, they used a

- Malaysian data are also impeached by the corresponding import data reported under HS 2701.12 from other OP List countries, because although the Malaysian import AUV of $511 USD/MT is based on minimal import volumes (*i.e.*, 897 MT), accounting for 0.01 percent of the total quantity (*i.e.*, 27,587,713 MT) and 0.003 percent of the total value (at $ 458,000 USD) of the aggregated imports in all six OP List countries (*i.e.*, $3,540,161,000 USD), it is about 300 percent higher than the weighted average price of all imports in the six OP List countries (*i.e.*, $128 USD/MT).[54] As such, the record evidence establishes that the Malaysian import value under HS 2701.12 is aberrational.

- Malaysian import data under HS 2701.12 (*i.e.*, $511 USD/MT) are also inconsistent with the corresponding SV data applied by Commerce in recent review proceedings (*i.e.*, $79.87 USD/MT for POR 8, $90.43 USD/MT for POR 9 and $91.36 USD/MT for POR 10).[55]

- Conversely, the Romanian import AUV under HS 2701.12 for the POR (*i.e.*, $136 USD/MT) is within a reasonable range of 6 percent of the weighted-average price of all imports in the six OP List countries, and the data yields a reliable surrogate value for high heat value bituminous coal.

- Alternatively, the Brazilian import AUV of $141 USD/MT also affords a reliable SV since it is based on the largest quantity of imports (*i.e.*, 18,263,785 MT) among the OP List countries.[56] The choice of Brazilian SV data (due to its much higher import quantity) is supported by agency precedent, as approved by the Court of International Trade (CIT). In *Calgon Carbon Corp. v. United States*, the CIT approved Commerce's methodology to prefer a SV data source that was representative of the highest volume of imports.[57]

### Petitioners' Rebuttal Comments:

- Commerce correctly used the Malaysian import value under HS 2701.12 to value the bituminous coal used by the mandatory respondents for the *Preliminary Results* and should continue to use the same value to value bituminous coal input for the final results.[58]

- The mandatory respondents' assertion that Commerce should use import values for merchandise classified under HS subheading 2701.19 is meritless, as the mandatory respondents failed to submit documents to support their assertion on the record.[59] In their final SV submission, the mandatory respondents identify HS 2701.12 as the proper HS

---

[54] conversion factor (*i.e.*, 1 kg of bituminous coal input=0.02057554 MMBTU), derived using certain conversion rates taken from X-rates monthly. Mandatory respondents argue that therefore, during the POR, the price of the exact same energy grade of bituminous coal in Malaysia ranged from $77 to $101 USD/MT, barely one-sixth the average price of $511USD/MT, the value preliminarily used to value bituminous coal input used during the POR.).

[54] *Id.* at 10-14 (The import quantities for all the OP List countries under HS 2701.12 are as follows: 18,263,785 MT (Brazil); 7,986,768 MT (Mexico); 920,773 MT (Russia); 377,503 MT (Romania); 37,988 MT (Kazakhstan); and 897 MT (Malaysia)).

[55] *See* Respondents' Case Brief at 16.

[56] *See* Respondents' Case Brief at 13-14. We note that the total quantity of imports under HS 2701.12 for all six OP List Countries is 27,587,713 MT (*See* Respondents' Case Brief at 13; *see also* Respondents' Final SV Submission at Exhibit 2B).

[57] *See* Respondents' Case Brief at 15 (citing *Calgon Carbon Corp. v. United States*, 38 Int'l Trade Rep. (BNA) 2202 (CIT 2017).

[58] *See* Petitioners' Rebuttal Brief at 5.

[59] *Id.* at 5-9.

category to value bituminous coal input, as the other coal inputs are valued using HS 2701.19-valuations which is consistent with Commerce's practice in prior segments.[60]

- In its pre-preliminary results comments,[61] Carbon Activated cited to its February 21, 2019 supplemental response to support its claim that HS 2701.19 is necessary to value its bituminous coal input.[62]  However, that response makes no claim that the bituminous coal input used by Carbon Activated possessed physical characteristics that would justify using a SV under HS 2701.19.  Instead, in that questionnaire response, Carbon Activated only highlighted the difference between the bituminous material input and 'smoke coal,' stating that "both bituminous coal and smoke coal belong to the same technical grade of bituminous coal.  The difference between the two is of degree, not of kind."[63]

- For Datong Juqiang, in response to Commerce's instruction asking Datong Juqiang to state the kcal and heat value, the ash content, moisture content, useful heat value and any other defining characteristics of the bituminous coal it purchased, including a list of each shipment obtained, by vendor, Datong Juqiang only provided a test report for one bituminous coal vendor, which does not designate a useful heat value.  Datong Juqiang failed to provide the requested information, despite having repeated those instructions in the heading of its response.  Instead, Datong Juqiang calculated the heat value in its brief, using the ash and moisture content values.  Datong Juqiang also provided a sworn-in declaration by its general manager attesting to the heat content value of the bituminous coal that Datong Juqiang used in the production of subject merchandise.[64]

- For Datong Juqiang's supplier, Datong Juqiang claimed that to the best of its knowledge, the gross calorific value of the non-coking bituminous coal it purchased is lower than 5,833 kcal/kg.  In making this statement, Datong Juqiang provided no indication that this claim pertained to bituminous coal direct materials, as opposed to energy coal consumed.  Instead of providing Commerce with a test report for bituminous coal that they used in the production of subject merchandise, Datong Juqiang's supplier provided a purchase contract that covers bituminous coal and other inputs, and provided a sworn-in declaration by its general manager attesting to the heat content value of the bituminous coal that Datong Juqiang's supplier used in the production of subject merchandise during the POR.[65]

- The Malaysian import value under HS subheading 2701.12 (*i.e.*, $500 USD/MT) is not aberrational, even when compared to import values under HS subheading 2701.12 from other OP List countries (160 percent higher than the POR average (*i.e.*, $192 USD/MT), or when compared to historical benchmarking data on the record of this segment (208 percent higher than the average value of the SVs used to value bituminous coal from previous PORs, including this POR (*i.e.*, $162.27 USD/MT)).[66]

- If Commerce does not rely on Malaysian import value under HS 2701.12 to value bituminous coal, it should rely on Brazilian imports under 2701.12, because Brazilian import volume exceeds the combined import volume of all five other OP List countries.[67]

---

[60] *Id.* at 6.
[61] *Id.* (citing to Respondents' May 29, 2019 Pre-Preliminary Results Comments at 6).
[62] *Id.* (citing to Carbon Activated's FebSuppDQR at 19.)
[63] *See* Petitioners' Rebuttal Brief at 6-7.
[64] *Id.* (citing to Datong Juqiang's Letter, "DJAC Supplemental Section D response," dated February 12, 2019 (Datong Juqiang's SDQR), at Exhibits SD-12 and SD-13).
[65] *Id.* at 8-9 (citing to Datong Juqiang's SDQR at 32-33 and Exhibit SD-56).
[66] *Id.* at 14.
[67] *Id.* at 16-17.

**Commerce's Position:**  We disagree with the mandatory respondents that we should use HS 2701.19 to value bituminous coal used as a raw material input in the production of the subject merchandise, and we disagree with the petitioners that we should continue to rely on Malaysian import data under HS 2701.12 to value this input.  For the reasons explained below, we determine that the Romanian import data under HS 2701.12 is the best available information on the record to value bituminous coal used as a raw material input.

Commerce's practice when selecting the best available information for valuing FOPs, in accordance with section 773(c)(1) of the Act, is to select, to the extent practicable, SVs which are product-specific, representative of a broad-market average, publicly available, contemporaneous with the POR, and tax and duty exclusive.[68]  Commerce undertakes its analysis of valuing the FOPs on a case-by-case basis, carefully considering the available evidence in light of the particular facts of each industry.[69]  While there is no hierarchy for applying the SV selection criteria, "{Commerce} must weigh available information with respect to each input value and make a product-specific and case-specific decision as to what the 'best' {SV} is for each input."[70]  Additionally, Commerce has a strong preference to value all FOPs in a single surrogate country, pursuant to 19 CFR 351.408(c)(2), as well as a practice "to only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."[71]

In this case, we selected Malaysia as our primary surrogate country, as discussed above, and for the final results, we continue to use Malaysia as the primary surrogate country.  Because Commerce selected Malaysia as the primary surrogate country, our first preference in selecting surrogate value data for this review is to utilize publicly available prices within Malaysia.[72]

In the *Preliminary Results*, we used Malaysian imports under HS 2701.12, to value bituminous coal used as a raw material input into the production of activated carbon.[73]  The mandatory respondents argue that we should use HS 2701.19 to value the bituminous coal used by certain respondents and suppliers that used bituminous coal with a lower heat value.[74]  However, there is

---

[68] *See, e.g.*, *First Administrative Review of Certain Polyester Staple Fiber from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 75 FR 1336 (January 11, 2010) (*PSF 2010*), and accompanying IDM at Comment 1.
[69] *See Glycine from the People's Republic of China:  Notice of Final Results of Antidumping Duty Administrative Review*, 70 FR 47176 (August 12, 2005) (*Glycine from China*), and accompanying IDM at Comment 1.
[70] *See, e.g.*, *Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 73 FR 55039 (September 24, 2008) (*PET Film 2008*), and accompanying IDM at Comment 2; *see also Freshwater Crawfish Tail Meat from the People's Republic of China; Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Rescission of Antidumping Duty Administrative Review*, 67 FR 19546, 19549 (April 22, 2002) (*Crawfish from China*), and accompanying IDM at Comment 2.
[71] *See Sodium Hexametaphosphate from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 77 FR 59375 (September 27, 2012), and accompanying IDM at Comment I.
[72] *See* 19 CFR 351.408(c)(2).
[73] *See* Memorandum, "Eleventh Administrative Review of Certain Activated Carbon from the People's Republic of China:  Surrogate Values for the Preliminary Results," dated June 10, 2019 (Preliminary SV Memo), at Attachment 1.
[74] *See* Respondents' Case Brief at 26-27.

no information on the record that supports the mandatory respondents' assertion that HS 2701.19 is the more appropriate HS subheading to value the bituminous coal input used by the mandatory respondents in the production of the subject merchandise.  The mandatory respondents assert, "Sub-heading Note 2 to Chapter 27 defines sub-heading 2701.12, 'bituminous coal' as coal having a volatile matter limit (on a dry, mineral-matter-free basis) exceeding 14 percent and a calorific value limit (on a moist, mineral-matter-free basis) equal to or greater than 5,833 kcal/kg.  Consequently, according to the mandatory respondents, all other bituminous coal which has a calorific value less than 5,833 kcal/kg is necessarily classified under HS 2701.19."[75] However, "Sub-heading Note 2 to Chapter 27" pertains specifically to Thai HS data, not Malaysian data.[76]  The record does not contain similar information with respect to the Malaysian imports under Chapter 27, and as such there is no record evidence to support the use of Malaysian import SV data under HS 2701.19 to value the raw material input, of bituminous coal, into the production of activated carbon.  Further, the mandatory respondents have not provided any evidence that they used a sub-bituminous coal, a lower quality bituminous coal used as a heat source in the production of steam, as a raw material input, which would be categorized as HS 2701.19.  Instead, the record is clear that the mandatory respondents have used bituminous coal as the raw material input into the production of the subject merchandise.[77]  Therefore, for the final results, we continue to use HS 2701.12 to value the mandatory respondents' bituminous coal raw material input.

The mandatory respondents also argue that the Malaysian bituminous coal value under HS code 2701.12, which was used in the *Preliminary Results*, is aberrational.[78]  When presented with evidence intended to demonstrate that a particular SV is aberrational, and therefore unreliable, Commerce will examine all relevant price information on the record, including any appropriate benchmark data, in order to accurately value the input in question.[79]  When considering benchmark data for purposes of determining whether a value is aberrational, Commerce examines historical import data for the potential surrogate countries for a given case, to the extent such import data are available, and/or examines data from the same HS category for the primary surrogate country over multiple years to determine if the current data appear aberrational compared to historical values.[80]  Merely appearing on the low or high end of a range of values is not enough to make data aberrational.[81]

With regards to the alleged aberrancy of the Malaysian import data under HS 2701.12, we agree with the mandatory respondents that the reliability of the Malaysian data under HS 2701.12 is called into question by the corresponding import data reported under HS 2701.12 from other OP

---

[75] *Id.*

[76] *See* Carbon Activated's FebSuppDQR Part I at 19.

[77] *Id.*; *see also* Datong Juqiang's SDQR at 8.

[78] *See* Respondents' Case Brief at 9-16.

[79] *See Certain Steel Threaded Rod from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2013-2014*, 80 FR 69938 (November 12, 2015), and accompanying IDM at Comment 6.

[80] *See Carbazole Violet Pigment 23 from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 75 FR 36630 (June 28, 2010), and accompanying IDM at Comment 6.

[81] *See, e.g.*, *Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 79 FR 26712 (May 9, 2014), and accompanying IDM at Comment 6 ("Merely being at the low end, or the high end of a range, for that matter, does not render a data point as an outlier.").

List countries. First, the Malaysian import AUV of $511 USD/MT is based on a limited import volume (*i.e.*, 897 MT), accounting for 0.01 percent of the total import quantity (*i.e.*, 27,587,713 MT) from all six OP List countries for the POR. Second, with respect to Malaysia's import value, as noted above, Commerce prefers to have historical data on the record with which to evaluate whether a value is aberrational.[82] However, Commerce has, in the past, compared the alleged aberrational value with values from countries on the OP List.[83] Here, the Malaysian import value of bituminous coal is approximately 297 percent higher than the weighted average price of all imports in the six OP List countries under HS 2701.12 (*i.e.*, $128 USD/MT), and 163.7 percent higher than the simple average price of all imports in the OP List countries (*i.e.*, $193.8 USD/MT).[84] As we do not have data from the same HS category for the primary surrogate country over multiple years, we are unable to evaluate the aberrancy of the Malaysian data in comparison to historical values.

We do not find the mandatory respondents' arguments pertaining to Malaysian imports of bituminous coal from the Philippines persuasive. The mandatory respondents argue that although a preponderant proportion of imports (750,000 kg out of 896,711 kg, *i.e.*, 84 percent of total imports) into Malaysia under HS 2701.12 reportedly originated in the Philippines, such imports were only recorded in one month.[85] Further, the mandatory respondents provide a letter from the Philippines Statistics Department allegedly demonstrating that there were no exports of coal to Malaysia from the Philippines during the POR.[86] It is Commerce's practice not to rely on country-specific export data to challenge the validity of country-specific import data because these data are not a suitable benchmark to test the validity of selected SV data.[87] Given different reporting and inspection requirements and timing considerations, it is unrealistic to expect export information to correspond one-to-one with import statistics for any given shipment of merchandise. Therefore, Commerce does not expect one country's export quantities to be a one-to-one identical match to another country's import data.[88] As such, we find that export data from the Philippines are not reliable for purposes of evaluating the legitimacy of the corresponding import volumes into Malaysia.[89] We also did not further evaluate the viability of the mandatory respondents' assertion that the Malaysian domestic market price data for bituminous coal, for the POR, obtained from the Malaysian Energy Commission, demonstrates that the Malaysian import

---

[82] *See Pure Magnesium from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011–2012*, 79 FR 94 (January 2, 2014), and accompanying IDM at Comment 2.

[83] *Id.*; *see also Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 53214 (October 22, 2018), and accompanying IDM at Comment 4.

[84] *See* Respondents' Final SV Submission at Exhibit 2B.

[85] *See* Respondents' Case Brief at 9-10 (citing Respondents' Final SV Submission at Exhibit 2B).

[86] *Id.*

[87] *See Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 37715 (July 2, 2014), and accompanying IDM at Issue 1.B.

[88] *See First Administrative Review of Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 FR 57995 (November 10, 2009), and accompanying IDM at Comment 3.f ("The Department does not expect one country's export quantities to be a one to one ratio to another country's import data.").

[89] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2015*, 82 FR 29033 (June 27, 2017), and accompanying IDM at Comment 13.

data under HS 2701.12 are aberrational[90] because these price data are expressed in units of energy (*i.e.*, Ringgit per one million British thermal unit (MMBTU)), and there is not sufficient record evidence to support the conversion factor used by the mandatory respondents (*i.e.*, 0.02057554 MMBTU/kg) to convert the reported Ringgit per energy unit values (Ringgit/MMBTU) into USD/MT values. In their SV submission, the mandatory respondents demonstrated how they calculated the conversion factor used to convert the reported Ringgit/MMBTU values into USD/MT values (*i.e.*, 0.02057554 MMBTU/kg).[91] However, this conversion factor was calculated based on the assumption that the Malaysian domestic bituminous coal has a calorific value of 5200 kcal/kg. Because there is no record evidence supporting that assumption, we did not further evaluate this assertion.

As noted above, it is Commerce's preference to value all FOPs utilizing data from the primary surrogate country and to consider alternative sources only when a suitable value from the primary surrogate country does not exist on the record. Upon reconsideration for the final results, we find that the record does not contain a suitable bituminous coal value from the primary surrogate country, Malaysia. Both parties argued that in the alternative, Commerce should use Brazilian imports under 2701.12, because Brazilian import volume exceeds the combined import volume of all five other OP List countries. As discussed above, Commerce generally seeks to minimize the number of countries that it relies on for surrogate value data.[92] Because the only usable financial statements on the record for the calculation of financial ratios come from Romcarbon, a Romanian company, Commerce is already relying on a secondary source for surrogate values. Therefore, we decline to rely on a third country, and for the final results, we have valued the bituminous coal input using the Romanian import data under HS 2701.12.[93]

**Comment 3:  Coal Tar Surrogate Value**

***Respondents' Comments:***

• In the *Preliminary Results*, Commerce valued Carbon Activated's coal tar pitch input based on import data reported under HS 2708.10 ("Pitch from coal and other mineral tars").[94] HS 2708.10 covers 100 percent pure pitch distilled in a tar workshop from coal or other mineral tars. Carbon Activated's "Coal Tar Pitch" input is synonymous with "Coal Tar" input (utilized by Datong Juqiang) and, therefore, merits classification in the same heading as coal tar, *i.e.*, HS subheading 2706.00 ("Tar distilled from coal, from lignite or from peat"), instead

---

[90] *Id.* (citing Respondents' Final SV Submission at Exhibit 3K).

[91] *See* Respondents' Final SV Submission at Exhibit 3K

[92] *See Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review, 2016-2017*, 83 FR 46704 (September 14, 2018), and accompanying IDM at Comment 1.

[93] *See* Final SV Memorandum at Attachment 1.

[94] *See* Respondents' Case Brief at 29. However, we note that contrary to the respondents' comments, even though Commerce included the HS subheadings for both HS Code 2706.00 (Coal Tar) and HS 2708.10 (Coal Tar Pitch) in the Preliminary SV Memo, for the *Preliminary Results*, only HS Code 2706.00 was used to value coal tar pitch for both Datong Juqiang and Carbon Activated. *See* Preliminary SV Memo at Attachment 1; *see also* footnote 106, below.

Barcode:3919699-01 A-570-904 REV - Admin Review 4/1/17 - 3/31/18

of 2708.10 ("Pitch from Coal and Other Mineral Tars"), which is a HS subheading for pure pitch.[95]

- Record evidence demonstrates that Carbon Activated's suppliers utilized coal tar pitch similar to Datong Juqiang's coal tar. While pitch is the single most predominant constituent of coal tar (*a.k.a.*, coal tar pitch), it is not identical to coal tar, which is comprised of several other constituents. Pitch is derived from coal tar or coal tar pitch through a series of production steps. In other words, pitch is a value-added product in relation to coal tar or coal tar pitch. As such, Commerce impermissibly conflated two different inputs-"coal tar pitch" and "pitch" in the preliminary results. Therefore, Commerce should value Carbon Activated's "coal tar pitch" input using HS 2706.00.[96]

- The Malaysian surrogate value of coal tar (or, coal tar pitch) based on import data in HS 2706.00, preliminarily used to value coal tar input, is anomalous since it is higher (at an AUV of $1,629 USD/MT) than the average price of valued added product, pitch, reported in Malaysian HS 2708.10 (*i.e.*, AUV of $722.87 USD/MT).[97] This fact establishes that the Malaysian HS 2706.00 import data for coal tar is distorted by the inclusion of non-subject goods, and therefore, anomalous and unreliable.

- Coal tar and coal tar pitch are one and the same and both are covered under HS 2706.00. Since the Malaysian import data under HS subheading 2706.00 ($1,629.5 USD/MT) is unreliable, Commerce cannot apply the resulting AUV to value coal tar and coal tar pitch. This provides an additional rationale to reject Malaysia as a primary surrogate country.[98]

- The record affords an alternative, superior SV for coal tar/coal tar pitch. It is Commerce's well-established practice to value an input by selecting a SV based on the largest quantity of imports. Among the OP List countries, Russia reported the largest quantity of imports under HS subheading 2706.00. As such, the Russian import data under HS 2706.00 ($163 USD/MT) is representative of the broadest market average, and affords the most reliable SV. Romania did not have any imports under HS 2706.00 during the POR.[99]

- The choice of Russian data under HS 2706.00 is further supported by the fact that the Russian import data for pitch reported under HS 2708.10 ($434 USD/MT), which is a higher value product than coal tar, is higher than the Russian import data for coal tar under HS 2706.00 ($163 USD/MT) .[100]

***Petitioners' Rebuttal Comments:***

- In the *Preliminary Results*, Commerce valued "coal tar pitch" input using the Malaysian import value for merchandise classified under HS subheading 2708.10 "Pitch from Coal and Other Mineral Tars", and it valued "coal tar" using the Malaysian import value under HS 2706.00 "Tar distilled from coal, from lignite or from peat."[101]

- The mandatory respondents are wrong that "coal tar pitch" and "coal tar" are synonymous, and should be valued using HS 2706.00. To the contrary, Commerce correctly listed "Coal

---

[95] *Id.*; *see also* Respondents' Final SV Submission at Exhibit 2B.
[96] *See* Respondents' Case Brief at 29-30.
[97] *Id.* at 21-22.
[98] *Id.*
[99] *Id.* at 23.
[100] *Id.*
[101] *See* Petitioners' Rebuttal Brief at 17.

Tar Pitch" as the input reported by the mandatory respondents and used the import value under HS subheading 2708.10 as the appropriate SV.

- For those producer-suppliers that used binder materials, both Datong Juqiang and Carbon Activated reported the input as "coal tar pitch." Neither respondents reported using "coal tar" as an input.[102]

- Carbon Activated also made a contradictory statement in its questionnaire responses by stating that "this coal tar pitch is commonly known as 'pitch' in the industry, which is solid at normal temperatures."[103] Thus, Carbon Activated conceded during the questionnaire phase of this segment that "coal tar pitch" is actually "pitch" and not "coal tar."[104]

- Coal tar is the by-product of the coke production process. In contrast, coal tar pitch is a downstream product that is manufactured by further distilling coal tar. Whether it is called "pitch" or "coal tar pitch," the binding material identified by Carbon Activated is not a by-product of coke.[105]

- The petitioners also placed on the record a declaration executed by a domestic industry official stating that the U.S. industry consumes coal tar pitch as the primary input for its re-agglomeration binder, and that to the best of his knowledge, coal tar pitch is properly classified under HS subheading 2708.10. This further demonstrates that "coal tar pitch" is "pitch" such that valuations under HS subheading 2708.10 are appropriate.

- Commerce should also reject the mandatory respondents' argument that Commerce should rely on the Russian import value under HS 2706.00, because as stated above, the mandatory respondents did not report consumption of "coal tar," but instead reported the use of "coal tar pitch." Therefore, any arguments about the Malaysian import value under HS subheading 2706.00 are inapplicable to this segment and are moot.

**Commerce's Position:** In the *Preliminary Results*, we valued the coal tar pitch input using GTA Malaysian import data under HS 2706.00.[106] However, we disagree with the respondents that we should continue to rely on import data under HS 2706.00 to value coal tar[107] in the final results.[108] For the reasons explained below, we determine that it is more appropriate to use Malaysian import data under HS 2708.10 to value coal tar pitch used by the mandatory respondents for the final results.

Commerce's practice when selecting the best available information for valuing FOPs, in accordance with section 773(c)(1) of the Act, is to select, to the extent practicable, SVs which

---

[102] *Id.* at 18.

[103] *Id.*

[104] *Id.*

[105] *Id.* at 20 (citing Respondents' SV Submission at Exhibit 5E).

[106] *See* Preliminary SV Memo at Attachment 1. In the Preliminary SV Memo at 5, Commerce included the HS subheadings for both HS Code 2706.00 (Coal Tar) and HS 2708.10 (Coal Tar Pitch). However, for the *Preliminary Results*, only HS Code 2706.00 was used to value coal tar pitch for both Datong Juqiang and Carbon Activated. *See* Preliminary SV Memo at Attachment 1.

[107] The respondents appear to have used the terms "coal tar" and "coal tar pitch" interchangeably throughout their case brief.

[108] While the respondents argue that Commerce should use HS subheading 2706.00 ("Tar distilled from coal, from lignite or from peat"), instead of 2708.10 ("Pitch from Coal and Other Mineral Tars"), to value Carbon Activated's "coal tar pitch" input, as noted above, in the *Preliminary Results*, Commerce actually used HS subheading 2706.00.

are product-specific, representative of a broad-market average, publicly available, contemporaneous with the POR, and tax and duty exclusive.[109]  Commerce undertakes its analysis of valuing the FOPs on a case-by-case basis, carefully considering the available evidence in light of the particular facts of each industry.[110]  While there is no hierarchy for applying the SV selection criteria, "{Commerce} must weigh available information with respect to each input value and make a product-specific and case-specific decision as to what the 'best' SV is for each input."[111]

Carbon Activated stated in its response that the coal tar pitch that its supplier used to produce the subject merchandise during the POR "is commonly known as 'pitch' in the industry, which is solid at normal temperatures."[112]  Additionally, for those producer-suppliers that used binder materials, both Datong Juqiang and Carbon Activated reported the input as "coal tar pitch," not "coal tar."[113]  Also, record evidence indicates that coal tar, through the fractionated distillation process, yields two different types of coal tar pitch:  binder and impregnating grade.[114]  There is no information on the record that substantiates the mandatory respondents' assertion that HS 2708.10 covers 100 percent pure pitch distilled in a tar workshop.[115]  Therefore, upon reconsideration for these final results, we find that imports under the subheading HS 2706.00 do not represent the best available information for valuing coal tar, because the record evidence supports a conclusion that HS 2706.00 covers coal tar, which is a by-product of the coke production process, whereas HS 2708.10 covers pitch, a product of the coal tar distillation process.  Accordingly, the mandatory respondents' argument that the Malaysian SV under HS 2706.00 is anomalous because it is higher than the Malaysian AUV under HS 2708.10 (*i.e.*, the more value-added product) is moot, because we are not using HS 2706.00 to value the respondent's coal tar pitch input for the final results.

Therefore, for these final results, we find that the Malaysian import data under HS 2708.10, constitute the best available information on the record to value the coal tar pitch used by the mandatory respondents in the production of the subject merchandise,[116] because HS 2708.10 is product-specific in that it is a provision for "Pitch from Coal and Other Mineral Tars." Accordingly, for the final results, we have valued the coal tar pitch used by both of the mandatory respondents based on the Malaysian import data under HS 2708.10.

---

[109] *See, e.g., PSF 2010* IDM at Comment 1.

[110] *See Glycine from China* IDM at Comment 1.

[111] *See, e.g., PET Film 2008* IDM at Comment 2; *see also Crawfish from China* IDM at Comment 2.

[112] *See* Carbon Activated's Letter, "Carbon Activated Response to Section D Parts II and III First Supplemental Questionnaire," dated March 15, 2019, at 4.

[113] *See* Carbon Activated's Letter, "Carbon Activated Response to Section D Questionnaire (Part II)," dated October 22, 2018, at Attachment A (page 4 and Exhibit D-1) and Attachment B (page 4 and Exhibit D-1); Carbon Activated's Letter, "Carbon Activated Response to Section D Part I Second Supplemental Questionnaire," dated March 25, 2019 (Carbon Activated's March SuppDQR), at Exhibit 2 SD-15; Carbon Activated's Letter, "Carbon Activated Response to Section D Supplemental Questionnaire," dated May 9, 2019, at Exhibit 3 SD-3; *see also* Datong Juqiang's Letter, "DJAC Section D Questionnaire Response," dated September 7, 2018, at 4 and Exhibits D-1, D-2, and D-3; and Datong Juqiang's SDQR at 31-33.

[114] *See* Respondents' November 9, 2018 Surrogate Value Submission at Exhibit 5E.

[115] *See* Respondents' Case Brief at 29.

[116] *See* Final SV Memorandum at Attachment 1.

Barcode:3919699-01 A-570-904 REV - Admin Review 4/1/17 - 3/31/18

**Comment 4: Calculation of Surrogate Financial Ratios**

*Respondents' Comments*:

- In the *Preliminary Results*, Commerce utilized the 2017 Romcarbon financial statements to value the financial ratios.[117]  Commerce's preliminary allocations of certain income and expense line items under certain accounting categories are contradicted by substantial record evidence and are otherwise not in accordance with law.[118]
- Commerce improperly excluded the "Note 5-Income from Penalties" line item from the financial ratio calculations without proffering any rationale.  For the final results, Commerce should include the income from penalties charged in the ratio calculation to offset sales, general and administrative expenses (SG&A) because it can be inferred that Romcarbon's "Income from Penalties" are related to, and accrue in the course of, its general operations and are recorded under "Other Gains and Losses."[119]  This inference is further supported by Commerce's settled practice of allocating expenses on penalties charged under the accounting category of SG&A expenses.
- Commerce also excluded "Note 5 - Gain/(Loss) on adjustment of investment property at fair value" and "Note 5 - Gain /(Loss) on disposal of investment property" line items from the financial ratio calculations without proffering any rationale.  However, because Romcarbon's general business activity is manufacturing of goods, "investment in property," which is an entirely different category of activity, is extrinsic to Romcarbon's general business operations.  Therefore, income from such "investment property" distorts Romcarbon's reported "profit before tax."  Accordingly, for the final results, Commerce should include these line items in the calculation of the financial ratios to offset Romcarbon's reported "profit before tax" in order to obtain an adjusted profit before tax that arises solely from the company's general operations (*i.e.*, manufacturing activities).
- Commerce also excluded the "Note 5 – Other Gains" line item from the ratio calculations without proffering any rationale.  Under Commerce's longstanding and settled practice, "Other gains" - income accrued from miscellaneous activities - are treated as a part of the general operations of the company unless the financial statement explicitly indicates otherwise.  Therefore, for the final results, the "other gains" line item should be applied to offset the SG&A expenses.
- Commerce improperly allocated "Note 7-Social contributions and Meal tickets" under SG&A expenses.[120]  For the final results, Commerce should re-allocate these two line items under labor.  As Commerce's NV build up already includes the cost of employers' contribution to social security and meal expenses, by allocating these two-line items under SG&A, Commerce impermissibly double-counted these expenses.

---

[117] *See* Respondents' Case Brief at 30 (citing Preliminary SV Memo at 10-11, and accompanying Excel worksheet, at Tab. "Romcarbon").

[118] *See* Respondents' Case Brief at 30.

[119] *Id.* at 31.

[120] *Id.* at 35 (citing Preliminary SV Memo and accompanying Excel worksheet, at Tab. "Romcarbon").

Filed By: Jinny Ahn, Filed Date: 12/12/19 10:40 AM, Submission Status: Approved

***Petitioners' Rebuttal Comments:***

- Commerce properly calculated surrogate financial ratios, as Commerce's preliminary calculations of financial ratios were in line with Commerce's prior administrative practice.[121]
- If Commerce were to accept the mandatory respondents' proposed modifications to the financial ratio calculations, it would result in a negative profit for Romcarbon.
- For "Note 5 -Income from Penalties Charged," Commerce's decision to exclude income from penalties charged from the calculation of surrogate financial ratios is consistent with the agency's practice of excluding from the calculation of surrogate financial ratios, gains and losses: (1) that are long term in nature, (2) that are not directly tied to a company's main operating activities, or (3) both long term and not core business related.[122]
- For "Note 5 - Gain/(Loss) on adjustment of investment property at fair value" and "Note 5 - Gain / (Loss) on disposal of investment property," the mandatory respondents' arguments are inconsistent in how they are requesting Commerce to treat the preliminarily disallowed offsets. For Romcarbon's non-core operating income from penalties charged, they request Commerce to apply it as an offset to SG&A. However, at the same time, mandatory respondents request Commerce to deduct Romcarbon's investment income from the company's pre-tax profit as a disallowed SG&A offset. This likely relates to their attempt to avoid the establishment of a net negative profit for Romcarbon.
- For "Note 5 – Other Gains," this was rightfully excluded from the calculation of surrogate financial ratios in the *Preliminary Results*, as the line item "other gains" represents income that does not directly arise from core operating activities.[123]
- For "Note 7 - Social Contributions" and "Meal Tickets," the mandatory respondents are incorrect in asserting that Commerce double-counted Romcarbon's expenses for social contributions and meal tickets. As Commerce's NV calculations do not include employer's social security contributions and meal expenses, Commerce did not double-count these expenses by classifying them under SG&A.[124]

**Commerce's Position:** In deriving appropriate surrogate values for SG&A, factory overhead and profit, Commerce typically examines the financial statements on the record of the proceeding and categorizes expenses as they relate to materials, labor, and equipment (MLE), overhead, SG&A, and profit, and excludes certain expenses (*e.g.*, movement expenses) consistent with Commerce's practice of accounting for these latter expenses elsewhere.[125] However, in NME cases, it is impossible for Commerce to further dissect the financial statements of a surrogate company as if the surrogate company were an interested party to the proceeding because Commerce does not seek information from or verify the information from the surrogate company.[126] Therefore, in calculating surrogate overhead and SG&A ratios, it is Commerce's practice to accept data from the surrogate producer's financial statements *in toto*, rather than performing a line-by-line analysis of the types of expenses included in each

---

[121] *See* Petitioners' Rebuttal Brief at 26.
[122] *Id.* at 27.
[123] *Id.* at 29-31.
[124] *Id.* at 32.
[125] *See Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 70163 (November 25, 2014), and accompanying IDM at Comment 6.
[126] *Id.*

category.[127]  As stated by the CIT, Commerce is "neither required to 'duplicate the exact production experience of the Chinese manufacturers,' nor undergo 'an item-by-item analysis in calculating factory overhead.'"[128]

With respect to the line item "Income from Penalties Charged" in Note 5-Other Gains and Losses, we agree with the mandatory respondents that we made an error by excluding this line item as an offset to SG&A.  Romcarbon's financial statements itemizes "Expenses with fines and penalties" in Note 9-Other Income.[129]  Because the expense is included in the SG&A section, we have moved "Expenses with fines and penalties" to SG&A as an offset.[130]

With respect to the treatment of "Note 5 - Gain/(Loss) on adjustment of investment property at fair value" and "Note 5 - Gain / (Loss) on disposal of investment property," we disagree with the mandatory respondents that these items should be treated as an offset to SG&A.  We will include items which are gains/losses on investments as offsets to SG&A if those investments are short-term.[131]  Further, these line items are related to investments in real estate which is "held for future capital appreciation" and not related to administrative or productive activity[132] and, therefore, not related to the primary operations of the company.[133]  Similarly, with respect to "Note 5 – Other Gains," there is no information which links this item to the general operations of the company, unlike "Note 3-Other Income," which we have included as an offset to SG&A. Accordingly, we will not include "Note 5 - Gain/(Loss) on adjustment of investment property at fair value," "Note 5 - Gain / (Loss) on disposal of investment property," or "Note 5 – Other Gains" as offsets to the SG&A financial ratio calculation.

With respect to "Note 7 - Social Contributions" and "Meal Tickets," we disagree with the mandatory respondents that this should be included under labor.  When labor items, such as social security contributions, clothing, housing, or meals, *etc.*, are clearly included in the SV for labor, we will include such items in the labor category of the surrogate financial ratios calculations to avoid double-counting such expenses.[134]  The Malaysian SV for labor provides no information whether Social Contributions and/or Meal Tickets are included in the SV for

---

[127] *See Rhodia, Inc. v. United States*, 240 F. Supp. 2d 1247, 1250-51 (CIT 2002) (*Rhodia*).

[128] *See Rhodia*, 240 F. Supp. 2d at 1250.

[129] *See* Respondents' Final SV Submission at Exhibit 10.

[130] *See* Final SV Memorandum.

[131] *See Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China:  Final Results of the First Antidumping Duty Administrative Review*, 76 FR 9753 (February 22, 2011), and accompanying IDM at Comment 1.

[132] *See* Respondent's Final SV Submission at Exhibit 10 (Independent Auditor's Report page 24).

[133] *See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*,73 FR 40485 (July 15, 2008), and accompanying IDM at Comment 18.D, where Commerce explained that it was its practice to exclude from the calculation of the surrogate financial ratios "income from long-term financial assets because such income is related to investing activities and is not associated with the general operations of the company.".

[134] *See Xanthan Gum from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2013-2014*, 82 FR 11428 (February 23, 2017), and accompanying IDM at Comment 14.

-22-

labor.[135]  Accordingly, because these items are not included in the labor SV, we are considering them as SG&A expenses for the purposes of calculating the surrogate financial ratios.

Finally, we note that we made an error in arithmetic when calculating the SG&A financial ratio. In the *Preliminary Results*, we had identified certain line items from Notes 3 and 5 as offsets to SG&A and set these items as negative values, identified in the row "Total Revenue."[136] However, in the row labelled "Total for Calculation," the formula for the SG&A numerator already sets the SG&A offset value as a negative value, which incorrectly resulted in the values which should be treated as SG&A expense offsets, being treated as additions to SG&A expenses rather than deductions to those expenses.[137]  For the final results, we have set the  values used as offsets to SG&A expenses to be positive values so that the value in the row labelled "Total Revenue" is correctly treated as a negative value in the numerator of the SG&A expense ratio calculation.[138]

**Comment 5:   Application of Adverse Facts Available for Merchandise Produced by Certain Suppliers of Carbon Activated**

*Petitioners' Comments:*

- In its final results, Commerce should apply partial AFA to a supplier of mandatory respondent Carbon Activated, Supplier X, due to its failure to substantiate during verification fundamental information submitted to Commerce over the course of this segment.  In addition, Commerce should apply AFA to three additional suppliers of Carbon Activated that failed to cooperate from the outset of this segment.[139]
- Commerce's verification of Carbon Activated's Supplier X reveals that the supplier was unable to substantiate two critical aspects of its reporting, which was contained in Carbon Activated's questionnaire responses.
- First, Commerce officials were unable to verify Supplier X's reported total production quantity that was used as the denominator in the calculation of the per-unit consumption of its FOPs.
- Second, Commerce officials were also unable to verify Supplier X's September 2017 reported consumption for carbonized materials, a significant input in the activated carbon production process.
- As information provided by an interested party could not be verified, Commerce must apply AFA to this supplier.[140]
- In addition, Commerce should apply AFA to three additional suppliers of Carbon Activated that failed to cooperate from the outset of this segment.  The record demonstrates that those three suppliers, along with Supplier X, account for a substantial percentage of the total quantity of subject merchandise sold by Carbon Activated in the United States during the

---

[135] *See* Petitioners' SV Submission at Attachment 4.
[136] *See* Preliminary SV Memo at 10-11, and accompanying Excel worksheet at tab "Romcarbon."
[137] *Id.*
[138] *See* Final SV Memo and accompanying Excel worksheet at tab "Romcarbon."
[139] *See* Petitioner's Case Brief at 2.
[140] *Id.* at 7 (citing *Yantai Timken Co. v. United States*, 521 F. Supp. 2d 1356, 1372-1377 (CIT 2007) (upholding Commerce's application of partial AFA to three expenses the company failed to substantiate at verification)).

POR.  However, for the *Preliminary Results*, Commerce applied neutral facts available (FA) to those three suppliers, which means there is no downside for Carbon Activated's failure to provide information for these suppliers.  Given that this quantity exported to the United States is significant, Commerce should apply AFA to all four suppliers so as not to allow for manipulation of the record in this and future reviews.[141]

- As AFA, Commerce should apply the highest NV calculated for any CONNUM in this segment of the proceeding to these four suppliers.[142]

***Carbon Activated's Rebuttal Comments:***

- The petitioners wrongfully draw a parallel between Supplier X, which failed verification, and the three uncooperative suppliers, reasoning that "Carbon Activated's submission of information for Supplier X that was ultimately unverifiable is as much of a failure to cooperate as is its failure to provide information for three other suppliers."  These are two different situations and should be treated differently.

- Also, the petitioners conflate Supplier X with Carbon Activated, referring to the interchangeably, as if they are one and the same such that Carbon Activated is to be held equally responsible for its supplier's failure to verify certain accounting of its finished goods and raw materials.  However, the petitioners fail to develop their reasoning as to why Carbon Activated should effectively be collapsed with Supplier X.  Notably, the petitioners fail to explain how Carbon Activated failed to act to the best of its ability.[143]

- Even assuming, *arguendo*, that with respect to Supplier X's merchandise, Carbon Activated is to be subjected to an AFA rate, the petitioners' choice of the AFA rate (*i.e.*, the highest calculated NV in this proceeding segment) is contradicted by the record evidence, because the highest NV proposed by the petitioners is based on subject merchandise which is produced using a source material which is a fundamentally different coal than the raw material underlying both of the CONNUMs produced by Supplier X.

- Commerce should apply the calculated NV for two of Supplier C's[144] CONNUMs because these two CONNUMs produced by Supplier C have the same physical material and form as the CONNUMs produced by Supplier X.[145]

- For the three uncooperative supplier-producers, Commerce should continue to apply neutral FA, because Carbon Activated made its best possible efforts in attempting to persuade the three suppliers to provide the relevant FOP data.[146]  Further, controlling judicial precedent also supports the application of a neutral FA rate for the three uncooperative suppliers.[147]

**Commerce's Position:**  We agree, in part, with the petitioners.  Specifically, we agree that we should apply AFA in valuing the merchandise produced by Supplier X.  However, with respect to the three unresponsive companies, we disagree that we should apply AFA in our valuation of the subject merchandise they supplied.  In the *Preliminary Results*, we applied neutral FA with

---

[141] *Id.*

[142] *Id.* at 7.

[143] *See* Carbon Activated's Rebuttal Brief at 12-13.

[144] Supplier C's identity is BPI.  For this company's name, *see* Carbon Activated's Final Calculation Memorandum.

[145] *See* Carbon Activated's Rebuttal Brief at 14-15.

[146] *Id.* at 2-12.

[147] *See Itochu Building Product Co., Inc. v. United States*, 2018 WL 1445676, 26-27 (March 22, 2018).

respect to the merchandise supplied by these unaffiliated non-responsive companies[148] and will continue to do so for the final results.

Section 776(a)(1) and (2) of the Act provides that, if necessary information is not available on the record, or an interested party: (A) withholds information that has been requested by Commerce, (B) fails to provide such information by the deadlines for submission or in the form or manner requested, subject to subsections 782(c)(1) and (e) of the Act, (C) significantly impedes a proceeding under the Act, or (D) provides such information but the information cannot be verified, Commerce shall, subject to subsection 782(d) of the Act, use facts otherwise available in reaching the applicable determination.

Where Commerce determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that Commerce shall inform the party submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that party an opportunity to remedy or explain the deficiency. If the party fails to remedy or satisfactorily explain the deficiency within the applicable time limits, subject to section 782(e) of the Act, Commerce may disregard all or part of the original and subsequent responses, as appropriate.

Section 776(b) of the Act provides that Commerce may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information. In doing so, Commerce is not required to determine, or make any adjustments to, a weighted-average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information. Further, section 776(b)(2) states that an adverse inference may include reliance on information derived from the petition, the final determination from the less than fair value investigation, a previous administrative review, or other information placed on the record.

Section 776(c) of the Act provides that, when Commerce relies on secondary information rather than on information obtained in the course of an investigation, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal. Secondary information is defined as information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[149] When selecting an AFA margin, Commerce is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.[150]

As noted by the petitioners, during our verification of Supplier X's books and records, it failed to substantiate its total POR production quantity used as the denominator for all its FOP

---

[148] *See Preliminary Results*, and accompanying PDM at 17.
[149] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act (SAA), H.R. Doc. 103-316, vol. 1 (1994), at 870.
[150] *See* Section 776(d)(3) of the Act.

Filed By: Jinny Ahn, Filed Date: 12/12/19 10:40 AM, Submission Status: Approved

consumption.[151]  Further, Supplier X failed to substantiate the reported consumption quantity of its main input, carbonized materials.[152]  Accordingly, because we could not verify two critical components of its FOP reporting, pursuant to section 776(a)(2)(D) of the Act, we determine that Commerce was unable to verify information Supplier X submitted to Commerce and, because the information that Supplier X provided was unverifiable, Supplier X did not act to the best of its ability.  Thus, an adverse inference in selecting from the facts available is warranted pursuant to section 776(b)(1) of the Act.  As AFA, we intend to rely on the highest NV calculated for any CONNUM in this review as the NV of the CONNUMs produced by Supplier X, rather than valuing individual FOPs, because the denominator used to derive all of Supplier X's reported FOPs is unreliable.[153]

We disagree with Carbon Activated that, in applying AFA in valuing the merchandise produced by Supplier X, we should use a CONNUM with the same physical characteristics as those produced by Supplier X.  Section 776(b)(1)(A) of the Act states that Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  Specifically, we disagree with Carbon Activated that we should use the NVs of CONNUMs with the similar physical characteristics produced by Supplier C to value the products produced by Supplier X.  Commerce may employ an adverse inference to ensure that a party does not obtain a more favorable result by failing to cooperate that if it had cooperated.[154]  By applying the NVs of similar products to Supplier X's products, we would effectively be applying a neutral FA plug, as we are doing to Carbon Activated's supplier-producers which we excused from reporting FOPs.[155]  The application of neutral FA is not remedial in nature, or adverse, so as to ensure cooperation, as contemplated by *Nan Ya Plastics* and the SAA.  Therefore, for these final results, we find it appropriate to apply the highest NV calculated for any CONNUM in this segment of the proceeding to the CONNUMs produced by Supplier X.

Additionally, we disagree with the petitioners that we should apply AFA in valuing the merchandise produced by the three unaffiliated Carbon Activated supplier-producers which were non-responsive.  As noted in the *Preliminary Results*, despite Carbon Activated's documented efforts to obtain the required FOP data from those supplier-producers, two of those supplier-producers ultimately failed to cooperate, and one of the supplier-producers had closed its operations.[156]  Additionally, Carbon Activated purchased the subject merchandise from those

---

[151] *See* Memorandum, "Verification of the Questionnaire Responses of Carbon Activated Tianjin Co., Ltd.'s Supplier in the Antidumping Administrative Review of Certain Activated Carbon from the People's Republic of China," dated September 27, 2019, at 6-7.

[152] *Id.* at 8.

[153] For further details, *see* Carbon Activated's Final Calculation Memorandum.

[154] *See Nan Ya Plastics Corp. v. United States*, 810 F. 3d 1333, 1338 (Fed. Cir. 2016) (*Nan Ya Plastics*) ("Commerce 'may employ such inferences to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'") (citing SAA at 870).

[155] *See* Commerce's Letter, "Eleventh Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China:  Supplier Exclusions," dated September 13, 2018.

[156] *See Preliminary Results* PDM at 17; *see also* Carbon Activated's Letter, "Carbon Activated Response to Section D," dated September 28, 2018, at 2-3 and Attachment E-1; Carbon Activated's Letter, "Carbon Activated Response to Section D (Part II) in the Eleventh Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China," dated October 22, 2018 (Carbon Activated's DQR (Part II)), at 2-3 and Attachment C; Carbon Activated's Letter, "Carbon Activated Response to Section D (Part III) in the Eleventh

Barcode:3919699-01 A-570-904 REV - Admin Review 4/1/17 - 3/31/18

supplier-producers through one or more trading companies and other supplier-producers which further manufactured the subject merchandise, and there is no evidence on the record which establishes that Carbon Activated had an existing relationship with those uncooperative supplier-producers.[157] The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has generally rejected the application of AFA to a cooperating respondent that is unable to provide the data of an unaffiliated party. In *Mueller*, the Federal Circuit recognized a narrow exception when the respondent is in a position to induce the unaffiliated party's cooperation.[158] The Federal Circuit in *Mueller* recognized that Commerce has a legitimate policy goal to compel cooperation of unaffiliated supplier-producers through the respondent both under sections 776(a) (facts otherwise available) and 776(b) (AFA) of the Act. However, the Federal Circuit stated that any application of those policies must be "reasonable on the particular facts and the predominant interest in accuracy is properly taken into account."[159] In *Mueller*, the Federal Circuit remanded the case for Commerce to recalculate the rate for the respondent affected by the non-cooperation, because the adverse inference had not created any direct adverse effect on the non-cooperating supplier-producer. Additionally, the Federal Circuit distinguished *Changzhou*, where "cooperating parties could not have induced the non-cooperating party to provide complete and accurate information," because the cooperating parties in *Changzhou* did not purchase goods from the non-cooperating parties and did not have an existing relationship.[160] In this instance, as noted above, Carbon Activated purchased the subject merchandise from the relevant supplier-producers through one or more trading companies and other supplier-producers which further manufactured the subject merchandise. We are, thus, not able to establish that Carbon Activated had an existing relationship with those uncooperative supplier-producers. Accordingly, we find that it is inappropriate to apply AFA to Carbon Activated as a result of the failure of these non-responsive supplier-companies to participate and, for the final results, we continue to apply the average NV to the sales of subject merchandise produced by the uncooperative supplier-producers.[161]

**Comment 6:  Selection of Appropriate Factors of Production Database for Carbon Activated**

***Carbon Activated's Comments:***

- In its supplemental questionnaire dated April 30, 2019, Commerce instructed Carbon Activated to recalculate the FOP variables MIXTURE, CARBONIZEDMATERIALM, DIRLABM, INDIRLABM, ELECTRICITYM, WATERM, and ENERGYCOALM, based on an incorrect formula.[162] Carbon Activated complied with Commerce's instructions and, in

---

[157] *See Preliminary Results* PDM at 17; *see also* Carbon Activated's Letter, "Correction to Factor of Production Reporting Exclusion Request," dated August 24, 2018; and Carbon Activated's DQR (Part II) at 2-3.

Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China," dated November 1, 2018 (Carbon Activated's DQR (Part III)), at 2-3 and Attachment B.

[158] *See Mueller Comercial De Mexico v. United States*, 753 F. 3d 1227, 1233, 1235 (Fed. Cir. 2014) (*Mueller*).

[159] *Id.* at 1233.

[160] *Id.* at 1235 (citing *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F. 3d 1367 (Fed. Cir. 2012) (*Changzhou*)).

[161] *See* Carbon Activated's Final Calculation Memorandum.

[162] *See* Respondents' Case Brief at 41.

Filed By: Jinny Ahn, Filed Date: 12/12/19 10:40 AM, Submission Status: Approved

the *Preliminary Results*, Commerce used the May 9, 2019 FOP database (cacfop04), which is the FOP database that uses the incorrect formula.

- Commerce should use the March 25, 2019 FOP database (cacfop03) as it was created using the most accurate formula for calculating MIXTURE. Specifically, the bituminous coal consumed for the base product is already the amount of bituminous coal required to produce one MT of finished product, thus, there is no need to multiply this consumption with ACTIVATEDMATERIAL in the further processor's[163] database. On the other hand, the anthracite coal in Supplier B's[164] FOP database is the amount of anthracite coal required to produce one MT of activated material used by the further processor to produce the final product, which should in fact be multiplied with ACTIVATEDMATERIAL in the further processor's database.

- Because these seven FOPs are inflated due to the incorrect formula used in cacfop04, Commerce should use cacfop03 in the final results.

***Petitioners' Rebuttal Comments:***

- Carbon Activated's request to switch databases is illogical and unsupported by record evidence.

- Without supporting evidence, Carbon Activated claims that when the further processor mixed inputs from two different suppliers it had a yield loss on the anthracite-based activated carbon obtained from Supplier B, but none on the bituminous-based activated carbon obtained from Supplier C.[165]

- Carbon Activated claims that it obtained finished activated carbon from Supplier C while Supplier B's FOP database reflects the amount of anthracite coal used to produce one MT of activated carbon. This statement is in contrast with the chain of production described in Carbon Activated's DQR (Part II) where Carbon Activated reported that it would use the upstream FOPs utilized by Supplier B and Supplier C for production of bituminous-coal-based activated carbon, which were acid washed by the further processor.[166] However, it now claims to have only experienced a yield loss on only anthracite-based activated carbon, and not on bituminous-based activated carbon or both forms of activated carbon.

- Supplier B and C have demonstrated their consumption of anthracite and bituminous coal[167] to produce one MT of activated carbon.[168] The activated carbon produced by Suppliers B and C were mixed together, termed MIXTURE, and then acid-washed by the further processor. Carbon Activated applied only its consumption factor to the anthracite coal from Supplier B. It is illogical, and contradicted by other record statements, to treat only the feedstock activated carbon from Supplier C as product activated by Supplier C that required no consumption factor at the further processor, but to treat the feedstock activated carbon

---

[163] The further processor's identity is BPI. For this company's name, *see* Carbon Activated's Final Calculation Memorandum.
[164] Supplier B's identity is BPI. For this company's name, *see* Carbon Activated's Final Calculation Memorandum.
[165] Supplier C's identity is BPI. For this company's name, *see* Carbon Activated's Final Calculation Memorandum.
[166] *See* Petitioners' Rebuttal Brief at 33 (citing Carbon Activated's DQR (Part II) at Attachment A at 1).
[167] Commerce notes that, while the petitioners' rebuttal brief indicates that Supplier C used anthracite coal, Supplier C actually reported that it used bituminous coal in its production process. *See* Petitioners' Rebuttal Brief at 34; and Carbon Activated's DQR (Part III) at Attachment D, Exhibit D-6.
[168] *See* Petitioners' Rebuttal Brief at 34-35 (citing Carbon Activated's DQR (Part I) at Attachment D and Carbon Activated's DQR (Part III) at Attachment A).

-28-

Barcode:3919699-01 A-570-904 REV - Admin Review 4/1/17 - 3/31/18

from Supplier B as if it were raw coal that was neither carbonized nor activated and instead was a raw feedstock input.

- Carbon Activated provides no support for the position inherent in its claim, which is that Supplier C could report the amount of inputs consumed per MT that would later be washed, mixed, and packaged by the further processor.

- Commerce properly instructed Carbon Activated to reflect the further processor's consumption factor for the mixed production of control numbers that used both anthracite-based activated carbon and bituminous-based activated carbon to both incoming sets of upstream FOPs.

- If Commerce relies on cacfop03, then Commerce must adjust the freight factor applied to direct materials. Whereas cacfop04 includes both DINLFT (freight distances for the main supplier to port) and DINLFT2 (freight distance between Suppliers B and C to the further processor), cacfop03 includes only DINLFT. Therefore, DINLFT2 would need to be included in database cacfop03 in order for Commerce's calculations to reflect both DINLFT + DINLFT2 and to account for all supplier distances.

**Commerce's Position:** We agree with the petitioners that Commerce used the correct FOP database in the *Preliminary Results*. As noted by the petitioners, Carbon Activated suggests that the bituminous coal from Supplier C does not incur the same, or any, yield loss from the acid washing process undertaken by the further processor as the anthracite coal from Supplier B. In Exhibit D-6 of Supplier C's section D questionnaire response, Supplier C reports the consumption of bituminous coal per unit of subject merchandise produced.[169] If we use Carbon Activated's formula for MIXTURE, Supplier C's consumption quantity for the product acid-washed by the further processor remains the same post-acid wash, without accounting for any yield loss incurred by the further processor. While Carbon Activated reports that Supplier C's activated carbon was acid-washed by the further processor,[170] the formula reported in Carbon Activated's Supp DQR (Part I) does not include the yield loss incurred by further processing as it does for Supplier B's input.[171] Moreover, the record shows that acid washed products incur yield-loss during production, it is reasonable to assume that all further processors incur some level of yield-loss. Accordingly, because the formula used in the FOP database, cacfop03, for the acid-washed products produced by the further processor does not include the yield loss of input product provided by Supplier C, for the final results we will continue to use cacfop04 as this FOP database includes the correct formula for calculating MIXTURE, CARBONIZEDMATERIALM, DIRLABM, INDIRLABM, ELECTRICITYM, WATERM, and ENERGYCOALM.

**Comment 7:   Correction of Preliminary Results Calculation Error**

***Datong Juqiang's Comments:***

- Commerce should correct a ministerial error in Datong Juqiang's margin calculation program.[172] In the *Preliminary Results*, Commerce calculated Datong Juqiang's freight using

---

[169] *See* Carbon Activated's DQR at Attachment D (Exhibit D-6)
[170] *See* Carbon Activated's DQR (Part II) at Attachment A.
[171] *See* Carbon Activated's March SuppDQR at 7-8.
[172] *See* Respondents' Case Brief at 37-40.

the uncapped freight distances for each input.  For the final results, Commerce should rely on the reported *Sigma*[173] capped distances in its margin calculation program, in calculating the freight cost for the inputs.[174]

**Commerce's Position:**  We agree with Datong Juqiang, that in our preliminary calculations we used uncapped freight distances instead of *Sigma* capped distances to calculate the FOP for each input reported by Datong Juqiang.  Therefore, for these final results, we have revised our calculations to rely on *Sigma* capped freight distances.[175]

**Comment 8:   Treatment of Tancarb Activated Carbon Co., Ltd.**

*Tancarb's Comments:*
- Tancarb filed its separate rate application (SRA) after the established deadline, and Commerce rejected its SRA.[176]  However, Commerce should accept Tancarb's untimely filed SRA because accepting the SRA is consistent with judicial precedent and would not unduly burden Commerce.[177]  The rejection of the application could cause undue and disproportionate harm to Tancarb's importers.[178]
- In the immediately preceding administrative review (*i.e.*, POR 2016-2017), Commerce initiated the review on Tancarb.  However, due to miscommunication between Tancarb and its counsel, Tancarb' separate rate certification (SRC) was not timely filed.  Accordingly, Tancarb was assigned the China-wide entity rate for the 2016-2017 POR.  Tancarb was not aware of this error until its entries began to liquidate sometime after the final results for the 2016-2017 POR published on October 22, 2018 and Commerce issued liquidation instructions.
- Once it realized the error in the 2016-2017 administrative review, Tancarb inquired as to its status in the current, 2017-2018 administrative review.  The review had been initiated on Tancarb, but no SRA had been filed on behalf of Tancarb in the current review either.  The deadline to file an SRA in the 2017-2018 (*i.e.*, July 6, 2018) had already passed by the time Tancarb became fully aware of this issue.
- The preliminary results were due on June 10, 2019, and Tancarb filed its late SRA on April 5, 2019.  The SRA was also filed prior to the end of the 30-day new facts deadline.[179]
- The CIT also has noted that it will "review on a case-by-case basis whether the interests of accuracy and fairness outweigh the burden placed on the Department and the interest in

---

[173] *See Sigma Corp. v. United States*, 117 F. 3d 1401, 1408 (Fed. Cir. 1997) (*Sigma*).
[174] *Id.*
[175] *See* Datong Juqiang's Final Calculation Memorandum.
[176] *See* Tancarb's Letter, "Request to Accept Separate Rate Application," dated April 5, 2019.  Commerce notified Tancarb of its intent to reject and remove the untimely submission from the record on April 29, 2019.  *See* Commerce's Letter to Tancarb, "Rejection of Untimely Filed Separate Rate Application," dated April 11, 2019 (ACCESS Barcode 3818243-01); and Memorandum, "Reject and remove Separate Rate Application," dated April 12, 2019 (ACCESS Barcode 3818654-01).
[177] *See* Tancarb's Case Brief at 9-10.
[178] *Id.* at 1.
[179] *Id.*

finality."[180]  In *Grobest*, the CIT noted that Commerce is limited by the fact that the antidumping statute is remedial in purpose, not punitive, and by the statute's goal of determining margins as accurately as possible.  With this understanding, the court in *Grobest* held that the interest of fairness outweighed the burden placed on Commerce in considering the acceptance of an untimely filed SRA, ruling Commerce's rejection of the late-filed submission was an abuse of discretion.[181]

**Petitioners' Rebuttal Comments:**

- Commerce acted appropriately in treating Tancarb as a part of the China-wide entity and should continue to do so in the final results.[182]
- In *Grobest*, the SRA in question was filed 95 days late but more than seven months before the preliminary results of the administrative review.  The Court also noted that the plaintiff in the case (*i.e.*, Amanda Foods (Vietnam) Ltd.), was prompt in correcting its error once it was discovered.  In contrast, Tancarb filed its SRA nine months late and only two months prior to the deadline for the *Preliminary Results*.  Moreover, while Tancarb claims to have taken prompt remedial action after becoming aware of a problem (*i.e.*, "sometime after October 22, 2018"),[183] it did not actually file its separate rate application until April 5, 2019, more than five months later.

**Commerce's Position:**  Commerce disagrees with Tancarb's assertions regarding the rejection of its untimely-filed SRA and Commerce's treatment of Tancarb in the *Preliminary Results* as part of the China-wide entity.  Accordingly, we continue to find that Tancarb should be treated as part of the China-wide entity for these final results.

As a threshold matter, the deadline to submit an SRA was 30 days after the publication of the *Initiation Notice* in the *Federal Register*.[184]  Publication of the *Initiation Notice* in the *Federal Register* constitutes public notification to interested parties, explains the requirements for demonstrating eligibility for a separate rate, and provides the applicable deadlines for which were clearly established in the *Initiation Notice*.  In addition, Commerce provides all interested parties with an opportunity to request an extension of time to file their submissions.  Specifically, 19 CFR 351.302(c) states that:

> Before the applicable time limit established under this part expires, a party may request an extension pursuant to paragraph (b) of this section. An untimely filed extension request will not be considered unless the party demonstrates that an extraordinary circumstance exists.  The request must be in writing, in a separate, stand-alone submission, filed consistent with § 351.303, and state the reasons for the request.  An extension granted to a party must be approved in writing.

---

[180] *Id.* at 4 (citing *Grobest & I-Mei Industrial (Vietnam) Co., Ltd. v. United States*, 815 F. Supp. 2d 1342, 1365 (CIT 2012) (*Grobest*)).

[181] *Id.*

[182] *See* Petitioners' Rebuttal Brief at 37.

[183] *Id.* at 39 (citing Tancarb's Letter, "Activated Carbon from the People's Republic of China - Request to Accept Separate Rate Application," dated April 5, 2019 (Tancarb Request Letter), at 2).

[184] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 FR 26258 (June 6, 2018) (*Initiation Notice*).

(1) An extension request will be considered untimely if it is received after the applicable time limit expires or as otherwise specified by the Secretary.

(2) An extraordinary circumstance is an unexpected event that:

    (i) Could not have been prevented if reasonable measures had been taken, and

    (ii) Precludes a party or its representative from timely filing an extension request through all reasonable means.

At no time prior to the July 6, 2018, SRA deadline did Tancarb request an extension of time to file its SRA, as directed in the regulations. Rather, Tancarb submitted, simultaneously, a letter requesting acceptance of the untimely submission and the now-rejected SRA on April 5, 2019, 273 days after the deadline.[185] In its April 5, 2019 Letter, Tancarb asserted that "the interests of accuracy and fairness outweigh any burden placed on the Department in considering this SRA several months late." In the same letter, Tancarb also cited to the CIT ruling in *Grobest*, asserting that the CIT concluded that Commerce's rigid application of its deadline constituted an abuse of discretion.[186]

In this case, Tancarb did not provide any extension request—it simply filed its April 5th letter requesting consideration of the untimely submission along with the untimely SRA. In addition, Commerce disagrees with Tancarb's claim as support for its untimely submission, that the circumstances in this case mirror those in the administrative review subject to *Grobest*. In *Grobest*, the CIT held that rejecting an SRC that was three months late was an abuse of discretion because, *inter alia*, the SRC had been submitted early in the proceeding, the respondent was diligent in attempting to correct the error, and the burden on the agency to consider the certification would have been minimal.[187]

However, none of those circumstances exist here. Tancarb's untimely submission was not "early in the proceeding." It was submitted 273 days after the established deadline expired and two months before the *Preliminary Results* were issued.[188] There is no evidence on the record that Tancarb demonstrated any diligence in filing timely information, as Tancarb did not communicate with Commerce regarding any difficulties in submitting its SRA until April 5, 2019. Further, presenting untimely information 273 days after the established deadline is not an example of diligence, as referenced in *Grobest*.

Additionally, in *Grobest*, the CIT found that the facts of that case suggested that the administrative burden of reviewing the SRC, rejected by Commerce, would not have been great because Commerce had granted the respondent company separate-rate status in the preceding three administrative reviews without needing to conduct a separate-rate analysis.[189] Therefore, the Court found that, but for the untimeliness of its submission, the respondent would likely have received a separate rate in the segment in question, with minimal administrative burden imposed

---

[185] *See* Tancarb Request Letter.

[186] *Id.* (citing *Grobest*, 815 F. Supp. 2d at 1342).

[187] *See Grobest*, 815 F. Supp. 2d at 1367.

[188] *See* Commerce's Letter, "Eleventh Antidumping Administrative Review of Certain Activated Carbon from the People's Republic of China (China): Rejection of Untimely Filed Separate Rate Application, dated April 11, 2019; *see also* rejected submission under ACCESS Barcode 3815792-01.

[189] *See Grobest*, 815 F. Supp. 2d at 1367.

upon Commerce, and, as a result of its rejected submission, was likely assigned an inaccurate and disproportionate margin.[190]  In this case, Tancarb was denied separate rate status in the preceding 2016-2017 administrative review as a result of its failure to file an SRC.  The administrative burden imposed upon Commerce for this review, therefore, would have been far greater than that contemplated by the CIT in *Grobest* because Commerce would have had to conduct a complete separate-rate eligibility analysis.  Thus, Tancarb's assertion that "Tancarb's submission was early enough in the proceeding to minimize concerns for finality, and accepting Tancarb's response would not overly burden Commerce,"[191] is incorrect.  Commerce did not make an inaccurate determination.  Rather, Tancarb failed to timely provide an SRA in order to demonstrate its eligibility for a separate rate.

Furthermore, notwithstanding the distinctions between this case and *Grobest*, the case law regarding Commerce's authority to reject untimely-filed submissions has developed such that Commerce's determination is further supported by the Federal Circuit's ruling in *PSC VSMPO*.[192]  In *PSC VSMPO*, the Federal Circuit explained that the CIT "erred when, in spite of this determination {that the information was untimely submitted}, it ordered Commerce to admit the affidavit into the record because of circumstances the Court described as 'not typical.'"  The Federal Circuit further stated that the CIT's decision to remand Commerce's determination to reject an untimely-filed document was an improper intrusion into Commerce's power to apply its own procedures for the timely resolution of antidumping reviews.[193]  Thus, based on the distinction between this case and *Grobest*, as well as subsequent support from the Federal Circuit in *PSC VSMPO*, it was within Commerce's authority to reject Tancarb's untimely SRA in this review, considering the extreme lateness of Tancarb's untimely filing.  Accordingly, we find that the circumstances of this case are more comparable with those addressed in *PSC VSMPO* than *Grobest*.

Commerce establishes deadlines to ensure its ability to complete administrative proceedings within statutorily mandated deadlines.  The CIT has long recognized the need to establish and enforce time limits for filings, the purpose of which is to aid Commerce in the administration of the antidumping laws.[194]  The purpose of requiring the submission of SRAs within 30 days of the publication of review initiations is to ensure that Commerce has sufficient time to gather information, issue supplemental questionnaires, if necessary, make separate rate determinations, then address the separate rate companies in the preliminary results.  In this administrative review, we have done exactly that for the eight companies that timely filed their SRAs or SRCs.[195]  Thus, we find that Tancarb has been appropriately assigned the China-wide entity rate in this review for its failure to submit a timely filed SRA.

---

[190] *Id.*
[191] *See* Tancarb's Case Brief at 7.
[192] *See PSC VSMPO-Avisma Corp. v. United States*, 688 F. 3d 751, 761 (Fed. Cir. 2012) (*PSC VSMPO*).
[193] *Id.*
[194] *See Nippon Steel Corp. v. United States*, 118 F. Supp. 2d 1366, 1377 (CIT 2000); *see also Drawn Stainless Steel Sinks from the People's Republic of China:  Final Results of the Antidumping Duty Administrative Review; 2012-2014*, 80 FR 69644 (November 10, 2015), and accompanying IDM at Comment 19.
[195] *See Preliminary Results* PDM at 5-6.

## VI. RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting all of the above positions and adjusting the margin calculation programs accordingly.  If accepted, we will publish the final results of review and the final dumping margins in the *Federal Register*.

☒                              ☐

_____              _____

Agree                        Disagree

12/11/2019

X _____

Signed by: JEFFREY KESSLER

Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance


presumption that reimbursement of antidumping duties occurred and the subsequent payment of double antidumping duties.

## Notification to Interested Parties

We are issuing and publishing these results in accordance with sections 751(a)(1) and 777(i)(1) of the Act.

Dated: December 10, 2019.

**Jeffrey I. Kessler,**
*Assistant Secretary for Enforcement and Compliance.*

## Appendix

**List of Topics Discussed in the Preliminary Decision Memorandum**

I. Summary
II. Background
III. Scope of the Order
IV. Companies Not Selected for Individual Examination
V. Preliminary Determination of No Shipments
VI. Comparisons to Normal Value
VII. Date of Sale
VIII. Constructed Export Price
IX. Normal Value
X. Currency Conversion
XI. Recommendation

[FR Doc. 2019–27137 Filed 12–16–19; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–904]**

### Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017–2018

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that Datong Juqiang Activated Carbon Co., Ltd. (Datong Juqiang) and Carbon Activated Tianjin Co., Ltd. (Carbon Activated) sold certain activated carbon from the People's Republic of China (China) at less than normal value during the period of review (POR) April 1, 2017 through March 31, 2018.

**DATES:** Applicable December 17, 2019.

**FOR FURTHER INFORMATION CONTACT:** Bob Palmer or Jinny Ahn, AD/CVD Operations, Office VIII, Enforcement and Compliance, International Trade Administration, Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0968 or (202) 482–0339, respectively.

**SUPPLEMENTARY INFORMATION:**

## Background

Commerce published the *Preliminary Results*[1] on June 14, 2019. For events subsequent to the *Preliminary Results, see* the Issues and Decision Memorandum.[2] On September 20, 2019,[3] in accordance with section 751(a)(3)(A) of the Tariff Act of 1930, as amended (the Act), Commerce extended the deadline for issuing the final results until December 11, 2019.

## Scope of the Order

The merchandise subject to the *Order*[4] is certain activated carbon. The products are currently classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) subheading 3802.1000. Although the HTSUS subheading is provided for convenience and customs purposes, the written description of the scope of the *Order* remains dispositive.[5]

## Analysis of Comments Received

In the Issues and Decision Memorandum, we addressed all issues raised in the interested parties' case and rebuttal briefs. In Appendix I to this notice, we provided a list of the issues raised by the parties. The Issues and Decision Memorandum is a public document and is on file in the Central Records Unit (CRU), Room B8024 of the main Commerce building, as well as electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov* and to all parties in the CRU. In addition, parties can directly access a complete version of the Issues and Decision Memorandum on the internet at *http://enforcement.trade.gov/frn/index.html.* The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

---

[1] *See Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017–2018,* 84 FR 27758 (June 14, 2019) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).

[2] *See* Memorandum, "Certain Activated Carbon from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Eleventh Antidumping Duty Administrative Review," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[3] *See* Memorandum, "Activated Carbon from the People's Republic of China: Extension of Deadline for Final Results of 2017–2018 Antidumping Duty Administrative Review," dated September 20, 2019.

[4] *See Notice of Antidumping Duty Order: Certain Activated Carbon from the People's Republic of China,* 72 FR 20988 (April 27, 2007) (*Order*).

[5] *See* Issues and Decision Memorandum for a complete description of the scope of the *Order.*

## Verification

Pursuant to section 782(i) of the Act, and 19 CFR 351.307(b)(iv), we conducted verification of the questionnaire responses of Carbon Activated.[6]

## Changes Since the Preliminary Results

Based on our review of the record and comments received from interested parties regarding our *Preliminary Results,* we made certain revisions to the margin calculations for Carbon Activated and Datong Juqiang,[7] and consequently, to the rate assigned to the non-examined, separate rate respondents. The Issues and Decision Memorandum contains additional details of these revisions.[8]

## Final Determination of No Shipments

In the *Preliminary Results, we* preliminarily determined that Charter Link Logistics Limited, Datong Municipal Yunguang Activated Carbon Co., Ltd., Jilin Bright Future Chemicals Co., Ltd., Shanxi Dapu International Trade Co., Ltd., Shanxi Industry Technology Trading Co., Ltd., Shanxi Tianxi Purification Filter Co., Ltd., and Tianjin Channel Filters Co., Ltd. had no shipments of subject merchandise to the United States during the POR.[9] We received no information to contradict this determination. Therefore, we continue to find that these companies had no shipments of subject merchandise during the POR and will issue appropriate liquidation instructions that are consistent with our "automatic assessment" clarification for these final results.[10]

---

[6] *See* Memoranda, "Verification of the Questionnaire Responses of Carbon Activated Tianjin Co., Ltd.'s Supplier in the Antidumping Administrative Review of Certain Activated Carbon from the People's Republic of China," and "Verification of the Questionnaire Responses of Carbon Activated Tianjin Co., Ltd.'s Supplier in the Antidumping Administrative Review of Certain Activated Carbon from the People's Republic of China," both dated September 27, 2019.

[7] *See* Memoranda, "Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China: Final Results Calculation Memorandum for Carbon Activated" (Carbon Activated's Final Calculation Memorandum), and "Antidumping Duty Administrative Review of Certain Activated Carbon the People's Republic of China: Final Results Calculation Memorandum for Datong Juqiang Activated Carbon Co., Ltd." (Datong Juqiang's Final Calculation Memorandum), both dated concurrently with this memorandum; *see also* Memorandum, "Eleventh Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Values for the Final Results," dated concurrently with this memorandum.

[8] *See* Issues and Decisions Memorandum at 3–4 for a summary of these revisions.

[9] *See Preliminary Results,* 84 FR at 27758.

[10] *See Non-Market Economy Antidumping Proceedings: Assessment of Antidumping Duties,* 76

Continued

**68882**    Federal Register / Vol. 84, No. 242 / Tuesday, December 17, 2019 / Notices

## Separate Rate Respondents

In our *Preliminary Results,* we determined that Carbon Activated, Datong Juqiang, and six other companies demonstrated their eligibility for separate rates.[11] We received no comments or argument since the issuance of the *Preliminary Results* that provide a basis for reconsideration of these determinations. Therefore, for these final results, we continue to find that the eight companies listed in the table in the ''Final Results'' section of this notice are eligible for a separate rate.

## Rate for Non-Examined Separate Rate Respondents

In the *Preliminary Results,*[12] and consistent with Commerce's practice,[13] we assigned the non-examined, separate rate companies a rate equal to the weighted average of the calculated weighted-average dumping margins for the mandatory respondents that are not zero, *de minimis* (*i.e.,* less than 0.5 percent), or based entirely on facts available, weighted by the total U.S. sales quantities from the public version of the submissions from the mandatory respondents.[14] No parties commented

on the methodology for calculating this separate rate. For the final results, we continue to apply this approach, as it is consistent with the intent of, and our use of, section 735(c)(5)(A) of the Act.[15]

## Final Results of the Review

For companies subject to this review, which established their eligibility for a separate rate, Commerce determines that the following weighted-average dumping margins exist for the POR from April 1, 2017 through March 31, 2018:

| Exporter | Weighted-average dumping margin (USD/kg)[16] |
|---|---|
| Beijing Pacific Activated Carbon Products Co., Ltd | 0.89 |
| Carbon Activated Tianjin Co., Ltd | 1.02 |
| Datong Juqiang Activated Carbon Co., Ltd | 0.86 |
| Jacobi Carbons AB[17] | 0.89 |
| Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd | 0.89 |
| Ningxia Huahui Activated Carbon Co., Ltd | 0.89 |
| Ningxia Mineral & Chemical Limited | 0.89 |
| Shanxi Sincere Industrial Co., Ltd | 0.89 |

In the *Preliminary Results,* Commerce found that 239 companies for which a review was requested did not establish eligibility for a separate rate because they did not file a separate rate application or a separate rate certification, as appropriate.[18] No interested party commented on Commerce's preliminary determination with respect to these 239 companies. Therefore, for these final results we determine these companies to be part of the China-wide entity. Because no party requested a review of the China-wide entity, and Commerce no longer considers the China-wide entity as an exporter conditionally subject to administrative reviews,[19] we did not conduct a review of the China-wide entity. Thus, the weighted-average

dumping margin for the China-wide entity (*i.e.,* 2.42 USD/kg)[20] is not subject to change as a result of this review.

## Assessment Rates

Pursuant to section 751(a)(2)(C) of the Act and 19 CFR 351.212(b), Commerce has determined, and U.S Customs and Border Protection (CBP) shall assess, antidumping duties on all appropriate entries covered by this review. We intend to issue assessment instructions to CBP 15 days after the publication date of these final results of review.

For each individually-examined respondent in this review which has a final weighted-average dumping margin that is not zero or *de minimis* (*i.e.,* less than 0.5 percent), we will calculate importer- (or customer-) specific per-unit duty assessment rates based on the

ratio of the total amount of dumping calculated for the importer's (or customer's) examined sales to the total sales quantity associated with those sales, in accordance with 19 CFR 351.212(b)(1).[21] We will also calculate (estimated) *ad valorem* importer-specific assessment rates with which to determine whether the per-unit assessment rates are *de minimis*.[22] Where either the respondent's weighted-average dumping margin is zero or *de minimis,* or an importer- (or customer-) specific assessment rate is zero or *de minimis,* we will instruct CBP to liquidate the appropriate entries without regard to antidumping duties.[23]

For the respondents which were not selected for individual examination in this administrative review and which qualified for a separate rate, the

FR 65694 (October 24, 2011) (*Assessment Practice Refinement*).

[11] *See Preliminary Results* PDM at 4–8.

[12] *Id.* at 10–11.

[13] *See, e.g., Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review,* 76 FR 56158, 56160 (September 12, 2011) (*Vietnam Shrimp*).

[14] *See* Memorandum, ''Certain Activated Carbon from the People's Republic of China: Calculation of Margin for Respondents Not Selected for Individual Examination,'' dated concurrently with this notice.

[15] *See Vietnam Shrimp,* 76 FR at 56160.

[16] In the second administrative review of the *Order,* Commerce determined that it would calculate per-unit weighted-average dumping margins and assessment rates for all future reviews. *See Certain Activated Carbon from the People's Republic of China: Final Results and Partial*

*Rescission of Second Antidumping Duty Administrative Review,* 75 FR 70208, 70211 (November 17, 2010) (*AR2 Carbon*), and accompanying Issues and Decision Memorandum (IDM) at Comment 3.

[17] In the third administrative review of the *Order,* Commerce found that Jacobi Carbons AB, Tianjin Jacobi International Trading Co. Ltd., and Jacobi Carbons Industry (Tianjin) should be treated as a single entity, and because there were no facts presented on the record of this review which would call into question our prior finding, we continue to treat these companies as part of a single entity for this administrative review, pursuant to sections 771(33)(E), (F), and (G) of the Act, and 19 CFR 351.401(f). *See Certain Activated Carbon from the People's Republic of China: Final Results and Partial Rescission of Third Antidumping Duty Administrative Review,* 76 FR 67142, 67145, n.25 (October 31, 2011); *see also Preliminary Results* PDM.

[18] *See Preliminary Results* PDM at 8.

[19] *See Antidumping Proceedings: Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings,* 78 FR 65963, 65969–70 (November 4, 2013).

[20] *See, e.g., Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012–2013,* 79 FR 70163, 70165 (November 25, 2014).

[21] *See AR2 Carbon* IDM at Comment 3.

[22] For calculated (estimated) *ad valorem* importer-specific assessment rates used in determining whether the per-unit assessment rate is *de minimis, see* Carbon Activated's Final Calculation Memorandum and Datong Juqiang's Final Calculation Memorandum and attached Margin Calculation Program Logs and Outputs.

[23] *See* 19 CFR 351.106(c)(2).

assessment rate will be equal to the rate assigned to them for the final results (*i.e.,* 0.89 USD/kg).

For the companies identified as part of the China-wide entity, we will instruct CBP to apply a per-unit assessment rate of 2.42 USD/kg to all entries of subject merchandise during the POR which were produced or exported by those companies.

Pursuant to a refinement in our non-market economy practice, for sales that were not reported in the U.S. sales data submitted by companies individually examined during this review, we will instruct CBP to liquidate entries associated with those sales at the rate for the China-wide entity. Furthermore, where we found that an exporter under review had no shipments of the subject merchandise, any suspended entries that entered under that exporter's case number (*i.e.,* at that exporter's cash deposit rate) will be liquidated at the rate for the China-wide entity.[24]

## Cash Deposit Requirements

The following per-unit cash deposit requirements will be effective upon publication of the final results of this administrative review for all shipments of the subject merchandise from China entered, or withdrawn from warehouse, for consumption on or after the publication date, as provided by section 751(a)(2)(C) of the Act: (1) For Carbon Activated, Datong Juqiang, and the non-examined separate rate respondents the cash deposit rate will be equal to their weighted-average dumping margins established in the final results of this review; (2) for previously investigated or reviewed Chinese and non-Chinese exporters not listed above that have separate rates, the cash deposit rate will continue to be the exporter-specific rate published for the most recently completed segment of this proceeding in which they were reviewed; (3) for all Chinese exporters of subject merchandise that have not been found to be entitled to a separate rate, the cash deposit rate will be equal to the weighted-average dumping margin for the China-wide entity (*i.e.,* 2.42 USD/kg); and (4) for all non-Chinese exporters of subject merchandise which have not received their own separate rate, the cash deposit rate will be the rate applicable to the Chinese exporter(s) that supplied that non-Chinese exporter. These per-unit cash deposit requirements, when imposed, shall remain in effect until further notice.

---

[24] For a full discussion of this practice, *see Assessment Practice Refinement,* 76 FR at 65694.

## Disclosure

We intend to disclose the calculations performed to parties in this proceeding within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b).

## Notification to Importers Regarding the Reimbursement of Duties

This notice also serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this POR. Failure to comply with this requirement could result in Commerce's presumption that reimbursement of antidumping duties has occurred and the subsequent assessment of double antidumping duties.

## Notification Regarding Administrative Protective Order

This notice also serves as a reminder to parties subject to administrative protective order (APO) of their responsibility concerning the return or destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3), which continues to govern business proprietary information in this segment of the proceeding. Timely written notification of the return or destruction of APO materials, or conversion to judicial protective order, is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

## Notification to Interested Parties

We are issuing and publishing these final results of administrative review and notice in accordance with sections 751(a)(1) and 777(i) of the Act.

Dated: December 11, 2019.

**Jeffrey I. Kessler,**

*Assistant Secretary for Enforcement and Compliance.*

## Appendix

### Issues and Decision Memorandum

I. Summary
II. Background
III. Scope of the Order
IV. Changes Since the *Preliminary Results*
V. Discussion of the Issues
    Comment 1: Selection of the Primary Surrogate Country
    Comment 2 Bituminous Coal Surrogate Value
    Comment 3: Coal Tar Surrogate Value
    Comment 4: Calculation of Surrogate Financial Ratios
    Comment 5: Application of Adverse Facts Available for Merchandise Produced by Certain Suppliers of Carbon Activated

    Comment 6: Selection of Appropriate Factors of Production Database for Carbon Activated
    Comment 7: Correction of Preliminary Results Calculation Error
    Comment 8: Treatment of Tancarb Activated Carbon Co., Ltd.
VI. Recommendation

[FR Doc. 2019–27134 Filed 12–16–19; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–489–816]

### Certain Oil Country Tubular Goods From Turkey: Rescission of Antidumping Duty Administrative Review; 2018–2019

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) is rescinding the administrative review of the antidumping duty order on certain oil country tubular goods (OCTG) from Turkey for the period September 1, 2018, through August 31, 2019.

**DATES:** Applicable December 17, 2019.

**FOR FURTHER INFORMATION CONTACT:** Lochard Philozin, AD/CVD Operations, Office I, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–4260.

**SUPPLEMENTARY INFORMATION:**

### Background

On September 3, 2019, Commerce published a notice of opportunity to request an administrative review of the antidumping duty order on OCTG from Turkey for the period of review September 1, 2018, through August 31, 2019.[1] On September 30, 2019, the petitioners[2] timely requested an administrative review of the order with respect to certain companies.[3] On

---

[1] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review,* 84 FR 45949 (September 3, 2019).

[2] The petitioners are United States Steel Corporation, Maverick Tube Corporation, Tenaris Bay City, Inc., TMK IPSCO, Vallourec Star, L.P., and Welded Tube USA.

[3] *See* the petitioners' Letter, "Oil Country Tubular Goods from Turkey: Request for Administrative Review of Antidumping Duty Order," dated September 30, 2019. The petitioners requested a review of the following companies: Bakır Grup Makine İmalat Bakım Montaj Demontaj Sanayi ve Ticaret Ltd. Şti., Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. and its affiliates (collectively, Borusan), Cayirova Boru Sanayi ve Ticaret A.S.,

Continued

Slip Op. 21-35

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD. AND CARBON ACTIVATED CORPORATION, ET AL., <br><br> Plaintiffs, <br><br> and <br><br> BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD. AND NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> CALGON CARBON CORPORATION AND CABOT NORIT AMERICAS, INC., <br><br> Defendant-Intervenors. | Before: Mark A. Barnett, Judge <br> Court No. 20-00007 |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the eleventh administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China.]

Dated: April 2, 2021

Dharmendra N. Choudhary and Jordan C. Kahn, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, DC, for Plaintiffs and Plaintiff-Intervenors. With them on the brief was Francis J. Sailer.

<u>Mollie L. Finnan</u>, Senior Trial Counsel, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, of Washington, DC, for Defendant.  With her on the brief were <u>Jeffrey B. Clark</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Claudia Burke</u>, Assistant Director.  Of counsel were <u>Ian A. McInerney</u> and <u>Ayat Mujais</u>, Attorneys, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Melissa M. Brewer</u>, Kelley Drye & Warren LLP, of Washington, DC, for Defendant-Intervenors.  With her on the brief were <u>John M. Herrmann</u>, <u>R. Alan Luberda</u>, and <u>Julia A. Kuelzow</u>.

Barnett, Judge: This matter is before the court following the U.S. Department of Commerce's ("Commerce" or "the agency") final results in the eleventh administrative review ("AR11") of the antidumping duty order on certain activated carbon from the People's Republic of China ("China") for the period of review ("POR") April 1, 2017, through March 31, 2018.  *See Certain Activated Carbon From the People's Republic of China*, 84 Fed. Reg. 68,881 (Dep't Commerce Dec. 17, 2019) (final results of antidumping duty admin. review; 2017–2018) ("*Final Results*"), ECF No. 39-2, and accompanying Issues and Decision Mem., A-570-904 (Dec. 11, 2019) ("I&D Mem."), ECF No. 39-3.[1]

---

[1] The administrative record filed in connection with the *Final Results* is divided into a Public Administrative Record ("PR"), ECF No. 39-5, and a Confidential Administrative Record ("CR"), ECF No. 39-4.  Parties filed joint appendices containing record documents cited in their briefs.  *See* Public J.A., ECF Nos. 52 (Vol. I; Tabs 1–13), 52-1 (Vol. II; Tabs 14–15), 52-2 (Vol. III; Tabs 16–30); Confidential J.A. ("CJA"), ECF Nos. 57 (Vol. I; Tabs 1–9), 57-1 (Vol. II; Tabs 10–15), 57-2 (Vol. III; Tabs 16–30); Suppl. Confidential J.A. ("Suppl. CJA"), ECF No. 62.  Citations are to the confidential joint appendices unless stated otherwise.

Plaintiffs and Plaintiff-Intervenors (collectively, "Plaintiffs")[2] challenge Commerce's (1) selection of Malaysia instead of Romania as the primary surrogate country; (2) selection of surrogate values for Carbon Activated's and DJAC's inputs of bituminous coal and coal tar pitch; and (3) calculation of surrogate financial ratios. *See* Confidential Pls.' and Pl.-Ints.' Mot. for J. on the Agency R. Pursuant to Rule 56.2, ECF No. 43, and accompanying [Corrected] Confidential Mem. of Law in Supp. of Pls.' and Pl.-Ints.' Mot. for J. on the Agency R. Pursuant to USCIT Rule 56.2 ("Pls.' Mem."), ECF No. 59; Confidential Pls.' and Pl.-Ints.' Reply to Def. and Def.-Ints.' Resps. to Pls.' and Pl.-Ints.' Rule 56.2 Mot. for J. on the Agency R. ("Pls.' Reply"), ECF No. 50.

Defendant United States ("the Government") and Defendant-Intervenors Calgon Carbon Corporation and Cabot Norit Americas, Inc. (together, "Calgon") filed response briefs in support of Commerce's determinations respecting each contested issue. *See* Def.'s Resp. to Pls.' Rule 56.2 Mot. for J. on the Agency R. ("Def.'s Resp."), ECF No. 45; Confidential Def.-Ints.' Resp. Br. in Opp'n to Pls.' Mot. for J. on the Agency R. ("Def.-Ints.' Resp."), ECF No. 48. At oral argument, the Government acknowledged that a remand with respect to financial ratios may be appropriate given Commerce's recent consideration of similar adjustments on remand in the tenth administrative review ("AR10") of the underlying order. Oral Arg. 1:38:55–1:40:05 (approximate time stamp

---

[2] Plaintiffs consist of Carbon Activated Tianjin Co., Ltd. ("Carbon Activated"), Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd. ("DJAC"), Beijing Pacific Activated Carbon Products Co., Ltd., Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Ningxia Mineral & Chemical Limited, and Shanxi Sincere Industrial Co., Ltd.

from oral argument), *available at* https://www.cit.uscourts.gov/sites/cit/files/031121-20-00007-MAB.mp3 (last visited Apr. 2, 2021).

For the following reasons, the court sustains Commerce's selection of surrogate data to value coal tar pitch and remands Commerce's determinations with respect to surrogate country selection, selection of surrogate data to value bituminous coal, and calculation of financial ratios.

## BACKGROUND

Commerce initiated AR11 on June 6, 2018. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 Fed. Reg. 26,258, 26,260 (Dep't Commerce June 6, 2018). On July 3, 2018, Commerce selected Carbon Activated and DJAC as mandatory respondents.[3] *Selection of Respondents for Individual Review* (July 3, 2018) at 5, PR 27, CJA Tab 2.

On June 14, 2019, Commerce issued its preliminary results. *Certain Activated Carbon From the People's Republic of China*, 84 Fed. Reg. 27,758 (Dep't Commerce June 14, 2019) (prelim. results of antidumping duty admin. review and prelim. determination of no shipments; 2017–2018) ("*Preliminary Results*"), PR 234, CJA Tab 21, and accompanying Decision Mem. for the Prelim. Results, A-570-904 (June 10, 2019) ("Prelim. Mem."), PR 225, CJA Tab 19. Commerce calculated preliminary weighted-average dumping margins for Carbon Activated and DJAC in the amounts of 1.65 percent and 4.33 percent, respectively. *Prelim. Results*, 84 Fed. Reg. at 27,759.

---

[3] When in reference to the underlying agency proceeding, the court refers to Carbon Activated and DJAC as "Respondents" and Calgon as "Petitioners."

Commerce calculated a separate rate for non-examined respondents in the amount of 3.90 percent, equal to the weighted-average rate of the mandatory respondents based on U.S. sales volume. *Id.*

Commerce issued the *Final Results* on December 17, 2019. Following several changes to the *Preliminary Results*, Commerce calculated final weighted-average dumping margins for Carbon Activated and DJAC in the amounts of 1.02 percent and 0.86 percent, respectively. *Final Results*, 84 Fed. Reg. at 68,882. The separate rate was therefore reduced to 0.89 percent. *Id.*

This appeal followed. *See* Summons, ECF No. 1; Compl., ECF No. 7. The court heard oral argument on March 11, 2021. *See* Docket Entry, ECF No. 65.[4]

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018) and 28 U.S.C. § 1581(c) (2018).[5] The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

### DISCUSSION

I.     **Legal Framework for Surrogate Country and Surrogate Value Selection**

An antidumping duty is "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673.

---

[4] Additional background information is summarized in each discussion section.
[5] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise specified.

Court No. 20-00007                                                        Page 6

When an antidumping duty proceeding involves a nonmarket economy country,

Commerce determines normal value by valuing the factors of production[6] used in

producing the subject merchandise; general expenses; profit; and "the cost of

containers, coverings, and other expenses" in a surrogate market economy country.  *Id.*

§ 1677b(c)(1).  In selecting these "surrogate values," Commerce must, "to the extent

possible," use data from a market economy country that is at "a level of economic

development comparable to that of the nonmarket economy country" and is a

"significant producer[] of comparable merchandise."  *Id.* § 1677b(c)(4).

Commerce has adopted a four-step process for selecting a primary surrogate

country:

> (1) the Office of Policy ("OP") assembles a list [("the OP List")] of potential
> surrogate countries that are at a comparable level of economic
> development to the [non-market economy] country; (2) Commerce
> identifies countries from the list with producers of comparable
> merchandise; (3) Commerce determines whether any of the countries
> which produce comparable merchandise are significant producers of that
> comparable merchandise; and (4) if more than one country satisfies steps
> (1)–(3), Commerce will select the country with the best factors data.

*Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016)

(second alteration original); *see also* Import Admin., U.S. Dep't of Commerce, Non–

Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004)

("Policy Bulletin 04.1"), http://enforcement.trade.gov/policy/bull04-1.html (last visited

---

[6] The factors of production include but are not limited to: "(A) hours of labor required, (B)
quantities of raw materials employed, (C) amounts of energy and other utilities
consumed, and (D) representative capital cost, including depreciation."  19 U.S.C.
§ 1677b(c)(3).

Apr. 2, 2021).  Commerce generally values all factors of production in a single surrogate

country, referred to as the "primary surrogate country."  *See* 19 C.F.R. § 351.408(c)(2)

(excepting labor).  *But see Antidumping Methodologies in Proceedings Involving Non–*

*Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092,

36,093–94 (Dep't Commerce June 21, 2011) (expressing a preference to value labor

based on industry-specific labor rates from the primary surrogate country).  Commerce

prefers surrogate values that are "product-specific, representative of a broad-market

average, publicly available, contemporaneous with the POR, and tax and duty

exclusive."  I&D Mem. at 13 & n.68 (citation omitted); *see also* 19 C.F.R.

§ 351.408(c)(1),(4) (directing Commerce to select "publicly available"/"non-proprietary

information" to value factors of production and "manufacturing overhead, general

expenses, and profit").  Commerce has broad discretion to determine what constitutes

"the best available information" for the selection of surrogate values.  *QVD Food Co. v.*

*United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).

## II.     Primary Surrogate Country Selection

For the *Preliminary Results*, Commerce determined that Malaysia and Romania,

among other countries on the OP List, constituted significant producers of comparable

merchandise for the POR based on their respective export volumes.  *See* Prelim. Mem.

at 14.  Commerce also found that Thailand constituted a significant producer of

comparable merchandise based on net exports by volume.  *See id.* at 15.  Based on its

subsequent analysis of surrogate value data, Commerce preliminarily selected Malaysia

as the primary surrogate country and Romania as the secondary surrogate country.

*See id.* at 15–16.  Commerce selected Malaysian import data to value Respondents' "raw materials, energy, and packing material inputs," *id.* at 24, and used a financial statement from a Romanian company, Romcarbon S.A. ("Romcarbon"), to value financial ratios, *id.* at 26.

For the *Final Results*, Commerce continued to select Malaysia as the primary surrogate country notwithstanding Respondents' arguments favoring Romania.  I&D Mem. at 6–7.  Commerce noted that both Malaysia and Romania are "at the same level of economic development as China."  *Id.* at 6.  With respect to the significant producer criterion, however, Commerce departed from its preliminary analysis.

Commerce stated that it relied on "exports of comparable merchandise from the six OP List countries, as a proxy for production data."  *Id*. at 7.  Commerce did not, however, explain its analysis of any country's exports or incorporate its preliminary analysis.  *See id.* at 7–8.  Commerce concluded that the record demonstrated that Malaysia was "a significant producer of identical merchandise" during the POR, but that the record did not support a finding that Romania was a significant producer of comparable merchandise.  *Id.* at 8.  Commerce explained that the record contained "three Malaysian financial statements" indicating that the "principal business activity" for each company "is the manufacture of activated carbon," *id.* at 7, whereas the record contained "only one financial statement . . . from a Romanian company," *id.* at 8.  Commerce noted that Romcarbon produced some activated carbon but primarily produced "polyethylene, polypropylene, polyvinyl chloride, polystyrene processing,

filters and protective materials." *Id.*[7]  Thus, while rejecting the Malaysian financial

statements to value financial ratios, *id*. at 9, Commerce selected Malaysia as the

primary surrogate country because "it provides stronger evidence of production of the

subject merchandise in the form of multiple financial statements," *id*. at 7–8.  Commerce

declined to compare the quality and availability of Malaysian and Romanian data for the

purpose of primary surrogate country selection, finding the issue to be "moot."  *Id.* at 8.

Commerce used Malaysian data to value Respondents' factors of production with

exceptions for financial ratios and bituminous coal, for which the agency used

Romanian data.  *See* Surrogate Values for the Final Results (Dec. 11, 2019) ("Final SV

Mem."), Attach. 1, PR 265–66, CJA Tab 28.

### A.  Parties' Contentions

Plaintiffs raise several challenges to Commerce's surrogate country selection.

Plaintiffs first contend that Commerce failed to address its departure from the

*Preliminary Results* with respect to Romania's status as a significant producer.  Pls.'

Mem. at 32.  Plaintiffs further contend that "Commerce's elimination of Romania was not

'supported by substantial evidence.'"  *Id.*  Plaintiffs point to record evidence concerning

Romcarbon's share of Romanian consumption of activated carbon, which Plaintiffs

argue can be used to ascertain total Romanian consumption of activated carbon in 2017

and, in turn, total Romanian production of activated carbon.  *See id.* at 32–33.  Plaintiffs

---

[7] Plaintiffs assert that at least some of this merchandise may be considered comparable
to the subject merchandise.  Pls.' Mem. at 33.  Commerce did not, however, state its
views on that issue.

also contend that Commerce's selection of Malaysia rests on a misinterpretation of both Commerce policy, which disfavors the "comparison of production data," *id.* at 34, and 19 U.S.C. § 1677b(c)(4), which permits the identification of more than one significant producer country and does not contain a preference for identical merchandise, *see id.* at 34–36; Pls.' Reply at 9–10.  Lastly, Plaintiffs contend that Commerce should have selected Romania as the primary surrogate country pursuant to statutory language indicating that the significant producer criterion need only be satisfied "to the extent possible" because Romania provided quality surrogate values for Respondents' main inputs.  Pls.' Mem. at 36 (quoting 19 U.S.C. § 1677b(c)(4)).

The Government contends that Commerce's selection of Malaysia as the primary surrogate country is supported by substantial evidence.  Def.'s Resp. at 12.  The Government points to evidence concerning Malaysia's export value and volume, *id.* at 14 (citing I&D Mem. at 7 & n.34), and the three Malaysian companies' production of identical merchandise, *id.* at 15.  The Government further contends that "[s]ubstantial evidence in the record supports Commerce's ultimate conclusion that Romania was not a significant producer of comparable merchandise during the period of review," *id.* at 16, and Plaintiffs failed to exhaust their argument that Romcarbon's financial statements demonstrated that Romania was a significant producer, *id.* at 18–21; *see also* Def.-Ints.' Resp. at 11–12 & n.1.

Calgon contends that Plaintiffs' arguments amount to an impermissible request for the court to reweigh the evidence and rest on the erroneous conclusion that the

record supports a finding that Romania is a significant producer of comparable

merchandise.  *See* Def.-Ints.' Resp. at 10–13.

In their Reply, Plaintiffs counter that the Government has advanced

impermissible *post hoc* justifications for Commerce's decision with respect to the

Government's analysis of export data.  Pls.' Reply at 9.  Plaintiffs further contend that

the doctrine of administrative exhaustion should not preclude arguments concerning

Romania's production of comparable merchandise because Commerce preliminarily

found that Romania was a significant producer of comparable merchandise and

Petitioners did not challenge that finding in their administrative case brief.  *Id.* at 4–6.

**B. Commerce's Selection of Malaysia as the Primary Surrogate Country Requires Reconsideration**

Commerce has failed to adequately explain or support with substantial evidence

its selection of Malaysia and rejection of Romania as the primary surrogate country.

While Commerce stated that it "analyzed exports of comparable merchandise from the

six OP List countries," the agency neglected to explain its analysis or state any findings

in that regard.  *See* I&D Mem. at 7.  The Government's assertion that Commerce based

its determination on Global Trade Atlas and 2017 UN Comtrade data regarding export

values and volume is not persuasive.  *See* Def.'s Resp. at 14 (citing I&D Mem. at 7 &

n.34).  The Government relies on a footnote in the Issues and Decision Memorandum

containing import and export volume data for each country on the OP List that merely

substantiates Commerce's assertion that no country is a net exporter by volume.  *See*

I&D Mem. at 7 n.34.  Commerce did not, however, analyze the data or reference the

value of any country's exports.  *See id*.  The Government's assertion at oral argument

that the court may instead infer Commerce's "analysis . . . from the record," Oral Arg.

8:25–8:47, also lacks merit.  The standard of review requires *Commerce*, not the court,

to "examine the record and articulate a satisfactory explanation for its action."

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir.

2013).

>          Commerce's statements regarding Malaysian production of identical

merchandise does not save its determination.  Commerce's "explanation must

reasonably tie the determination under review to the governing statutory standard and

to the record evidence by indicating what statutory interpretations the agency is

adopting and what facts the agency is finding."  *CS Wind Vietnam Co. v. United States*,

832 F.3d 1367, 1376 (Fed. Cir. 2016).  Section 1677b(c)(4)(B) "does not distinguish

between identical and comparable merchandise" for purposes of identifying significant

producer countries.  *Foshan Shunde Yongjian Housewares & Hardwares Co. v. United

States*, 37 CIT 256, 264, 896 F.Supp.2d 1313, 1322 (2013).  Commerce's conclusion

that "Malaysia provides the best available information . . . because it is the only country

on the OP List that is a significant producer of *identical* merchandise" suggests,

however, that the agency favored the production of identical merchandise when

selecting a primary surrogate country.  I&D Mem. at 8 (emphasis added).  Commerce

failed to explain why any such preference comports with the plain statutory language or

constitutes a permissible interpretation thereof.[8]  Commerce also did not explain why

production of identical merchandise by three companies was "significant" pursuant to

section 1677b(c)(4).  *See id.*; *cf.* Policy Bulletin 04.1 (explaining that Commerce's

decision "should be made consistent with the characteristics of world production of, and

trade in, comparable merchandise (subject to the availability of data on these

characteristics)").

With respect to Commerce's consideration of Romania, although "Commerce has

the flexibility to change its position" from the *Preliminary Results* to the *Final Results*,

the agency must "explain the basis for its change" and that explanation must be

"supported by substantial evidence."  *Asociacion Colombiana de Exportadores de

Flores v. United States*, 22 CIT 173, 185, 6 F. Supp. 2d 865, 880 (1998); *see also Peer

Bearing Co. v. United States*, 22 CIT 472, 481–82, 12 F. Supp. 2d 445, 456 (1998).

For these *Final Results*, Commerce purported to reconsider the export quantities

it had relied on for the *Preliminary Results*.  I&D Mem. at 7; *see generally* Prelim. Mem.

at 14.  Without any analysis, however, Commerce reached the contrary conclusion that

"the record . . . does *not* support a finding that Romania . . . is a significant producer of

---

[8] At oral argument, the Government relied on Policy Bulletin 04.1 to assert that
Commerce maintains a preference for production of identical merchandise in its
surrogate country selection process, but that this preference only arises when
Commerce is comparing data quality.  Oral Arg. 15:05–16:28.  Policy Bulletin 04.1
merely states the steps Commerce must follow in order to identify the countries on the
OP List subject to examination for significant production of comparable (inclusive of
identical) merchandise.  *See* Policy Bulletin 04.1.  It does not support the existence of a
policy preference concerning production of identical merchandise, either with respect to
significant production or otherwise.

comparable merchandise."  I&D Mem. at 8 (emphasis added).  Commerce failed to

explain why its preliminary finding based on export quantity was no longer valid or cite

substantial evidence for the change.[9]

Commerce appears to have based its decision on a comparison of the number of

financial statements on the record from Romania as compared to Malaysia and

differences in the principal production activities among the companies.  *See id*. at 7–8.

However, "Commerce's practice is not to evaluate [t]he extent to which a country is a

significant producer . . . against . . . the comparative production of the five or six

countries on [Commerce's] surrogate country list."  *Jacobi Carbons AB v. United States*,

43 CIT ___, ___, 365 F. Supp. 3d 1344, 1353 (2019) (citation omitted) (alterations

original); *see also* Policy Bulletin 04.1.

The Government offers no persuasive defense of Commerce's determination.

The Government asserts that "Commerce reasonably concluded that Romania's exports

by value (102,387 USD) and quantity (3051 kg) were too small to reflect significant

production on this record."  Def.'s Resp. at 16 (citing DJAC and Carbon Activated

Surrogate Country Cmts. (Oct, 12, 2018) ("Respondents' SC Cmts."), PR 99, CJA Tab

---

[9] The court takes no position on the soundness of Commerce's preliminary conclusion respecting Romania or any other potential surrogate country.  However, the court must ensure that Commerce's change in position is not arbitrary.  *See Asociacion Colombiana de Exportadores de Flores*, 22 CIT at n.20, 6 F. Supp. 2d at n.20 (explaining that "[a] change [in position] is arbitrary [when] the factual findings underlying the reason for [the] change are not supported by substantial evidence" or when the change is unsupported by a reasoned explanation that is "[]consistent with the statutory mandate").

6).[10]  The Government further asserts that "Commerce reasonably concluded that

Romanian production of activated carbon was not significant in terms of world

production of, and trade in, comparable merchandise."  Def.'s Resp. at 17 (citing Policy

Bulletin 04.1; *Fresh Garlic Prods. Assoc. v. United States*, 40 CIT ___, ___, 180 F.

Supp. 3d 1233, 1244 (2016)).  Notably, the Government does not cite to Commerce's

determination, which lacks any such analysis of Romanian production in the context of

world production.  The Government's *post hoc* rationalizations are not a basis upon

which the court may sustain Commerce's determination.  *See Burlington Truck Lines,*

*Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

        The Government also argues that the court should sustain Commerce's selection

of Malaysia as the primary surrogate country irrespective of any shortcomings in

Commerce's decision regarding Romania because Commerce expressed its clear view

that the quality of the available data supports Malaysia.  Oral Arg. 23:46–24:34; *cf.*

Def.'s Resp. at 14 (arguing that Commerce based its selection of Malaysia, in part, on

consideration of the fourth selection criterion—data quality).  The Government

misconstrues Commerce's sequential surrogate country selection methodology and the

court's standard of review.  Commerce selected Malaysia after concluding that Malaysia

was a significant producer of identical merchandise and Romania was not a significant

producer of comparable merchandise.  *See* I&D Mem. at 7–8.  Commerce subsequently

---

[10] Contrary to the Government's assertion, the volume of Romanian exports in the cited
source documentation is 34,000 kg, not 3051 kg.  *See* Respondents' SC Cmts., Ex. 1;
Prelim. Mem. at 14.

considered Malaysian data quality in isolation and without reference to the comparable

quality of Romanian data because Commerce found that Romania did not meet the

significant producer requirement of section 1677b(c)(4)(B).  *See id.* at 8.[11]  Thus, the

court cannot sustain Commerce's determination on this basis.

Plaintiffs argue that record evidence concerning Romcarbon's share of the

domestic market establishes that Romania is a significant producer of comparable

merchandise.  Pls.' Mem. at 32–33.  It is not the court's role to determine in the first

instance whether the evidence favors Plaintiffs' position.  As discussed below, the

question is whether Plaintiffs waived those arguments, as Defendant and Calgon

contend, or should have the opportunity to present the arguments to Commerce.

Congress has directed the court to, "whe[n] appropriate, require the exhaustion

of administrative remedies."  28 U.S.C. § 2637(d).  While exhaustion is not jurisdictional,

*Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1363–64 (Fed. Cir.

2019), the statute "indicates a congressional intent that, absent a strong contrary

reason, the [USCIT] should insist that parties exhaust their remedies before the

pertinent administrative agencies," *id.* at 1362 (quoting *Boomerang Tube LLC v. United*

*States*, 856 F.3d 908, 912 (Fed. Cir. 2010)).

The Government argues that Respondents should have raised their domestic

market share argument before Commerce because they "had full and fair notice of the

---

[11] Commerce compared the Malaysian and Romanian financial statements on the
record for purposes of its significant producer analysis, but otherwise declined to
compare the quality of each country's data.  I&D Mem. at 7–8.

agency's intent to rely on Malaysia rather than Romania or another country."  Def.'s

Resp. at 20; *cf*. Def.-Ints.' Resp. at 11–12 & n.1.[12]  For the *Preliminary Results*,

however, Commerce determined that Romania, among other countries, was a

significant producer of comparable merchandise and reached its surrogate country

decision based on an analysis of each countries' respective data quality.  Prelim. Mem.

at 14–16.  Petitioners did not advance arguments challenging Commerce's findings

regarding the significant producer criterion, *see generally* Pet'rs' [Case] Br. (Oct. 7,

2019), CR 422, PR 253, CJA Tab 23, and Commerce did not signal any intention to

revisit its analysis.  Commerce need not "expressly notify interested parties any time it

intends to change its methodology between its preliminary and final determinations"

when there is "relevant data in the record" and interested parties advance "arguments

related to that data before Commerce."  *Boomerang*, 856 F.3d at 913.  However,

"*Boomerang* does not require parties to anticipate issues that have not been raised by a

party or the agency at that point."  *Calgon Carbon Corp. v. United States* ("*Calgon*

*AR10*"), 44 CIT ___, ___, 443 F. Supp. 3d 1334, 1353 (2020)) (citing *Boomerang*, 856

F.3d at 913).

---

[12] The Government argues that "[P]laintiffs offer no legal authority that would require consideration or adoption of a single company's share of its own domestic marketplace as a measure of significant producer status on a worldwide scale."  Def.'s Resp. at 20.  Commerce, however, is not required to adopt any specific measure.  Agency policy provides that "the standard for 'significant producer' will vary from case to case," and thus leaves open the possibility that Commerce will consider alternative measures.  Policy Bulletin 04.1.

Here, Romania's status as a significant producer was not among the issues raised by interested parties or Commerce prior to Commerce's issuance of the *Final Results*. Thus, Plaintiffs' arguments are not precluded by the doctrine of administrative exhaustion.[13]

In sum, Commerce has not provided an adequate explanation supported by substantial evidence giving effect to the statutory term "significant producer of comparable merchandise" pursuant to 19 U.S.C. § 1677b(c)(4)(B). The court is unable to discern Commerce's reasons for rejecting Romania as a primary surrogate country; selecting Malaysia as the primary surrogate country; and avoiding any comparative analysis of data quality for that purpose. Accordingly, Commerce's determination is remanded for reconsideration and further explanation.

## III. Bituminous Coal

For the *Final Results*, Commerce selected Romanian import data under Harmonized Schedule ("HS") 2701.12 as the surrogate value for bituminous coal after finding that the average unit value of Malaysian imports under HS 2701.12 was unreliable. I&D Mem. at 13–15. Commerce rejected Respondents' request to use import data under HS 2701.19, which covers "Other Coal," to value certain inputs of bituminous coal. *Id.* at 13–14. Respondents based their request on the application of

---

[13] Plaintiffs also argued that Commerce should have selected Romania as the primary surrogate country even if the evidence did not support a finding that Romania was a significant producer. *See* Pls.' Mem. at 36. Neither the Government nor Calgon directly responded to this argument. For the same reasons discussed above in relation to Plaintiffs' arguments concerning Romcarbon's domestic market share, the argument may be addressed by Commerce, as appropriate, on remand.

Chapter 27, Subheading Note 2 ("Note 2") to their inputs.  *See id.* at 14.  Note 2 limits

HS 2701.12, *inter alia*, to bituminous coal with "a calorific value limit . . . equal to or

greater than 5,833 kcal/kg."  *Id.*  Respondents therefore reasoned that Commerce

should value bituminous coal with a calorific value that is less than 5,833 kcal/kg under

HS 2701.19.  *Id.*

Upon review of the record, Commerce concluded that Note 2 applied solely to

Thai import data and declined to apply Note 2 to another country's import data.  *Id.* at 14

& n.76 (citing Carbon Activated Resp. to Sec. D Suppl. Questionnaire (Pt. I) (Feb. 21,

2019) ("Carbon Activated's 1SDQR (Pt. I)") at 19, CR 254–88, PR 162–65, CJA Tab

12); *see also* Carbon Activated's 1SDQR (Pt. I), Ex. SD-27 (copy of Note 2).

Commerce also found that Respondents had failed to demonstrate consumption of the

type of sub-bituminous coal typically "used as a heat source" that would be covered by

HS 2701.19.  I&D Mem. at 14.

### A.  Parties' Contentions

Plaintiffs contend that Commerce's declination to recognize the applicability of

Note 2 to all countries in the World Customs Organization ("WCO") through the

Harmonized System of Nomenclature contradicts Commerce practice and judicial

precedent.  Pls.' Mem. at 17–19.[14]  Plaintiffs also contend that Commerce erred in

---

[14] Plaintiffs cite *Jiangsu Senmao Bamboo & Wood Industry Co. v. United States*, 42 CIT
___, ___, 322 F. Supp. 3d 1308, 1320 (2018); Issues and Decision Mem. for the Final
Determination in the Antidumping Duty Investigation of Certain Stilbenic Optical
Brightening Agents from the People's Republic of China, A-570-972 (Mar. 19, 2012) at
2–6 ("*Stilbenic* Mem."), *available at* https://enforcement.trade.gov/frn/summary/prc/

incorporating use as a consideration in its surrogate value selection because HS

2701.19 is not delimited by use.  *Id.* at 20.

The Government contends that Commerce's reliance on Romanian import data

under HS 2701.12 is supported by substantial evidence.  Def.'s Resp. at 22.  The

Government asserts that there is no record evidence demonstrating that Note 2 is

identical for all WCO countries or that Respondents used the type of bituminous coal

that would be covered by HS 2701.19.  *See id.* at 22–23; *cf.* Def.-Ints.' Resp. at 16–18.

Calgon contends that the precedent relied on by Plaintiffs is distinguishable.

Def.-Ints.' Resp. at 16–17.  Calgon further contends that the inclusion of "Additional U.S.

Notes" in the U.S. Harmonized Tariff System ("HTSUS") supports Commerce's decision

not to assume that subheading notes are identical across countries.  *See id.* at 17.

### B. Commerce's Selection of Surrogate Data to Value Bituminous Coal Requires Reconsideration and Further Explanation

The court is unable to discern the path of Commerce's reasoning on this issue

and remands the matter for reconsideration and further explanation with respect to the

applicability of Note 2 and Commerce's understanding of the relevant parts of the

record.

Commerce addressed Respondents' request to apply Note 2 as a factual matter

and found the request unsupported by the record.  I&D Mem. at 14.  Commerce did not,

---

2012-7215-1.pdf (last visited Apr. 2, 2021); and Issues and Decision Mem. for the Final
Results of the 2011 - 2012 Admin. Review on Polyethylene Terephthalate Film, Sheet,
and Strip from the People's Republic of China, A-570-924 (June 24, 2014) at 14–20
("*PET* Mem."), *available at* https://enforcement.trade.gov/frn/summary/prc/2014-15574-
1.pdf (last visited Apr. 2, 2021).  *See* Pls.' Mem. at 17–18; Pls.' Reply at 2.

however, address Respondents' argument that Note 2 applied to the tariff systems of

countries other than Thailand given the harmonization of WCO tariff classification at the

six-digit level.  *See* Case Br. of [DJAC], [Carbon Activated] and Carbon Activated Corp.

(Oct. 7, 2019) ("Respondents' Case Br.") at 27 n.38, CR 421, PR 250, CJA Tab 22.

 Respondents' argument is not without precedent.  In prior determinations,

Commerce has taken the position that products subject to international trade generally

will enter WCO countries under the same six-digit subheading.  *See PET* Mem. at 20

(stating that "[t]he International Convention on the Harmonized Commodity and Coding

System applies the same [HS] six-digit prefix to products subject to international trade");

First Admin. Review of Sodium Hexametaphosphate from the People's Republic of

China: Issues and Decision Mem. for the Final Results, A-570-908 (Oct. 12, 2010) at 8

n.32, *available at* https://enforcement.trade.gov/frn/summary/prc/2010-26458-1.pdf (last

visited Apr. 2, 2021) ("*Hex* Mem.") (stating same).  Commerce has relied on this

principle to apply a subheading chapter note placed on an administrative record in

connection with South African import data to Indonesian data for purposes of surrogate

valuation.  *See PET* Mem. at 20.  Commerce also has considered the way in which the

United States classifies an input to determine the correct six-digit heading under

another country's classification system for surrogate valuation.  *See Stilbenic* Mem. at 4

& n.22; *Hex* Mem. at 7–8.  Commerce's rationale for rejecting Respondents' argument

on this issue, without further explanation, is arbitrary; thus, a remand is necessary for

Commerce to clarify or revise its position.[15]

Additionally, Commerce's understanding of the record evidence concerning the

characteristics of Respondents' bituminous coal inputs is unclear.  Commerce stated

that "[R]espondents have not provided *any* evidence that they used [the type of

bituminous coal that] would be categorized as HS 2701.19."  I&D Mem. at 14 (emphasis

added).  There is, however, some indication in the record that Respondents (or their

respective suppliers) consumed bituminous coal with a calorific value that is less than

5,833 kcal/kg.  *See* Carbon Activated Resp. to Sec. D Pts. II and III First Suppl.

Questionnaire (Mar. 15, 2019) ("Carbon Activated's SDQR Pts. II–III"), Ex. SD-15, CR

---

[15] Parties' remaining arguments are not persuasive.  Calgon's argument regarding the
inclusion of "Additional U.S. Notes" in the HTSUS is based on information that is not
part of the administrative record and was not the basis of an argument before
Commerce.  Def.-Ints.' Resp. at 17 (citing Pls.' Mem. at 17–18 & n.6, which in turn, cites
a webpage as evidence of the HTSUS).  While there is no indication that Note 2 is
specific to Thailand, such arguments are better left for Commerce to consider and
address in the first instance.

Plaintiffs' reliance on *Jiangsu Senmao* is also misplaced.  In that case, the court
held that Commerce erred in rejecting a respondent's administrative case brief because
it contained purportedly untimely factual information in the form of HS Explanatory
Notes ("ENs").  *Jiangsu Senmao*, 322 F. Supp. 3d at 1323–24.  The court reasoned that
"[t]he ENs are not evidence" or factual information used to value factors of production
but are instead "an international legal reference essential to the proper interpretation of
the HS nomenclature and [General Rules of Interpretation]."  *Id.* at 1324.  The court
distinguished ENs from import data—factual information—used to value the factors of
production.  *See id.*  Note 2 falls within the latter category.  *Cf. Degussa Corp. v. United
States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) ("The section and chapter notes are
integral parts of the HTSUS, and have the same legal force as the text of the
headings.").  However, as discussed, the inquiry does not end there to the extent that
Commerce must address Respondents' arguments concerning the harmonization of six-
digit subheadings.

301–17, PR 180, CJA Tab 13; DJAC Suppl. Sec. D Resp. (Feb. 12, 2019) ("DJAC's

SDQR") at 8, Exs. SD-12, SD-13, SD-56, CR 174–252, PR 148–56, CJA Tab 11.  It is

unclear whether Commerce considered this evidence or found it insufficient.

Accordingly, on remand, Commerce must also reconsider and further explain its view of

the record on this issue.[16]

## IV.    Coal Tar Pitch

        For the *Preliminary Results*, Commerce valued coal tar pitch using Malaysian

import data under HS 2706.00, which covers "Coal Tar."  I&D Mem. at 18; *see also*

Surrogate Values for the Prelim. Results (June 10, 2019) ("Prelim. SV Mem."), Attach.

1, PR 226–29, CJA Tab 20.[17]  For the *Final Results*, Commerce instead used Malaysian

import data under HS 2708.10, which covers "Pitch from Coal and Other Mineral Tars."

*Id.* at 18, 19.  Commerce offered several rationales for its decision.

        Commerce explained that Respondents each reported the input as "coal tar

pitch" and not "coal tar" for certain suppliers, *id.* at 19, and that coal tar pitch "is

commonly known as 'pitch' in the industry," *id.* at 19 & n.112 (citation omitted).

Regarding the production process, Commerce noted that two types of coal tar pitch—

---

[16] The court further leaves to Commerce, on remand, to address Plaintiffs' arguments
concerning the valuation of bituminous coal inputs with an undetermined calorific value.
*See* Pls.' Mem. at 20–21 (asserting that, for such inputs, Commerce should use the
average of Romanian data under HS 2701.12 and HS 2701.19); Pls.' Reply at 3 (same).
[17] In the narrative portion of its preliminary surrogate value memorandum, Commerce
listed both coal tar and coal tar pitch as surrogate values with corresponding tariff
provisions of HS 2706.00 and HS 2708.10, respectively.  *See* Prelim. SV Mem. at 5.
Commerce preliminarily used only HS 2706.00, however, to value Respondents' coal tar
pitch.  Prelim. SV Mem., Attach. 1; *see also* I&D Mem. at 18 n.106 (noting the
discrepancy).

binder and impregnating grade—are derived from the fractionated distillation of coal tar.
*Id.* at 19 & n.114 (citing First Surrogate Value Cmts. By [Respondents] (Nov. 9, 2018)
("Respondents' SV Cmts."), Ex. 5E, PR 109–14, CJA Tab 9).  Commerce thus found
"that HS 2706.00 covers coal tar, which is a by-product of the coke production process,
whereas HS 2708.10 covers pitch, a product of the coal tar distillation process."  *Id.* at
19.  Commerce rejected as unsupported Respondents' "assertion that HS 2708.10
covers [only] 100 percent pure pitch distilled in a tar workshop."  *Id.* at 19 & n.115 (citing
Respondents' Case Br. at 29).

    **A.  Parties' Contentions**

    Plaintiffs contend that Commerce's reliance on commercial parlance instead of
pitch content to select HS 2706.00 represents an unexplained departure from the
agency's approach in the prior administrative review, which was affirmed by the court.
Pls.' Mem. at 22–23 (citing *Calgon (AR10)*, 443 F. Supp. 3d at 1343–45); Pls.' Reply at
14.  Plaintiffs argue that HS 2706.00 must be construed to cover coal tar or coal tar
pitch with less than 100 percent pitch content and "[HS] 2708.10 must be construed to
cover 100[ percent] pure pitch."  *Id.* at 24.  Concluding otherwise, Plaintiffs argue, could
result in the same input being covered by both subheadings.  *Id.*  Plaintiffs also contend
that Malaysian import data under both HS 2706.00 and HS 2708.10 are aberrant based
on the predominance of Spanish exports in the average unit values and Commerce
should instead rely on Russian import data under HS 2706.00.  *See id.* at 24–27.

    The Government contends that Commerce's surrogate value selection is
supported by substantial evidence.  Def.'s Resp. at 24.  The Government argues that

"Commerce reasonably rejected the premise that coal tar and coal tar pitch are

indistinguishable" based on the process by which coal tar and pitch are produced and

Respondents failed to establish that their respective inputs were covered by HS

2706.00.  *Id.* at 25; *cf.* Def.-Ints.' Resp. at 20–21.  The Government also contends that

Plaintiffs failed to present their arguments regarding the aberrancy of the Malaysian

data to Commerce and those arguments are now barred by the doctrine of

administrative exhaustion.  Def.'s Resp. at 26–27; *cf.* Def.-Ints.' Resp. at 22–23 & n.3.

Plaintiffs counter that the ENs to HS 2706.00 establish that coal tars with pitch

content above 60 percent are covered by that subheading.  Pls.' Reply at 16; *see also*

*id.* at 15–16 (averring that ENs are judicially noticeable pursuant to *Jiangsu Senmao*,

322 F. Supp. 3d at 1324).  Plaintiffs also contend that the Government's exhaustion

argument lacks merit because Respondents challenged the aberrancy of HS 2706.00

before Commerce and lacked the opportunity to present to Commerce arguments

concerning HS 2708.10.  *Id.* at 16–17.

### B. Commerce's Selection of Surrogate Data to Value Coal Tar Pitch is Supported by Substantial Evidence

Plaintiffs are correct that, in AR10, Commerce valued inputs of coal tar pitch

using HS 2706.00.  *Calgon (AR10)*, 443 F. Supp. 3d at 1343.  In that proceeding,

Commerce based its decision on pitch content and discounted evidence demonstrating

that the respondents used coal tar pitch and a separate pitch input for the same

production purpose.  *Id.* at 1344.  It is well settled, however, that "each administrative

review is a separate exercise of Commerce's authority that allows for different

conclusions based on different facts in the record."  *Jiaxing Brother*, 822 F.3d at 1299

(quoting *Qingdao Sea–Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed.

Cir. 2014)).  Thus, the question is whether Commerce has offered an adequate

explanation "for treating similar situations differently."  *SKF USA Inc. v. United States*,

263 F.3d 1369, 1382 (Fed. Cir. 2001) (citation omitted).

 This issue presents a close call.  While Commerce's determination may have

benefitted from greater recognition that the agency had departed from its treatment of

coal tar pitch in AR10, the court discerns from Commerce's discussion an adequate

explanation, supported by substantial evidence, for the change.

 Respondents' submissions in the underlying proceeding demonstrate that the

distillation of coal tar yields coal tar pitch.  I&D Mem. at 19 & n.114 (citing Respondents'

SV Cmts., Ex. 5E).  Further distillation of coal tar pitch yields higher grades of pitch.

*See* Respondents' SV Cmts., Ex. 5E, Fig. 1 (a schematic illustration of the production of

coal tar pitch and anthracene oil-based pitch beginning with the distillation of coal tar).

Given that coal tar pitch is referred to as "pitch" in commercial parlance, Commerce was

within its discretion to identify HS 2708.10 instead of HS 2706.00 as the best available

information.  *See* I&D Mem. at 19; *QVD Food Co.*, 658 F.3d at 1323.

 Plaintiffs' assertion that HS 2706.00 covers coal tar and coal tar pitch with less

than 100 percent pitch content and HS 2708.10 covers 100 percent pure pitch is

unsupported by citations to record evidence.  *See* Pls.' Mem. at 24; I&D Mem. at 19.

Plaintiffs' argument that a contrary conclusion would result in the same input being

covered under both headings also is not persuasive.  *See* Pls.' Mem. at 24.  At the

hearing, the court afforded Plaintiffs an additional opportunity to explain why their inputs

of coal tar pitch are necessarily covered by HS 2706.00.  Letter to Counsel (Mar. 3,

2021) ("Ltr. to Counsel") ¶ 3(a)(i), ECF No. 61.  Plaintiffs referred to record evidence

concerning the processing of coal tar into coal tar pitch, but which also demonstrates

that coal tar generally has a lower pitch content than the coal tar pitch consumed by

Respondents.  Oral Arg. 1:17:33–1:18:54, 1:23:11–1:27:55.  *Compare* Pls.' Mem. at 23

(citing Respondents' SV Cmts., Ex. 5G), *and* Respondents' Case Br. at 29–30 & nn.47–

48 (citing Respondents' SV Cmts., Ex. 5K), *with* Carbon Activated's SDQR Pts. II–III,

Ex. SD-6 (reflecting the pitch content of their inputs), *and* DJAC's SDQR, Ex. SD-53

(same).  This evidence is insufficient to require the distinction Plaintiffs seek to draw

with respect to the competing subheadings and, thus, does not detract from the

substantial evidence supporting Commerce's determination.

     Plaintiffs' argument that the ENs to HS 2706.00 support a finding that coal tar

pitch is covered by that subheading, Pls.' Reply at 15–16, is precluded by the doctrine

of administrative exhaustion.  *See* 28 U.S.C. § 2637(d); *Weishan Hongda*, 917 F.3d

1362.  Notwithstanding the ENs' usefulness as a legal reference for purposes of tariff

classification, *see Jiangsu Senmao*, 322 F. Supp. 3d at 1324, Respondents failed to

argue the relevance of the ENs before Commerce.  A remand to the agency to consider

the ENs in the first instance would undermine the interest in judicial efficiency that

administrative exhaustion is intended to protect.  *See, e.g.*, *Corus Staal BV v. United

States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

Plaintiffs likewise failed to exhaust their arguments regarding the aberrancy of Malaysian import data under HS 2708.10 based on the predominance of Spanish exports in the average unit values. Pls.' Mem. at 25–26. Plaintiffs' argument that they had "no opportunity" to present arguments concerning the reliability of this value to Commerce is unconvincing. Pls.' Reply at 17. Respondents' administrative case brief presented arguments against the use of HS 2708.10 based on Respondents' understanding that Commerce had preliminarily used that subheading to value Carbon Activated's coal tar pitch. *See* Respondents' Case Br. at 29–30. Respondents thus had ample opportunity to present this argument to Commerce and cannot now "seek[] a new 'bite at the apple.'" *Calgon (AR10)*, 443 F. Supp. 3d at 1353–54; *see also Boomerang*, 856 F.3d at 913 (finding an abuse of the discretion afforded by 28 U.S.C. § 2637(d) when the court declined to require exhaustion of arguments the proponent of which had the opportunity to present to Commerce).[18]

Accordingly, Commerce's determination to use Malaysian data under HS 2708.10 to value coal tar pitch is sustained.

---

[18] Commerce declined to consider Respondents' argument that the Malaysian average unit value under HS 2706.00 is aberrant because it is higher than the Malaysian average unit value under HS 2708.10. I&D Mem. at 19. Commerce reasoned that the issue is moot given Commerce's decision not to rely on HS 2706.00. *Id.* Because the court is sustaining Commerce's decision to use HS 2708.10, the court need not address Plaintiffs' arguments concerning an alternative basis for finding HS 2706.00 to be aberrant or whether such arguments are foreclosed by the doctrine of administrative exhaustion.

Court No. 20-00007                                                                                    Page 29

### V.      Financial Ratios

For the *Final Results*, as noted, Commerce valued financial ratios using Romcarbon's 2017 financial statement.  I&D Mem. at 6.  At issue are various adjustments to the financial ratios.  *See id.* at 21–23.  Respondents requested Commerce to (1) offset pre-tax profit by the amounts listed under "Gain/(Loss) on adjustment of investment property at fair value" and "Gain/(Loss) on disposal of investment property"; (2) offset sales, general, and administrative expenses ("SG&A") by the amount listed under "Other Gains"; and (3) allocate the amount listed under "Social Contributions" and "Meal Tickets" to labor costs instead of SG&A.  Respondents' Case Br. at 32–36.  Commerce declined each request.  I&D Mem. at 22–23.  In so doing, however, Commerce treated Respondents' request to offset pre-tax profit as a request to offset SG&A.  *See id.* at 22.

In its response brief, the Government urged the court to sustain Commerce's determinations as to the contested adjustments.  Def.'s Resp. at 27–31.  Following the Government's filing of the response, the court sustained Commerce's determination on remand in AR10 to make adjustments to the financial ratios based on Romcarbon's financial statement that are similar to—if not the same as—certain adjustments Commerce declined to make in this case.  *See* Pls.' Reply at 19–22 (discussing *Calgon Carbon Corp., et al. v. United States, et al.*, Court No. 18-cv-00232, Final Results of Redetermination Pursuant to Court Remand at 8–13, 23 (CIT Aug. 5, 2020)); *Calgon Carbon Corp. v. United States*, 44 CIT ___, ___, 487 F. Supp. 3d 1359, 1362 (2020)

(sustaining Commerce's adjustments as uncontested and consistent with the court's remand instructions).

At oral argument, the Government stated that it could not identify distinguishing features in the financial statements that merited different treatment in this administrative review. Oral Arg. 1:39:25–1:40:04; *see also* Ltr. to Counsel ¶ 4(a). The Government further stated that although there might be differences in other aspects of the factual record that would support different treatment, particularly in relation to indirect labor costs, any remand should encompass all aspects of the adjustments so as not to constrain Commerce's redetermination. Oral Arg. 1:40:35–1:40:55. Calgon argued that the administrative record in AR11 as compared to AR10 supports certain distinctions but reserved its arguments for Commerce's consideration on remand. Oral Arg. 1:41:31–1:42:30.

Accordingly, given the inconsistencies between Commerce's determinations in AR10 and AR11 and the discrepancies in Commerce's explanations for declining the adjustments, this issue is remanded for reconsideration.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby:

**ORDERED** that Commerce's *Final Results* are sustained in part and remanded in part, consistent with this Opinion; it is further

**ORDERED** that Commerce's selection of surrogate data to value coal tar pitch is sustained; it is further

Court No. 20-00007                                                          Page 31

     **ORDERED** that, on remand, Commerce shall reconsider its selection of Malaysia as the primary surrogate country; it is further

     **ORDERED** that, on remand, Commerce shall reconsider its selection of surrogate data to value bituminous coal; it is further

     **ORDERED** that, on remand, Commerce shall reconsider the adjustments to the surrogate financial statements; it is further

     **ORDERED** that Commerce shall file its remand redetermination on or before July 1, 2021; it is further

     **ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

     **ORDERED** that any comments or responsive comments must not exceed 5,000 words.


                        /s/    Mark A. Barnett
                        Mark A. Barnett, Judge

Dated: April 2, 2021
       New York, New York

Import Administration Policy Bulletin

Number: 04.1

Topic: Non-Market Economy Surrogate Country Selection Process

Approved: _____

       James Jochum

       Assistant Secretary

         for Import Administration

_____

Date

Statement of Issue

This policy bulletin provides guidance regarding the Department's selection of surrogate market economy countries in non-market economy ("NME") cases.

Background

The statute provides broad discretion in the selection of surrogate market economy countries to value NME factors of production. In particular, section 773(c)(1)(B) of the Act reads:

> ...the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

Section 773(c)(4) of the Act adds:

The administering authority shall utilize *to the extent possible* ... prices ... in one or more market economy countries that are -

> 1. at a level of economic development comparable to that of the nonmarket economy country, and
>
> 2. a significant producer of comparable merchandise.

The terms "comparable level of economic development," "comparable merchandise," and "significant producer" are not defined in the statute. However, the Department's regulations attempt to clarify the statute's general guidance regarding surrogate country selection. In determining economic comparability, section 351.408 of the regulations places primary emphasis on per capita income, although other information can be considered. Some clarification is also provided in the Conference Report to the 1988 Omnibus Trade and Competitiveness Act, which added to the statute the current NME provisions and states that "significant producer" includes any country that is a "significant net exporter."[1] Section 351.408 of the regulations also makes clear that the relative weight attached to each of the two selection criteria, described above, is unspecified because the relative importance that the Department attaches to each will necessarily vary depending on the specific facts in each case.

The Conference Report also states that the Department should seek to use, if possible, data (in the surrogate market economy country) that reflect levels of technology and production volumes that are similar to the producers under investigation.

Statement of Policy

In each NME investigation and review, the team considers potential surrogate countries in terms of their economic comparability to the NME country, and whether they are significant producers of comparable merchandise. The team then designates one country as the primary surrogate in a memo to the file, which explains how that country satisfies the statutory selection criteria. The memo must give substantive reasons on the record for why it deems the country selected to be a "significant producer" of comparable merchandise. It must include more than mere assertions, and must separately address the significant producer and comparable merchandise requirements. If one or both of the statutory criteria cannot be met, the memo should explain why this is the case, and why the particular country was selected as the primary surrogate.

The statute does not require that the Department use a surrogate country that is at a level of economic development *most* comparable to the NME country and that is the *most* significant producer of comparable merchandise. The statute requires only that the Department use a surrogate market economy country that is at a level of economic development comparable to that of the NME country and that is a significant producer of comparable merchandise. Even these requirements are not binding, as the statute requires that they be met *only to the extent possible*. Accordingly, the Department has adopted the following approach of sequential consideration of the statutory elements.[2]

*Economic Comparability*

First, early in a proceeding, the operations team sends the Office of Policy ("OP") a written request for a list of potential surrogate countries. In response, OP provides a list of potential surrogate countries that are at a comparable level of economic development to the NME country.[3] OP determines economic comparability on the basis of per capita gross national income, as reported in the most current annual issue of the <u>World Development Report</u> (The World Bank).[4] The surrogate countries on the list are not ranked and should be considered equivalent in terms of economic comparability.[5] Both the team's written request and OP's response should be made available to interested parties by being placed on the record of the proceeding.

*Comparable Merchandise*

Second, the operations team identifies those countries with producers of comparable merchandise among the potential surrogates on OP's list. As noted above, "comparable merchandise" is not defined in the statute or the regulations, since it is best determined on a case-by-case basis. Even so, there are some basic rules that every team should follow. In all cases, if identical merchandise is produced,[6] the country qualifies as a producer of comparable merchandise. In cases where identical merchandise is not produced, the team must determine if other merchandise that is comparable is produced. How the team does this depends on the subject merchandise. For example, in some cases, *e.g.*, steel and textiles, physical form and the extent of processing/finishing essentially distinguish different products. In such cases, consideration of major inputs often is not required, as it is normally sufficient for the team to identify comparable merchandise on the basis of physical differences in the merchandise and whether the product is one of low or high value-added. Thus, if circular steel pipe and tube were the subject merchandise, rectangular steel pipe and tube, hot-rolled steel sheet and plate, steel wire rod, steel wire rope, steel bar, and structurals, all of which are low value-added products of roughly similar form (made by combining iron, energy, and further processing), would constitute comparable merchandise.

A similar approach can also be used in the case of industrial commodity chemicals and when

the subject merchandise is part of a spectrum of light manufactured products, *e.g.*, paper clips, fireworks, wax candles, cased pencils, toys, shoes, gift boxes, folding metal tables and chairs. In these cases, the large number, and generic nature, of the inputs makes input matching very complicated. Therefore, it may make more sense for the operations team to consider the physical characteristics of the merchandise, and the extent of further value-added process in identifying comparable merchandise.

In other cases, however, where there are major inputs, *i.e.*, inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products, comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate.

*Significant Producer*

Third, the operations team determines whether any of the countries which produce comparable merchandise are "significant" producers of that comparable merchandise. The extent to which a country is a *significant* producer should not be judged against the NME country's production level or the comparative production of the five or six countries on OP's surrogate country list. Instead, a judgement should be made consistent with the characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics). Since these characteristics are specific to the merchandise in question, the standard for "significant producer" will vary from case to case. For example, if there are just three producers of comparable merchandise in the world, then arguably any commercially meaningful production is significant. Intermittent production, however, would not be significant. If there are ten large producers and a variety of small producers, "significant producer" could be interpreted to mean one of the top ten. If, in the example above, there is also a middle-size group of producers, then "significant producer" could be interpreted as one of the top ten or middle group. In another case, there may not be adequate data available from major producing countries. In such a case, "significant producer" could mean a country that is a net exporter, even though the selected surrogate country may not be one of the world's top producers. Because the meaning of "significant producer" can differ significantly from case to case, fixed standards such as "one of the top five producers" have not been adopted. For example, South Korea is, by almost any measure, a significant producer of steel, even though in 2001 it was not one of the top five producers overall.

Given that the decision as to what constitutes "significant production" in a particular case depends on available (often scarce) data, the specific criteria and supporting factual information used to determine whether a potential surrogate country is a significant producer is left to the discretion of the operations team. The operations team may consult with U.S. Government experts who have made their own assessments of the world's producers of comparable merchandise or who can supply the team with country production or trade data. Other possible sources of data supporting the "significant production" decision may include non-governmental organizations or international trade/industry association publications and similar sources.

Sometimes, none of the countries identified as being economically comparable are a significant producer of comparable merchandise, as defined above. Or, it may happen that some countries meet both criteria, but sufficient data (with respect to quantity and quality) are not available to enable the Department to use any of those countries as the primary surrogate. In such cases, the team should request a second list of potential surrogate countries from OP, and then follow the country selection procedure described above.

*Data Considerations*

Fourth, if more than one country has survived the selection process to this point, the country with the best factors data is selected as the primary surrogate country.[7] Even if no issues arise regarding economic comparability and significant production, data quality is a critical consideration affecting surrogate country selection. After all, a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable. Limited data availability sometimes is the reason why the team will "go off" the OP list in search of a viable primary surrogate country.

In assessing data and data sources, it is the Department's stated practice to use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data.

*Exceptions to the Sequencing Procedure*

Occasionally, there are also cases in which it is more appropriate for the team to address economic comparability only *after* the significant producer of comparable merchandise requirement is met. Cases where particular emphasis on "significant producer of comparable merchandise" is warranted are generally those that involve subject merchandise that is unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production), *e.g.*, crawfish, which is produced by only a few countries. See *Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Preliminary Results of Antidumping Duty Administrative Review*, 67 FR 63877 (October 16, 2002). Particular emphasis on "significant producer of comparable merchandise" is also generally warranted where major inputs are not widely traded internationally, *e.g.*, electricity, which is used intensively in the production of magnesium. See *Notice of Preliminary Results of Antidumping Duty Administrative Review: Pure Magnesium from the Russian Federation*, 59 FR 55427 (November 7, 1994).[8]

The significant producer requirement is particularly important in these cases because the Department wants to avoid selecting a surrogate country in which the relative scarcity (either through domestic sources or through imports) of a major non- or little-traded input precludes the country from being a competitive producer of comparable merchandise. For example, in the *Notice of Preliminary Determination of Sales at Less Than Fair Value: Urea Ammonium Nitrate Solutions From the Russian Federation*, 67 FR 62008 (October 3, 2002), the Department placed particular emphasis on the significant producer requirement in light of the gas-intensive nature of urea ammonium nitrate production, and the fact that natural gas is not commonly imported into the countries being considered as surrogate countries.

In cases in which the significant producer of comparable merchandise criterion is particularly important, the team should first ensure, on the basis of in-house research (including possible communications with other U.S. Government experts) and any interested party comments, that the significant producer of comparable merchandise requirement is met. Only after this requirement is met should the team consider economic comparability. If the competing significant producer countries are at disparate levels of economic development, and the necessary factors data is available in these countries, then the team should use the country closest to the NME country in terms of per capita GNI. On the other hand, if the significant producer countries are at closely similar levels of economic development, as are the countries on a surrogate country selection list, the team should use the country with the best factor price data. Where only one country satisfies the significant producer and data requirements, that country will normally be used.

1. A net exporter is defined as a country whose exports exceed its imports.

2. An alternative approach that the Department has considered, but rejected as administratively unfeasible would be to assess the extent to which each country "grades out" *overall* with respect to the two statutory criteria. For example, each country would be assessed with respect to economic comparability and the extent to which it was a significant producer of comparable merchandise. These two grades would then be weighted together to arrive at a composite grade for each country. Teams would then have to combine with this composite grade an assessment or grading of factors data quality and completeness in the country. The best surrogate would then be selected on the basis of this overall grade.

3. OP excludes non-market economy countries from the list of potential surrogate countries, and also excludes countries that technically are presumed to be market economies, but which in OP's judgement are unsuitable sources for factor values (*e.g.*, Cuba).

4. In the past, the OP memos also referenced growth rates and the national distribution of labor between the agriculture and non-agriculture sectors. However, since these factors are not determinative in the selection of an economically comparable surrogate country, they will no longer be included in future OP memos.

5. IA's current practice reflects in large part the fact that the statute does not require the Department to use a surrogate country that is at a level of economic development *most* comparable to the NME country.

6. If considering a producer of identical merchandise leads to data difficulties, the operations team may consider countries that produce a broader category of reasonably comparable merchandise.

7. An additional surrogate is sometimes used to fill factor price "holes" in the primary surrogate.

8. For example, concerns were raised in *Pure Magnesium from the Russian Federation* about the electricity-intensive nature of magnesium production and the fact that electricity, as a general rule, is not significantly traded into potential surrogate countries. These concerns made clear the importance, from an electricity valuation standpoint, of selecting a surrogate that was a significant producer of magnesium or some other comparable electricity-intensive product. However, none of the countries on OP's initial surrogate country list produced "comparable merchandise," even after that had been more broadly defined. (After consulting with experts at the U.S. Bureau of Mines and the DOC Trade Development Metals Division, the Department concluded in that case that "comparable merchandise" comprised magnesium and aluminum because both are "light metals" in terms of weight, are electricity-intensive products, are produced using an electrolytic process, and share some common end-uses. The Department, with the help of the U.S. Bureau of Mines, identified four significant producers of such "comparable merchandise," defining significant production as production exceeding 100,000 metric tons per year. Venezuela, Argentina, Brazil and South Africa were found to be "significant producers" of either magnesium or aluminum. Because only Brazil produced magnesium, the Department selected Brazil as the primary surrogate country.

503 F.Supp.3d 1278
United States Court of International Trade.

CARBON ACTIVATED TIANJIN CO., LTD. and
Carbon Activated Corporation, et al., Plaintiffs,
and
Beijing Pacific Activated Carbon Products Co., Ltd.
and Ningxia Guanghua Cherishmet Activated
Carbon Co., Ltd., Plaintiff-Intervenors,
v.
UNITED STATES, Defendant,
and
Calgon Carbon Corporation and Cabot Norit
Americas, Inc., Defendant-Intervenors.

Slip Op. 21-35
|
Court No. 20-00007
|
April 2, 2021

**Synopsis**
**Background:** Exporters filed suit challenging Department of Commerce's final results for eleventh administrative review of antidumping duty order on activated carbon from People's Republic of China. Exporters moved for judgment on agency record.

**Holdings:** The Court of International Trade, Mark A. Barnett, J., held that:

[1] selection of primary surrogate country required reconsideration;

[2] selection of surrogate data to value bituminous coal required reconsideration;

[3] selection of surrogate data to value coal tar pitch was supported by substantial evidence; and

[4] refusal to make adjustments to financial ratios required reconsideration.

Sustained in part and remanded.

**Procedural Posture(s):** Review of Administrative Decision; Motion for Judgment on Administrative Record.

West Headnotes (21)

**[1]** **Customs Duties**—Foreign market value, fair value, and adjustment

Department of Commerce conducts a four-step process for selecting a primary surrogate country when an antidumping duty proceeding involves a nonmarket economy country: (1) the Office of Policy (OP) assembles a list of potential surrogate countries that are at a comparable level of economic development to the non-market economy country, (2) Commerce identifies countries from the list with producers of comparable merchandise, (3) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise, and (4) if more than one country satisfies those steps, Commerce will select the country with the best factors data. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(c)(4).

**[2]** **Customs Duties**—Foreign market value, fair value, and adjustment

When an antidumping duty proceeding involves a nonmarket economy country, Department of Commerce generally values all factors of production in a single surrogate country, referred to as the primary surrogate country. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(c)(3); 19 C.F.R. § 351.408(c)(2).

**[3]** **Customs Duties**—Foreign market value, fair value, and adjustment

In an antidumping duty proceeding, Department of Commerce prefers surrogate values that are

product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review (POR), and tax and duty exclusive. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(c)(4); 19 C.F.R. § 351.408(c)(1),(4).

**[4]**    **Customs Duties** Foreign market value, fair value, and adjustment

In an antidumping duty proceeding, Department of Commerce has broad discretion to determine what constitutes the best available information for the selection of surrogate values. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(c)(4).

**[5]**    **Customs Duties** Foreign market value, fair value, and adjustment

Department of Commerce's selection of Malaysia and rejection of Romania as primary surrogate country that was significant producer of comparable merchandise was not adequately explained or supported with substantial evidence, in final results of administrative review of antidumping duty order on activated carbon from China; although Commerce stated that it analyzed exports of comparable merchandise from list of six countries, Commerce failed to explain its analysis or make comparative analysis of data quality, failed to explain why favoring production of identical rather than comparable merchandise comported with antidumping statute, and failed to explain why its preliminary finding based on export quantity was no longer valid or cite substantial evidence for change in final results. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(c)(4)(B).

**[6]**    **Customs Duties** Proceedings
**Customs Duties** Scope of inquiry or review

The standard of review for an antidumping determination requires Department of Commerce, not the Court of International Trade, to examine the administrative record and articulate a satisfactory explanation for its action.

**[7]**    **Customs Duties** Proceedings

In an antidumping duty proceeding, Department of Commerce's explanation must reasonably tie the determination under review to the governing statutory standard and to the record evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding.

**[8]**    **Customs Duties** Foreign market value, fair value, and adjustment

The antidumping statute does not distinguish between identical and comparable merchandise for purposes of identifying significant producer countries in selecting surrogate values when the antidumping duty proceeding involves a nonmarket economy country. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(c)(4)(B).

**[9]**    **Customs Duties** Proceedings

Although Department of Commerce has the flexibility to change its position from the preliminary results of an administrative review of an antidumping order to the final results, the agency must explain the basis for its change, and that explanation must be supported by

substantial evidence.

**[10]    Customs Duties**⬦Scope of inquiry or review

Court of International Trade must ensure that Department of Commerce's change in position from the preliminary results of an administrative review of an antidumping order to the final results is not arbitrary.

**[11]    Customs Duties**⬦Foreign market value, fair value, and adjustment

In selecting the primary surrogate country, Department of Commerce's practice is not to evaluate the extent to which a country is a significant producer against the comparative production of the five or six countries on Commerce's surrogate country list. Tariff Act of 1930 § 773, 🔖 19 U.S.C.A. § 1677b(c)(4).

**[12]    Customs Duties**⬦Scope of inquiry or review

The government's post hoc rationalizations are not a basis upon which the Court of International Trade may sustain Department of Commerce's antidumping determination.

**[13]    Customs Duties**⬦Court of International Trade (Formerly Customs Court) and Proceedings Therein

While exhaustion is not jurisdictional, the statute directing Court of International Trade to require the exhaustion of administrative remedies when

appropriate indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies. 28 U.S.C.A. § 2637(d).

**[14]    Customs Duties**⬦Proceedings

Department of Commerce need not expressly notify interested parties any time it intends to change its methodology between its preliminary and final antidumping determinations when there is relevant data in the record and interested parties advance arguments related to that data before Commerce; however, parties are not required to anticipate issues that have not been raised by a party or the agency at that point. 28 U.S.C.A. § 2637(d).

**[15]    Customs Duties**⬦Court of International Trade (Formerly Customs Court) and Proceedings Therein

Exporters were not required to exhaust administrative remedies for their argument that financial statements demonstrated Romania was significant producer, in challenging Department of Commerce's selection of Malaysia and rejection of Romania as primary surrogate country that was significant producer of comparable merchandise in final results of administrative review of antidumping duty order on activated carbon from China, since Romania's status as significant producer was not among issues raised by interested parties or Commerce prior to Commerce's issuance of final results. Tariff Act of 1930 § 773, 🔖 19 U.S.C.A. § 1677b(c)(4)(B); 28 U.S.C.A. § 2637(d).

**[16]    Customs Duties**⊸Foreign market value, fair value, and adjustment

Department of Commerce's selection of surrogate data to value bituminous coal was not adequately explained or supported with substantial evidence, in final results of administrative review of antidumping duty order on activated carbon from China; path of Commerce's reasoning could not be discerned for selecting Romanian import data under tariff schedule as surrogate value for bituminous coal after finding average unit value of Malaysian imports under that provision was unreliable, for rejecting exporters' request to use import data under different provision, or for refusing to apply tariff schedule note to other countries' import data, or whether Commerce considered evidence of exporters' use of specific type of bituminous coal or found such evidence insufficient.

**[17]    Customs Duties**⊸Proceedings

Each administrative review of an antidumping duty order is a separate exercise of Department of Commerce's authority that allows for different conclusions based on different facts in the record.

**[18]    Customs Duties**⊸Proceedings

Department of Commerce must adequately explain its treatment of similar situations differently in different administrative reviews of the same antidumping duty order.

**[19]    Customs Duties**⊸Foreign market value, fair value, and adjustment

Department of Commerce's selection of surrogate data to value coal tar pitch, in final results of eleventh administrative review of antidumping duty order on activated carbon from China, was supported by substantial evidence, although Commerce valued coal tar pitch using Malaysian import data under tariff schedule provision covering coal tar in tenth review but relied on provision covering pitch from coal and other mineral tars in eleventh review, since Commerce explained that exporters each reported input as coal tar pitch and not coal tar, that coal tar pitch was referred to as pitch in commercial parlance, that two types of coal tar pitch were derived from fractionated distillation of coal tar, and that selected tariff provision covered pitch as product of coal tar distillation process.

**[20]    Customs Duties**⊸Court of International Trade (Formerly Customs Court) and Proceedings Therein

Exporters failed to exhaust administrative remedies for their arguments that explanatory notes (ENs) to tariff schedule subheading supported finding that coal tar pitch was covered by that subheading and that Malaysian import data under subheading that Department of Commerce selected was aberrant due to predominance of Spanish exports in average unit values, in final results of eleventh administrative review of antidumping duty order on activated carbon from China, since exporters failed to assert arguments before Commerce despite ample opportunity to do so. 28 U.S.C.A. § 2637(d).

**[21]    Customs Duties**⊸Determination, Judgment, and Relief;  Summary Judgment

Department of Commerce's adjustments to financial ratios, in final results of eleventh administrative review of antidumping duty order on activated carbon from

remand for reconsideration, since in tenth review Court of International Trade had sustained Commerce's determination on remand to make adjustments to financial ratios based on financial statement that was similar to, if not same as, adjustments Commerce declined to make in eleventh review, and there were discrepancies in Commerce's explanation for declining to make adjustments.

**Attorneys and Law Firms**

**\*1281** Dharmendra N. Choudhary and Jordan C. Kahn, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, DC, for Plaintiffs and Plaintiff-Intervenors. With them on the brief was Francis J. Sailer.

Mollie L. Finnan, Senior Trial Counsel, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, of Washington, DC, for Defendant. With her on the brief were Jeffrey B. Clark, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director. Of counsel were Ian A. McInerney and Ayat Mujais, Attorneys, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Melissa M. Brewer, Kelley Drye & Warren LLP, of Washington, DC, for Defendant-Intervenors. With her on the brief were John M. Herrmann, R. Alan Luberda, and Julia A. Kuelzow.

**OPINION AND ORDER**

BARNETT, Judge:

This matter is before the court following the U.S. Department of Commerce's ("Commerce" or "the agency") final results in the eleventh administrative review ("AR11") of the antidumping duty order on certain activated carbon from the People's Republic of China

("China") for the period of review ("POR") April 1, 2017, through March 31, 2018. *See Certain Activated Carbon From the People's Republic of China*, 84 Fed. Reg. 68,881 (Dep't Commerce Dec. 17, 2019) (final results of antidumping duty admin. review; 2017–2018) ("*Final Results*"), ECF No. 39-2, and accompanying Issues and Decision Mem., A-570-904 (Dec. 11, 2019) ("I&D Mem."), ECF No. 39-3.[1]

Plaintiffs and Plaintiff-Intervenors (collectively, "Plaintiffs")[2] challenge Commerce's **\*1282** (1) selection of Malaysia instead of Romania as the primary surrogate country; (2) selection of surrogate values for Carbon Activated's and DJAC's inputs of bituminous coal and coal tar pitch; and (3) calculation of surrogate financial ratios. *See* Confidential Pls.' and Pl.-Ints.' Mot. for J. on the Agency R. Pursuant to Rule 56.2, ECF No. 43, and accompanying [Corrected] Confidential Mem. of Law in Supp. of Pls.' and Pl.-Ints.' Mot. for J. on the Agency R. Pursuant to USCIT Rule 56.2 ("Pls.' Mem."), ECF No. 59; Confidential Pls.' and Pl.-Ints.' Reply to Def. and Def.-Ints.' Resps. to Pls.' and Pl.-Ints.' Rule 56.2 Mot. for J. on the Agency R. ("Pls.' Reply"), ECF No. 50.

Defendant United States ("the Government") and Defendant-Intervenors Calgon Carbon Corporation and Cabot Norit Americas, Inc. (together, "Calgon") filed response briefs in support of Commerce's determinations respecting each contested issue. *See* Def.'s Resp. to Pls.' Rule 56.2 Mot. for J. on the Agency R. ("Def.'s Resp."), ECF No. 45; Confidential Def.-Ints.' Resp. Br. in Opp'n to Pls.' Mot. for J. on the Agency R. ("Def.-Ints.' Resp."), ECF No. 48. At oral argument, the Government acknowledged that a remand with respect to financial ratios may be appropriate given Commerce's recent consideration of similar adjustments on remand in the tenth administrative review ("AR10") of the underlying order. Oral Arg. 1:38:55–1:40:05 (approximate time stamp from oral argument), *available at* https://www.cit.uscourts.gov/sites/cit/files/031121-20-00007-MAB.mp3 (last visited Apr. 2, 2021).

For the following reasons, the court sustains Commerce's selection of surrogate data to value coal tar pitch and remands Commerce's determinations with respect to surrogate country selection, selection of surrogate data to value bituminous coal, and calculation of financial ratios.

**BACKGROUND**

Commerce initiated AR11 on June 6, 2018. *Initiation of Antidumping and Countervailing Duty Administrative*

*Reviews*, 83 Fed. Reg. 26,258, 26,260 (Dep't Commerce June 6, 2018). On July 3, 2018, Commerce selected Carbon Activated and DJAC as mandatory respondents.[3] Selection of Respondents for Individual Review (July 3, 2018) at 5, PR 27, CJA Tab 2.

On June 14, 2019, Commerce issued its preliminary results. *Certain Activated Carbon From the People's Republic of China*, 84 Fed. Reg. 27,758 (Dep't Commerce June 14, 2019) (prelim. results of antidumping duty admin. review and prelim. determination of no shipments; 2017–2018) ("*Preliminary Results*"), PR 234, CJA Tab 21, and accompanying Decision Mem. for the Prelim. Results, A-570-904 (June 10, 2019) ("Prelim. Mem."), PR 225, CJA Tab 19. Commerce calculated preliminary weighted-average dumping margins for Carbon Activated and DJAC in the amounts of 1.65 percent and 4.33 percent, respectively. *Prelim. Results*, 84 Fed. Reg. at 27,759. Commerce calculated a separate rate for non-examined respondents in the amount of 3.90 percent, equal to the weighted-average rate of the mandatory respondents based on U.S. sales volume. *Id.*

Commerce issued the *Final Results* on December 17, 2019. Following several changes to the *Preliminary Results*, Commerce calculated final weighted-average dumping margins for Carbon Activated and DJAC in the amounts of 1.02 percent and 0.86 percent, respectively. ***1283** Final Results*, 84 Fed. Reg. at 68,882. The separate rate was therefore reduced to 0.89 percent. *Id.*

This appeal followed. *See* Summons, ECF No. 1; Compl., ECF No. 7. The court heard oral argument on March 11, 2021. *See* Docket Entry, ECF No. 65.[4]

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018) and 28 U.S.C. § 1581(c) (2018).[5] The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

## I. Legal Framework for Surrogate Country and Surrogate Value Selection

An antidumping duty is "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673. When an antidumping duty proceeding involves a nonmarket economy country,[6] Commerce determines normal value by valuing the factors of production used in producing the subject merchandise; general expenses; profit; and "the cost of containers, coverings, and other expenses" in a surrogate market economy country. *Id.* § 1677b(c)(1). In selecting these "surrogate values," Commerce must, "to the extent possible," use data from a market economy country that is at "a level of economic development comparable to that of the nonmarket economy country" and is a "significant producer[ ] of comparable merchandise." *Id.* § 1677b(c)(4).

[1] [2] [3] [4]Commerce has adopted a four-step process for selecting a primary surrogate country:

> (1) the Office of Policy ("OP") assembles a list [("the OP List")] of potential surrogate countries that are at a comparable level of economic development to the [non-market economy] country; (2) Commerce identifies countries from the list with producers of comparable merchandise; (3) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise; and (4) if more than one country satisfies steps (1)–(3), Commerce will select the country with the best factors data.

*Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016) (second alteration original); *see also* Import Admin., U.S. Dep't of Commerce, Non–Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004) ("Policy Bulletin 04.1"), http://enforcement.trade.gov/policy/bull04-1.html (last visited Apr. 2, 2021). Commerce generally values all factors of production in a single surrogate country, referred to as the "primary surrogate country." *See* 19

C.F.R. § 351.408(c)(2) (excepting labor). *But see Antidumping Methodologies in Proceedings Involving Non–Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,093–94 (Dep't Commerce June 21, 2011) (expressing a preference to value labor based on industry-specific labor rates from the primary **\*1284** surrogate country). Commerce prefers surrogate values that are "product-specific, representative of a broad-market average, publicly available, contemporaneous with the POR, and tax and duty exclusive." I&D Mem. at 13 & n.68 (citation omitted); *see also* 19 C.F.R. § 351.408(c)(1),(4) (directing Commerce to select "publicly available"/"non-proprietary information" to value factors of production and "manufacturing overhead, general expenses, and profit"). Commerce has broad discretion to determine what constitutes "the best available information" for the selection of surrogate values. *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).

## II. Primary Surrogate Country Selection

For the *Preliminary Results*, Commerce determined that Malaysia and Romania, among other countries on the OP List, constituted significant producers of comparable merchandise for the POR based on their respective export volumes. *See* Prelim. Mem. at 14. Commerce also found that Thailand constituted a significant producer of comparable merchandise based on net exports by volume. *See id.* at 15. Based on its subsequent analysis of surrogate value data, Commerce preliminarily selected Malaysia as the primary surrogate country and Romania as the secondary surrogate country. *See id.* at 15–16. Commerce selected Malaysian import data to value Respondents' "raw materials, energy, and packing material inputs," *id.* at 24, and used a financial statement from a Romanian company, Romcarbon S.A. ("Romcarbon"), to value financial ratios, *id.* at 26.

For the *Final Results*, Commerce continued to select Malaysia as the primary surrogate country notwithstanding Respondents' arguments favoring Romania. I&D Mem. at 6–7. Commerce noted that both Malaysia and Romania are "at the same level of economic development as China." *Id.* at 6. With respect to the significant producer criterion, however, Commerce departed from its preliminary analysis.

Commerce stated that it relied on "exports of comparable merchandise from the six OP List countries, as a proxy for production data." *Id.* at 7. Commerce did not, however, explain its analysis of any country's exports or incorporate its preliminary analysis. *See id.* at 7–8. Commerce concluded that the record demonstrated that Malaysia was "a significant producer of identical merchandise" during the POR, but that the record did not support a finding that Romania was a significant producer of comparable merchandise. *Id.* at 8. Commerce explained that the record contained "three Malaysian financial statements" indicating that the "principal business activity" for each company "is the manufacture of activated carbon," *id.* at 7, whereas the record contained "only one financial statement ... from a Romanian company," *id.* at 8. Commerce noted that Romcarbon produced some activated carbon but primarily produced "polyethylene, polypropylene, polyvinyl chloride, polystyrene processing, filters and protective materials." *Id.*[7] Thus, while rejecting the Malaysian financial statements to value financial ratios, *id.* at 9, Commerce selected Malaysia as the primary surrogate country because "it provides stronger evidence of production of the subject merchandise in the form of multiple financial statements," *id.* at 7–8. Commerce declined to compare the quality and availability of Malaysian and Romanian data **\*1285** for the purpose of primary surrogate country selection, finding the issue to be "moot." *Id.* at 8.

Commerce used Malaysian data to value Respondents' factors of production with exceptions for financial ratios and bituminous coal, for which the agency used Romanian data. *See* Surrogate Values for the Final Results (Dec. 11, 2019) ("Final SV Mem."), Attach. 1, PR 265–66, CJA Tab 28.

### A. Parties' Contentions

Plaintiffs raise several challenges to Commerce's surrogate country selection. Plaintiffs first contend that Commerce failed to address its departure from the *Preliminary Results* with respect to Romania's status as a significant producer. Pls.' Mem. at 32. Plaintiffs further contend that "Commerce's elimination of Romania was not 'supported by substantial evidence.' " *Id.* Plaintiffs point to record evidence concerning Romcarbon's share of Romanian consumption of activated carbon, which Plaintiffs argue can be used to ascertain total Romanian consumption of activated carbon in 2017 and, in turn, total Romanian production of activated carbon. *See id.* at 32–33. Plaintiffs also contend that Commerce's selection of Malaysia rests on a misinterpretation of both Commerce policy, which disfavors the "comparison of

production data," *id.* at 34, and 19 U.S.C. § 1677b(c)(4), which permits the identification of more than one significant producer country and does not contain a preference for identical merchandise, *see id.* at 34–36; Pls.' Reply at 9–10. Lastly, Plaintiffs contend that Commerce should have selected Romania as the primary surrogate country pursuant to statutory language indicating that the significant producer criterion need only be satisfied "to the extent possible" because Romania provided quality surrogate values for Respondents' main inputs. Pls.' Mem. at 36 (quoting 19 U.S.C. § 1677b(c)(4)).

The Government contends that Commerce's selection of Malaysia as the primary surrogate country is supported by substantial evidence. Def.'s Resp. at 12. The Government points to evidence regarding Malaysia's export value and volume, *id.* at 14 (citing I&D Mem. at 7 & n.34), and the three Malaysian companies' production of identical merchandise, *id.* at 15. The Government further contends that "[s]ubstantial evidence in the record supports Commerce's ultimate conclusion that Romania was not a significant producer of comparable merchandise during the period of review," *id.* at 16, and Plaintiffs failed to exhaust their argument that Romcarbon's financial statements demonstrated that Romania was a significant producer, *id.* at 18–21; *see also* Def.-Ints.' Resp. at 11–12 & n.1.

Calgon contends that Plaintiffs' arguments amount to an impermissible request for the court to reweigh the evidence and rest on the erroneous conclusion that the record supports a finding that Romania is a significant producer of comparable merchandise. *See* Def.-Ints.' Resp. at 10–13.

In their Reply, Plaintiffs counter that the Government has advanced impermissible *post hoc* justifications for Commerce's decision with respect to the Government's analysis of export data. Pls.' Reply at 9. Plaintiffs further contend that the doctrine of administrative exhaustion should not preclude arguments concerning Romania's production of comparable merchandise because Commerce preliminarily found that Romania was a significant producer of comparable merchandise and Petitioners did not challenge that finding in their administrative case brief. *Id.* at 4–6.

**\*1286 B. Commerce's Selection of Malaysia as the Primary Surrogate Country Requires**

**Reconsideration**

[5]  [6] Commerce has failed to adequately explain or support with substantial evidence its selection of Malaysia and rejection of Romania as the primary surrogate country. While Commerce stated that it "analyzed exports of comparable merchandise from the six OP List countries," the agency neglected to explain its analysis or state any findings in that regard. *See* I&D Mem. at 7. The Government's assertion that Commerce based its determination on Global Trade Atlas and 2017 UN Comtrade data regarding export values and volume is not persuasive. *See* Def.'s Resp. at 14 (citing I&D Mem. at 7 & n.34). The Government relies on a footnote in the Issues and Decision Memorandum containing import and export volume data for each country on the OP List that merely substantiates Commerce's assertion that no country is a net exporter by volume. *See* I&D Mem. at 7 n.34. Commerce did not, however, analyze the data or reference the value of any country's exports. *See id.* The Government's assertion at oral argument that the court may instead infer Commerce's "analysis ... from the record," Oral Arg. 8:25–8:47, also lacks merit. The standard of review requires *Commerce*, not the court, to "examine the record and articulate a satisfactory explanation for its action." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013).

[7]  [8] Commerce's statements regarding Malaysian production of identical merchandise does not save its determination. Commerce's "explanation must reasonably tie the determination under review to the governing statutory standard and to the record evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding." *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016). Section 1677b(c)(4)(B) "does not distinguish between identical and comparable merchandise" for purposes of identifying significant producer countries. *Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States*, 37 C.I.T. 256, 264, 896 F.Supp.2d 1313, 1322 (2013). Commerce's conclusion that "Malaysia provides the best available information ... because it is the only country on the OP List that is a significant producer of *identical* merchandise" suggests, however, that the agency favored the production of identical merchandise when selecting a primary surrogate country. I&D Mem. at 8 (emphasis added). Commerce failed to explain why any such preference comports with the plain statutory language or constitutes a permissible interpretation thereof.[*] Commerce also did not explain why production of identical merchandise by three companies was

"significant" pursuant to 🔖 section 1677b(c)(4). *See id.*; *cf.* Policy Bulletin 04.1 (explaining that Commerce's decision "should be made consistent with the characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics)").

[9]With respect to Commerce's consideration of Romania, although "Commerce **\*1287** has the flexibility to change its position" from the *Preliminary Results* to the *Final Results*, the agency must "explain the basis for its change" and that explanation must be "supported by substantial evidence." 🔖 *Asociacion Colombiana de Exportadores de Flores v. United States*, 22 C.I.T. 173, 185, 6 F. Supp. 2d 865, 880 (1998); *see also Peer Bearing Co. v. United States*, 22 C.I.T. 472, 481–82, 12 F. Supp. 2d 445, 456 (1998).

[10]For these *Final Results*, Commerce purported to reconsider the export quantities it had relied on for the *Preliminary Results.* I&D Mem. at 7; *see generally* Prelim. Mem. at 14. Without any analysis, however, Commerce reached the contrary conclusion that "the record ... does *not* support a finding that Romania ... is a significant producer of comparable merchandise." I&D Mem. at 8 (emphasis added). Commerce failed to explain why its preliminary finding based on export quantity was no longer valid or cite substantial evidence for the change.[9]

[11]Commerce appears to have based its decision on a comparison of the number of financial statements on the record from Romania as compared to Malaysia and differences in the principal production activities among the companies. *See id.* at 7–8. However, "Commerce's practice is not to evaluate [t]he extent to which a country is a significant producer ... against ... the comparative production of the five or six countries on [Commerce's] surrogate country list." 🔖 *Jacobi Carbons AB v. United States*, 43 CIT ——, ——, 365 F. Supp. 3d 1344, 1353 (2019) (citation omitted) (alterations original); *see also* Policy Bulletin 04.1.

[12]The Government offers no persuasive defense of Commerce's determination. The Government asserts that "Commerce reasonably concluded that Romania's exports by value (102,387 USD) and quantity (3051 kg) were too small to reflect significant production on this record." Def.'s Resp. at 16 (citing DJAC and Carbon Activated Surrogate Country Cmts. (Oct, 12, 2018) ("Respondents' SC Cmts."), PR 99, CJA Tab 6).[10] The Government further asserts that "Commerce reasonably concluded that Romanian production of activated carbon was not significant in terms of world production of, and trade in, comparable merchandise." Def.'s Resp. at 17 (citing

Policy Bulletin 04.1; *Fresh Garlic Prods. Assoc. v. United States*, 40 CIT ——, ——, 180 F. Supp. 3d 1233, 1244 (2016)). Notably, the Government does not cite to Commerce's determination, which lacks any such analysis of Romanian production in the context of world production. The Government's *post hoc* rationalizations are not a basis upon which the court may sustain Commerce's determination. *See* 🔖 *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

The Government also argues that the court should sustain Commerce's selection of Malaysia as the primary surrogate country irrespective of any shortcomings in Commerce's decision regarding Romania **\*1288** because Commerce expressed its clear view that the quality of the available data supports Malaysia. Oral Arg. 23:46–24:34; *cf.* Def.'s Resp. at 14 (arguing that Commerce based its selection of Malaysia, in part, on consideration of the fourth selection criterion—data quality). The Government misconstrues Commerce's sequential surrogate country selection methodology and the court's standard of review. Commerce selected Malaysia after concluding that Malaysia was a significant producer of identical merchandise and Romania was not a significant producer of comparable merchandise. *See* I&D Mem. at 7–8. Commerce subsequently considered Malaysian data quality in isolation and without reference to the comparable quality of Romanian data because Commerce found that Romania did not meet the significant producer requirement of 🔖 section 1677b(c)(4)(B). *See id.* at 8.[11] Thus, the court cannot sustain Commerce's determination on this basis.

Plaintiffs argue that record evidence concerning Romcarbon's share of the domestic market establishes that Romania is a significant producer of comparable merchandise. Pls.' Mem. at 32–33. It is not the court's role to determine in the first instance whether the evidence favors Plaintiffs' position. As discussed below, the question is whether Plaintiffs waived those arguments, as Defendant and Calgon contend, or should have the opportunity to present the arguments to Commerce.

[13]Congress has directed the court to, "whe[n] appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). While exhaustion is not jurisdictional, *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1363–64 (Fed. Cir. 2019), the statute "indicates a congressional intent that, absent a strong contrary reason, the [USCIT] should insist that parties exhaust their remedies before the pertinent administrative agencies," *id.* at 1362 (quoting 🔖 *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017)).

[14]The Government argues that Respondents should have raised their domestic market share argument before Commerce because they "had full and fair notice of the agency's intent to rely on Malaysia rather than Romania or another country." Def.'s Resp. at 20; *cf.* Def.-Ints.' Resp. at 11–12 & n.1.[12] For the *Preliminary Results*, however, Commerce determined that Romania, among other countries, was a significant producer of comparable merchandise and reached its surrogate country decision based on an analysis of each countries' respective data quality. Prelim. Mem. at 14–16. Petitioners did not advance arguments challenging Commerce's findings regarding the significant producer criterion, *see generally* Pet'rs' [Case] Br. (Oct. 7, 2019), CR 422, PR 253, CJA Tab 23, and Commerce did not signal any intention to revisit its analysis. Commerce need not "expressly notify interested parties any time it intends to change its methodology between its preliminary and final determinations" when there is "relevant **\*1289** data in the record" and interested parties advance "arguments related to that data before Commerce." *Boomerang*, 856 F.3d at 913. However, "*Boomerang* does not require parties to anticipate issues that have not been raised by a party or the agency at that point." *Calgon Carbon Corp. v. United States ("Calgon AR10")*, 44 CIT ——, ——, 443 F. Supp. 3d 1334, 1353 (2020) (citing *Boomerang*, 856 F.3d at 913).

[15]Here, Romania's status as a significant producer was not among the issues raised by interested parties or Commerce prior to Commerce's issuance of the *Final Results*. Thus, Plaintiffs' arguments are not precluded by the doctrine of administrative exhaustion.[13]

In sum, Commerce has not provided an adequate explanation supported by substantial evidence giving effect to the statutory term "significant producer of comparable merchandise" pursuant to 19 U.S.C. § 1677b(c)(4)(B). The court is unable to discern Commerce's reasons for rejecting Romania as a primary surrogate country; selecting Malaysia as the primary surrogate country; and avoiding any comparative analysis of data quality for that purpose. Accordingly, Commerce's determination is remanded for reconsideration and further explanation.

### III. Bituminous Coal

For the *Final Results*, Commerce selected Romanian import data under Harmonized Schedule ("HS") 2701.12

as the surrogate value for bituminous coal after finding that the average unit value of Malaysian imports under HS 2701.12 was unreliable. I&D Mem. at 13–15. Commerce rejected Respondents' request to use import data under HS 2701.19, which covers "Other Coal," to value certain inputs of bituminous coal. *Id.* at 13–14. Respondents based their request on the application of Chapter 27, Subheading Note 2 ("Note 2") to their inputs. *See id.* at 14. Note 2 limits HS 2701.12, *inter alia*, to bituminous coal with "a calorific value limit ... equal to or greater than 5,833 kcal/kg." *Id.* Respondents therefore reasoned that Commerce should value bituminous coal with a calorific value that is less than 5,833 kcal/kg under HS 2701.19. *Id.*

Upon review of the record, Commerce concluded that Note 2 applied solely to Thai import data and declined to apply Note 2 to another country's import data. *Id.* at 14 & n.76 (citing Carbon Activated Resp. to Sec. D Suppl. Questionnaire (Pt. I) (Feb. 21, 2019) ("Carbon Activated's 1SDQR (Pt. I)") at 19, CR 254–88, PR 162–65, CJA Tab 12); *see also* Carbon Activated's 1SDQR (Pt. I), Ex. SD-27 (copy of Note 2). Commerce also found that Respondents had failed to demonstrate consumption of the type of sub-bituminous coal typically "used as a heat source" that would be covered by HS 2701.19. I&D Mem. at 14.

#### A. Parties' Contentions

Plaintiffs contend that Commerce's declination to recognize the applicability of Note 2 to all countries in the World Customs Organization ("WCO") through the Harmonized System of Nomenclature contradicts Commerce practice and judicial precedent. Pls.' Mem. at 17–19.[14] Plaintiffs **\*1290** also contend that Commerce erred in incorporating use as a consideration in its surrogate value selection because HS 2701.19 is not delimited by use. *Id.* at 20.

The Government contends that Commerce's reliance on Romanian import data under HS 2701.12 is supported by substantial evidence. Def.'s Resp. at 22. The Government asserts that there is no record evidence demonstrating that Note 2 is identical for all WCO countries or that Respondents used the type of bituminous coal that would be covered by HS 2701.19. *See id.* at 22–23; *cf.* Def.-Ints.' Resp. at 16–18.

Calgon contends that the precedent relied on by Plaintiffs is distinguishable. Def.-Ints.' Resp. at 16–17. Calgon further contends that the inclusion of "Additional U.S.

Notes" in the U.S. Harmonized Tariff System ("HTSUS") supports Commerce's decision not to assume that subheading notes are identical across countries. *See id.* at 17.

### B. Commerce's Selection of Surrogate Data to Value Bituminous Coal Requires Reconsideration and Further Explanation

[16]The court is unable to discern the path of Commerce's reasoning on this issue and remands the matter for reconsideration and further explanation with respect to the applicability of Note 2 and Commerce's understanding of the relevant parts of the record.

Commerce addressed Respondents' request to apply Note 2 as a factual matter and found the request unsupported by the record. I&D Mem. at 14. Commerce did not, however, address Respondents' argument that Note 2 applied to the tariff systems of countries other than Thailand given the harmonization of WCO tariff classification at the six-digit level. *See* Case Br. of [DJAC], [Carbon Activated] and Carbon Activated Corp. (Oct. 7, 2019) ("Respondents' Case Br.") at 27 n.38, CR 421, PR 250, CJA Tab 22.

Respondents' argument is not without precedent. In prior determinations, Commerce has taken the position that products subject to international trade generally will enter WCO countries under the same six-digit subheading. *See PET* Mem. at 20 (stating that "[t]he International Convention on the Harmonized Commodity and Coding System applies the same [HS] six-digit prefix to products subject to international trade"); First Admin. Review of Sodium Hexametaphosphate from the People's Republic of China: Issues and Decision Mem. for the Final Results, A-570-908 (Oct. 12, 2010) at 8 n.32, *available at* https://enforcement.trade.gov/frn/summary/prc/2010-2645 8-1.pdf (last visited Apr. 2, 2021) ("*Hex* Mem.") (stating same). Commerce has relied on this principle to apply a subheading chapter note placed on an administrative record in connection with South African import data to Indonesian data for purposes of surrogate valuation. *See PET* Mem. at 20. Commerce also has considered the way in which the United States classifies an input to determine the correct six-digit heading **\*1291** under another country's classification system for surrogate valuation. *See Stilbenic* Mem. at 4 & n.22; *Hex* Mem. at 7–8. Commerce's rationale for rejecting Respondents' argument on this issue, without further explanation, is arbitrary; thus, a remand is necessary for Commerce to clarify or revise its position.[15]

Additionally, Commerce's understanding of the record evidence concerning the characteristics of Respondents' bituminous coal inputs is unclear. Commerce stated that "[R]espondents have not provided *any* evidence that they used [the type of bituminous coal that] would be categorized as HS 2701.19." I&D Mem. at 14 (emphasis added). There is, however, some indication in the record that Respondents (or their respective suppliers) consumed bituminous coal with a calorific value that is less than 5,833 kcal/kg. *See* Carbon Activated Resp. to Sec. D Pts. II and III First Suppl. Questionnaire (Mar. 15, 2019) ("Carbon Activated's SDQR Pts. II–III"), Ex. SD-15, CR 301–17, PR 180, CJA Tab 13; DJAC Suppl. Sec. D Resp. (Feb. 12, 2019) ("DJAC's SDQR") at 8, Exs. SD-12, SD-13, SD-56, CR 174–252, PR 148–56, CJA Tab 11. It is unclear whether Commerce considered this evidence or found it insufficient. Accordingly, on remand, Commerce must also reconsider and further explain its view of the record on this issue.[16]

### IV. Coal Tar Pitch

For the *Preliminary Results*, Commerce valued coal tar pitch using Malaysian import data under HS 2706.00, which covers "Coal Tar." I&D Mem. at 18; *see also* Surrogate Values for the Prelim. Results (June 10, 2019) ("Prelim. SV Mem."), Attach. 1, PR 226–29, CJA Tab 20.[17] For the *Final Results*, Commerce instead used Malaysian import data under HS 2708.10, **\*1292** which covers "Pitch from Coal and Other Mineral Tars." *Id.* at 18, 19. Commerce offered several rationales for its decision.

Commerce explained that Respondents each reported the input as "coal tar pitch" and not "coal tar" for certain suppliers, *id.* at 19, and that coal tar pitch "is commonly known as 'pitch' in the industry," *id.* at 19 & n.112 (citation omitted). Regarding the production process, Commerce noted that two types of coal tar pitch—binder and impregnating grade—are derived from the fractionated distillation of coal tar. *Id.* at 19 & n.114 (citing First Surrogate Value Cmts. By [Respondents] (Nov. 9, 2018) ("Respondents' SV Cmts."), Ex. 5E, PR 109–14, CJA Tab 9). Commerce thus found "that HS 2706.00 covers coal tar, which is a by-product of the coke production process, whereas HS 2708.10 covers pitch, a product of the coal tar distillation process." *Id.* at 19. Commerce rejected as unsupported Respondents' "assertion that HS 2708.10 covers [only] 100 percent pure pitch distilled in a tar workshop." *Id.* at 19 & n.115 (citing Respondents' Case Br. at 29).

**A. Parties' Contentions**

Plaintiffs contend that Commerce's reliance on commercial parlance instead of pitch content to select HS 2706.00 represents an unexplained departure from the agency's approach in the prior administrative review, which was affirmed by the court. Pls.' Mem. at 22–23 (citing *Calgon (AR10)*, 443 F. Supp. 3d at 1343–45); Pls.' Reply at 14. Plaintiffs argue that HS 2706.00 must be construed to cover coal tar or coal tar pitch with less than 100 percent pitch content and "[HS] 2708.10 must be construed to cover 100[ percent] pure pitch." *Id.* at 24. Concluding otherwise, Plaintiffs argue, could result in the same input being covered by both subheadings. *Id.* Plaintiffs also contend that Malaysian import data under both HS 2706.00 and HS 2708.10 are aberrant based on the predominance of Spanish exports in the average unit values and Commerce should instead rely on Russian import data under HS 2706.00. *See id.* at 24–27.

The Government contends that Commerce's surrogate value selection is supported by substantial evidence. Def.'s Resp. at 24. The Government argues that "Commerce reasonably rejected the premise that coal tar and coal tar pitch are indistinguishable" based on the process by which coal tar and pitch are produced and Respondents failed to establish that their respective inputs were covered by HS 2706.00. *Id.* at 25; *cf.* Def.-Ints.' Resp. at 20–21. The Government also contends that Plaintiffs failed to present their arguments regarding the aberrancy of the Malaysian data to Commerce and those arguments are now barred by the doctrine of administrative exhaustion. Def.'s Resp. at 26–27; *cf.* Def.-Ints.' Resp. at 22–23 & n.3.

Plaintiffs counter that the ENs to HS 2706.00 establish that coal tars with pitch content above 60 percent are covered by that subheading. Pls.' Reply at 16; *see also id.* at 15–16 (averring that ENs are judicially noticeable pursuant to 🔖 *Jiangsu Senmao*, 322 F. Supp. 3d at 1324). Plaintiffs also contend that the Government's exhaustion argument lacks merit because Respondents challenged the aberrancy of HS 2706.00 before Commerce and lacked the opportunity to present to Commerce arguments concerning HS 2708.10. *Id.* at 16–17.

**B. Commerce's Selection of Surrogate Data to Value Coal Tar Pitch is Supported by Substantial**

**Evidence**

[17]  [18]Plaintiffs are correct that, in AR10, Commerce valued inputs of coal tar pitch using HS 2706.00. *Calgon (AR10)*, 443 F. Supp. 3d at 1343. In that proceeding, Commerce based its decision on pitch **\*1293** content and discounted evidence demonstrating that the respondents used coal tar pitch and a separate pitch input for the same production purpose. *Id.* at 1344. It is well settled, however, that "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." 🔖 *Jiaxing Brother*, 822 F.3d at 1299 (quoting *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014)). Thus, the question is whether Commerce has offered an adequate explanation "for treating similar situations differently." 🔖 *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (citation omitted).

[19]This issue presents a close call. While Commerce's determination may have benefitted from greater recognition that the agency had departed from its treatment of coal tar pitch in AR10, the court discerns from Commerce's discussion an adequate explanation, supported by substantial evidence, for the change.

Respondents' submissions in the underlying proceeding demonstrate that the distillation of coal tar yields coal tar pitch. I&D Mem. at 19 & n.114 (citing Respondents' SV Cmts., Ex. 5E). Further distillation of coal tar pitch yields higher grades of pitch. *See* Respondents' SV Cmts., Ex. 5E, Fig. 1 (a schematic illustration of the production of coal tar pitch and anthracene oil-based pitch beginning with the distillation of coal tar). Given that coal tar pitch is referred to as "pitch" in commercial parlance, Commerce was within its discretion to identify HS 2708.10 instead of HS 2706.00 as the best available information. *See* I&D Mem. at 19; *QVD Food Co.*, 658 F.3d at 1323.

Plaintiffs' assertion that HS 2706.00 covers coal tar and coal tar pitch with less than 100 percent pitch content and HS 2708.10 covers 100 percent pure pitch is unsupported by citations to record evidence. *See* Pls.' Mem. at 24; I&D Mem. at 19. Plaintiffs' argument that a contrary conclusion would result in the same input being covered under both headings also is not persuasive. *See* Pls.' Mem. at 24. At the hearing, the court afforded Plaintiffs an additional opportunity to explain why their inputs of coal tar pitch are necessarily covered by HS 2706.00. Letter to Counsel (Mar. 3, 2021) ("Ltr. to Counsel") ¶ 3(a)(i), ECF No. 61. Plaintiffs referred to record evidence concerning the processing of coal tar into coal tar pitch, but which also demonstrates that coal tar generally has a lower pitch

content than the coal tar pitch consumed by Respondents. Oral Arg. 1:17:33–1:18:54, 1:23:11–1:27:55. *Compare* Pls.' Mem. at 23 (citing Respondents' SV Cmts., Ex. 5G), *and* Respondents' Case Br. at 29–30 & nn.47–48 (citing Respondents' SV Cmts., Ex. 5K), *with* Carbon Activated's SDQR Pts. II–III, Ex. SD-6 (reflecting the pitch content of their inputs), *and* DJAC's SDQR, Ex. SD-53 (same). This evidence is insufficient to require the distinction Plaintiffs seek to draw with respect to the competing subheadings and, thus, does not detract from the substantial evidence supporting Commerce's determination.

[20]Plaintiffs' argument that the ENs to HS 2706.00 support a finding that coal tar pitch is covered by that subheading, Pls.' Reply at 15–16, is precluded by the doctrine of administrative exhaustion. *See* 28 U.S.C. § 2637(d); *Weishan Hongda,* 917 F.3d at 1362. Notwithstanding the ENs' usefulness as a legal reference for purposes of tariff classification, *see Jiangsu Senmao,* 322 F. Supp. 3d at 1324, Respondents failed to argue the relevance of the ENs before Commerce. A remand to the agency to consider the ENs in the first instance would undermine the interest in judicial efficiency that administrative exhaustion is intended to protect. *See, e.g.,* **\*1294** *Corus Staal BV v. United States,* 502 F.3d 1370, 1379 (Fed. Cir. 2007).

Plaintiffs likewise failed to exhaust their arguments regarding the aberrancy of Malaysian import data under HS 2708.10 based on the predominance of Spanish exports in the average unit values. Pls.' Mem. at 25–26. Plaintiffs' argument that they had "no opportunity" to present arguments concerning the reliability of this value to Commerce is unconvincing. Pls.' Reply at 17. Respondents' administrative case brief presented arguments against the use of HS 2708.10 based on Respondents' understanding that Commerce had preliminarily used that subheading to value Carbon Activated's coal tar pitch. *See* Respondents' Case Br. at 29–30. Respondents thus had ample opportunity to present this argument to Commerce and cannot now "seek[ ] a new 'bite at the apple.' " *Calgon (AR10),* 443 F. Supp. 3d at 1353–54; *see also Boomerang,* 856 F.3d at 913 (finding an abuse of the discretion afforded by 28 U.S.C. § 2637(d) when the court declined to require exhaustion of arguments the proponent of which had the opportunity to present to Commerce).[18]

Accordingly, Commerce's determination to use Malaysian data under HS 2708.10 to value coal tar pitch is sustained.

## V. Financial Ratios

[21]For the *Final Results,* as noted, Commerce valued financial ratios using Romcarbon's 2017 financial statement. I&D Mem. at 6. At issue are various adjustments to the financial ratios. *See id.* at 21–23. Respondents requested Commerce to (1) offset pre-tax profit by the amounts listed under "Gain/(Loss) on adjustment of investment property at fair value" and "Gain/(Loss) on disposal of investment property"; (2) offset sales, general, and administrative expenses ("SG&A") by the amount listed under "Other Gains"; and (3) allocate the amount listed under "Social Contributions" and "Meal Tickets" to labor costs instead of SG&A. Respondents' Case Br. at 32–36. Commerce declined each request. I&D Mem. at 22–23. In so doing, however, Commerce treated Respondents' request to offset pre-tax profit as a request to offset SG&A. *See id.* at 22.

In its response brief, the Government urged the court to sustain Commerce's determinations as to the contested adjustments. Def.'s Resp. at 27–31. Following the Government's filing of the response, the court sustained Commerce's determination on remand in AR10 to make adjustments to the financial ratios based on Romcarbon's financial statement that are similar to—if not the same as—certain adjustments Commerce declined to make in this case. *See* Pls.' Reply at 19–22 (discussing *Calgon Carbon Corp., et al. v. United States, et al.,* Court No. 18-cv-00232, Final Results of Redetermination Pursuant to Court Remand at 8–13, 23 (CIT Aug. 5, 2020)); *Calgon Carbon Corp. v. United States,* 44 CIT ——, ——, 487 F. Supp. 3d 1359, 1362 (2020) (sustaining Commerce's adjustments as uncontested and consistent with the court's remand instructions).

At oral argument, the Government stated that it could not identify distinguishing features in the financial statements that merited different treatment in this administrative review. Oral Arg. 1:39:25–1:40:04; **\*1295** *see also* Ltr. to Counsel ¶ 4(a). The Government further stated that although there might be differences in other aspects of the factual record that would support different treatment, particularly in relation to indirect labor costs, any remand should encompass all aspects of the adjustments so as not to constrain Commerce's redetermination. Oral Arg. 1:40:35–1:40:55. Calgon argued that the administrative record in AR11 as compared to AR10 supports certain distinctions but reserved its arguments for Commerce's consideration on remand. Oral Arg. 1:41:31–1:42:30.

Accordingly, given the inconsistencies between

Commerce's determinations in AR10 and AR11 and the discrepancies in Commerce's explanations for declining the adjustments, this issue is remanded for reconsideration.

**CONCLUSION AND ORDER**

In accordance with the foregoing, it is hereby:

**ORDERED** that Commerce's *Final Results* are sustained in part and remanded in part, consistent with this Opinion; it is further

**ORDERED** that Commerce's selection of surrogate data to value coal tar pitch is sustained; it is further

**ORDERED** that, on remand, Commerce shall reconsider its selection of Malaysia as the primary surrogate country; it is further

**ORDERED** that, on remand, Commerce shall reconsider its selection of surrogate data to value bituminous coal; it is further

**ORDERED** that, on remand, Commerce shall reconsider the adjustments to the surrogate financial statements; it is further

**ORDERED** that Commerce shall file its remand redetermination on or before July 1, 2021; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words.

**All Citations**

503 F.Supp.3d 1278

## Footnotes

[1] The administrative record filed in connection with the *Final Results* is divided into a Public Administrative Record ("PR"), ECF No. 39-5, and a Confidential Administrative Record ("CR"), ECF No. 39-4. Parties filed joint appendices containing record documents cited in their briefs. *See* Public J.A., ECF Nos. 52 (Vol. I; Tabs 1–13), 52-1 (Vol. II; Tabs 14–15), 52-2 (Vol. III; Tabs 16–30); Confidential J.A. ("CJA"), ECF Nos. 57 (Vol. I; Tabs 1–9), 57-1 (Vol. II; Tabs 10–15), 57-2 (Vol. III; Tabs 16–30); Suppl. Confidential J.A. ("Suppl. CJA"), ECF No. 62. Citations are to the confidential joint appendices unless stated otherwise.

[2] Plaintiffs consist of Carbon Activated Tianjin Co., Ltd. ("Carbon Activated"), Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd. ("DJAC"), Beijing Pacific Activated Carbon Products Co., Ltd., Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Ningxia Mineral & Chemical Limited, and Shanxi Sincere Industrial Co., Ltd.

[3] When in reference to the underlying agency proceeding, the court refers to Carbon Activated and DJAC as "Respondents" and Calgon as "Petitioners."

[4] Additional background information is summarized in each discussion section.

[5] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise specified.

[6] The factors of production include but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3).

[7] Plaintiffs assert that at least some of this merchandise may be considered comparable to the subject merchandise. Pls.' Mem. at 33. Commerce did not, however, state its views on that issue.

[8] At oral argument, the Government relied on Policy Bulletin 04.1 to assert that Commerce maintains a

preference for production of identical merchandise in its surrogate country selection process, but that this preference only arises when Commerce is comparing data quality. Oral Arg. 15:05–16:28. Policy Bulletin 04.1 merely states the steps Commerce must follow in order to identify the countries on the OP List subject to examination for significant production of comparable (inclusive of identical) merchandise. *See* Policy Bulletin 04.1. It does not support the existence of a policy preference concerning production of identical merchandise, either with respect to significant production or otherwise.

[9]   The court takes no position on the soundness of Commerce's preliminary conclusion respecting Romania or any other potential surrogate country. However, the court must ensure that Commerce's change in position is not arbitrary. *See* *Asociacion Colombiana de Exportadores de Flores*, 22 C.I.T. at n.20, 6 F.Supp. 2d at n.20 (explaining that "[a] change [in position] is arbitrary [when] the factual findings underlying the reason for [the] change are not supported by substantial evidence" or when the change is unsupported by a reasoned explanation that is "[ ]consistent with the statutory mandate").

[10]  Contrary to the Government's assertion, the volume of Romanian exports in the cited source documentation is 34,000 kg, not 3051 kg. *See* Respondents' SC Cmts., Ex. 1; Prelim. Mem. at 14.

[11]  Commerce compared the Malaysian and Romanian financial statements on the record for purposes of its significant producer analysis, but otherwise declined to compare the quality of each country's data. I&D Mem. at 7–8.

[12]  The Government argues that "[P]laintiffs offer no legal authority that would require consideration or adoption of a single company's share of its own domestic marketplace as a measure of significant producer status on a worldwide scale." Def.'s Resp. at 20. Commerce, however, is not required to adopt any specific measure. Agency policy provides that "the standard for 'significant producer' will vary from case to case," and thus leaves open the possibility that Commerce will consider alternative measures. Policy Bulletin 04.1.

[13]  Plaintiffs also argued that Commerce should have selected Romania as the primary surrogate country even if the evidence did not support a finding that Romania was a significant producer. *See* Pls.' Mem. at 36. Neither the Government nor Calgon directly responded to this argument. For the same reasons discussed above in relation to Plaintiffs' arguments concerning Romcarbon's domestic market share, the argument may be addressed by Commerce, as appropriate, on remand.

[14]  Plaintiffs cite *Jiangsu Senmao Bamboo & Wood Industry Co. v. United States*, 42 CIT ——, ——, 322 F. Supp. 3d 1308, 1320 (2018); Issues and Decision Mem. for the Final Determination in the Antidumping Duty Investigation of Certain Stilbenic Optical Brightening Agents from the People's Republic of China, A-570-972 (Mar. 19, 2012) at 2–6 ("*Stilbenic* Mem."), *available at* https://enforcement.trade.gov/frn/summary/prc/ 2012-7215-1.pdf (last visited Apr. 2, 2021); and Issues and Decision Mem. for the Final Results of the 2011 - 2012 Admin. Review on Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China, A-570-924 (June 24, 2014) at 14–20 ("*PET* Mem."), *available at* https://enforcement.trade.gov/frn/summary/prc/2014-15574-1.pdf (last visited Apr. 2, 2021). *See* Pls.' Mem. at 17–18; Pls.' Reply at 2.

[15]  Parties' remaining arguments are not persuasive. Calgon's argument regarding the inclusion of "Additional U.S. Notes" in the HTSUS is based on information that is not part of the administrative record and was not the basis of an argument before Commerce. Def.-Ints.' Resp. at 17 (citing Pls.' Mem. at 17–18 & n.6, which in turn, cites a webpage as evidence of the HTSUS). While there is no indication that Note 2 is specific to Thailand, such arguments are better left for Commerce to consider and address in the first instance.

Plaintiffs' reliance on *Jiangsu Senmao* is also misplaced. In that case, the court held that Commerce erred in rejecting a respondent's administrative case brief because it contained purportedly untimely factual information in the form of HS Explanatory Notes ("ENs"). *Jiangsu Senmao*, 322 F. Supp. 3d at 1323–24. The court reasoned that "[t]he ENs are not evidence" or factual information used to value factors

of production but are instead "an international legal reference essential to the proper interpretation of the HS nomenclature and [General Rules of Interpretation]." *Id.* at 1324. The court distinguished ENs from import data—factual information—used to value the factors of production. *See id.* Note 2 falls within the latter category. *Cf. Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) ("The section and chapter notes are integral parts of the HTSUS, and have the same legal force as the text of the headings."). However, as discussed, the inquiry does not end there to the extent that Commerce must address Respondents' arguments concerning the harmonization of six-digit subheadings.

16    The court further leaves to Commerce, on remand, to address Plaintiffs' arguments concerning the valuation of bituminous coal inputs with an undetermined calorific value. *See* Pls.' Mem. at 20–21 (asserting that, for such inputs, Commerce should use the average of Romanian data under HS 2701.12 and HS 2701.19); Pls.' Reply at 3 (same).

17    In the narrative portion of its preliminary surrogate value memorandum, Commerce listed both coal tar and coal tar pitch as surrogate values with corresponding tariff provisions of HS 2706.00 and HS 2708.10, respectively. *See* Prelim. SV Mem. at 5. Commerce preliminarily used only HS 2706.00, however, to value Respondents' coal tar pitch. Prelim. SV Mem., Attach. 1; *see also* I&D Mem. at 18 n.106 (noting the discrepancy).

18    Commerce declined to consider Respondents' argument that the Malaysian average unit value under HS 2706.00 is aberrant because it is higher than the Malaysian average unit value under HS 2708.10. I&D Mem. at 19. Commerce reasoned that the issue is moot given Commerce's decision not to rely on HS 2706.00. *Id.* Because the court is sustaining Commerce's decision to use HS 2708.10, the court need not address Plaintiffs' arguments concerning an alternative basis for finding HS 2706.00 to be aberrant or whether such arguments are foreclosed by the doctrine of administrative exhaustion.

---

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

A-570-904
Remand – ARP 4/1/17—3/31/18
Ct. No. 20-00007
Slip Op. 21-35
**Public Document**
E&C/OVIII:  MJA

***Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation, et al. v. United States***
**Consol. Court No. 20-00007 (CIT April 2, 2021)**

FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

## I.    SUMMARY

The Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the Court of International Trade (CIT) in

*Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation, et al. v. United States*,

Court No. 20-00007, Slip Op. 21-35 (CIT April 2, 2021) (*Remand Order*).  These final remand

results concern the eleventh administrative review of certain activated carbon from China.[1]  The

CIT directed Commerce to reconsider the surrogate value (SV) for bituminous coal, surrogate

country (SC) selection, and adjustments to the surrogate financial ratios.[2]

As set forth in detail below, pursuant to the CIT's *Remand Order*, we have further

explained, and reconsidered, in part, our determination regarding the SV for bituminous coal, SC

selection, and adjustments to the surrogate financial ratios.  Consequently, for the purposes of

these final results of redetermination, Commerce has made certain changes to the mandatory

respondents' margin calculations,[3] and consequently, to the rate of Beijing Pacific Activated

---

[1] *See Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2017-2018*, 84 FR 68881 (December 17, 2019) (*AR11 Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Remand Order* at 4.
[3] The mandatory respondents in this administrative review are Datong Juqiang Activated Carbon Co., Ltd. (Datong Juqiang) and Carbon Activated Tianjin Co., Ltd. (Carbon Activated) (collectively, the mandatory respondents).

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

Carbon Products Co., Ltd. (Beijing Pacific), Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. (GHC), Ningxia Mineral & Chemical Limited (Ningxia Mineral), and Shanxi Sincere Industrial Co., Ltd. (Shanxi Sincere).[4]

## II.    REMANDED ISSUES

### 1.    <u>Bituminous Coal Surrogate Value</u>

**Background**

In the *AR11 Final Results*, Commerce selected the average unit value (AUV) for Romanian import data under Harmonized System (HS) heading 2701.12 as the SV for bituminous coal used to produce activated carbon after finding that the AUV for Malaysian imports under HS 2701.12 was aberrantly high and based on a limited import volume, and thus unreliable.[5]  In making this decision, Commerce rejected the mandatory respondents' request to use import data under HS 2701.19, which covers "Other Coal," to value certain inputs of bituminous coal.[6]  The mandatory respondents based their request on the text of Chapter 27, Subheading Note 2, as excerpted from the Thai HS code.[7]  Specifically, Note 2 limits HS 2701.12, *inter alia*, to bituminous coal with "a calorific value limit equal to or greater than 5,833 kilocalorie (kcal)/kilogram (kg)."[8]  The mandatory respondents therefore asserted that Commerce should value bituminous coal with a calorific value that is less than 5,833 kcal/kg under HS 2701.19.[9]  Commerce declined to do so, finding that Note 2 applied solely to Thai import data and declining to apply Note 2 to another country's (*i.e.*, Malaysia) import data.[10]

---

[4] Beijing Pacific, GHC, Ningxia Mineral, Shanxi Sincere were not selected for individual examination during the review, but qualified for a separate rate, and are participating in the litigation.
[5] *See AR11 Final Results* IDM at 9-16.
[6] *Id.* at 14.
[7] *Id.*; *see also* Carbon Activated's Letter, "Carbon Activated Response to Section D Supplemental Questionnaire (Part I)," dated February 21, 2019 (Carbon Activated's SDQR Part I), at 19 and Exhibit SD-27.
[8] *See AR11 Final Results* IDM.
[9] *Id.*
[10] *Id.* at 13.

Filed By: Jinny Ahn, Filed Date: 7/1/21 1:15 PM, Submission Status: Approved

In litigation before the CIT, the mandatory respondents, Beijing Pacific, GHC, Ningxia Mineral, and Shanxi Sincere (collectively, the Plaintiffs, or the Respondents) challenged Commerce's decision not to recognize the applicability of Note 2 to all countries in the World Customs Organization (WCO) through the Harmonized System of Nomenclature.[11]

In the *Remand Order*, the CIT concluded that it was unable to discern the path of Commerce's reasoning and remanded for reconsideration and further explanation with respect to the applicability of Note 2 and Commerce's understanding of the relevant parts of the record.[12] The CIT stated that the Plaintiffs' argument is not without precedent, noting that, in prior determinations, Commerce has taken the position that products subject to international trade generally will enter WCO countries under the same six-digit subheading.[13]

**Analysis**

In light of the CIT's *Remand Order*, Commerce has reconsidered and provided further explanation regarding the applicability of Note 2 of the Thai HS code to Chapter 27 of the Malaysian tariff schedule in determining the appropriate SV for the bituminous coal input. Based on the following analysis, Commerce has now determined to use import data reported under Malaysian HS subheading 2701.19 to value the bituminous coal input used by Datong Juqiang, Datong Juqiang's supplier, and one of Carbon Activated's suppliers. With regard to

---

[11] *See Remand Order* at 19.

[12] *Id.* at 20.

[13] *Id.* at 21 (citing *Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 37715 (July 2, 2014) (*PET Film from China*), and accompanying IDM at 20 (stating that "{t}he International Convention on the Harmonized Commodity and Coding System applies the same {HS} six-digit prefix to products subject to international trade"); and *First Administrative Review of Sodium Hexametaphosphate from the People's Republic of China: Final Results of the Antidumping Duty Administrative Review*, 75 FR 64695 (October 20, 2010) (*Sodium Hex from China*), and accompanying IDM at 8 n.32. (stating same).

3

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

bituminous coal used by Carbon Activated's other supplier, Supplier C,[14] and by Carbon Activated's uncooperative supplier[15] for which we applied Supplier C's factors of production (FOPs) data to compute the normal value (NV), we continue to use Romanian import data reported under HS 2701.12. We explain in detail below.

Commerce's practice when selecting the best available information for valuing FOPs, in accordance with section 773(c)(1) of the Tariff Act of 1930, as amended (the Act), is to select, to the extent practicable, SVs which are publicly available, contemporaneous with the period of review (POR), representative of a broad market average, tax- and duty-exclusive, and specific to the inputs being valued.[16] While there is no hierarchy for applying the SV selection criteria, "{Commerce} must weigh available information with respect to each input value and make a product-specific and case-specific decision as to what the 'best' {SV} is for each input."[17] Additionally, Commerce has a strong preference to value all FOPs in a single SC, pursuant to 19 CFR 351.408(c)(2), as well as a practice "to only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."[18]

---

[14] The identity of this supplier is business proprietary. For Supplier C's identity, *see* Memorandum, "Draft Remand Redetermination Results Calculation Memorandum for Carbon Activated Tianjin Co., Ltd. in the Eleventh Administrative Review of Certain Activated Carbon from the People's Republic of China," dated May 28, 2021 (CAT Draft Remand Calculation Memorandum). Because we are making no changes to the determinations as set forth in the Draft Remand Results, we are adopting the analysis in the CAT Draft Remand Calculation Memorandum for the final remand results. Commerce also notes that FOPs reported for Supplier C's CONNUMs comprise a small percentage of the volume of subject merchandise reported in Carbon Activated's FOP database; *see also* Memorandum, "Business Proprietary Information regarding Carbon Activated's Supplier-Supplier C," dated concurrently with this this final results of redetermination pursuant to remand (BPI Memorandum).

[15] The identity of the uncooperative supplier is business proprietary. For the uncooperative supplier's identity, *see* CAT Draft Remand Calculation Memorandum.

[16] *See, e.g.*, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 FR 11349 (March 17, 2009), and accompanying IDM at Comment 2.

[17] *See, e.g.*, *Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 FR 55039 (September 24, 2008) (*PET Film 2008*), and accompanying IDM at Comment 2.

[18] *See Sodium Hexametaphosphate from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 77 FR 59375 (September 27, 2012) (*Sodium Hex from China 2012*), and accompanying IDM at Comment I.

4

Here, the Respondents assert that the Thai Note 2 to Chapter 27 on the record (which defines sub-heading 2701.12, "bituminous coal" as coal having a volatile matter limit (on a dry, mineral-matter-free basis) exceeding 14 percent and a calorific value limit equal to or greater than 5,833 kcal/kg) can be applied to Malaysian import data under the same HS subheading, because the identical six-digit HS breakouts and sub-heading notes exist for all WCO countries, such that Note 2 to Chapter 27 is the same across countries, including Romania, Malaysia, and Thailand.[19]  Further, they claim that the test reports on the record demonstrate the heat value of the bituminous coal input used by Datong Juqiang, Datong Juqiang's supplier, and one of Carbon Activated's suppliers is calculated to be below 5,833 kcal/kg.[20]  However, for Carbon Activated's other supplier (*i.e.*, Supplier C), and for Carbon Activated's uncooperative supplier for which we applied Supplier C's FOPs data to compute the NV, there is no record evidence regarding the heat value of its bituminous coal input used in the production of activated carbon.

Because the record for this segment of the proceeding did not contain information to evaluate the Respondents' assertion that the subheading notes at the six-digit level are the same for all WCO countries, Commerce placed on the record information published by the WCO (*i.e.*, Harmonized System Compendium).[21]  The Harmonized System Compendium states that:

---

[19] *See* Memorandum in Support of Plaintiffs' and Plaintiff-Intervenors' Motion for Judgment on the Agency Record Pursuant to USCIT Rule 56.2, Case No. 20-0007 (CIT) filed on June 24, 2020, at 17.

[20] *See* Datong Juqiang's Letter, "DJAC Supplemental Section D response," dated February 12, 2019 (DJAC Supp D Response), at Exhibits SD-12, SD-13, SD-56; *see also* Carbon Activated's Letter, "Carbon Activated Response to Section D Parts II and III First Supplemental Questionnaire," dated March 15, 2019 (CAT Supp D Response), at Exhibit SD-15; *see also* Mandatory Respondents' Letter, "Case Brief of Datong Juqiang Activated Carbon Co., Ltd., Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation in the Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China (A-570-904)," dated October 7, 2019, at 28.

[21] *See* Memorandum, "Draft Remand Redetermination Results in the Eleventh Administrative Review of Certain Activated Carbon from the People's Republic of China:  Surrogate Values for the Draft Redetermination," dated May 28, 2021 (Draft Remand SV Memorandum), at Attachment 2, page 21 (Harmonized System Compendium) (Commerce notes this document is also available at:  http://www.wcoomd.org/-/media/wco/public/global/pdf/topics/nomenclature/activities-and-programmes/30-years-hs/hs-compendium.pdf?la=en).

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

The Harmonized System comprises:

• General Rules for the interpretation of the Harmonized System;

• Section and Chapter Notes, including Subheading Notes;

• A list of headings arranged in systematic order and, where appropriate, subdivided

into subheadings.[22]

The Harmonized System Compendium also states that the "Harmonized System constitutes a

coherent set of headings and subheadings, which, together with the General Interpretative Rules

(GIR) and Section, Chapter and Subheading Notes, provide for the systematic and uniform

classification of goods."[23]  Further, the introductory paragraph for GIR in the Harmonized

System Compendium provides:

> {T}o be completely sound, a classification system must associate each individual
> product with a single heading (and, as the case may be, subheading), to which that
> product can be simply and unequivocally assigned.  Hence it must contain rules
> designed to ensure that a given product is always classified in one and the same
> heading (and subheading), to the exclusion of any others which might appear to
> merit consideration.  All classification decisions must be based upon the
> application of these rules.[24]

Further, GIR No.6 provides:

> 6.  For legal purposes, the classification of goods in the subheadings of a heading
> shall be determined according to the terms of those subheadings and any related
> Subheading Notes and, *mutatis mutandis*, to the above Rules, on the
> understanding that only subheadings at the same level are comparable.  For the
> purpose of this Rule the relative Section and Chapter Notes also apply, unless the
> context otherwise requires.[25]

This information provides additional context to, and is consistent with, prior determinations in

which Commerce has concluded that "{t}he International Convention on the Harmonized

---

[22] *Id.*
[23] *Id.* at 20.
[24] *Id.* at 21.
[25] *Id.* at 24.

Filed By: Jinny Ahn, Filed Date: 7/1/21 1:15 PM, Submission Status: Approved

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

Commodity and Coding System applies the same {HS} six-digit prefix to products subject to international trade").[26]  Based on this information, and because Thai Note 2 to Chapter 27 explains "bituminous coal" means coal having a volatile matter limit (on a dry, mineral-matter-free basis) exceeding 14 percent and a calorific value limit equal to or greater than 5,833 kcal/kg), we now find that Malaysian HS subheading 2701.19 covers the same merchandise as Thai HS subheading 2701.19.  Additionally, because the test reports on the record demonstrate the heat value of the bituminous coal input used by Datong Juqiang, Datong Juqiang's supplier, and one of Carbon Activated's suppliers is below 5,833 kcal/kg,[27] for these final remand results we have valued the bituminous coal input used by Datong Juqiang, Datong Juqiang's supplier, and one of Carbon Activated's suppliers using import data reported under Malaysian HS subheading 2701.19.  We find that the AUV under Malaysian HS subheading 2701.19 is reliable, as there is no indication that the AUV is unusable as a result of being, for example, aberrantly high or based on a limited amount of imports.[28]  With regard to bituminous coal used by Carbon Activated's other supplier, Supplier C, and by Carbon Activated's uncooperative supplier for which we applied Supplier C's FOP data to compute the NV, we continue to use Romanian import data reported under HS 2701.12, as we do not have record evidence, such as test reports for the bituminous coal input used by these suppliers, that would support valuing this input using imports under subheading 2701.19.[29]  This determination is consistent with Commerce's practice

---

[26] See *PET Film from China* IDM at 20; *see also Sodium Hex from China* IDM at 8 n. 32.
[27] See *DJAC Supp D Response* at Exhibits SD-12, SD-13 and SD-56; *see also CAT Supp D Response* at Exhibit SD-15.
[28] See Petitioners' Letter, "Eleventh Administrative Review of the Antidumping Order on Certain Activated Carbon from the People's Republic of China:  Petitioners' Final Affirmative Surrogate Value Submission," dated May 13, 2019, at Attachment 2.
[29] See Carbon Activated's SDQR Part I at 9 and Exhibit SD-27 (Commerce notes that the test report provided by Supplier C in this exhibit is the test report for smoke coal, which Supplier C asserts is a type of energy coal, whose technical grate is bituminous coal, that Supplier C used to provide energy for activation.).

7

in which we apply different SVs for the same input used by different respondents, based on the available evidence regarding input specificity.[30]

## 2. <u>Surrogate Country Selection</u>

**Background**

     In the *AR11 Preliminary Results*, Commerce determined that Malaysia and Romania constituted significant producers of comparable merchandise during the POR based on their respective export volumes.[31] Because none of the six OP List countries[32] were net exporters during the POR,[33] we used the export volumes of the primary HS heading included in the scope, *i.e.*, exports of HS number 3802.10 (activated carbon), as a proxy for domestic production.[34] Commerce preliminarily determined that all six OP List countries were significant producers of comparable merchandise, stating that none of the total export volumes from the OP List countries were insignificant.[35] Based on its subsequent analysis of availability of SV data,

---

[30] *See Certain Activated Carbon from the People's Republic of China: Final Results and Partial Rescission of Second Antidumping Duty Administrative Review*, 75 FR 70208 (November 17, 2010) (*Carbon AR2*), and accompanying IDM at Comment 4b (Commerce used Coal India Limited (CIL) data to value steam coal where the necessary data have been reported by the respondents and where the useful heat value (UHV) specificity of the CIL data corresponds to the UHV specificity of the steam coal input used by the respondents. Otherwise, Commerce used WTA Indian imports of steam coal under Indian HTS number 2701.19.20: "Steam Coal" for the respondent's suppliers, which did not report the UHV of their steam coal input.).

[31] *See Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*, 84 FR 27758 (June 14, 2019) (*AR11 Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 14.

[32] *See* Commerce's Letter Re: "Certain Activated Carbon from the People's Republic of China (China): Request for Comments re: (1) Economic Development, (2) Surrogate Country and (3) Surrogate Value Information," dated September 14, 2018, at Attachment (OP List) (Commerce notes that Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia are the countries identified as countries that are at the same level of economic development as China based on per capita 2017 Gross National Income (GNI) data in the OP List).

[33] On the record, we have import and export data from the Global Trade Atlas (GTA) and UN Comtrade for entries made under the HS subheading 3802.10, covering the subject merchandise. *See* Mandatory Respondents' Letter, "DJAC and Carbon Activated Surrogate Country Comments: Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China," dated October 12, 2018 (Respondents' SC Comments), at Exhibit 1. The export volumes for the OP List countries are: 16,475,976 kg (Malaysia); 1,308,800 kg (Brazil); 8,778,259 kg (Mexico); 849,850 kg (Russia); 612,474 kg (Kazakhstan); and 34,000 kg (Romania). The import volumes for the OP List countries are: 32,892,163 kg (Malaysia); 14,854,141 kg (Russia); 14,449,228 kg (Mexico); 5,797,030 kg (Brazil); 2,004,526 kg (Kazakhstan); and 1,106,000 kg (Romania).

[34] *See AR11 Preliminary Results* PDM at 14.

[35] *Id.*

8

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

Commerce preliminarily selected Malaysia as the primary SC and used a financial statement from a Romanian company, Romcarbon S.A. (Romcarbon) (a producer of polyethylene, polypropylene and filters), to calculate surrogate financial ratios.  In the *AR11 Final Results*, Commerce continued to select Malaysia as the primary SC and continued to use the Romcarbon statements for financial ratios.[36]  However, with respect to the significant producer criterion, Commerce departed from its preliminary finding and determined that Romania was not a significant producer of comparable merchandise, explaining that the record contained financial statements from three Malaysian producers of activated carbon, providing more direct evidence of significant production of activated carbon which is identical to the subject merchandise in the form of multiple financial statements.  Further, Commerce explained that there is no equivalent information on the record with respect to Romanian production, as there is only one financial statement on the record from Romcarbon.  Romcarbon's statements indicate that its principal business activity is the manufacture of polyethylene, polypropylene and filters, although one of its seven profit centers is dedicated to the production of respiratory protective equipment and active carbon.[37]  Commerce found that this is not evidence of "significant production," compared to the three financial statements from Malaysian activated carbon producers on the record.[38] Therefore, for the *AR11 Final Results*, Commerce selected Malaysia as the primary SC, stating "{b}ecause there are multiple Malaysian financial statements on the record, all of which contain evidence of production of identical merchandise, there is more direct evidence on the record that Malaysia is a significant producer of identical merchandise."[39]  Commerce did not compare the

---

[36] *See AR11 Final Results* IDM at 4.
[37] *Id.* at 7-8.
[38] *Id.*
[39] *Id.*

9

Appx101

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

quality and availability of Malaysian and Romanian data for the purpose of primary SC selection in the *AR11 Final Results*, finding the issue to be "moot."[40]

During litigation at the CIT, Plaintiffs challenged Commerce's use of Malaysia as the primary SC.

In the *Remand Order*, the CIT remanded Commerce's selection of Malaysia as the primary SC for further explanation, concluding that Commerce did not adequately explain its decision to depart from its preliminary finding that Romania is a significant producer of comparable merchandise. With regard to this issue, the CIT further stated that although section 773(c)(4)(B) of the Act "does not distinguish between identical and comparable merchandise" for purposes of identifying significant producer countries, Commerce's conclusion that "Malaysia provides the best available information … because it is the only country on the OP List that is a significant producer of identical merchandise" suggests that the agency favored the production of identical merchandise when selecting a primary SC.[41] The CIT also stated that Plaintiffs did not fail to exhaust their administrative remedies with regard to their argument that Romcarbon's financial statements demonstrated that Romania was a significant producer, because Romania's status as a significant producer was not among the issues raised by interested parties or by Commerce prior to Commerce's issuance of the *AR11 Final Results*.[42]

**Analysis**

In light of the CIT's *Remand Order*, Commerce has reconsidered and provided further explanation regarding its determination to use Malaysia as the primary SC. Based on the following analysis, for these final results of redetermination on remand, Commerce now finds

---

[40] *Id.*
[41] *See Remand Order* at 12 (citing *Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States*, 896 F. Supp. 2d 1313, 1322 (CIT 2013)).
[42] *Id.* at 17-18.

that Romania is a significant producer of comparable merchandise, based on export volumes. Further, Commerce has determined to continue to use Malaysia as the primary SC based on its subsequent analysis of the availability of SV data.  We explain in detail below.

*Economic Comparability*

Malaysia and Romania are both economically comparable to China, as both countries are on the OP List, and are, therefore, determined, based on per capita GNI, to be at the same level of economic development as China.[43]

*Significant Producer of Comparable Merchandise*

Section 773(c)(4)(B) of the Act requires Commerce to value FOPs, to the extent possible, in an SC that is a significant producer of comparable merchandise.  Neither the statute nor Commerce's regulations provide further guidance on the definition of comparable merchandise or significant producer.  Given the absence of any definition in the statute or regulations, Commerce looks to other sources such as the Policy Bulletin 04.1 and legislative history for guidance.[44]  Policy Bulletin 04.1 explains that Commerce should not compare production levels in the non-market economy (NME) country and the potential surrogate countries in order to identify significant producers.[45]  Instead, Policy Bulletin 04.1 provides, "Commerce should define 'significant producer' in relation to world production and trade (subject to the availability of data on these characteristics)."[46]  Moreover, the legislative history provides that the term "significant producer" includes any country that is a "net exporter" of identical or comparable merchandise.[47]  However, that text does not define the phrase "net exporter" or explain whether a

---

[43] *See* OP List.
[44] *See* Enforcement and Compliance Policy Bulletin 04.1:  Non-Market Economy Surrogate Country Selection Process (March 1, 2004) (Policy Bulletin 04.1), available at https://enforcement.trade.gov/policy/bull04-1.html.
[45] *Id.*
[46] *Id.*; *see also DuPont Teijin Films v. United States*, 997 F. Supp. 2d 1338, 1342 (CIT 2014).
[47] *See Conference Report to the 1988 Omnibus Trade & Competitiveness Act*, H.R. Rep. No. 100-576 (1988) at 590.

11

Appx103

potential SC must constitute a net exporter in terms of quantity, value, or both to fit the example provided in the legislative history.[48]  The CIT has held that this term (*i.e.*, significant producer) is not statutorily defined, and is "inherently ambiguous,"[49] and that this ambiguous provision of the Act does not compel Commerce to define "significant producer" in any particular manner.[50] Accordingly, Commerce may examine export volumes from among those countries that are at the same level of economic development to determine whether a country is a significant producer.[51]

Also, Policy Bulletin 04.1 states that "in all cases, if identical merchandise is produced, the country qualifies as a producer of comparable merchandise."[52]  Commerce has also previously stated that, if comparable merchandise is produced, a country qualifies as a producer of comparable merchandise.[53]  Therefore, if the record contains evidence of domestic production of comparable merchandise, then this evidence directly addresses the requirement of production of comparable merchandise under section 773(c)(4) of the Act.  Such evidence may include the financial statements of a commercial producer of comparable merchandise in the SC.[54]

In this review, the record contains the import and export quantity and value data during the POR for all six OP List countries of the primary HS heading included in the scope, *i.e.*, HS subheading 3802.10., published by the GTA (for Brazil, Malaysia, Mexico, Romania, and

---

[48] *Id.*
[49] *See Fresh Garlic Producers Ass'n v United States*, 121 F. Supp. 3d 1313, 1338-39 (CIT 2015).
[50] *See Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1274 n.5 (CIT 2006).
[51] *See Certain Uncoated Paper from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 81 FR 3112 (January 20, 2016), and accompanying IDM at Comment 1.
[52] *Id.*; *see also* Policy Bulletin 04.1.
[53] *See Sebacic Acid from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 62 FR 65674, 65676 (December 15, 1997) ("{T}o impose a requirement that merchandise must be produced by the same process and share the same end uses to be considered comparable would be contrary to the intent of the statute.").
[54] *See Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1683-1684  (CIT 2006) (upholding Commerce's selection of India as a significant producer using the financial statements of Indian companies), *rev'd on other grounds*, *Dorbest Ltd. v. United States*, 604 F.3d 1363 (2010).

12

Russia) and 2017 UN Comtrade (for Kazakhstan).[55]  These data demonstrate that none of the

countries in the OP List are net exporters of subject merchandise.[56]  Further, world production

and trade data of comparable merchandise are not available on the record of this administrative

review.  Therefore, for these final results of redetermination on remand, we analyzed exports of

comparable merchandise (*i.e.*, POR export quantities under HS subheading 3802.10) from the six

OP List countries, as a proxy for production data.

Pursuant to the guidance provided by Policy Bulletin 04.1, which provides that

Commerce should not compare production levels in the NME country and the potential surrogate

countries in order to identify significant producers, we now find that all six OP List countries are

significant producers of comparable merchandise, based on export volumes.[57]  Specifically, we

now find that the exports from Romania, while relatively small compared to the export volumes

under HS subheading 3902.10 from the other OP List countries, are not negligible; thus, we

determine that they are significant.

Further, the three Malaysian financial statements on the record indicate that each

company's principal business activity is the manufacture of activated carbon, which is identical,

and thus comparable, to the subject merchandise in this proceeding.  While Romcarbon's

principal activities are the manufacture of polyethylene, polypropylene, polyvinyl chloride,

polystyrene processing, filters and protective materials, its financial statements indicate that its

profit center no.2 includes an "Active Coal Workshop," which is dedicated to the production of

activated carbon.[58]  Therefore, for both Malaysia and Romania, the financial statements on the

---

[55] *See* Respondents' SC Comments at Exhibit 1.
[56] *Id.*
[57] *Id.*
[58] *See* Mandatory Respondents' Letter, "First Surrogate Value Comments by DJAC and CA Tianjin:  Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China," dated November 9, 2018 (Respondents' Surrogate Value Submission), at Exhibit 9, page 1303 (Romcarbon's profit center no. 2 includes a "Workshop of Active Carbon").

13

record provide evidence of domestic production of comparable merchandise under section 773(c)(4) of the Act.

*Data Considerations*

If more than one potential SC is determined to be economically comparable and a significant producer of comparable merchandise, Commerce selects the primary SC based on data quality and availability.[59]  When evaluating SV data, Commerce considers several factors, including whether the SVs are publicly available, contemporaneous with the POR, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs being valued.[60] There is no hierarchy among these criteria.  It is Commerce's practice to carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis of valuing the FOPs.[61]

The record contains complete, publicly-available, contemporaneous, and input-specific Malaysian data for nearly all of the inputs used by the two mandatory respondents to produce the subject merchandise during the POR – including the bituminous coal input used to produce nearly the entire production volume of the subject merchandise reported in both mandatory respondents' respective FOP databases – with the exception of the financial ratios, as discussed below.[62]  Further, the record also contains complete, publicly-available, and contemporaneous

---

[59] *See* Policy Bulletin 04.1.

[60] *Id.*; *see also Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 FR 11349 (March 17, 2009), and accompanying IDM at Comment 2.

[61] *See Certain Preserved Mushrooms from the People's Republic of China:  Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 FR 40477 (July 17, 2006), and accompanying IDM at Comment 1.

[62] *See* Petitioners' Letter, "Certain Activated Carbon from the People's Republic of China – Petitioners' Submission of Surrogate Values," dated November 9, 2018 (Petitioners' SV Comments).

and input-specific Romanian data for nearly all of the inputs used by the two mandatory respondents to produce the subject merchandise during the POR.[63]

We have considered the quality of data on the record and find that, on the basis of input specificity of the available data, the Malaysian SV data are superior to those of Romania. Malaysia is one of only a small number of countries with an HS subheading that includes a tariff classification at the ten-digit level that is specific to coconut-shell charcoal (*i.e.*, HTS subheading 4402.90.1000), a direct material that is consumed in significant quantities in the production of subject merchandise by the mandatory respondents. On the other hand, Romania only provides a six-digit basket category HS subheading, 4402.90, which covers wood-based charcoal and also includes nut-based charcoal, which is an input not used by the mandatory respondents. Further, although Malaysia provides multiple financial statements from producers of identical (and thus comparable) merchandise which are representative of the experience of the mandatory respondents, they do not provide breakouts for raw material, labor, and energy. In contrast, the one Romanian financial statement on the record provides the specificity needed to calculate the financial ratios because it provides breakouts for these categories of expenses. Therefore, we continue to select Malaysia as the primary SC for these final results of redetermination, because it provides the best available information from which to value the mandatory respondent's FOPs.

Additionally, while the three Malaysian financial statements provide evidence that Malaysia is a producer of identical merchandise, they lack usable financial data in that none of them have separate line items breaking down the cost of raw materials and energy. Therefore, we continue to use the Romcarbon financial statements for the calculation of the surrogate

---

[63] *See* Mandatory Respondents' Letter, "Final Surrogate Value Comments by DJAC and CA Tianjin: Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China," dated May 13, 2019 (Respondents' Final SV Comments).

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

financial ratios, as they are the only financial statements on the record which present the

financial data in a manner that is feasible for the calculation of these ratios.

### 3.  **Commerce's Accounting Adjustments in Romcarbon's Financial Ratio Calculations**

**Background**

In the *AR11 Final Results*, Commerce valued financial ratios using the 2017 financial

statements from the Romanian company, Romcarbon.[64]  Before the CIT, Plaintiffs argued that

Commerce's allocation of certain line items in Romcarbon's financial statements are not in

accordance with Commerce's practice and not supported by substantial evidence.  Further,

Plaintiffs argued that Commerce's decision in the *AR11 Final Results*, issued December 11,

2019, is inconsistent with Commerce's subsequent financial ratios adjustments in the *AR10*

*Remand Redetermination*, where Commerce used the POR-contemporaneous financial

statements from the same Romanian company that we used to value financial ratios for the *AR11*

*Final Results* (*i.e.*, Romcarbon).[65]  Specifically, Plaintiffs argued that:  (1) "other gains" should

offset selling, general, and administrative (SG&A) expenses instead of being excluded, because

this line item is treated as part of a company's general operations; (2) "gain/(loss) on adjustment

of investment property at fair value," and "gain/(loss) on disposal of investment property" should

offset the reported "profit before tax" instead of being excluded, because all of these gains accrue

from activities outside of Romcarbon's general business, *i.e.*, manufacturing of goods; and (3)

"social contributions" and "meal tickets" should be allocated under "labor," instead of SG&A

expenses, in order to avoid double counting because both line items capture indirect labor cost

---

[64] *See AR11 Final Results*; *see also* Memorandum, "Eleventh Administrative Review of Certain Activated Carbon from China:  Surrogate Value for the Final Results," dated December 11, 2019 (Final SV Memorandum), at Attachment 1.

[65] *See Final Results of Redetermination Pursuant to Court Remand, Calgon Carbon Corporation et al. v. United States*, Consol. Court No. 18-00232, Slip Op.20-65, dated August 4, 2020 (*AR10 Remand Redetermination*), available at https://enforcement.trade.gov/remands/20-65.pdf.

16

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

expenses, which Commerce already included in the NV build-up.[66]  Commerce argued that the accounting adjustments are supported by substantial evidence in the record and are not contrary to law.  In the *Remand Order*, the CIT directed Commerce to consider Plaintiffs' arguments, given the inconsistencies between Commerce's determinations in the *AR10 Remand Redetermination* and the *AR11 Final Results* and the discrepancies in Commerce's explanations for declining the adjustments.[67]

**Analysis**

In light of the CIT's *Remand Order*, Commerce has reconsidered the allocation of the expenses at issue as follows below.

*Gain/(Loss) on adjustment of investment property at fair value, and Gain/(Loss) on disposal of investment property*

In the *AR11 Final Results*, Commerce excluded "gain/(loss) on adjustment of investment property at fair value," and "gain/(loss) on disposal of investment property," from the calculation of financial ratios.[68]  Commerce's established practice is to deduct income from investment property from a manufacturing entity's reported "profit before tax," as the income from investment does not pertain to the company's general business activity (*i.e.*, manufacturing of goods).[69]  Because Romcarbon included the line items "gain/(loss) on adjustment of investment property at fair value" and "gain/(loss) on disposal of investment property" in the revenue build-up, these two line items contribute to, and are included in, its reported "profit before tax."[70]

---

[66] *See* Plaintiffs' Motion at 39-44.
[67] *See Remand Order* at 30.
[68] *See* Final SV Memorandum at Attachment 1.
[69] *See, e.g., Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2009-2010*, 78 FR 11143, 11146 (February 15, 2013), and accompanying IDM at Comment 16.
[70] *See* Respondents' Surrogate Value Submission at Exhibit 9, page 1323.

Filed By: Jinny Ahn, Filed Date: 7/1/21 1:15 PM, Submission Status: Approved

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

Because Romcarbon's general business activity is the manufacture of goods,[71] these two line items are extrinsic to Romcarbon's ordinary business operation.  Therefore, for this final remand redetermination, we have offset Romcarbon's reported "profit before tax" with the amounts under these two line items and recalculated the profit ratio accordingly.

*Other Gains*

In the *AR11 Final Results*, Commerce excluded "other gains" from its computation of financial ratios.[72]  It is Commerce's practice to calculate the SG&A expense ratio to include only items that relate to the general operation of the company as a whole.[73]  In determining whether it is appropriate to include in or exclude from the SG&A calculation particular income or expense items, Commerce reviews the nature of the item and its relation to the general operations of the company.[74]  Commerce's practice is to treat incomes accrued from miscellaneous activities as a part of the general operations of the company unless the financial statements explicitly indicate otherwise.[75]

With respect to "Other Gains," as noted above, Commerce's practice is to treat income accrued from miscellaneous activities as a part of the general operations of the company unless the financial statement explicitly indicates otherwise.[76]  Because there is no indication on the record that the amount under the line item "other gains" does not pertain to the general operations of the company,[77] for this final remand redetermination we have offset Romcarbon's

---

[71] *Id.* at page 1303.
[72] *See* Final SV Memorandum at Attachment 1.
[73] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances:  Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 FR 76918 (December 23, 2004), and accompanying IDM at Comment 2.
[74] *Id.*
[75] *See Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 73 FF 55039 (September 24, 2008), and accompanying IDM at Comment 3.
[76] *Id.*
[77] *See* Respondents' Surrogate Value Submission at Exhibit 9, page 1376.

Filed By: Jinny Ahn, Filed Date: 7/1/21 1:15 PM, Submission Status: Approved

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

reported SG&A with the amounts under "other gains," and recalculated the financial ratios accordingly.

*Social Contributions and Meal Tickets*

In the *AR11 Final Results*, we categorized "Social Contributions" and "Meal Tickets" under SG&A expenses.[78]  When labor items, such as social security contributions, clothing, housing, meals, *etc.*, are clearly included in the SV for labor, we will include such items in the labor category of the surrogate financial ratios calculations to avoid double-counting such expenses.[79]  The Malaysian SV for labor which we used to value labor cost in *AR11 Final Results* (*i.e.*, POR-contemporaneous Malaysian labor SV from Trading Economics) provides no information on whether Social Contributions and/or Meal Tickets are included in the SV for labor.[80]  Therefore, because the record does not contain evidence to conclude that Commerce's labor SV already includes the cost of employer's contribution to social security and meal expenses, it is not appropriate to make the adjustments requested by the Respondents.[81]  Thus, in the *AR11 Final Results*, by allocating these two items to SG&A, we did not double count these expenses.  Therefore, for this final remand redetermination we continue to classify the "meal tickets" and "social contribution" line items as SG&A expenses.

---

[78] *See* AR11 Final SV Memorandum at Attachment 1.

[79] *See Xanthan Gum from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2013-2014*, 82 FR 11428 (February 23, 2017) (*Xanthan Gum*), and accompanying IDM at Comment 14.

[80] *See* Petitioners' SV Comments at Attachment 4.

[81] *See, e.g., Frozen Warmwater Shrimp Final Results and Rescission, in Part, of 2004/2006 Antidumping Duty Administrative and New Shipper Reviews*, 72 FR 52049 (September 12, 2007) (*Frozen Warmwater Shrimp*), and accompanying IDM at Comment 3 (Commerce notes that the  International Labor Organization data, used to value labor in *Frozen Warmwater Shrimp*, did not include labor related costs, such as employers' contributions in respect of their employees paid to social security and pension schemes.  Accordingly, for the purposes of financial ratio calculations, Commerce categorized "Contributions to Gratuity Fund" as a part of the overhead calculation.).

Filed By: Jinny Ahn, Filed Date: 7/1/21 1:15 PM, Submission Status: Approved

### III.    SUMMARY AND ANALYSIS OF RESPONDENTS' COMMENTS ON DRAFT REMAND RESULTS

Commerce released the Draft Remand Results to parties for comments on May 28, 2021.[82]  The Plaintiffs filed comments on the Draft Remand Results on June 8, 2021.[83]  On June 11, 2021, Commerce issued a letter to the Respondents, noting that the Respondents' Original Comments contained untimely filed factual information, and requesting that they remove the new factual information and refile the submission.[84]  The Respondents filed the redacted version of the comments on June 14, 2021.[85]  On June 15, 2021, the Respondents filed a letter requesting that Commerce reconsider Commerce's rejection of Respondents' Original Comments, arguing that the information at issue does not constitute new factual information because it is "widely available and public reference material."[86]  On June 23, 2021, Commerce issued a memorandum responding to the Request for Reconsideration, explaining that for reasons of administrative finality and for notice and due process considerations, it is reasonable and necessary to close the record to new factual information – including information that is publicly available.[87]  Commerce also explained that it had not reopened the record on remand and thus it would not be accepting new factual information.  Further, Commerce issued an additional letter to the Respondents, noting that the Respondents' Redacted Comments continued to include new factual information, and requested that they remove the new factual information and resubmit the

---

[82] *See* Draft Remand Results.
[83] *See* Respondents' Letter, "Comments on Draft Remand:  Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China," dated June 8, 2021 (Respondents' Original Comments).
[84] *See* Commerce's Letter, "Rejection of June 8, 2021, Comments on Draft Remand," dated June 11, 2021; *see also* Memorandum, "Rejection of Factual Information from GDLSK," dated June 11, 2021; *see also* Memorandum, "Rejection of Factual Information from GDLSK," dated June 14, 2021.
[85] *See* Respondents' Letter, "Redacted and Resubmitted Comments on Draft Remand:  Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China," dated June 14, 2021 (Respondents' Redacted Comments).
[86] *See* Respondents' Letter," Request for Reconsideration of Draft Remand Comments Rejection," dated June 15, 2021 (Request for Reconsideration).
[87] *See* Memorandum, "Request for Reconsideration from GDLSK," dated June 21, 2021.

20

comments.[88]  On June 24, the Respondents filed the second redacted version of the comments.[89]
No other parties filed comments on the Draft Remand Results.  As explained below, we continue
to reach the same conclusions that we reached in the Draft Remand Results.  We address each of
the Respondents' comments and provide our analysis in turn.

**Issue 1:  Bituminous Coal Surrogate Value**

*Respondents' Comments*

- In the Draft Remand Results, Commerce has now reconsidered and properly
  acknowledges that HS chapter notes apply to all WCO countries, and accordingly, has
  properly changed the SVs for a portion of bituminous coal (*i.e.*, bituminous coal with
  known calorific value) from those used in the *AR11 Final Results*.

- However, in preferring Malaysian import data reported under HS 2701.19 to value the
  bituminous coal with known calorific value, Commerce failed to select the best available
  information on this record.[90]  Given that Commerce already determined that the
  Malaysian data reported under HS 2701.12 was aberrant and unreliable, the agency
  should be skeptical of Malaysian import data reported under 2701.19, which covers the
  same input of lower heat value, because the SV reported thereunder could likewise be
  distorted.[91]  At a minimum, between the two available choices, Romanian HTS
  subheading 2701.19 and Malaysian HTS subheading 2701.19, the former is preferable
  because – unlike Malaysian import data under HS 2701.12 – the Romanian import data
  reported under 2701.12 is undistorted.[92]

---

[88] *See* Commerce's Letter, "Rejection of June 14, 2021, Redacted and Resubmitted Comments on Draft Remand,"
dated June 23, 2021.
[89] *See* Respondents' Letter, "Second Redacted and Resubmitted Comments on Draft Remand," June 23, 2021
(Respondents' Comments).
[90] *See* Respondents' Comments at 10.
[91] *Id.* at 11.
[92] *Id.*

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

- Further, the Draft Remand Results improperly value bituminous coal having unknown heat value with data reported under Romanian HS 2701.12, stating that Commerce does not have record evidence, such as test reports for the bituminous coal input used by these suppliers, that would support valuing this input using imports under subheading 2701.19.[93]

- However, Commerce likewise does not have record evidence to support valuing this input using imports under HS 2701.12 only.[94]  Therefore, in the Draft Remand Results, Commerce impermissibly speculates that bituminous coal having unknown calorific value should be classified under HS 2701.12.[95]

- Given other record evidence showing that similar bituminous coal utilized in producing identical merchandise had a calorific value less than 5,833 kcal/kg, the most reasonable inference regarding the calorific value for such bituminous coal with unknown heat value, is that their calorific value should be likewise less than 5,833 kcal/kg.[96]

- While Commerce specifically required Datong Juqiang and Datong Juqiang's supplier to provide calorific value information and test reports for their bituminous coal input, Commerce never asked Supplier C to provide such information.[97]

- Because Commerce never requested Supplier C to evidence the calorific value of its bituminous coal, Supplier C never provided such evidence.  Under these facts, Commerce is precluded from drawing an adverse inference that such coal invariably had a calorific value equal to or great than 5,833 kcal/kg (and thereby meriting classification under HS

---

[93] *Id.* at 3.
[94] *Id.*
[95] *Id.*
[96] *Id.* at 4.
[97] *Id.* at 5.

Filed By: Jinny Ahn, Filed Date: 7/1/21 1:15 PM, Submission Status: Approved

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

2701.19).[98]  The CIT in *AR1 Litigation*, under similar factual circumstances where specificity for an input was on the record for one mandatory respondent, but not for another mandatory respondent because Commerce did not request that information from the second mandatory respondent, disfavored application of different SVs between the two parties.[99]

- Therefore, in its final remand redetermination, Commerce should apply Romanian import data under HS 2701.19 to value bituminous coal of unknown calorific value. Alternatively, an inference based on equal probability suggests that the calorific value of such bituminous coal could be either (1) less than 5,833 kcal/kg or; (2) equal to or greater than the threshold limit of 5,833 kcal/kg.  Accordingly, a conservative methodology for valuing such unknown calorific value bituminous coal requires Commerce to average the SVs reported in HS 2701.19 with those reported under HS 2701.12.[100]

- Further, Commerce correctly recognized that Malaysian import data reported under HS 2701.12 are not viable in *AR11 Final Results*.  Therefore, in the final remand redetermination, Commerce should average data reported under Romanian HS 2701.12 and Romanian HS 2701.19, as averaging the Romanian data under HS 2701.12 with the Malaysian data under HS 2701.19 would result in a potentially distortive SV because it would be drawing SVs for the same input--bituminous coal, varying only in terms of calorific value, from two different source countries.[101]

---

[98] *Id.* (citing *Calgon Carbon Corp. v. United States*, 35 CIT 235, 244 (2011) (*AR1 Litigation*)).
[99] *Id.*
[100] *Id.* at 6.
[101] *Id.*

Filed By: Jinny Ahn, Filed Date: 7/1/21 1:15 PM, Submission Status: Approved

- Commerce's regulatory policy underlying surrogate valuation – repeatedly affirmed by the CIT – is to minimize the distortion that occurs from using data from multiple countries.[102]

- While Commerce may on occasion have to employ data from a secondary surrogate country based on the absence of viable data for a particular input, there is no basis for Commerce to employ data from different countries to value bituminous coal for the final remand redetermination, given the indisputably reliable Romanian data on the record.[103]

- Therefore, in the final remand redetermination, Commerce should value both the bituminous coal input with known heat value and unknown heat value with Romanian import data reported under HS 2701.19.  Or, alternatively, apply the Romanian HS 2701.19 to value bituminous coal with a known heat value, and use the average of the data reported under Romanian HS 2701.12 and 2701.19 to value the bituminous coal input with unknown heat value.[104]

**Commerce's Position:**  The respondents claim that Commerce should (1) use Romanian import data reported under HS 2701.19 for bituminous coal with both a known calorific value and unknown calorific values, or (2) in the alternative, apply Romanian HS 2701.19 to value bituminous coal with a known calorific value, and use an average of the data under Romanian HS 2701.12 and 2701.19 for bituminous coal with unknown calorific value.  We disagree with the respondents and explain in detail below.

---

[102] *Id.* at 6 and 11 (citing *Clearon Corp. v. United States*, 2013 Ct. Intl. Trade LEXIS 27, *21 (Feb. 10, 2013) ("the use of a 'single surrogate country' is justified when, as here, all other factors are 'fairly equal' because minimizing distortion supports a finding that Commerce relied upon the best available information on the record."); also citing *Peer Bearing Co.-Changshan v. United States*, 804 F. Supp. 2d 1337, 1353 (CIT 2011); 19 C.F.R. § 351.408(c)(1)).
[103] *Id.* at 12.
[104] *Id.* at 2.

As stated above, Commerce's practice, when selecting the best available information for valuing FOPs, in accordance with section 773(c)(1) the Act, is to select, to the extent practicable, SVs which are input-specific, representative of a broad-market average, publicly available, contemporaneous with the POR, and tax- and duty-exclusive.[105]  Further, Commerce undertakes its analysis of valuing the FOPs on a case-by-case basis, carefully considering the available evidence in light of the particular facts of each industry.[106]  In addition, it is a long-standing Commerce practice that a party arguing that data are aberrational or unreliable must provide sufficient evidence to support its argument.[107]  Commerce has previously noted that "{i}nterested parties must provide specific evidence showing the value is aberrational.  If a party presents sufficient evidence to demonstrate a particular surrogate value is not viable, {Commerce} will assess all relevant price information on the record, including any appropriate benchmark data, in order to accurately value the input in question."[108]  When there is insufficient evidence to find certain data aberrational, Commerce does not discard the data.[109]  Additionally, Commerce has a strong preference to value all FOPs in a single surrogate country, pursuant to 19 CFR 351.408(c)(2), as well as a practice "to only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."[110]

In the Draft Remand Results, we continued to find Malaysia as the proper selection for the primary surrogate country, and, as discussed *infra*, for the final results of redetermination, we

---

[105] *See, e.g.*, *First Administrative Review of Certain Polyester Staple Fiber from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 75 FR 1336 (January 11, 2010), and accompanying IDM at Comment 1.
[106] *See Glycine from the People's Republic of China:  Notice of Final Results of Antidumping Duty Administrative Review*, 70 FR 47176 (August 12, 2005), and accompanying IDM at Comment 1.
[107] *See, e.g.*, *Carbazole Violet Pigment 23 from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 75 FR 36630 (June 28, 2010) (*Carbazole Violet Pigment*), and accompanying IDM at Comment 4.
[108] *Id.*
[109] *See Carbazole Violet Pigment* IDM at Comment 6.
[110] *See Sodium Hex from China 2012* IDM at Comment I.

25

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

continue to use Malaysia as the primary surrogate country.  Because Commerce selected Malaysia as the primary surrogate country, our first preference in selecting SVs for these final results of redetermination is to utilize publicly available prices within Malaysia.[111]

Although Respondents assert that the Malaysian import data reported under HS 2701.19 could be distorted merely because we determined Malaysian import data reported under HS 2701.12 to be aberrant and unreliable, we find this claim unavailing and without merit.  As stated above, the party arguing that data are unreliable must provide sufficient evidence to support its argument.  The Respondents do not identify any record information to support their claim that data reported under HS 2701.19 could be distorted, and the record lacks any appropriate benchmark data or other price information to support their contention.  As there is no evidentiary basis to find that the Malaysian import data reported under HS 2701.19 are aberrantly high, Commerce cannot discard the data.[112]

Likewise, the Respondents' assertion that Commerce improperly valued bituminous coal having unknown heat value with data reported under Romanian HS 2701.12 because Commerce never asked Supplier C to provide test reports, is without merit.  Although Commerce did not ask Supplier C to provide test reports for its bituminous coal input, Commerce asked Supplier C to "provide a detailed description of 'smoke coal' and explain the difference between smoke coal and bituminous coal."[113]  In response to this question, Supplier C stated, "Smoke coal is a type of energy coal, whose technical grade is bituminous coal, that {Supplier C} used to provide energy for activation."  Supplier C further stated, "{b}oth bituminous coal and smoke coal belong to the same technical grade of bituminous coal."[114]  In relation to this statement, Supplier C only

---

[111] *See* Draft Remand SV Memorandum at Attachment 1.
[112] *Id.*
[113] *See* Carbon Activated's SDQR Part I at 19, Exhibit SD-27.
[114] *Id.*

Filed By: Jinny Ahn, Filed Date: 7/1/21 1:15 PM, Submission Status: Approved

provided a test report for its smoke coal input, thereby failing to substantiate its claim that "{b}oth bituminous coal and smoke coal belong to the same technical grade of bituminous coal"[115] with supporting documents (such as bituminous coal test reports). The Respondents' reference to the CIT's decision in *AR1 Litigation* to support their contention that Commerce should apply Romanian HS 2701.19 to value the bituminous coal with unknown heat values is unavailing and not on point. The circumstances the Respondents cite to in *AR1 Litigation* pertain to the acceptance of additional evidence at verification.[116] The CIT in *AR1 Litigation* noted that although Commerce had no obligation to accept additional evidence at verification, once Commerce did accept such evidence from one respondent at verification, however, Commerce had an obligation to treat the other respondent fairly by giving it a similar opportunity.[117] Because similar circumstances do not exist here, the CIT's decision in *AR1 Litigation* is inapplicable to this case. Further, it is our long-standing practice in this case for parties to provide the calorific values of the inputs.[118]

Additionally, a party arguing that data are unreliable must provide sufficient evidence to support its argument. In this administrative review segment of the proceeding, the Respondents request that Commerce use HS 2701.19 (Other Coal), instead of HS 2701.12 (Bituminous Coal) to value bituminous coal. In *AR11 Final Results*, Commerce declined to apply Thai notes to Chapter 27, which limits HS 2701.12, *inter alia*, to bituminous coal with "a calorific value limit equal to or greater than 5,833 kcal/ kg,"[119] to the Malaysian subheading, stating that "Subheading Note 2 to Chapter 27" pertains specifically to Thai HS data, not Malaysian data."[120] Therefore,

---

[115] *Id.* at SD-27.
[116] *See AR1 Litigation*, 35 CIT 235 at 244.
[117] *Id.*
[118] *See, e.g., Carbon AR2*; *see also Certain Activated Carbon from the People's Republic of China: Final Results of the Fifth Antidumping Duty Administrative Review*, 78 FR 70533 (November 20, 2013) (*AR5 Final Results*).
[119] *See AR11 Final Results* IDM.
[120] *Id.* at 14.

Commerce decided to continue to use HS 2701.12 to value bituminous coal, concluding that the record did not contain similar information with respect to the Malaysian imports under Chapter 27, and as such there was no record evidence to support the use of Malaysian import SV data under HS 2701.19 for the bituminous coal input.[121]  However, while we have now applied the Thai HS subheading notes to the Malaysian HS 2701.12 for these final results of redetermination, we still lack record evidence to depart from using HS 2701.12 to value the bituminous coal used by Supplier C and the uncooperative supplier, which comprise a small percentage of the volume of subject merchandise reported in Carbon Activated's FOP database.

Moreover, the plain language description of the GTA data for HS 2701.12 (Bituminous Coal, Not Agglomerated)[122] matches the mandatory respondents' description of their input (*i.e.*, bituminous coal) and supports Commerce's decision to rely on this HS category for the input. Commerce has long relied on a plain reading of the HS descriptions to determine the best available information to value a specific input.[123]  Commerce cannot consider the application of HS 2701.19 with the description "Other Coal," without record evidence to demonstrate that the coal input the mandatory respondents identify as "bituminous coal," is actually of the kind and grade that is more appropriately classified under HS 2701.19 (Other Coal).  Based on the information placed on the record by the mandatory respondents, there is only sufficient evidence to determine that the bituminous coal used by Datong Juqiang, Datong Juqiang's supplier, and one of Carbon Activated's suppliers can be valued with import data reported under HS 2701.19. The record lacks evidence to support a departure from our finding in the *AR11 Final Results* that HS 2701.12 is the appropriate HS code to value Supplier C's, and accordingly, Carbon

---

[121] *Id.*

[122] *See* Draft Remand SV Memorandum at Attachment 1.

[123] *See, e.g.*, *Certain Woven Electric Blankets from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 75 FR 38459 (July 2, 2010), and accompanying IDM at Comment 5.

Activated's uncooperative supplier's bituminous coal input.  Because the Respondents did not provide evidence demonstrating that it would be inappropriate for Commerce to value Supplier C's bituminous coal input using data reported under HS 2701.12, Commerce continues to find that HS 2701.12, based on the description of the input, is the best available information to value Supplier C and the uncooperative supplier's bituminous coal input.

Respondents also failed to provide any evidence to support their alternative claim that Commerce should average the surrogate values reported in HS 2701.19 with those reported under HS 2701.12.  As noted above, in *AR11 Final Results*, the AUV for Malaysian imports under HS 2701.12 was determined to be aberrantly high and based on a limited import volume. As Commerce generally seeks to minimize the number of countries that it relies on for SV data,[124] and as Commerce continues to use Romania as the secondary SC as explained *infra*, Commerce continues to use the AUV for Romanian import data under HS heading 2701.12 as the SV for bituminous coal used by Supplier C and the uncooperative supplier, which comprise a small percentage of the volume of subject merchandise reported in Carbon Activated's FOP database.[125]

Further, as the Plaintiffs have correctly noted, Commerce may on occasion have to employ data from a secondary SC based on the absence of viable data from the primary SC for a particular input.[126]  As explained *infra*, we continue to use Malaysia as the primary SC based on the availability of input-specific data, and to use Romania as the secondary surrogate country, as Romania provides usable financial statements.  Therefore, for these final results of

---

[124] *See Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review, 2016-2017*, 83 FR 46704 (September 14, 2018), and accompanying IDM at Comment 1.
[125] *See* BPI Memorandum.
[126] *See, e.g.*, *Fresh Garlic from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 36168, 36170 (June 17, 2013), and accompanying IDM at Comment 9.

29

redetermination, Commerce continues to use import data reported under Malaysian HS subheading 2701.19 to value the bituminous coal input used by Datong Juqiang, Datong Juqiang's supplier, and one of Carbon Activated's suppliers, and to use Romanian import data reported under HS 2701.12 to value bituminous coal used by Supplier C, and by Carbon Activated's uncooperative supplier.[127]  This determination is consistent with Commerce's practice in which we apply different SVs for the same input used by different respondents, based on the available evidence regarding input specificity.[128]

## Issue 2:  Surrogate Country Selection

*Respondents' Comments*

- In the Draft Remand Results, Commerce now finds that both Romania and Malaysia are significant producers of comparable merchandise.  This determination is a departure from Commerce's determination in the *AR11 Final Results*, where Commerce found Malaysia to be the only significant producer of comparable merchandise among the OP List countries.[129]

- Accordingly, in the Draft Remand Results, Commerce relied on data considerations to choose Malaysia over Romania as the primary SC, stating that Malaysia provides "data for nearly all of the inputs used by the two mandatory respondents to produce the subject merchandise during the POR – including the bituminous coal input used to produce nearly the entire production volume of the subject merchandise reported in both

---

[127] The identity of the uncooperative supplier is business proprietary.  For the uncooperative supplier's identity, *see* CAT Draft Remand Calculation Memorandum.
[128] *See Carbon AR2* IDM at Comment 4b.
[129] *See* Respondents' Comments at 12.

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

mandatory respondents' respective FOP databases – with the exception of the financial ratios."[130]

- However, Commerce's proffered rationale in favor of Malaysia is unsupported by substantial record evidence.[131]

- First, Commerce's findings concerning bituminous coal are directly contrary to the record evidence. Commerce already rejected the unreliable Malaysian HS subheading 2701.12 data for valuing higher calorific heat value (heat value equal to or greater than 5,833 kcal/kg) bituminous coal. As such, the record lacks a usable Malaysian SV under HS 2701.12. Indeed, Commerce applied Romanian HS subheading 2701.12 for valuing bituminous coal of unknown heat value. Therefore, for valuing bituminous coal of an unknown heat value used by two different suppliers, Malaysia demonstrably fails to afford a reliable SV, whereas in contrast, Romania affords reliable SVs for both grades of bituminous coal (*i.e.*, bituminous coal with lower calorific value (covered by import data reported under HS 2701.19) and unknown calorific value (covered by the average of import data reported under HS 2701.12 and 2701.19).[132]

- Second, the financial ratios represent a significant portion of both mandatory respondents' NV.[133] This impact on NV must be considered when selecting surrogate countries per Commerce's practice, which has been affirmed by the CIT.[134] The Romcarbon financial data therefore provide a compelling basis for Commerce to have

---

[130] *Id.* at 13.
[131] *Id.*
[132] *Id.* at 14.
[133] *Id.*
[134] *Id.* (citing *Certain Steel Nails from the People's Republic of China: Final Results of Third Antidumping Duty Administrative Review*, 78 Fed. Reg. 16,651 (Mar. 18, 2013), and accompanying IDM at Comment 1D; and *Jiaxing Brother Fastener Co. v United States*, 11 F.Supp.3d 1326, 1333 (CIT 2014) (*Jiaxing Brother*)).

31

selected Romania as the primary surrogate country for China.  At a minimum, Commerce must in its final remand explain its deviation from its normal practice by selecting the surrogate country without regards to data availability for such a large portion of NV.[135]  Commerce's SV choices for two key FOPs – bituminous coal and surrogate financial ratios – strongly support selecting Romania and undermine the choice of Malaysia.[136]

- Third, in the Draft Remand Results, Commerce advances a new rationale to favor Malaysia for the first time in AR11, *i.e.*, for valuing carbonized materials.  Specifically, Commerce states, "Malaysia is one of only a small number of countries with an HS subheading that includes a tariff classification at the ten-digit level that is specific to coconut-shell charcoal (*i.e.*, HTS subheading 4402.90.1000), a direct material that is consumed in significant quantities in the production of subject merchandise by the mandatory respondents.  On the other hand, Romania only provides a six-digit basket category HS subheading, 4402.90, which covers wood-based charcoal and also includes nut-based charcoal, which is an input not used by the mandatory respondents."[137]

- This draft remand position is both unavailing and unsupported by record evidence.  First, in a remand proceeding Commerce should not rely on an entirely new substantive basis in support of its SC choice (*i.e.*, Malaysia).[138]

- Second, the assertion that coconut-shell charcoal was used by mandatory respondents is unsupported for at least three of Carbon Activated's suppliers.[139]  While one of the mandatory respondents (Datong Juqiang) used coconut shell charcoal, the record lacks

---

[135] *Id.*
[136] *Id.*
[137] *Id.* at 17.
[138] *Id.*
[139] *Id.* at 17.

information about the underlying material (whether coal, coconut, wood, or nut) of the carbonized material utilized by the three Carbon Activated suppliers, who appear to have used coal-based carbonized material – not coconut shell charcoal.[140]  Commerce never requested that the three Carbon Activated suppliers in question provide this additional information.[141]

- Consequently, the rationale that the Malaysian HTS subheading 4402.90.1000 for coconut-shell charcoal affords greater product specificity in relation to the input as compared to Romanian HS subheading 4402.90 (Wood Charcoal (Including Shell Or Nut Charcoal), Excluding That Of Bamboo), which is a basket category heading encompassing coconut shell charcoal as well as wood charcoal, is unavailing.[142]

- To the contrary, Romanian HS 4002.90 affords a superior SV choice for all three of Carbon Activated suppliers' coal-based carbonized material.[143]  In *AR5 Final Results*, Commerce accepted that wood and nut charcoal could also be used to produce certain types of activated carbon.[144]  The CAFC also affirmed Commerce's decision that:  (a) wood charcoal could be used to produce the subject merchandise; and (b) between wood charcoal and coconut shell charcoal, the latter is not more comparable to coal-based carbonized materials.[145]

---

[140] *Id.* (citing Carbon Activated's SDQR Part I at12; and Carbon Activated Letter, "Section D Questionnaire Response, Part I," dated September. 28, 2018, at Exhibit D-2 in Attachment D.  (Plaintiffs note that Supplier C's production process shows it used bituminous coal to produce carbonized material at the carbonization stage and mixed such self-produced carbonized material with purchased carbonized material at the activation stage.  Plaintiffs assert that this fact also indicates that purchased carbonized materials should have the same initial substrate, *i.e.*, coal, in order to form a homogeneous mixture, and ensure that the integrity of the final product is not compromised.)).

[141] *Id.* at 17.

[142] *Id.* at 18.

[143] *Id.*

[144] *Id.* at 20 (citing*AR5 Final Results* IDM Comment 6.

[145] *Id.* (citing *Jacobi Carbons AB v. United States*, 619 Fed. Appx. 992, 999 (Fed. Cir. 2015)).

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

- Therefore, as compared to the Malaysian HTS subheading 4402.90.1000 data for coconut shell charcoal only, the choice of Romanian HS subheading 4402.90 (which encompasses both coconut shell charcoal and wood- and nut-based charcoal) affords a more reliable and representative SV for all three of Carbon Activated's suppliers' coal-based carbonized material.[146]

- Third, Romanian HS subheading 4402.90 is vastly superior to Malaysian HTS subheading 4402.90.1000 in terms of data quality. Romanian HS subheading 4402.90 import data are based on imports from 23 partner countries with a total quantity of 27,152,840 kg. On the other hand, Malaysian HTS subheading 4402.90.1000 import data are based on Malaysian imports from only four partner countries with a total quantity of merely 336,395 kg. That is, the commercial significance of the Romanian import data is 81 times greater than that of Malaysia.[147]

- As such, Commerce's reliance on an additional metric – the carbonized material SV – to support its choice of Malaysia as the surrogate country is demonstrably misguided and undermined by record evidence and longstanding agency and judicial precedent.[148]

**Commerce's Position:** Commerce disagrees with the Respondents' contention that the lack of usable Malaysian data for surrogate financial ratios, and some of the bituminous coal input used by the mandatory respondents during the POR, makes Romania a more appropriate choice of primary SC for this review. We continue to find that Malaysia provides the best available information based on data quality and availability.

---

[146] *Id.* at 22.
[147] *Id.*
[148] *Id.* at 23.

Filed By: Jinny Ahn, Filed Date: 7/1/21 1:15 PM, Submission Status: Approved

As noted above, Commerce undertakes to select SVs using the best available information that is on the record in light of our established SV analytical criteria.[149] There is no hierarchy among these criteria. It is Commerce's practice to carefully consider the available evidence considering the particular facts of each industry when undertaking its analysis of valuing the FOPs.[150]

Respondents first contend that Commerce should have used import data reported under HS 2701.12 and HS 2701.19 to value bituminous coal used by Supplier C and the uncooperative supplier, instead of using import data reported under HS 2701.12. The Respondents further argue that because Romania provides usable data under HS 2701.12, whereas the Malaysian data under the same HS code was determined to be aberrantly high and based on a limited import volume, Romania provides better quality data with regards to the bituminous coal input with unknown heat values. However, as noted, *supra*, there is no information on the record of this administrative review that supports the conclusion that an *average* of the Romanian data reported under HS 2701.12 and HS 2701.19 is more specific than Romanian data reported under HS 2701.12 alone to value bituminous coal used by Supplier C and the uncooperative supplier. As explained above, based on available record evidence, we continue to value the bituminous coal input used by Supplier C and the uncooperative supplier with Romanian import data reported under HS 2701.12 because the description of this HS code matches the description of the input. Further, while we continue to use data under Romanian HS 2701.12 (*i.e.*, data from the secondary surrogate country) to value the bituminous coal input used by Supplier C and the

---

[149] *Id.*; *see also Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 FR 11349 (March 17, 2009), and accompanying IDM at Comment 2.

[150] *See Certain Preserved Mushrooms from the People's Republic of China: Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 FR 40477 (July 17, 2006), and accompanying IDM at Comment 1.

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

uncooperative supplier, we have a usable SV from the primary SC (*i.e.*, data reported under

Malaysian HS 2701.19) covering nearly all of the bituminous coal input used by the mandatory

respondents.  In addition, Commerce notes that contrary to the Respondents' assertion that the

Romanian HS 2701.19 is preferable to Malaysian HS 2701.19 in terms of data quality, the

Romanian import data that the Respondents placed on the record is not POR-specific because the

data cover the period 2016-2018,[151] whereas the Malaysian data under HS 2701.19 is

contemporaneous with the POR (*i.e.*, April 2017-March 2018).[152]  Because the FOPs reported for

Supplier C's CONNUMs comprise a small percentage of the volume of subject merchandise

reported in Carbon Activated's FOP database, it is appropriate to use data from the primary SC,

that is input-specific and POR-contemporaneous, as are the data reported under Malaysian HS

2701.19 in this case.  For these final results of redetermination, Commerce continues to select the

primary SC based on data quality and availability, and only resort to a secondary SC when data

from the primary SC are unavailable.

Second, the Respondents' contention that the financial ratios represent a significant

portion of both mandatory respondents' NV, and that this impact on NV must be considered

when selecting surrogate countries, is unsupported by prior agency determinations and CIT

precedents.  The Respondents cite to a Commerce determination and a CIT decision where the

*main input*'s outsized impact on the NV buildup led Commerce to prioritize that input in making

its surrogate country selection,[153] and thus their reliance on these cases is misplaced.  In *Steel*

*Nails*, the dispute was on the choice of SC between Ukraine and Thailand, and the discussion

---

[151] *See* Respondents' Final SV Comments at Exhibit 2.
[152] *See* Petitioners' SV Comments at Attachment 2.
[153] *See* Respondents' Comments at 14 (citing *Certain Steel Nails from the People's Republic of China:  Final Results of Third Antidumping Duty Administrative Review*, 78 FR 16651 (March 18, 2013) (*Steel Nails*), and accompanying IDM Comment 1D; and *Jiaxing Brother*).

Filed By: Jinny Ahn, Filed Date: 7/1/21 1:15 PM, Submission Status: Approved

was on which country better provides reliable information to value all of the inputs.[154]  In *Steel Nails*, Thailand was determined to be the SC, because not only did Thailand provide usable financial ratios, it also provided "{s}pecific data to value *the two primary inputs*, steel wire rod and steel plate, that comprise the majority of normal value."[155]  Similarly, in *Jiaxing Brother*, the CIT affirmed Commerce's choice of Thailand as the primary SC, noting that Thai steel data provide superior quality for the main input:  steel.[156]  In *Jiaxing Brother*, the CIT noted Commerce's rationale for why it would choose Thailand as the primary SC, despite the relative weakness in the Thai financial statements and another input, is reasonable, stating, "{n}either input influences Plaintiffs' normal value nearly as much as *the steel input*, meaning a reasonable mind could conclude as Commerce did that the overall accuracy of the calculation is best enhanced by reliance on a more specific steel surrogate value than on the financial statements or the Philippine HCl surrogate value."[157]  As stated *infra*, we continue to choose Malaysia as the primary SC based on data considerations.  Therefore, to best enhance the overall accuracy of the calculation by relying on a more input-specific SV, we continue to use Malaysia as the primary surrogate country and rely on the Romanian financial statements for the calculation of financial ratios.

Third, this is the first time in this review where Commerce reached the analysis of data reliability with respect to Romania, as Romania was determined not to be a significant producer of subject merchandise in *AR11 Final Results*.  Moreover, the CIT has ordered Commerce to further explain its SC selection.[158]  Thus, Respondents' contention that in a remand proceeding

---

[154] *See Steel Nails* IDM at Comment 1D.
[155] *Id.* (emphasis added).
[156] *See Jiaxing Brother*, 11 F. Supp. 3d at 1333.
[157] *Id.* (emphasis added).
[158] *See Remand Order* at 18.

37

Commerce should not rely on an entirely new substantive basis in support of its SC choice (*i.e.*, Malaysia), is unavailing.  Further, the record clearly demonstrates that Datong Juqiang used coconut shell charcoal in the production of the subject merchandise,[159] and therefore, a tariff classification at the ten-digit level that is specific to coconut-shell charcoal (*i.e.*, HTS subheading 4402.90.1000) is the most appropriate SV to value this input.

For the three Carbon Activated suppliers, we agree that we could value coal based carbonized material with either coconut shell or wood charcoal.  However, while the Respondents contend that the Romanian data are better, they do not identify any record evidence that the Malaysian data under HS 4402.90.1000 are aberrational, not a commercial quantity, or otherwise unreliable.  In addition, contrary to the Respondents' assertion that the Romanian HS subheading 4402.90 is vastly superior to Malaysian HS subheading 4402.90.1000 in terms of data quality, the Romanian import data that the Respondents put on the record are not POR-specific, as the data cover the period 2016-2018,[160] while the import data under Malaysian HS subheading 4402.90.1000 are contemporaneous with the POR (*i.e.*, April 2017-March 2018).[161] Further, Commerce has a strong preference for valuing all SVs from a single surrogate country.[162]  Therefore, we will continue to value coal-based carbonized materials using Malaysian data for imports reported under HS subheading 4402.90.1000 because these data are not aberrational, reflect a commercial quantity from the primary surrogate country, and as noted

---

[159] *See* Datong Juqiang's Letter, "DJAC Second Supplemental Sections C and D response," dated March 6, 2019, at Exhibit 1; *see also* Memorandum, "Draft Redetermination Results Calculation Memorandum for Datong Juqiang Activated Carbon Co., Ltd. in the Eleventh Administrative Review of Certain Activated Carbon from the People's Republic of China," dated May 28, 2021 (DJAC Draft Calculation Memorandum).  Because we are making no changes to the determinations as set forth in the Draft Remand Results, we are adopting the analysis in the DJAC Draft Calculation Memorandum for the final remand results.

[160] *See* Respondents' Final SV Comments at Exhibit 2.

[161] *See* Petitioners' SV Comments at Attachment 2.

[162] *See Sodium Hex from China 2012* IDM at Comment I.

in previous segments of this proceeding,[163] are viable proxy to value coal-based carbonized materials.

Therefore, for these final results of redetermination, Commerce continues to use Malaysia as the primary SC, on the basis of data availability and quality, and continues to use Romania as the secondary SC for the valuation of financial ratios and a small quantity of the bituminous coal input.

## Issue 3:  Adjustments in Romcarbon's Financial Ratio Calculations

*Respondents' Comments*

- In the Draft Remand Results, Commerce continued to classify the "meal tickets" and "social contribution" line items as SG&A expenses, stating that the record does not contain evidence to conclude that Commerce's labor SV already includes the cost of employer's contribution to social security and meal expenses, thus it is not appropriate to make the adjustments requested by the Respondents.[164]

- This rationale is unpersuasive because there is no evidence that the Malaysian wage labor data exclude "meal tickets" and "social contribution" either.  Commerce merely speculates that these two cost elements are not included in the Malaysian wage data.[165]

- This determination is also facially inconsistent with Commerce's rationale in the Draft Remand Results in support of allocating "other gains" as an offset to SG&A instead of excluding them from the calculation of financial ratios, in which Commerce noted that

---

[163] *See Certain Activated Carbon from the People's Republic of China:  Final Results and Partial Rescission of Third Antidumping Duty Administrative Review*, 76 FR 67142 (October 31, 2011), and accompanying IDM.
[164] *See* Respondents' Comments at 23.
[165] *Id.*

39

there is no record evidence demonstrating that the amount reported under the line item

"other gains" does not pertain to the general operations of the company.[166]

- Therefore, by applying the same rationale, Commerce should allocate "social

    contributions" and "meal tickets" to labor cost in the final remand.[167]

- Alternatively, at a minimum, a fair determination requires that given the uncertainty as to

    whether the two cost elements – "social contributions" and "meal tickets" – are included

    in the Malaysian wage data, Commerce should exclude these two cost elements from the

    ratio calculations altogether.[168]

**Commerce's Position:**  Commerce disagrees with the Respondents' contention that

Commerce's classification of "meal tickets" and "social contribution" line items as SG&A

expenses is based on mere speculation.

In deriving surrogate financial ratios, "it is {Commerce}'s longstanding practice to avoid

double-counting costs where the requisite data are available to do so."[169]  Furthermore, in *Labor*

*Methodologies*, Commerce has stated, "{Commerce} will adjust the surrogate financial ratios

when the available record information-in the form of itemized indirect labor costs-demonstrates

that labor costs are overstated."[170]  Therefore, when labor items, such as social security

contributions, clothing, housing, meals, *etc.*, are clearly included in the SV for labor, we will

---

[166] *Id.* at 24.

[167] *Id.*

[168] *Id.*

[169] *See Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam:  Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 76 FR 56158 (September 12, 2011), and accompanying IDM at Comment 5.B. (citing *Certain Tissue Paper Products from the People's Republic of China:  Final Results and Final Rescission, In Part, of Antidumping Duty Administrative Review*, 72 FR 58642 (October 16, 2007), and accompanying IDM at Comment 2).

[170] *See Antidumping Methodologies in Proceedings Involving Non-Market Economies:  Valuing the Factor of Production:  Labor*, 76 FR 36092, 36094 (June 21, 2011) (*Labor Methodologies*).

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

include such items in the labor category of the surrogate financial ratios calculations to avoid double-counting such expenses.[171]

However, for this review, the source of the Malaysian SV for labor which we used to value labor cost in *AR11 Final Results* (*i.e.*, POR-contemporaneous Malaysian labor SV from Trading Economics) provides no information on whether "social contributions" and/or "meal tickets" are included in the SV for labor,[172] and there is no record evidence demonstrating that the labor SV used was overstated. Therefore, for this final remand redetermination, Commerce has finalized the adjustments of allocation and classification of the expenses in Romcarbon's financial statements, and continues to classify the expenses reported under "Social Contributions" and "Meal Tickets" as SG&A expenses. As this allocation of indirect labor costs is in line with Commerce's prior determinations,[173] CIT precedents,[174] and the guidelines provided in *Labor Methodologies*,[175] the Respondents' assertion that the Commerce's allocation of "social contributions" and "meal tickets" under SG&A expenses is inconsistent with Commerce's rationale in support of offsetting Romcarbon's SG&A with the amounts under "other gains" is without merit.

Further, Commerce continues to offset Romcarbon's reported "profit before tax" with the amounts under "Gain/(Loss) on adjustment of investment property at fair value" and "Gain/(Loss) on disposal of investment property," because, as stated above, these two line items are extrinsic to Romcarbon's ordinary business operations (*i.e.*, manufacture of goods). Commerce continues to offset Romcarbon's reported SG&A with the amounts under "other

---

[171] *See Xanthan Gum* IDM at Comment 14; *see also Drawn Stainless Steel Sinks from the People's Republic of China: Investigation, Final Determination*, 78 FR 13019 (February 26, 2013), and accompanying IDM at Comment 3.
[172] *See* Petitioners' SV Comments at Attachment 4.
[173] *See, e.g., Xanthan Gum* IDM at Comment 14.
[174] *See, e.g., Jiaxing Brother Fastener Co. v. United States*, 461 F. Supp. 3d 1346, 1351 (CIT 2020).
[175] *See Labor Methodologies*, 76 FR at 36094.

gains," because there is no indication on the record that the amount under this line item does not pertain to the general operations of the company.

## IV.    RESULTS OF FINAL REMAND REDETERMINATION

Consistent with the *Remand Order*, we reconsidered our choice of HS code for the bituminous coal SV used in the production of activated carbon, the choice of SC, and adjustments in financial ratios, and additionally have addressed and clarified these issues in this remand redetermination.  Based on the foregoing explanations, we made certain changes to our determinations regarding the choice of the input-specific HS code used to value bituminous coal, and the adjustments to our calculation of financial ratios based on Romcarbon's financial statements.  Accordingly, we revised the margin calculations for the mandatory respondents, Carbon Activated and Datong Juqiang, from those in the *AR11 Final Results*.  Thus, we also revised the separate rate margin for Beijing Pacific, GHC, Ningxia Mineral, and Shanxi Sincere, the non-individually examined respondents that qualified for a separate rate and participated in the litigation.[176]  Based on these changes, the estimated weighted-average dumping margins for Carbon Activated, Datong Juqiang, Beijing Pacific, GHC, Ningxia Mineral, and Shanxi Sincere for the POR, April 1, 2017, through March 31, 2018, are listed in the chart below.

| Exporter | Weighted-Average Dumping Margin from *AR11 Final Results* (USD/kg) | Weighted-Average Dumping Margin for the Remand Redetermination (USD/kg) |
|---|---|---|
| Carbon Activated Tianjin Co., Ltd. | 1.02 | 0.94 |

---

[176] *See AR11 Final Results*, 84 FR at 68882 (explaining method for determining rate for non-examined separate rate respondents); *see also* CAT Draft Remand Calculation Memorandum; DJAC Draft Remand Calculation Memorandum; and Memorandum, "Calculation of the Margin for Respondents Not Selected for Individual Examination," dated May 28, 2021 (Draft SR Remand Calculation Memorandum) (Because we are making no changes to the determinations as set forth in the Draft Remand Results, we are adopting the analysis in the Draft SR Remand Calculation Memorandum for the final remand results.).

42

Barcode:4139211-01 A-570-904 REM - Remand 4/1/17 - 3/31/18 Ct.No. 20-00007 Slip Op 21-35

| | | |
|---|---|---|
| Datong Juqiang Activated Carbon Co., Ltd. | 0.86 | 0.55 |
| Beijing Pacific Activated Carbon Products Co., Ltd. | 0.89 | 0.61 |
| Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. | 0.89 | 0.61 |
| Ningxia Mineral & Chemical Limited | 0.89 | 0.61 |
| Shanxi Sincere Industrial Co., Ltd. | 0.89 | 0.61 |

6/30/2021

X

Signed by: CHRISTIAN MARSH

Christian Marsh
Acting Assistant Secretary
 for Enforcement and Compliance

43

Slip Op. 21-149

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION, AND DATONG JUQIANG ACTIVATED CARBON CO., LTD., <br><br>      Plaintiffs, <br><br>      and <br><br> BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., NINGXIA MINERAL & CHEMICAL LIMITED, AND SHANXI SINCERE INDUSTRIAL CO., LTD., <br><br>      Plaintiff-Intervenors, <br><br>      v. <br><br> UNITED STATES, <br><br>      Defendant, <br><br>      and <br><br> CALGON CARBON CORPORATION AND CABOT NORIT AMERICAS, INC., <br><br>      Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge <br> Court No. 20-00007 |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's remand results in the eleventh administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China.]

Dated: October 22, 2021

<u>Francis J. Sailer</u>, <u>Dharmendra N. Choudhary</u> and <u>Jordan C. Kahn</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., for Plaintiffs and Plaintiff-Intervenors.

<u>Mollie L. Finnan</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant.  With her on the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Claudia Burke</u>, Assistant Director.  Of counsel on the brief was <u>Ashlande Gelin</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>John M. Herrmann</u>, <u>R. Alan Luberda</u>, and <u>Melissa M. Brewer</u>, Kelley Drye & Warren LLP, of Washington, D.C., for Defendant-Intervenors.

        Barnett, Chief Judge:  This matter is before the court following the U.S.

Department of Commerce's ("Commerce" or "the agency") redetermination upon

remand in this case.  *See* Final Results of Redetermination Pursuant to Court Remand

("Remand Results"), ECF No. 68-1.[1]

        Plaintiffs and Plaintiff-Intervenors (collectively, "Plaintiffs")[2] commenced this case

challenging several aspects of Commerce's final results in the eleventh administrative

review ("AR11") of the antidumping duty order on certain activated carbon from the

People's Republic of China ("China") for the period of review ("POR") April 1, 2017,

---

[1] The administrative record associated with the Remand Results is divided into a Public Remand Record ("PRR"), ECF No. 69-3 and a Confidential Remand Record ("CRR"), ECF No. 69-2.  The administrative record associated with the *Final Results* is divided into a Public Record ("PR"), ECF No. 39-5, and a Confidential Record ("CR"), ECF No. 39-4.  Parties filed joint appendices containing record documents cited in their briefs. *See* Public Remand J.A., ECF No. 75; Confidential Remand J.A. ("CRJA"), ECF No. 74. Citations are to the CRJA unless stated otherwise.

[2] Plaintiffs consist of Carbon Activated Tianjin Co., Ltd. ("Carbon Activated"), Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd. ("DJAC"), Beijing Pacific Activated Carbon Products Co., Ltd., Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Ningxia Mineral & Chemical Limited, and Shanxi Sincere Industrial Co., Ltd.

through March 31, 2018. *See Certain Activated Carbon From the People's Republic of China*, 84 Fed. Reg. 68,881 (Dep't Commerce Dec. 17, 2019) (final results of antidumping duty admin. review; 2017–2018) ("*Final Results*"), ECF No. 39-2, and accompanying Issues and Decision Mem., A-570-904 (Dec. 11, 2019) ("I&D Mem."), ECF No. 39-3. Plaintiffs challenged Commerce's (1) selection of Malaysia instead of Romania as the primary surrogate country; (2) selection of surrogate values for Carbon Activated and DJAC's inputs of bituminous coal and coal tar pitch; and (3) calculation of surrogate financial ratios. *See, e.g.*, [Corrected] Confidential Mem. of Law in Supp. of Pls.' and Pl.-Ints.' Mot. For J. on the Agency R. Pursuant to USCIT Rule 56.3, ECF No. 59.

On April 2, 2021, the court remanded Commerce's selection of Malaysia as the primary surrogate country and Commerce's selection of surrogate data to value bituminous coal, sustained Commerce's selection of surrogate data to value coal tar pitch, and directed Commerce to reconsider the adjustments to the surrogate financial statements on remand. *See Carbon Activated Tianjin Co. v. United States* ("*Carbon Activated I*"), 45 CIT __, __, 503 F. Supp. 3d 1278 (2021).[3]

On June 30, 2021, Commerce filed its Remand Results. Therein, Commerce retained Malaysia as the primary surrogate country, reconsidered its valuation of bituminous coal, and further explained its adjustments to the financial ratios. *See* Remand Results at 2–19, 21–42.

---

[3] The court's opinion in *Carbon Activated I* presents background information on this case, familiarity with which is presumed.

Plaintiffs filed comments opposing the Remand Results. *See* Confidential Pls.'

Comments in Opp'n to Remand Redetermination ("Pls. Opp'n Cmts."), ECF No. 70.

Defendant United States ("the Government") filed comments in support of the Remand

Results. *See* Def.'s Resp. to Pls.' Comments on Commerce's Remand

Redetermination, ECF No. 73 ("Def.'s Reply Cmts."). Defendant-Intervenors Calgon

Carbon Corporation and Cabot Norit Americas, Inc. filed a letter expressing support for

the Remand Results without further comment. Letter from John M. Hermann to the

Court (Aug. 30, 2021), ECF No. 72.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018) and 28 U.S.C. § 1581(c)

(2018).[4] The court will uphold an agency determination that is supported by substantial

evidence and otherwise in accordance with law. 19 U.S.C § 1516a(b)(1)(B)(i).

### DISCUSSION

### I.   Legal Framework for Surrogate Country and Surrogate Value Selection

An antidumping duty is "the amount by which the normal value exceeds the

export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673.

When an antidumping duty proceeding involves a nonmarket economy country,

---

[4] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise specified.

Commerce determines normal value by valuing the factors of production[5] in a surrogate

country, *see id*. §1677b(c)(1), and those values are referred to as "surrogate values."  In

selecting surrogate values, Commerce must, "to the extent possible," use "the best

available information" from a market economy country or countries that are

economically comparable to the nonmarket economy country and are "significant

producers of comparable merchandise."  *Id.* § 1677b(c)(1), (4).

In selecting a primary surrogate country, Commerce has adopted a four-step

approach:

> (1) the Office of Policy ("OP") assembles a list of potential surrogate
> countries that are at a comparable level of economic development to the
> [non-market economy] country; (2) Commerce identifies countries from the
> list with producers of comparable merchandise; (3) Commerce determines
> whether any of the countries which produce comparable merchandise are
> significant producers of that comparable merchandise; and (4) if more
> than one country satisfies steps (1)-(3), Commerce will select the country
> with the best factors data.

*Jianxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016);

*see also* Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate

Country Selection Process, Policy Bulletin 04.1 (2004), https://enforcement.trade.gov/

policy/bull04-1.html (last visited Oct. 22, 2021).

Commerce generally values all factors of production in a single surrogate

country, referred to as the "primary surrogate country."  *See* 19 C.F.R. § 351.408(c)(2)

---

[5] The factors of production include but are not limited to: "(A) hours of labor require, (B)
quantities of raw materials employed, (C) amounts of energy and other utilities
consumed, and (D) representative capital cost, including depreciation." 19 U.S.C.
§ 1677b(c)(3).

(excepting labor).  *But see Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,093–94 (Dep't Commerce June 21, 2011) (expressing a preference to value labor based on industry-specific labor rates from the primary surrogate country).  Commerce prefers surrogate values that are "input-specific, representative of a broad-market average, publicly available, contemporaneous with the POR, and tax- and duty-exclusive."  Remand Results at 25 & n.105 (citation omitted); *see also* 19 C.F.R. § 351.408(c)(1), (4) (directing Commerce to select "publicly available"/"non-proprietary information" to value factors of production and "manufacturing overhead, general expenses, and profit").  Commerce has broad discretion to determine what constitutes "the best available information" for the selection of surrogate values.  *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).

## II.    Bituminous Coal Surrogate Value Selection

For the *Final Results*, Commerce valued all bituminous coal using Romanian import data under the Harmonized System ("HS") heading 2701.12 (Bituminous Coal, Not Agglomerated) after finding that the average unit value of Malaysian imports under HS 2701.12 was unreliable.  I&D Mem. at 13–16.  The court remanded the issue to Commerce for further explanation as to the applicability of Chapter 27, Subheading Note 2 ("Note 2")[6] to Commerce's selection of a surrogate value.  *Carbon Activated I*,

---

[6] Note 2 limits HS 2701.12, *inter alia*, to bituminous coal with "a calorific value limit . . . equal to or greater than 5,833 [kilocalories per kilogram ("kcal/kg")]."  I&D Mem. at 14.  For the *Final Results*, Commerce declined to apply Note 2 based on the agency's view that Note 2 pertained solely to Thai HS data, not Malaysian HS data.  I&D Mem. at 14.

503 F. Supp. 3d at 1290–91.  On remand, Commerce determined that Note 2 applied to

Malaysian HS data and chose different data sets to value bituminous coal depending on

whether the calorific value of the bituminous coal was known to be below 5,833 kcal/kg.

*See* Remand Results at 3–7.[7]  Commerce continued to rely on Romanian import data

under HS 2701.12 to value bituminous coal that was not documented as having a

calorific value below 5,833 kcal/kg but determined to use Malaysian import data under

HS 2701.19 (Other Coal) to value bituminous coal with a known calorific value below

5,833 kcal/kg in light of its determination that Note 2 applied to the Malaysian import

data.  *Id.* at 7–8

### A.  Bituminous Coal Having Unknown Calorific Value

In its Draft Remand Results, Commerce determined that bituminous coal used by

two of Carbon Activated's suppliers—Supplier C and an uncooperative supplier[8]—

should be valued using Romanian import data reported under HS 2701.12 because

Commerce lacked record evidence demonstrating that such bituminous coal had a

calorific value of less than 5,833 kcal/kg as required for valuation under HS 2701.19.

Draft Results of Redetermination Pursuant to Court Remand ("Draft Remand Results")

at 7, PRR 1, CRJA Tab 11.

---

[7] Commerce changed its position regarding the applicability of Note 2 in order to be consistent with "prior determinations in which Commerce . . . concluded that '[t]he International Convention on the Harmonized Commodity and Coding System applies the same [HS] six-digit prefix to products subject to international trade.'"  Remand Results at 6–7 & n.26 (citations omitted) (alternations in original).

[8] The names of Supplier C and the uncooperative supplier are proprietary and not relevant to the court's disposition of this case.

For the Remand Results, Commerce further explained that "the plain language description of . . . HS 2701.12 . . . matche[d] the mandatory respondents' description of their input (i.e., bituminous coal)." Remand Results at 28. Furthermore, without record evidence demonstrating that the coal input the mandatory respondents identified as "bituminous coal" was actually the "kind and grade more appropriately classified under HS 2701.19" (i.e., coal with a calorific value limit of less than 5,833 kcal/kg), Commerce stated that it could not consider that coal to fall under HS 2701.19. *Id.*

In their comments on the Draft Remand Results, Plaintiffs argued that Commerce never asked Supplier C to provide test reports documenting the calorific value of its inputs. *See id.* at 22, 26. Commerce explained that although it did not specifically ask "Supplier C to provide test results for its bituminous coal input, [it] asked Supplier C to 'provide a detailed description of "smoke coal" and explain the difference between smoke coal and bituminous coal.'" *Id.* at 26 & n.113 (citing Carbon Activated Resp. to Sec. D Suppl. Questionnaire (Part I) (Feb. 21, 2019) ("Carbon Activated's SDQR") at 19, Ex. SD-27, PR 162–65, CR 254–88, CRJA Tab 5). Supplier C responded that "[b]oth bituminous coal and smoke coal belong to the same technical grade of bituminous coal." *Id.* at 26 & n.114 (citing same). However, Supplier C provided only "a test report for its smoke coal input," and not for its bituminous coal, leading Commerce to find that Supplier C failed to substantiate that the two were equivalent. *Id.* at 26–27. Without these test results, Commerce continued to use import data reported under Romanian HS subheading 2701.12 to value bituminous coal used by Supplier C and the uncooperative supplier. *Id.* at 30.

### 1. Parties' Contentions

Plaintiffs contend that Commerce should have valued all bituminous coal with an unknown calorific value using the average of Romanian HS 2701.12 and HS 2701.19 data. Pls. Opp'n Cmts. at 2. Plaintiffs argue that because the record establishes that "the heat value of the bituminous coal input used by [DJAC], [DJAC's] supplier, and one of Carbon Activated's suppliers [was] below 5,833 kcal/kg," and thus was covered by HS 2701.19, *id.* at 3 (quoting Remand Results at 7), Commerce "impermissibly speculate[d] that the bituminous coal having unknown calorific value should be classified under [HS] 2701.12," *id.* Plaintiffs further argue that "Commerce never asked Carbon Activated's Supplier C . . . to provide calorific value information for its bituminous coal input" and is thus "precluded from . . . 'impos[ing] a de facto adverse facts available rate.'" *Id.* at 3–4 (quoting *Calgon Carbon Corp. v. United States*, 35 CIT 234, 244 (2011)) (emphasis omitted).

The Government contends that, with respect to bituminous coal having unknown calorific value, Commerce reasonably relied on Romanian HS 2701.12. Def.'s Reply Cmts. at 5–6. The Government argues that (i) there is "no record evidence" to support valuing these suppliers' "bituminous coal under HS 2701.19," (ii) "[t]he plain language description of HS 2701.12 . . . matches [Plaintiffs'] own description of their own input," (iii) Commerce's "decision to use different datasets for different respondents 'is consistent with Commerce's practice,'" and (iv) "Commerce's path to reliance on Romanian HS 2701.12 . . . is reasonably discernable." *Id.* at 6–7.

## 2. Commerce's Selection of Romanian HS 2701.12 Data to Value Bituminous Coal of Unknown Calorific Value is Supported by Substantial Evidence

There is no dispute that the record lacks evidence regarding the heat value of the input for Carbon Activated's Supplier C and Carbon Activated's uncooperative supplier. While Plaintiffs argue that Commerce impermissibly speculated that bituminous coal should be classified as "bituminous coal" under HS 2701.12, *see* Pls.' Opp'n Cmts. at 3–5, any basis for Commerce to apply HS 2701.19 was equally speculative. The court declines to reweigh the record evidence and finds that substantial evidence supports Commerce's decision to value bituminous coal of unknown calorific value under HS 2701.12.

Neither Supplier C nor Carbon Activated's uncooperative supplier documented the heat value of the bituminous coal they used. *See* Remand Results at 28. While Commerce specifically asked Carbon Activated "to provide a detailed description of 'smoke coal' *and* explain the difference between smoke coal and bituminous coal," Carbon Activated's SDQR at 19 (emphasis added), Carbon Activated only documented the calorific value of Supplier C's smoke coal, *see id.*, Ex. SD-27. Because Carbon Activated failed to document the calorific value of Supplier C's bituminous coal and acknowledged that "the two types of coal differ in terms of key parameters such as volatile matter content, moisture and heat value," Carbon Activated's SDQR at 19, Commerce declined to value such coal as "Other Coal" under HS 2701.19, Remand Results at 30. Carbon Activated provided no information regarding the calorific value of the bituminous coal used by its uncooperative supplier. *Id.* at 7.

Plaintiffs' reliance on *Calgon Carbon* to argue that Commerce was required to provide Supplier C with a "similar opportunity" to submit evidence of the calorific value of its bituminous coal is inapposite. *See* Pls.' Opp'n Cmts. at 4 (citing *Calgon Carbon*, 35 CIT at 244). *Calgon Carbon* involved a respondent that voluntarily provided supplemental information at verification concerning the purity of hydrochloric acid. 35 CIT at 244. Commerce accepted this supplemental information and, based on that information, selected a different surrogate value for that respondent than it did for another respondent. *Id.* The court held that although Commerce had no obligation to accept the supplemental information, once it did, the agency had an obligation to give the other respondent an opportunity to provide comparable information, and failure to do so "led to arbitrary and unfair treatment." *Id.* Unlike the respondent in *Calgon Carbon*, Carbon Activated had an opportunity to substantiate its claim that smoke coal and bituminous coal had similar calorific values, but failed to do so.

Without evidence of the calorific value of the bituminous coal reported by Carbon Activated's suppliers, Commerce turned to other methods to value bituminous coal used by these suppliers. Specifically, Commerce reasoned that the "plain language description" of HS 2701.12—"Bituminous Coal, Not Agglomerated"—most accurately described the bituminous coal in question. Remand Results at 28. The court has found that Commerce may rely on the plain meaning of HS descriptions to determine the best available information to value a specific input. *See Mid Continent Steel & Wire, Inc. v. United States*, 42 CIT __, __, 321 F. Supp. 3d 1313, 1325 (2018) (sustaining use of a surrogate value based on the HS description that best matched the description provided

by the respondent).  Having reviewed the record and Commerce's explanation for its

valuation of bituminous coal without a reported calorific value, the court finds that

Commerce has provided a reasoned explanation based on substantial evidence to

value bituminous coal.

### B.  Bituminous Coal Having Known Calorific Value

As discussed above, having found that Note 2 applied to Malaysian HS

subheading 2701.19, and having found no indication that the average unit value for

Malaysian imports under HS 2701.19 was unreliable or aberrantly high, in the Draft

Remand Results Commerce valued bituminous coal inputs with documented heat value

below 5,833 kcal/kg using Malaysian HS 2701.19.  Draft Remand Results at 7.

Plaintiffs argued that because Commerce found Malaysian data reported under HS

2701.12 to be aberrant and unreliable, the agency should also disregard Malaysian data

reported under HS 2701.19.  Second Redacted and Resubmitted Comments on Draft

Remand (June 23, 2021) ("Second Comments on Draft Remand") at 10–11, PRR 19,

CRR 13, CRJA Tab 19.  Commerce responded that it continued to find the Malaysian

HS 2701.19 subheading preferable to Romania's because there was no evidence on

the record showing that the Malaysian data was distorted, aberrational, or otherwise

unreliable.  Remand Results at 26.  Commerce further noted that it had a preference for

selecting surrogate values from the primary surrogate country which, in this case, was

Malaysia.  Remand Results at 25–26.

### 1. Parties' Contentions

Plaintiffs contend that Commerce should have valued all bituminous coal having known calorific value below 5,833 kcal/kg using Romanian HS 2701.19.  Pls. Opp'n Cmts. at 2.  Plaintiffs argue that because Commerce found Malaysian HS 2701.12 data to be "aberrant and unreliable, . . . Commerce should be skeptical of Malaysian [HS] 2701.19" data.  *Id.* at 6.  Further, they argue that because Commerce has "acknowledge[d] that Romanian data is necessary to value bituminous coal" of unknown calorific value, Commerce should use Romanian data to value all bituminous coal "in accordance with [Commerce's] policy underlying surrogate valuation to minimize distortion that occurs when using data from multiple countries."  *Id.*

The Government contends that Commerce's selection of Malaysian import data under HS 2701.19 should be sustained because Commerce provided a reasoned explanation for its selection of such data and Plaintiffs' assertions of unreliability are unsupported.  Def.'s Reply Cmts. at 4–5.

### 2. Commerce's Selection of Malaysian HS 2701.19 Data to Value Certain Bituminous Coal is Sustained

Pursuant to 19 C.F.R. § 351.408(c)(2), Commerce "normally will value all [factors of production] in a single surrogate country."  The court has acknowledged Commerce's regulatory preference "to use surrogate value data from the primary surrogate country to minimize distortion."  *Tri Union Frozen Prods., Inc. v. United States*, 41 CIT __, __, 227 F. Supp. 3d 1387, 1400 (2017).  Furthermore, the court has upheld Commerce's practice of requiring a party to provide support for any argument that data are

aberrational or unreliable.  *See, e.g.*, *Jinan Farmlady Trading Co. v. United States*, 41

CIT __, __, 228 F. Supp. 3d 1351, 1356–57 (2017) (finding Commerce's determination

that data was not aberrational reasonable when respondent had not provided

demonstrative evidence).

   Here, Plaintiffs have not provided any evidence that the Malaysian HS 2701.19

data are aberrant or unreliable.  *See* Pls.' Opp'n Cmts. at 6–7.  Plaintiffs have also failed

to justify their position that Commerce should have found Malaysian HS 2701.19 data to

be distorted simply because the agency separately found Malaysian HS 2701.12 data to

be distorted.  *See id*.  Accordingly, Plaintiffs' argument that Romanian HS 2701.19 data

"is preferable to Malaysia because . . . Romanian [HS] 2701.12 data is undistorted,"

Pls.' Opp'n Cmts. at 6, is without support.  Commerce has provided a reasoned

explanation for not rejecting the Malaysian HS 2701.19 data—such import data is

presumed to be reliable and the record is devoid of evidence to the contrary.  The

parties to the proceeding bear the burden of establishing an adequate record, *QVD*

*Food Co.*, 658 F. 3d at 1324, and Plaintiffs have not met that burden with respect to this

issue.

   Commerce explained that it selected Malaysian HS 2701.19 data pursuant to its

preference to value all factors of production in a single surrogate country, which, in this

case, was Malaysia.  *See* Remand Results at 25–26 & n.111 (citation omitted); *see also*

19 C.F.R. § 351.408(c)(2).  Plaintiffs have not shown that Commerce was unreasonable

in its selection of Malaysian HS 2701.19 data to value bituminous coal when the record

demonstrated that the coal had a calorific value of less than 5,833 kcal/kg and

Commerce's decision was otherwise supported by substantial evidence.

### III.   Surrogate Country Selection

In *Carbon Activated I*, the court was "unable to discern Commerce's reasons for

rejecting Romania as a primary surrogate country" and "selecting Malaysia as the

primary surrogate country" and accordingly remanded the matter to Commerce for

reconsideration and further explanation.  503 F. Supp. 3d at 1289.  On remand,

Commerce determined that both Malaysia and Romania qualified as potential surrogate

countries, finding that both countries were economically comparable to China and

significant producers of comparable merchandise.  Remand Results at 11–14.

However, Commerce again selected Malaysia as the primary surrogate country after

finding that Malaysian surrogate value data was superior to Romanian data based on its

relative specificity.  *Id.* at 14–16; 34.

With respect to the valuation of charcoal, Commerce explained that the

Malaysian data reflected "a tariff classification at the 10-digit level that is specific to

coconut-shell charcoal (i.e., [HS] subheading 4402.90.1000), a direct material that is

consumed in significant quantities in the production of the subject merchandise by the

mandatory respondents;" however, the Romanian data reflected only "a six-digit basket

category HS subheading, 4402.90, which covers wood-based charcoal [but] also

includes nut-based charcoal, which is an input not used by the mandatory respondents."

*Id.* at 15.

Despite selecting Malaysia as the primary surrogate country, Commerce again

chose the financial statement of Romcarbon, a Romanian producer of comparable

merchandise, to determine financial ratios because that statement provided specific

breakouts for raw material, labor, and energy that were not provided in the Malaysian

financial statements. *Id.* at 15–16

### A. Parties' Contentions

Plaintiffs contend that Commerce should have chosen Romania over Malaysia as

the primary surrogate country because, in their view, "Romania provides superior data

quality" to Malaysia. Pls.' Opp'n Cmts. at 7 (emphasis and capitalization omitted). As

evidence of this superiority, Plaintiffs point to the aberrant Malaysian HS 2701.12 data

and Commerce's concession that the Malaysian financial statements lacked usable

financial data. *Id.* at 7–8. Plaintiffs argue that Commerce incorrectly claimed that

Romanian import data placed on the record was not POR-specific, *id.* at 10, and that

Commerce's reliance on the more specific HS subheading for coconut-shell charcoal is

unsupported because Carbon Activated's suppliers do not use coconut shell charcoal

as an input, *id.* at 11.

The Government contends that Commerce's reliance on the specificity of the

tariff classification for coconut shell charcoal, used by some respondents, provides

support for Commerce's selection of Malaysia as the primary surrogate country. Def.'s

Reply Cmts. at 12. The Government asserts that Commerce has the discretion to

"value coal-based carbonized material with either coconut shell or wood charcoal" and

the record indicated that "[DJAC] used coconut shell charcoal in the production of the

subject merchandise." *Id.* The Government also rejects Plaintiffs' contention that the aberrancy of Malaysian HS 2701.12 precluded Commerce from selecting Malaysia as the primary surrogate country. *Id.* at 11. According to the Government, "Commerce still had usable Malaysian data 'covering nearly all of the bituminous coal input used by the mandatory respondents,'" *id.* at 11–12 (quoting Remand Results at 36), and Plaintiffs "provided no evidence to support discarding Malaysian data beyond the data under Malaysian HS 2701.12," *id.* at 12.

### B. Commerce's Selection of Malaysia as the Primary Surrogate Country is Sustained

In its Remand Results, Commerce determined that both Malaysia and Romania were significant producers of comparable merchandise; thus, Commerce selected the primary surrogate country based on data considerations. Remand Results at 11–16. While Plaintiffs invite the court to second guess the agency's determination, it is the court's task to determine whether Commerce has supported its determination with substantial evidence. *Huaiyin Foreign Trade Corp. (30)*, 322 F.3d 1369, 1374 (Fed. Cir 2003). Upon consideration of the Remand Results, the court finds that Commerce's selection of Malaysia as the primary surrogate country is supported by substantial evidence.

First, Commerce has provided a reasoned explanation as to why it selected Malaysia as the primary surrogate country: the specificity of the HS number for a known input (coconut shell charcoal) and data that was more contemporaneous with the POR. *See* Remand Results at 15, 34–39. While Carbon Activated's suppliers do not use

coconut shell charcoal, Carbon Activated Resp. to Sec. D Questionnaire (Sept. 28, 2018), Att. B/Ex.D-5, Att. C/Ex. D-5, Att. D./Ex. D-5, PR 90, CR 50-74, CRJA Tab 2, Plaintiffs ignore Commerce's rationale for relying on the specificity provided by the Malaysian HS data.  *See* Pls.' Opp'n Cmts. at 11 (focusing solely on Carbon Activated's suppliers to the exclusion of DJAC).  Specifically, another mandatory respondent, DJAC, used coconut shell charcoal in the production of the subject merchandise.  *See* Remand Results at 38 & n.159 (citations omitted).  Because Commerce needed to value coconut shell charcoal for at least one of the respondents, and because Malaysia—and not Romania—was able to provide data at that level of specificity, Commerce's discussion of coconut shell charcoal supports its selection of Malaysia as the primary surrogate country.  Furthermore, Plaintiffs fail to identify any record evidence suggesting that the Malaysian HS 4402.90.100 data is aberrational or unreliable—they simply disagree with Commerce's use of such data.

Plaintiffs also object to Commerce's consideration of the Malaysian surrogate value information as more contemporaneous with the period of review than the Romanian data.  *See* Pls.' Opp'n Cmts. at 10–11.  While Plaintiffs aver that the Romanian data they submitted were contemporaneous with the POR, *id*. at 10, those data were presented to Commerce as covering the period "2016-2018."  *See* Final Surrogate Value Comments by DJAC and [Carbon Activated] (May 13, 2019) ("Final SV Comments") at Ex. 2A, PR 207–16, CRJA Tab 7.  Now, before the court, Plaintiffs seek to clarify that, "the auto-generated heading was titled '2016-2018' because the data source is programmed to automatically download three years of data," but before the

data was submitted to Commerce, "a 'macro' [was] used to filter POR-specific data."

Pls.' Opp'n Cmts. at 10.  This additional information is not part of the administrative

record, which otherwise supports Commerce's finding that the Malaysian surrogate

value data is more contemporaneous with the POR than the Romanian data.

      The court also rejects Plaintiffs' argument that Commerce was required to give

the respondent an opportunity to address any deficiency in the data.  Potential

surrogate value data is submitted to Commerce on a party's own initiative, not in

response to a request by Commerce.  *See, e.g.*, *Shenzhen Xinboda Indus. Co. v.*

*United States*, 42 CIT __, __, 357 F. Supp. 3d 1295, 1305 & n.25 (2018).  Thus, 19

U.S.C. § 1677m(d) is inapplicable here.  *See id*.  In short, there was no apparent

deficiency in the Romanian data; Commerce accepted the data as presented; and

Commerce evaluated the quality of that data in comparison to the quality of the

Malaysian data.  Commerce's finding that the Malaysian data was more

contemporaneous with the POR is supported by substantial evidence.

      Likewise, Plaintiffs' argument that the primary surrogate country should be

weighted toward the country from which the financial ratios are drawn is unconvincing.

Not only do Plaintiffs fail to cite to any provision of law or regulation requiring Commerce

to weight its analysis in such a way, but they rely on instances in which a production

input's outsized impact on normal value led Commerce to prioritize that input in

selecting a surrogate country, not the financial ratios' impact on the normal value; thus,

such reliance is inapposite.  Pls.' Opp'n Cmts. at 8–9 (relying on Issues and Decision

Mem. for the Final Results of the Third Antidumping Duty Admin. Review at 13–14,

*available at* https://enforcement.trade.gov/frn/summary/prc/2013-06173-1.pdf (last

visited Oct. 22, 2021) (outsized impact of steel wire rod led to selection of Thailand as

the primary surrogate country); *Jiaxing Brother Fastener Co. v. United States*, 11 F.

Supp. 3d 1326, 1333 (2014), *aff'd* 822 F.3d 1289 (Fed. Cir. 2016) (sustaining

Commerce's choice of primary surrogate country based on superior data quality despite

the relative weakness in financial statements from that country and the more limited

impact of the financial ratios on normal value)).

      Furthermore, Plaintiffs' focus on Commerce's previous reliance on the source of

financial ratios to select a primary surrogate country is misplaced.  *See* Pls.' Opp'n

Cmts. at 8–9.  At most, these examples show that Commerce *may* consider the source

of financial ratios to determine the primary surrogate country, not that Commerce *must*.

*See Tianjin Wanhua Co. v. United States*, 41 CIT __, __, 253 F. Supp. 3d 1318, 1327–

29 (2017) (affirming Commerce's selection of Indonesia as the primary surrogate

country based on the relative superiority of the Indonesian financial statements);

*Ancientree Cabinet Co. v. United States*, 45 CIT __, __, Slip Op. 21-87, 2021 WL

2931313, at *8–9, *11 (CIT July 12, 2021) (concluding that Commerce acted within its

discretion when selecting Romania as the primary surrogate country based on superior

financial data); *Certain Cased Pencils from the People's Republic of China*, 78 Fed.

Reg. 42,932 (Dep't Commerce July 18, 2013) (final results of antidumping duty

administrative review and determination to revoke order in party; 2010-2011), and

accompanying Issues and Decision Mem., A-570-827, (July 10, 2013),

https://enforcement.trade.gov/frn/summary/prc/2013-17160-1.pdf (last visited Oct. 22,

2021) (selecting the Philippines as primary surrogate country because of the superiority of Philippine financial data for deriving surrogate financial ratios).  Indeed, Carbon Activated has not cited, and this court cannot find, any authority indicating that Commerce must base the selection of a primary surrogate country on the quality of financial data.  Accordingly, the court sustains Commerce's selection of Malaysia as the primary surrogate country as based on substantial evidence.

**IV.    Financial Ratios**

In *Carbon Activated I*, the court remanded the *Final Results* to Commerce to reconsider certain adjustments to the financial ratios, including: (i) offsetting pre-tax profits by the amount listed under "Gain/(Loss)" for adjustment and disposal of investment property; (ii) offsetting sales, general and administrative expenses ("SG&A") by the amount listed under "Other Gains"; and (iii) allocating the amount listed under "Social Contributions" and "Meal Tickets" to labor costs instead of SG&A.  503 F. Supp. 3d at 1294–95.  The remand provided Commerce with the opportunity to address its treatment of these issues in AR11 in light of its treatment of similar adjustments to the financial ratios in the tenth administrative review ("AR10") of this antidumping duty order.  *See id.*  On remand, Commerce offset pre-tax profits by the amount listed under "Gain/(Loss)" for adjustment and disposal of investment property and offset SG&A by the amount listed under "Other Gains."  Remand Results at 17–19.  With respect to "Social Contributions" and "Meal Tickets," however, Commerce continued to allocate these line items to SG&A.  *Id.* at 19.

### A. Parties' Contentions

Plaintiffs contend that Commerce "erroneously allocated [ ] 'Social Contributions' and 'Meal Tickets' under SG&A" instead of labor costs.  Pls.' Opp'n Cmts. at 17. Plaintiffs argue that, "[a]bsent evidence that Malaysian labor data excluded these costs," such "costs are presumed to be embedded within the reported labor cost."  *Id.*

The Government contends that Commerce's retention of "Social Contributions" and "Meal Tickets" under SG&A is supported by substantial evidence and lawful.  Def.'s Reply Cmts. at 17.

### B. Commerce's Allocation of "Social Contributions" and "Meal Tickets" to SG&A is Sustained

In *Carbon Activated I*, the court instructed Commerce to reconsider or further explain why "Social Contributions" and "Meal Tickets" should be allocated to SG&A instead of labor expenses as was the case in AR10.  503 F. Supp. 3d at 1295.  In the Remand Results, Commerce explained that it will "avoid double-counting costs [when] the requisite data are available to do so."  Remand Results at 40 & n.169 (citation omitted).  Thus, "when labor items . . . are clearly included in the [surrogate value] for labor, [Commerce] will include such items in the labor category of the surrogate financial ratios calculations to avoid double-counting such expenses."  Issues and Decision Mem. for the Final Results of the First Antidumping Duty Admin. Review, A-570-985 (February 13, 2017) at 73, https://enforcement.trade.gov/frn/summary/prc/2017-03505-1.pdf (last visited Oct. 22, 2021); *see also Hangzhou Yingqing Material Co. v. United States*, 40 CIT __, __,195 F. Supp. 3d 1299, 1310–1311 (2016) (citing agency decisions in which

Commerce adjusted surrogate financial ratios to avoid double counting labor costs).

Commerce's practice of adjusting financial ratios to avoid such double counting has

been accepted by the court.  *See Elkay Mfg. Co. v. United States*, 40 CIT __, __,180 F.

Supp. 3d 1245, 1256–1258 (2016) (sustaining a determination Commerce made in

order to avoid the possibility of double-counting).

In the Remand Results, Commerce explained that the source of the Malaysian

surrogate value for labor did not indicate whether "Social Contributions" or "Meal

Tickets" were included in that surrogate value and there was no record evidence

indicating "that the labor [surrogate value] used was overstated."  Remand Results at

41.  Plaintiffs do not, and during the remand proceeding did not, point to any evidence

that these items are included in the surrogate value for labor.  *See* Pls.' Opp'n Resp at

17; Second Comments on Draft Remand at 23–24.  Instead, Plaintiffs simply assert,

without citation to any prior Commerce determinations, court precedent, or Commerce

guidelines, that absent evidence that the Malaysian surrogate labor data excluded

"Social Contributions" and "Meal Tickets," such costs "are presumed to be embedded

within the reported labor cost."  Pls.' Opp'n Cmts. at 17.  Commerce rejected this

unsupported assertion and noted the absence of record evidence demonstrating that

the labor surrogate value included these costs.  *See* Remand Results at 41.

Accordingly, this court finds that Commerce has adequately explained the basis for its

allocation of "Social contributions" and "Meal tickets" to SG&A and sustains

Commerce's adjustments to the financial ratios as supported by substantial evidence.

Court No. 20-00007                                                     Page 24

CONCLUSION

For the forgoing reasons, the court will sustain Commerce's Remand Results.

Judgment will enter accordingly.

/s/    Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: October 22, 2021
      New York, New York

**Federal Register** / Vol. 86, No. 208 / Monday, November 1, 2021 / Notices

| | Department contact |
|---|---|
| **Antidumping Duty Proceedings** | |
| Carbon and Alloy Steel Cut-to-Length Plate from Austria A–433–812 (1st Review) | Mary Kolberg, (202) 482–1785. |
| Carbon and Alloy Steel Cut-to-Length Plate from Belgium A–423–812 (1st Review) | Mary Kolberg, (202) 482–1785. |
| Carbon and Alloy Steel Cut-to-Length Plate from Brazil A–351–847 (1st Review) | Mary Kolberg, (202) 482–1785. |
| Carbon and Alloy Steel Cut-to-Length Plate from China A–570–047 (1st Review) | Mary Kolberg, (202) 482–1785. |
| Carbon and Alloy Steel Cut-to-Length Plate from France A–427–828 (1st Review) | Mary Kolberg, (202) 482–1785. |
| Carbon and Alloy Steel Cut-to-Length Plate from Germany A–428–844 (1st Review) | Mary Kolberg, (202) 482–1785. |
| Carbon and Alloy Steel Cut-to-Length Plate from Korea A–580–887 (1st Review) | Mary Kolberg, (202) 482–1785. |
| Carbon and Alloy Steel Cut-to-Length Plate from Italy A–475–834 (1st Review) | Mary Kolberg, (202) 482–1785. |
| Carbon and Alloy Steel Cut-to-Length Plate from Japan A–588–875 (1st Review) | Mary Kolberg, (202) 482–1785. |
| Carbon and Alloy Steel Cut-to-Length Plate from South Africa A–791–822 (1st Review) | Mary Kolberg, (202) 482–1785. |
| Carbon and Alloy Steel Cut-to-Length Plate from Taiwan A–583–858 (1st Review) | Mary Kolberg, (202) 482–1785. |
| Carbon and Alloy Steel Cut-to-Length Plate from Turkey A–489–828 (1st Review) | Mary Kolberg, (202) 482–1785. |
| Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from China A–570–958 (2nd Review). | Mary Kolberg, (202) 482–1785. |
| Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia A–560–823 (2nd Review). | Mary Kolberg, (202) 482–1785. |
| Heavy Forged Hand Tools, With or Without Handles from China A–570–803 (3rd Review) | Thomas Martin, (202) 482–3936. |
| Iron Construction Castings from Brazil A–351–503 (5th Review) | Mary Kolberg, (202) 482–1785. |
| Iron Construction Castings from Canada A–122–503 (5th Review) | Mary Kolberg, (202) 482–1785. |
| Iron Construction Castings from China A–570–502 (5th Review) | Mary Kolberg, (202) 482–1785. |
| Stainless Steel Plate in Coils from Belgium A–423–808 (4th Review) | Jacky Arrowsmith, (202) 482–5255. |
| Stainless Steel Plate in Coils from South Africa A–791–805 (4th Review) | Jacky Arrowsmith, (202) 482–5255. |
| Stainless Steel Plate in Coils from Taiwan A–583–830 (4th Review) | Jacky Arrowsmith, (202) 482–5255. |
| **Countervailing Duty Proceedings** | |
| Carbon and Alloy Steel Cut-to-Length Plate from China C–570–858 (1st Review) | Thomas Martin, (202) 482–3936. |
| Carbon and Alloy Steel Cut-to-Length Plate from Korea C–580–888 (1st Review) | Jacky Arrowsmith, (202) 482–5255. |
| Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from China C–570–959 (2nd Review). | Mary Kolberg, (202) 482–1785. |
| Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia C–560–824 (2nd Review). | Jacky Arrowsmith, (202) 482–5255. |
| Iron Construction Castings from Brazil C–351–504 (5th Review) | Mary Kolberg, (202) 482–1785. |
| Stainless Steel Plate in Coils from South Africa C–791–806 (4th Review) | Mary Kolberg, (202) 482–1785. |
| **Suspended Investigations** | |
| No Sunset Review of suspended investigations is scheduled for initiation in November 2021 | |

Commerce's procedures for the conduct of Sunset Review are set forth in 19 CFR 351.218. The *Notice of Initiation of Five-Year (Sunset) Review* provides further information regarding what is required of all parties to participate in Sunset Review.

Pursuant to 19 CFR 351.103(c), Commerce will maintain and make available a service list for these proceedings. To facilitate the timely preparation of the service list(s), it is requested that those seeking recognition as interested parties to a proceeding contact Commerce in writing within 10 days of the publication of the Notice of Initiation.

Please note that if Commerce receives a Notice of Intent to Participate from a member of the domestic industry within 15 days of the date of initiation, the review will continue.

Thereafter, any interested party wishing to participate in the Sunset Review must provide substantive comments in response to the notice of initiation no later than 30 days after the date of initiation. Note that Commerce has modified certain of its requirements for serving documents containing business proprietary information, until further notice.[1]

This notice is not required by statute but is published as a service to the international trading community.

Dated: October 18, 2021.

**James Maeder,**
*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*

[FR Doc. 2021–23746 Filed 10–29–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

[1] *See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19; Extension of Effective Period,* 85 FR 41363 (July 10, 2020).

**DEPARTMENT OF COMMERCE**

**International Trade Administration]**

**[A–570–904]**

**Certain Activated Carbon From the People's Republic of China: Notice of Court Decision Not in Harmony With the Results of Antidumping Administrative Review; Notice of Amended Final Results**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** On October 22, 2021, the Court of International Trade (CIT) issued its final judgment in *Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation, et al.* v. *United States,* Consol. Court No. 20–00007, sustaining the Department of Commerce (Commerce)'s remand results pertaining to the eleventh administrative review of the antidumping duty (AD) order on certain activated carbon from the People's Republic of China (China) covering the period of April 1, 2017, through March 31, 2018. Commerce is notifying the public that the CIT's final judgment is not in harmony with

Commerce's final results of the administrative review, and that Commerce is amending the final results with respect to the dumping margin assigned to Carbon Activated Tianjin Co., Ltd. (Carbon Activated), Datong Juqiang Activated Carbon Co., Ltd. (Datong Juqiang) (collectively, the mandatory respondents), Beijing Pacific Activated Carbon Products Co., Ltd. (Beijing Pacific), Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. (GHC), Ningxia Mineral & Chemical Limited (Ningxia Mineral), and Shanxi Sincere Industrial Co., Ltd. (Shanxi Sincere).

**DATES:** Applicable November 1, 2021.

**FOR FURTHER INFORMATION CONTACT:** Jinny Ahn, AD/CVD Operations, Office VIII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC, 20230; telephone: (202) 482–0339.

**SUPPLEMENTARY INFORMATION:**

## Background

On December 17, 2019, Commerce published its *Final Results* in the 2017–2018 AD administrative review of certain activated carbon from China.[1] Commerce calculated a weighted-average dumping margin of 0.86 U.S. dollars (USD)/kg for Datong Juqiang and a weighted-average dumping margin of 1.02 USD/kg for Carbon Activated, and assigned Beijing Pacific, GHC, Ningxia Mineral, and Shanxi Sincere a separate rate of 0.89 USD/kg.[2]

The mandatory respondents, as well as Beijing Pacific, GHC, Ningxia Mineral, and Shanxi Sincere (collectively, the respondents), appealed Commerce's *Final Results*. On April 2, 2021, the CIT remanded the *Final Results*, and directed Commerce to reconsider Commerce's selection of Malaysia as the primary surrogate country, Commerce's selection of surrogate data to value bituminous coal, and Commerce's adjustments to the surrogate financial ratios.[3]

In its remand redetermination, issued in July 2021, Commerce: (1) Reconsidered and further explained its determination to use Malaysia as the primary surrogate country; (2) reconsidered its choice of HS code for the bituminous coal SV used in the production of activated carbon; and (3)

reconsidered and further explained its allocation of certain line items in valuing financial ratios using the 2017 financial statements from the Romanian company, Romcarbon SA (Romcarbon).[4] Specifically, Commerce changed the surrogate value used to value bituminous coal from the average unit value of imports reported under Romanian HS 2701.12 to the average unit value of imports reported under Malaysian HS 2701.19 for most of the bituminous coal input used in the production of the subject merchandise during the period of review. In addition, Commerce made necessary changes with respect to the allocation of certain line items in calculating the financial ratios using the 2017 financial statements from Romcarbon. Accordingly, Commerce made changes to the margin calculations for the mandatory respondents and revised the separate rate for Beijing Pacific, GHC, Ningxia Mineral, and Shanxi Sincere.[5] On October 22, 2021, the CIT sustained Commerce's final redetermination.[6]

## Timken Notice

In its decision in *Timken*,[7] as clarified by *Diamond Sawblades*,[8] the Court of Appeals for the Federal Circuit held that, pursuant to section 516A(a) and (e) of the Tariff Act of 1930, as amended (the Act), Commerce must publish a notice of court decision that is not "in harmony" with a Commerce determination and must suspend liquidation of entries pending a "conclusive" court decision. The CIT's October 22, 2021 judgment constitutes a final decision of the CIT that is not in harmony with Commerce's *Final Results*. Thus, this notice is published in fulfillment of the publication requirement of *Timken*.

## Amended Final Results

Because there is now a final court decision, Commerce amends the *Final Results* with respect to the respondents as follows:

| Exporters | Weighted-average dumping margin (USD/kg)[9] |
|---|---|
| Carbon Activated Tianjin Co., Ltd .......................................... | 0.94 |
| Datong Juqiang Activated Carbon Co., Ltd ........................... | 0.55 |
| Beijing Pacific Activated Carbon Products Co., Ltd .................... | 0.61 |
| Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd ...... | 0.61 |
| Ningxia Mineral & Chemical Limited ...................................... | 0.61 |
| Shanxi Sincere Industrial Co., Ltd .......................................... | 0.61 |

## Cash Deposit Requirements

Because the mandatory respondents, Beijing Pacific, Ningxia Mineral, and Shanxi Sincere have superseding cash deposit rates (*i.e.*, there have been final results published in a subsequent administrative review), we will not issue revised cash deposit instructions to U.S. Customs and Border Protection (CBP) for these companies. Accordingly, this notice will not affect the current cash deposit rate for these companies. For GHC, because it does not have a superseding cash deposit rate, Commerce will issue revised cash deposit instructions to CBP. Additionally, with respect to GHC, Commerce will instruct CBP to refund the difference between the amount of cash deposits paid as a result of the application of the *Final Results* and the amount due as a result of the application of these amended final results.

## Liquidation of Suspended Entries

At this time, Commerce remains enjoined by CIT order from liquidating entries that were exported by Carbon Activated, Datong Juqiang, Beijing Pacific, GHC, Ningxia Mineral, and Shanxi Sincere, and were entered, or withdrawn from warehouse, for consumption during the period April 1, 2017, through March 31, 2018. These entries will remain enjoined pursuant to the terms of the injunction during the pendency of any appeals process.

In the event the CIT's ruling is not appealed, or, if appealed, upheld by a

---

[1] *See Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017–2018*, 84 FR 68881 (December 17, 2019) (*Final Results*).

[2] *Id.*

[3] *See Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation, et al.* v. *United States*, 503 F. Supp. 3d 1278 (CIT 2021).

[4] *See Final Results of Redetermination Pursuant to Court Remand, Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation, et al.* v. *United States*, Court No. 20–00007, Slip Op. 21–35, dated July 1, 2021, available at *https://enforcement.trade.gov/remands/21-35.pdf*.

[5] *Id.* at 1–2, 40–41.

[6] *See Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation, et al.* v. *United States*, Court No. 20–00007, Slip Op. 21–149 (CIT October 22, 2021).

[7] *See Timken Co.* v. *United States*, 893 F.2d 337, 341 (Fed. Cir. 1990) (*Timken*).

[8] *See Diamond Sawblades Mfrs. Coalition* v. *United States*, 626 F.3d 1374 (Fed. Cir. 2010) (*Diamond Sawblades*).

[9] In the second administrative review of the AD order on certain activated carbon from China, Commerce determined that it would calculate per-unit assessment and cash deposit rates for all future reviews of this order. *See Certain Activated Carbon from the People's Republic of China: Final Results and Partial Rescission of Second Antidumping Duty Administrative Review*, 75 FR 70208, 70211 (November 17, 2010); *see also Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013–2014*, 80 FR 61172 (October 9, 2015) at 61174 n.21.

final and conclusive court decision, Commerce intends to instruct CBP to assess antidumping duties on unliquidated entries of subject merchandise exported by Carbon Activated, Datong Juqiang, Beijing Pacific, GHC, Ningxia Mineral, and Shanxi Sincere in accordance with 19 CFR 351.212(b). We will instruct CBP to assess antidumping duties on all appropriate entries covered by this review when the importer-specific assessment rate is not zero or *de minimis*. Where an import-specific assessment rate is zero or *de minimis*,[10] we will instruct CBP to liquidate the appropriate entries without regard to antidumping duties.

## Notification to Interested Parties

This notice is issued and published in accordance with sections 516A(c) and (e) and 777(i)(1) of the Act.

Dated: October 26, 2021.

**Ryan Majerus,**

*Deputy Assistant Secretary for Policy and Negotiations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2021–23858 Filed 10–28–21; 4:15 pm]

**BILLING CODE 3510-DS-P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–357–824, A–201–856, A–821–833]**

### Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable October 26, 2021.

**FOR FURTHER INFORMATION CONTACT:** Dmitry Vladimirov at (202) 482–0665 and Christopher Williams at (202) 482–5166 (Argentina); James Hepburn at (202) 482–1882 and Preston Cox at (202) 482–5041 (Mexico); George McMahon at (202) 482–1167 and Marc Castillo at (202) 482–0519 (the Russian Federation (Russia)); AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

## The Petitions

On October 6, 2021, the Department of Commerce (Commerce) received

[10] *See* 19 CFR 351.106(c)(2).

antidumping duty (AD) petitions concerning imports of oil country tubular goods (OCTG) from Argentina, Mexico, and Russia filed in proper form on behalf of Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, U.S. Steel Tubular Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO, CLC (the USW), and Welded Tube USA, Inc. (the petitioners), domestic producers of OCTG and a certified union that represents workers engaged in the production of OCTG.[1] The Petitions were accompanied by countervailing duty (CVD) petitions concerning imports of OCTG from the Republic of Korea and Russia.[2]

On October 7, 8, 14, and 19, 2021, Commerce requested supplemental information pertaining to certain aspects of the Petitions in separate supplemental questionnaires.[3] The petitioners filed responses to the supplemental questionnaires on October 12, 13, 18, and 21, 2021.[4]

In accordance with section 732(b) of the Tariff Act of 1930, as amended (the Act), the petitioners allege that imports of OCTG from Argentina, Mexico, and Russia are being, or are likely to be, sold in the United States at less than fair value (LTFV) within the meaning of section 731 of the Act, and that imports of such products are materially injuring, or threatening material injury to, the OCTG industry in the United States. Consistent with section 732(b)(1) of the

[1] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties: Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia," dated October 6, 2021 (Petitions).

[2] *Id.*

[3] *See* Commerce's Letters, "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Supplemental Questions," dated October 7, 2021; and "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Supplemental Questions," dated October 19, 2021; and Country-Specific Supplemental Questionnaires: Argentina Supplemental, Mexico Supplemental, and Russia Supplemental, dated October 8, 2021, and Russia Second Supplemental, dated October 14, 2021.

[4] *See* Petitioners' Letters, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to General Issues Questionnaire," dated October 12, 2021 (First General Issues Supplement) and "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to Second General Issues Questionnaire," dated October 21, 2021 (Second General Issues Supplement); *see also* Petitioners' Country-Specific Supplemental Responses, dated October 13, 2021; and Russia Second Supplemental Response, dated October 18, 2021.

Act, the Petitions are accompanied by information reasonably available to the petitioners supporting their allegations.

Commerce finds that the petitioners filed the Petitions on behalf of the domestic industry, because the petitioners are interested parties, as defined in sections 771(9)(C) and 771(9)(D) of the Act. Commerce also finds that the petitioners demonstrated sufficient industry support for the initiation of the requested LTFV investigations.[5]

## Period of Investigation

Because the Petitions were filed on October 6, 2021, the period of investigation (POI) for these LTFV investigations is October 1, 2020, through September 30, 2021, pursuant to 19 CFR 351.204(b)(1).[6]

## Scope of the Investigations

The products covered by these investigations are OCTG from Argentina, Mexico, and Russia. For a full description of the scope of these investigations, *see* the appendix to this notice.

## Comments on the Scope of the Investigations

On October 13, 2021, Commerce spoke with counsel to the petitioners regarding the proposed scope, to ensure that the scope language in the Petitions is an accurate reflection of the products for which the domestic industry is seeking relief.[7]

As discussed in the *Preamble* to Commerce's regulations, we are setting aside a period for interested parties to raise issues regarding product coverage (*i.e.,* scope).[8] Commerce will consider all comments received from interested parties and, if necessary, will consult with interested parties prior to the issuance of the preliminary determinations. If scope comments include factual information,[9] all such factual information should be limited to public information. To facilitate preparation of its questionnaires, Commerce requests that all interested parties submit such comments by 5:00 p.m. Eastern Time (ET) on November

[5] *See infra,* section titled "Determination of Industry Support for the Petitions."

[6] *See* 19 CFR 351.204(b)(1).

[7] *See* Memorandum, "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Phone Call with Counsel to the Petitioners," dated October 13, 2021.

[8] *See Antidumping Duties; Countervailing Duties, Final Rule,* 62 FR 27296, 27323 (May 19, 1997) (*Preamble*).

[9] *See* 19 CFR 351.102(b)(21) (defining "factual information").