No. 2022-1298

---

IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION, DATONG JUQIANG ACTIVATED CARBON CO., LTD., BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., NINGXIA MINERAL & CHEMICAL LIMITED, SHANXI SINCERE INDUSTRIAL CO., LTD.,
*Plaintiff-Appellants*,

v.

UNITED STATES, CALGON CARBON CORPORATION, NORIT AMERICAS INC., fka Cabot Norit Americas, Inc.,
*Defendants-Appellees*.

---

Appeal from the United States Court of International Trade in
No. 20-cv-00007, Chief Judge Mark A. Barnett

---

## **BRIEF FOR DEFENDANT-APPELLEE, UNITED STATES**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

CLAUDIA BURKE
Assistant Director

*Of Counsel*:
ASHLANDE GELIN
Attorney
Office of the Chief Counsel
  For Trade Enforcement and Compliance

MOLLIE L. FINNAN
Senior Counsel for Management
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, D.C.

May 31, 2022

*Attorneys for Defendant-Appellee*

1

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................ iii

STATEMENT OF RELATED CASES ................................................ix

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE.................................................................2

STATEMENT OF FACTS .....................................................................3

I. Legal Framework For Surrogate Country And Surrogate Value Selection ....3

II. Administrative Background.........................................................6

    A. Initiation And Preliminary Results.......................................6

    B. Final Results ...............................................................8

III. Trial Court Proceeding ..............................................................9

IV. Remand Results And Subsequent Trial Court Proceeding............................11

SUMMARY OF THE ARGUMENT .....................................................13

ARGUMENT .................................................................................15

I. Standard Of Review.....................................................................15

II. Commerce's Selection Of Malaysia As The Primary Surrogate Country Is Supported By Substantial Evidence And In Accordance With Law.........15

    A. Commerce Reasonably Determined That Malaysian Data Are More Specific To The Respondents' Input For Coconut Shell Charcoal.....18

    B. Commerce Reasonably Determined That Malaysian Data Are Contemporaneous With The Period Of Review .................................21

C.     Surrogate Value Selection Is Made On A Case-by-Case Basis; There Is No Hierarchy In Selection Criteria ........................................25

      1.     The Weight Of Financial Ratios In Surrogate Selection ..........27
      2.     The Weight Of A Main Input In Surrogate Selection...............31

III.  Commerce's Valuation Of Bituminous Coal, Of Known And Unknown Calorific Values, Is Supported By Substantial Evidence And In Accordance With Law..................................................................................32

     A.     Commerce Lawfully Selected Malaysian HS 2701.19 ("Other Coal") To Value Bituminous Coal Of Known Calorific Value......................34

     B.     Commerce Lawfully Selected Romanian HS 2701.12 ("Bituminous Coal") To Value Bituminous Coal Of Unknown Calorific Value......37

IV.  Commerce's Valuation of Coal Tar Pitch Based On Malaysian Import Data Under HS 2708.10 Is Supported By Substantial Evidence And In Accordance With Law ....................................................................................45

CONCLUSION .....................................................................................................55

CERTIFICATE OF COMPLIANCE.........................................................................57

# TABLE OF AUTHORITIES

Cases ........................................................................................... Page(s)

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  802 F.3d 1339 (Fed. Cir. 2015) ...........................................................15

*Ancientree Cabinet Co. v. United States*,
  532 F. Supp. 3d 1241 (Ct. Int'l Trade 2021) ............................... 19, 29

*Blue Field (Sichuan) Food Indus. Co. v. United States*,
  949 F. Supp. 2d 1311 (2013) ...............................................................17

*Boomerang Tube LLC v. United States*,
  856 F.3d 908 (Fed. Cir. 2017) ...................................................... 31, 53

*Calgon Carbon Corp. v. United States*,
  35 C.I.T. 234 (2011) (*Calgon Carbon AR1*)................................. 41, 43

*Calgon Carbon Corp. v. United States*,
  443 F. Supp. 3d 1334 (Ct. Int'l Trade 2020) (*Calgon Carbon AR10*) .. 11, 46, 53

*Camau Frozen Seafood Processing Import Export Corp. v. United States*,
  929 F. Supp. 2d 1352 (Ct. Int'l Trade 2013) .....................................54

*Carbon Activated Tianjin Co., Ltd. v. United States*,
  Slip Op. No. 21-149, 547 F. Supp. 3d 1310 (Ct. Int'l Trade 2021) ....................3

*Carbon Activated Tianjin Co., Ltd. v. United States*,
  Slip Op. No. 21-35, 503 F. Supp.3d 1278 (Ct. Int'l Trade 2021)
  (*Carbon Activated I*) ...........................................................................3

*Coalition for the Preservation of Am. Brake Drum and Rotor Aftermarket
  Mfr. v. United States*, 44 F. Supp. 2d 229 (Ct. Int'l Trade 1999)............... 17, 27

*Consol. Bearings Co. v. United States*,
  166 F. Supp. 2d 580 (Ct. Int'l Trade 2001), *rev'd and remanded
  on related but other grounds*, 348 F.3d 997 (Fed. Cir. 2003) ..........................51

*Corus Staal BV v. United States*,
  502 F.3d 1370 (Fed. Cir. 2007) ....................................... 31, 50, 51, 53

*Dorbest Ltd. v. United States*,
  604 F.3d 1363 (Fed. Cir. 2010) ........................................ 4, 5, 31, 53

*Dupont Teijin Films USA, LP v. United States*,
  407 F.3d 1211 (Fed. Cir. 2005) ...........................................................15

*Fine Furniture (Shanghai) Ltd. v. United States*,
    321 F. Supp. 3d 1282 (Ct. Int'l Trade 2018), *amended*,
    521 F. Supp. 3d 1337 (Ct. Int'l Trade 2021) ........................................26

*Fuwei Films (Shandong) Co. v. United States*,
    837 F. Supp. 2d 1347 (Ct. Int'l Trade 2012) ............................... 40, 49

*Gerber Food (Yunnan) Co. v. United States*,
    601 F. Supp. 2d 1370 (Ct. Int'l Trade 2009) ........................................52

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (2006) ................................................................27

*Graphic Controls Corp. v. Utah Medical Prods., Inc.*,
    149 F.3d 1382 (Fed. Cir. 1998) ............................................................41

*Heze Huayi Chem. Co., Ltd. v. United States*,
    No. 17-00032, 2018 WL 2328183 (Ct. Int'l Trade May 22, 2018)...................26

*Hi-Shear Technology Corp. v. United States*,
    356 F.3d 1372 (Fed. Cir. 2004) ............................................................51

*Home Meridian Int'l. Inc. v. United States*,
    772 F.3d 1289 (Fed. Cir. 2014) ............................................................27

*Hung Vuong Corp. v. United States*,
    483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) ........................................43

*Jacobi Carbons AB v. United States*,
    992 F. Supp. 2d 1360 (Ct. Int'l Trade 2014), *aff'd*,
    619 F. App'x 992 (Fed. Cir. 2015) (*Jacobi Carbons AR4*) .......................... 5, 54

*Jiangsu Senmao Bamboo and Wood Indus. Co., Ltd. v. United States*,
    322 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ........................................50

*Jiaxing Bro. Fastener Co. v. United States*,
    11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) (*Jiaxing I*) .......................6

*Jiaxing Bro. Fastener Co. v. United States*,
    822 F.3d 1289 (Fed. Cir. 2016) (*Jiaxing Bro. II*) ...................... passim

*Jiaxing Brother Fastener Co. v. United States*,
    428 F. Supp. 3d 1364, 1379 n. 29 (Ct. Int'l Trade 2020) ..................................30

*Jinan Farmlady Trading Co. v. United States*,
    228 F. Supp. 3d 1351 (Ct. Int'l Trade 2017) ........................................36

*Marvin Furniture (Shanghai) Co. v. United States*,
    867 F. Supp. 2d 1301 (Ct. Int'l Trade 2012), *aff'd*,
    744 F. 3d 1319 (Fed. Cir. 2014) ........................................................22

*Mid Continent Steel & Wire, Inc. v. United States*,
    321 F. Supp. 3d 1313 (2018) ..............................................................39

*Monsanto Co. v. Scruggs*,
    459 F.3d 1328 (Fed. Cir. 2006) ..........................................................41

*Mukand, Ltd. v. United States*,
    767 F.3d 1300 (Fed. Cir. 2014) ................................................... 22, 23

*Nan Ya Plastics Corp. v. United States*,
    810 F.3d 1333 (Fed. Cir. 2016) ..........................................................19

*Nation Ford Chem. Co. v. United States*,
    166 F.3d 1373 (Fed. Cir. 1999) ............................................. 4, 17, 27

*Papierfabrik Aug. Koehler SE v. United States*,
    843 F.3d 1373 (Fed. Cir. 2016) ..........................................................25

*Qingdao Sea–Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014) ..........................................................46

*Qingdao Sea-Line Trading Co., Ltd. v. United States*,
    Case No. 10-00304, Slip Op. No. 12-39, 2012 WL 990904
    (Ct. Int'l Trade Mar. 21, 2012) ..........................................................24

*QVD Food Co. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) ............................................. 6, 19, 49

*Rhodia, Inc. v. United States*,
    185 F. Supp. 2d 1343 (Fed. Cir. 2001) ..............................................20

*Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc.
    v. United States*, 268 F.3d 1376 (Fed. Cir. 2001) ..............................17

*Shenzhen Xinboda Industrial Company v. United States*,
    357 F. Supp. 3d 1295 (Ct. Int'l Trade 2018) .............................. 24, 25

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001) ..........................................................46

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ..........................................................20

*Stainless Steel Pipe, Inc. v. United States*,
    298 F.3d 1330 (Fed. Cir. 2002) ..........................................................43

*Ta Chen Stainless Steel Pipe, Ltd.*,
  342 F.Supp.2d 1191 (Ct. Int'l Trade 2004) ........................................................52

*Taian Ziyang Food Company Ltd., v. United States*,
  783 F. Supp. 2d 1292 (Ct. Int'l Trade 2011) ............................................. 18, 26

*U.S. Steel Corp. v. United States*,
  638 F. Supp. 2d 1199 (Fed. Cir. 2009) ..............................................................20

*United States Steel Corp. v. United States*,
  621 F.3d 1351 (Fed. Cir. 2010) .............................................................................3

*United States v. Eurodif*, 555 U.S. 305 (2009) .......................................................15

*Weishan Hongda Aquatic Food Co. v. United States*,
  917 F.3d 1353 (Fed. Cir. 2019) ...................................................................... 5, 50

*Xiamen Int'l Trade & Indus. Co. v. United States*,
  953 F. Supp. 2d 1307 (2013) ......................................................................... 20, 26

*Zenith Elecs. Corp. v. United States*,
  988 F.2d 1573 (Fed. Cir. 1993) ..........................................................................44

*Zhejiang DunAn Hetian Metal Co. v. United States*,
  652 F.3d 1333 (Fed. Cir. 2011) ..........................................................................40

*Zhejiang Native Produce Animal By-Products Imp. & Exp. Grp. Corp., et al. v. United States*, Slip Op. 09-61, 2009 WL 1726360
  (Ct. Int'l Trade 2009)..........................................................................................41

Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................................15
19 U.S.C. § 1673 .......................................................................................3
19 U.S.C. § 1675(a)(1)(B), (2)(A) ............................................................4
19 U.S.C. § 1675(a)(2)(A) .........................................................................3
19 U.S.C. § 1677(18)(A) ...........................................................................7
19 U.S.C. § 1677(35)(A) ...........................................................................3
19 U.S.C. § 1677b(c) .................................................................................7
19 U.S.C. § 1677b(c)(1) ....................................................................... 6, 24
19 U.S.C. § 1677b(c)(1)(B) .......................................................................4
19 U.S.C. § 1677b(c)(3) .............................................................................4
19 U.S.C. § 1677b(c)(4) .............................................................................5
19 U.S.C. § 1677m(d) ..................................................................... 22, 23, 24
19 U.S.C. § 1677m(e) ...............................................................................24
28 U.S.C. § 2637(d) ........................................................................... 31, 50

Regulations

19 C.F.R. § 351.301(c)(1) ........................................................................24
19 C.F.R. § 351.301(c)(3) ........................................................................24
19 C.F.R. § 351.408(c)(2) .................................................................... 5, 34
19 C.F.R. § 351.408(c)(4) ...........................................................................5

Rules

Federal Circuit Rule 28(b) .........................................................................2
Federal Circuit Rule 32(b)(1) ...................................................................41
Federal Rules of Appellate Procedure 28 .................................................41
Federal Rule of Appellate Procedure 28(b) ...............................................2

## Other Authorities

*Certain Activated Carbon From the People's Republic of China 2018–2019*,
86 Fed. Reg. 10,539 (Dep't of Commerce Feb. 22, 2021) and IDM at Cmt. 3
(Activated Carbon AR 12)....................................................................................50

*Certain Activated Carbon from the People's Republic of China: Final Results
and Partial Rescission of Second Antidumping Duty Administrative Review*,
75 Fed. Reg. 70,208 (Nov. 17, 2010), and IDM at Cmt. 4b
(Activated Carbon AR2)......................................................................................45

*Certain Activated Carbon from the People's Republic of China: Final Results
and Partial Rescission of Third Antidumping Duty Administrative Review*,
76 Fed. Reg. 67142 (October 31, 2011), and IDM. .............................................21

*Certain Activated Carbon From the People's Republic of China:
Final Results of Antidumping Duty Administrative Review; 2013–2014*;
80 Fed. Reg. 61172 (Dep't of Commerce Oct. 9, 2015) ......................................48

*Certain Activated Carbon From the People's Republic of China; 2010-2011;
Final Results of Antidumping Duty Administrative Review*;
77 Fed. Reg. 67337 (Dep't of Commerce Nov. 9, 2012)......................................48

*Certain Cased Pencils From the People's Republic of China: Final Results of
Antidumping Duty Administrative Review and Determination To Revoke
Order In Part; 2010-2011*, 78 Fed. Reg. 42,932 (Dep't of Commerce
Jul. 18, 2013), IDM at Cmt. 1...............................................................................28

Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate
Country Selection Process, Policy Bulletin 04.1 (2004),
https://enforcement.trade.gov/policy/bull04-1.html........................................ 5, 26

*Xanthan Gum From the People's Republic of China: Final Results of
Antidumping Duty Administrative Review, Final Determination of No
Shipments, Final Partial Rescission; 2014-2015*, 82 Fed. Reg. 11,434
(Feb. 23, 2017), IDM at Cmt 11 ..........................................................................40

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Rule 47.5, defendant-appellee's counsel states that she is unaware of any other appeal in or from these actions that previously was before this Court, or any other appellate court, under the same or similar title.  However, defendant-appellee's counsel is aware of two pending cases that could directly affect or be affected by the Court's decision in this appeal:

1.    *Carbon Activated Tianjin Co. v. United States*, Ct. Int'l Trade Case No. 21-cv-00131-MAB – challenges Commerce's determination in the twelfth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China; and

2.    *Carbon Activated Tianjin Co. v. United States*, Ct. Int'l Trade Consol. Case No. 22-cv-00017-MAB – challenges Commerce's determination in the thirteenth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China.

BRIEF FOR DEFENDANT-APPELLEE
UNITED STATES

———————————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

———————————————————————

No. 2022-1298

———————————————————————

CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED
CORPORATION, DATONG JUQIANG ACTIVATED CARBON CO., LTD.,
BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., NINGXIA
GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., NINGXIA
MINERAL & CHEMICAL LIMITED, SHANXI SINCERE INDUSTRIAL CO., LTD.,
*Plaintiff-Appellants*,

v.

UNITED STATES, CALGON CARBON CORPORATION,
NORIT AMERICAS INC., fka Cabot Norit Americas, Inc.,
*Defendants-Appellees*.

———————————————————————

## **STATEMENT OF THE ISSUES**

1.    Whether the determination of the United States Department of

Commerce (Commerce) to select Malaysia as the primary surrogate country was

supported by substantial evidence and in accordance with law.

2.    Whether Commerce's determination to value bituminous coal of

unknown calorific values, using Romanian data under Harmonized System

(HS) 2701.12 ("Bituminous Coal"), and bituminous coal of known calorific values,

using Malaysian data under HS 2701.19 ("Other Coal"), was supported by substantial evidence and in accordance with law.

3.      Whether Commerce's determination to value coal tar pitch, using Malaysian data under HS 2708.10 ("pitch from coal and other mineral tars") rather than Russian data under HS 2706.00 ("tar distilled from coal, from lignite or from peat," – e.g., coal tar), was supported by substantial evidence and in accordance with law.

## STATEMENT OF THE CASE[1]

Plaintiffs-appellants (collectively, Carbon Activated)[2] appeal from a decision of the United States Court of International Trade that upheld Commerce's assessment of antidumping duties against Carbon Activated for imports of certain activated carbon from China into the United States in the eleventh administrative review (AR11) of the subject merchandise. *Carbon Activated Tianjin Co., Ltd. v. United States*, Slip Op. No. 21-35, 503 F. Supp.3d 1278 (Ct. Int'l Trade 2021)

---

[1]  Pursuant to Federal Rule of Appellate Procedure 28(b), and Federal Circuit Rule 28(b), we include statements of the case and facts because we disagree with plaintiffs-appellants' statement of the case and facts.

[2]  Plaintiffs-appellants are Carbon Activated Tianjin Co., Ltd. (Carbon Tianjin), Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd. (Datong Juqiang or DJAC), Beijing Pacific Activated Carbon Products Co., Ltd., Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Ningxia Mineral & Chemical Limited, and Shanxi Sincere Industrial Co., Ltd. (collectively, Carbon Activated).

(*Carbon Activated I* or *CA I*) (Appx40-76 (slip opinion), Appx77-92 (published)),

*following remand*, Slip Op. No. 21-149, 547 F. Supp. 3d 1310 (Ct. Int'l Trade

2021) (*Carbon Activated II* or *CA II*) (Appx136-159 (slip opinion)).  The period of

review (POR) is April 1, 2017 through March 31, 2018.  Appx37.

## STATEMENT OF FACTS

## I.    Legal Framework For Surrogate Country And Surrogate Value Selection

The Tariff Act of 1930, as amended, establishes a remedial regime to

combat unfair trade practices.  Pursuant to the Act, Commerce imposes an

antidumping duty on imported merchandise that "is being, or is likely to be, sold in

the United States at less than fair value" and harms the domestic industry.

19 U.S.C. § 1673.  A sale occurs at less than fair market value if its "normal value"

(a producer's home market price) exceeds the "export price" (the price of the

product sold in the United States) or "constructed export price."  *United States*

*Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (citing

19 U.S.C. § 1677(35)(A)).

To determine the appropriate antidumping duty, Commerce calculates a

"dumping margin" for the subject merchandise, equal to the difference between

normal value and the export or constructed export price.  *Id.*; 19 U.S.C.

§ 1675(a)(2)(A).  Commerce memorializes the dumping margin(s) in an

antidumping duty order.  Following entry of that order, Commerce may conduct

annual administrative reviews of the duty rate.  19 U.S.C. §§ 1675(a)(1)(B),

(2)(A).

When, as here, an antidumping duty proceeding involves a nonmarket

economy country (*e.g.*, China), Commerce determines normal value by valuing the

factors of production used in producing the merchandise, and then adds "an

amount for general expenses and profit, plus the cost of containers, coverings, and

other expenses" in a surrogate market economy country.  *See* 19 U.S.C.

§ 1677b(c)(1)(B).  Commerce uses this framework "to construct a hypothetical

market value" of the subject merchandise in the non-market economy country.

*Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).[3]

Commerce has adopted a four-step process for selecting a primary surrogate

country, in which the agency: (1) compiles a non-exhaustive list of countries that

are at the same or comparable level of economic development as the non-market

economy country; (2) ascertains which of the listed countries produce comparable

merchandise; (3) determines whether any of the countries are significant producers

of such merchandise; and (4) evaluates the availability and reliability of record

---

[3] Factors of production (also known as inputs) generally include raw materials, labor, and utilities.  19 U.S.C. § 1677b(c)(3).  Commerce also values additional selling, general, and administrative expenses, factory overhead, and profit, "using financial ratios derived from publicly-available financial statements of producers of comparable merchandise in the surrogate country."  *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010).

data from any countries satisfying the first three criteria, and ultimately selecting the one with the best factors data. *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016) (*Jiaxing Bro. II*); *see also* 19 U.S.C. § 1677b(c)(4); Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), https://enforcement.trade.gov/policy/bull04-1.html.

When weighing data quality, Commerce prefers surrogate values that are "product-specific, representative of a broad-market average, publicly available, contemporaneous with the {period of review}, and tax and duty exclusive." Appx13; Policy Bulletin 04.1. Commerce also has a regulatory preference to value all factors of production in a single surrogate country, 19 C.F.R. § 351.408(c)(2), and this preference extends to surrogate financial ratios, *id.* § 351.408(c)(4). *See Dorbest*, 604 F.3d at 1368. This preference is intended to "limit{} the amount of distortion introduced into {Commerce's} calculations." *Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360, 1377 (Ct. Int'l Trade 2014), *aff'd*, 619 F. App'x 992 (Fed. Cir. 2015) (*Jacobi Carbons AR4*). Commerce will only resort to a secondary surrogate country if the data from the primary surrogate are unavailable or unreliable. *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1360 (Fed. Cir. 2019); *Jiaxing Bro. Fastener Co. v. United States*,

11 F. Supp. 3d 1326, 1332–33 (Ct. Int'l Trade 2014) (*Jiaxing I*), *aff'd*, *Jiaxing II*, 822 F.3d 1289.

The statute ultimately requires Commerce use the "best available information" on the record.  19 U.S.C. § 1677b(c)(1).  However, because the statute is silent as to what constitutes the "best available information," Commerce has broad discretion in deciding what record evidence meets that criteria.  *E.g.*, *Jiaxing II*, 822 F.3d at 1294; *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (describing Commerce's discretion as "broad" or "wide" (citations omitted)).

## II.    <u>Administrative Background</u>

### A.    <u>Initiation And Preliminary Results</u>

In June 2018, Commerce initiated the eleventh administrative review (AR11) of the antidumping duty order on certain activated carbon from the People's Republic of China.  Appx183-192.  Commerce selected Carbon Activated Tianjin Co., Ltd. (Carbon Tianjin) and Datong Juqiang Activated Carbon Co., Ltd. (Datong Juqiang or DJAC) as mandatory respondents.  Appx193-198.

In June 2019, Commerce published its *Preliminary Results*, Appx5285-5287, supported by a preliminary issues and decision memorandum (PDM), Appx4455-4488.  Because Commerce considers China a nonmarket economy country, the agency engaged its four-step process for selection of a surrogate

country. *See* 19 U.S.C. §§ 1677(18)(A), 1677b(c). Of six potential market-economy surrogate countries at the same level of economic development as China during the period of review, Appx297-298, Commerce preliminarily determined, in relevant part, that Malaysia and Romania were also significant producers of comparable merchandise based on export volume under the primary HS heading included in the scope, *i.e.*, exports of HS number 3802.10 (activated carbon), Appx4467-4469. Based on a subsequent analysis of the surrogate value data, Commerce preliminarily determined that Malaysian data afforded the best available information and selected Malaysia as the primary surrogate country. Appx4469-4470. The Malaysian data on the record are product specific, contemporaneous with the period of review, publicly available, tax exclusive, and representative of a broad market average. Appx4478. Commerce also had complete and reliable Malaysian data for nearly all factors of production. *See* Appx4469. Accordingly, Commerce preliminarily selected Malaysia as the primary surrogate country. Appx4470.

With respect to certain material inputs, Commerce preliminarily determined to value bituminous coal based on Malaysian data under HS 2701.12 ("Bituminous Coal") and to value coal tar based on Malaysian data under HS 2706.00 ("coal tar"). Appx4469; Appx4492-4493. However, Commerce determined to use a 2017 financial statement from a Romanian company, Romcarbon S.A., to value

financial ratios.  Appx4480-4481; Appx4498-4499.  Commerce ultimately

calculated preliminary weighted-average dumping margins for Carbon Tianjin

(1.65 percent) and DJAC (4.33 percent), as well as a separate rate for non-

examined respondents (3.90 percent).  Appx5286.

### B.    Final Results

In December 2019, Commerce issued the *Final Results*, Appx37-39,

supported by an issues and decision memorandum (IDM), Appx3-36, which made

limited changes to the *Preliminary Results*, *see* Appx5-6.  In relevant part,

Commerce continued to rely on Malaysia as the primary surrogate country

notwithstanding Carbon Activated's advocacy for Romania.  Appx6-11.  Although

Commerce had preliminarily determined that both countries were significant

producers of comparable merchandise, the agency now concluded that the record

demonstrated that Malaysia was a significant producer during the period of review,

but that Romania was not.  Appx9-10.  Commerce thereafter declined to compare

the quality and availability of Malaysian and Romanian data for purpose of

primary surrogate country selection, finding the issue to be moot.  Appx10.

Commerce used Malaysian data to value respondents' factors of production with

exceptions for bituminous coal and financial ratios, for which Commerce used

Romanian data.  Appx10-25; Appx5374-5380.  The agency also made changes to

the margin calculations, resulting in lower final weighted-average dumping

margins for Carbon Activated (1.02 percent), for DJAC (0.86 percent), and for the separate rate respondents (0.89 percent).  Appx38.

## III.    **Trial Court Proceeding**

On appeal to the Court of International Trade, Carbon Activated challenged Commerce's selection of Malaysia as a surrogate country and surrogate valuations of two material inputs, bituminous coal and coal tar pitch.  In April 2021, the court issued an initial decision that, in relevant part, sustained Commerce's selection of surrogate data to value coal tar pitch, and remanded with respect to surrogate country selection and selection of surrogate data to value bituminous coal. Appx77-92.

The trial court's remand order expressed concern that Commerce's *Final Results* had inappropriately selected Malaysia, and rejected Romania, without a reasoned analysis.  Appx86 (*CA I*, 503 F. Supp. 3d at 1289).  For example, the trial court concluded that Commerce had not explained adequately its decision to depart from its preliminary finding that Romania was a significant producer of comparable merchandise during the period of review.  Appx85-86 (*CA I*, 503 F. Supp. 3d at 1288).

The trial court's remand order also expressed concern with Commerce's reasoning with respect to the bituminous coal valuation.  Appx86-87 (*CA I*, 503 F. Supp. 3d at 1289-91).  In the *Final Results*, Commerce valued all bituminous coal

using Romanian import data under the HS heading 2701.12 (Bituminous Coal, Not Agglomerated) after finding that the average unit value of Malaysian imports under HS 2701.12 was unreliable.  Appx11-18.  In so doing, it had rejected Carbon Activated's request to instead use Romanian import data under HS 2701.19 (Other Coal) to value certain bituminous coal with a calorific value of less than 5,833 kcal/k.  *Id.*  Carbon Activated relied on Chapter 27 of the Thai HS code, specifically Note 2, which it argued limited HS 2701.12 to, in relevant part, to Bituminous Coal with "a calorific value limit equal to or greater than 5,833 kilocalorie (kcal)/kilogram (kg)."  Appx11.  Commerce disagreed, concluding that the code limitation applied only to Thai import data.  Appx15-16.  But the trial court found that the rationale for rejecting Carbon Activated's argument was arbitrary without further explanation.

The court reasoned that there was evidence that, "{i}n prior determinations, Commerce has taken the position that products subject to international trade generally will enter {World Customs Organization (WCO)} countries under the same six-digit subheading" and "Commerce has relied on this principle to apply a subheading chapter note placed on an administrative record . . . for purposes of surrogate valuation."  Appx87 (*CA I*, 503 F. Supp. 3d at 1290).  The trial court also recognized that there was "some indication in the record that Respondents (or their respective suppliers) consumed bituminous coal with a calorific value that is less

than 5,833 kcal/kg" and that it was "unclear whether Commerce considered this evidence or found it insufficient." Appx87 (*CA I*, 503 F. Supp. 3d at 1291). Accordingly, Commerce's bituminous coal surrogate value selection was remanded for reconsideration and further explanation. *Id*.

Finally, the trial court sustained Commerce's determination to value Carbon Activated's material input, coal tar pitch, under Malaysian HS 2708.10, which covers "pitch from coal and other mineral tars." Appx87-89 (*CA I*, 503 F. Supp. 3d at 1291-94). The trial court reasoned that, although Commerce departed from its treatment of coal tar pitch in the prior administrative review (*i.e.*, using instead Malaysian data under HS 2706.00 (tar distilled from coal, from ignate or from peat)), Commerce provided "an adequate explanation, supported by substantial evidence, for the change." Appx88 (*CA I*, 503 F. Supp. 3d at 1293 (citing *Calgon Carbon Corp. v. United States*, 443 F. Supp. 3d 1334, 1344 (Ct. Int'l Trade 2020) (*Calgon Carbon AR10*)). Accordingly, Commerce's determination to use Malaysian data under HS 2708.10 to value coal tar pitch was sustained.

## IV.    Remand Results And Subsequent Trial Court Proceeding

In June 2021, Commerce filed its remand results that, in relevant part, further explained, and reconsidered, the selection of primary surrogate country and surrogate value selection for bituminous coal. Appx93-135. On remand, Commerce redetermined that Romania was, in fact, a significant producer of

comparable merchandise, but that Malaysia still provided superior data for primary surrogate country selection based on specificity.  Appx103-108; Appx126-131.

With respect to bituminous coal, Commerce maintained in part, and adjusted in part, its valuation of bituminous coal.  Specifically, Commerce redetermined that a limitation appearing in the Thai HS Note 2 applied to Malaysian data as well.  Appx94-99.  The agency then employed a combination of Malaysian and Romanian data sets to value respondents' bituminous coal, depending on whether the calorific value of the bituminous coal was known to be less than 5,833 kcal/kg.  Appx99-100; Appx116-122.

Specifically, Commerce had initially valued all bituminous coal using Romanian import data under HS 2701.12 after finding Malaysian import data under HS 2701.12 were unreliable.  Appx11-18.  On remand, Commerce redetermined to use Malaysian import data under HS 2701.19 (Other Coal) to value bituminous coal with disclosed calorific values below 5,833 kcal/kg, reported in use by Datong Juqiang, Datong Juqiang's supplier, and one of Carbon Tianjin's suppliers.  Appx94-100.  However, Commerce continued its reliance on Romanian import data under HS 2701.12 to value bituminous coal with undisclosed calorific values, reported in use by Carbon Tianjin's other supplier (Supplier C) and by Carbon Tianjin's uncooperative supplier for which Commerce applied Supplier C's factors of production.  *Id*.

Back before the trial court, the trial court sustained Commerce's remand results. Appx136-159. As relevant here, the agency's remand results were supported by substantial evidence and not contrary to law with respect to its valuation of bituminous coal, Appx141-150, and selection of surrogate country, Appx150-156. Judgment was entered in favor of the United States. Appx1-2. This appeal followed.

## SUMMARY OF THE ARGUMENT

Commerce assessed antidumping duties against Carbon Activated based on a reasoned decision supported by substantial evidence and in accordance with law. Carbon Activated unpersuasively challenges three aspects of Commerce's determination (selection of primary surrogate country and selection of surrogate values for bituminous coal and coal tar pitch).

First, Commerce amply explained its selection of Malaysia over Romania as the primary surrogate country based on the superior quality of the Malaysian data on record. In particular, the Malaysian data are contemporaneous with the period of review and the Russian data are not. The Malaysian data also offered more product-specific import data to value the one substantiated carbonized material input used on record.

Second, Commerce reasonably determined to value bituminous coal input with a known calorific value using Malaysian HS 2701.19 (Other Coal), which

indisputably encompassed the reported value (of less than 5,833 kcal/kg).

Commerce further reasonably determined to value bituminous coal of unknown

calorific value using a different dataset, Romanian HS 2701.12 (Bituminous Coal),

based on respondents having reported using "bituminous coal" and the plain

meaning of the HS code to encompass "bituminous coal." Commerce selected the

best available information relative to (i) the lack of evidence required for a

subheading note limitation; and (ii) the alternative methods advocated by Carbon

Activated.

Lastly, Commerce reasonably determined to value coal tar pitch based on

Malaysian import data under HS 2708.12 (pitch). It was the best available

information and, specifically, it was better than the alternative advocated by

Carbon Activated, which was import data under HS 2706.00 (coal tar) from

Russia. Insofar as Carbon Activated now bases several of its objections to

Commerce's approach on arguments that were never before Commerce, the

doctrine of administrative exhaustion bars their consideration for the first time in

litigation. In any event, they are not supported.

Accordingly, the Court should affirm the trial court's judgment that

sustained Commerce's determination in the eleventh administrative review of the

antidumping duty order on certain activated carbon from China.

# **ARGUMENT**

## I.     **Standard Of Review**

The Court applies the same standard of review that was applied by the trial

court.  *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed.

Cir. 2005).  Accordingly, the Court will uphold Commerce's determination "unless

it is unsupported by substantial record evidence or is not in accordance with the

law." *Id.* (citing 19 U.S.C. § 1516a(b)(1)(B)(i)); *see also United States v. Eurodif*,

555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which

{Commerce} relies . . . are conclusive unless unsupported by substantial

evidence.").

## II.     **Commerce's Selection Of Malaysia As The Primary Surrogate Country Is Supported By Substantial Evidence And In Accordance With Law**

The Court should affirm the trial court's decision sustaining Commerce's

selection of Malaysia as the primary surrogate country, which is supported by

substantial evidence and not contrary to law.  As the trial court explained,[4]

Commerce's remand results reflect a redetermination that both Malaysia and

---

[4]  Although the Court considers the record anew, the Court has declared that it "will not ignore the informed opinion of the {trial court}."  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (explaining this Court gives "great weight to the informed opinion of the Court of International Trade . . . {and} it is nearly always the starting point of {its} analysis" (citations and quotation marks omitted)).

Romania qualified as potential surrogate countries—both countries were economically comparable to China, as well as significant producers of comparable merchandise. Appx152 (citing Appx103-108). Commerce's preference for Malaysia arose based on relative data quality and availability. *Id.* (citing Appx106-107). Specifically, substantial evidence supported selection of Malaysia, as the primary surrogate country, based on: (i) the input specificity of record data from Malaysia for coconut shell charcoal for one of the exporters, and (ii) the fact that Malaysian data are more contemporaneous for the period of review. Appx106-107; Appx129-130.

Carbon Activated argues that Romania provides better quality data. *See generally* CA Br. at 50-64. As the trial court observed, however, Carbon Activated's subjective view of the evidence is immaterial: "{W}hile Plaintiffs invite the court to second guess the agency's determination, it is the court's task to determine whether Commerce has supported its determination with substantial evidence." Appx152 (citation omitted). Carbon Activated's various rationales for why one surrogate value may be superior to another ignore that standard of review. Commerce "need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production as long as it was a reasonable way." *Coalition for the Preservation of Am. Brake Drum and Rotor Aftermarket Mfr. v. United States*, 44 F. Supp. 2d 229, 258 (Ct. Int'l Trade 1999)

(*Brake Drum*); *see also Blue Field (Sichuan) Food Indus. Co. v. United States*, 949 F. Supp. 2d 1311, 1326 (2013) ("The court will uphold Commerce's surrogate value choices if {it} fairly considered record evidence when choosing surrogates, so that a reasonable mind could accept Commerce's findings" (citing *Consol. Edison*, 305 U.S. at 217 (defining the "substantial evidence" standard))); *Jiaxing II*, 822 F.3d at 1301 (explaining the relevant question is "not whether the information Commerce used was the best available {information}, but rather whether a reasonable mind could conclude that Commerce chose the best available information").

In any event, for the reasons that follow, none of Carbon Activated's arguments undermine Commerce's selection of Malaysia as the primary surrogate country. *See Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001) (recognizing "Commerce's special expertise" in administering the antidumping statute (citation and quotation marks omitted)); *Nation Ford*, 166 F.3d at 1377 (explaining Commerce has "wide discretion in the valuation of factors of production"). The reasoned bases for Commerce's determination, moreover, are fully set forth in the remand record; thus, they are not "post hoc" rationales, as Carbon Activated repeatedly mischaracterizes them to be. *See* Appx129-130 (explaining the trial court ordered Commerce to further explain its surrogate country selection on remand).

### A.    Commerce Reasonably Determined That Malaysian Data Are More Specific To The Respondents' Input For Coconut Shell Charcoal

Commerce permissibly concluded that Malaysian data under HS 4402.90.1000 was the best available information on which to value respondents' carbonized material input because it was specific to the known input (coconut shell charcoal) of at least one mandatory respondent.  Commerce explained that the Malaysian data reflect a tariff classification at the 10-digit level that is specific to coconut-shell charcoal (*i.e.*, HTS subheading 4402.90.1000), and this is "a direct material . . . consumed in significant quantities {by one of the mandatory respondents, Datong Juqiang} in production of the subject merchandise . . . ." Appx107; Appx130.  In contrast, the Romanian data reflect only a six-digit basket category HS subheading, 4402.90, which includes both a wood-based and nut-based charcoal."  Appx107; *see Taian Ziyang Food Company Ltd., v. United States*, 783 F. Supp. 2d 1292, 1330 (Ct. Int'l Trade 2011) (discussing the importance of product specificity in surrogate value selection).

Commerce agreed that it could value the coal-based carbonized material input with either coconut shell data under HTS 4402.99.1000, which was also specific to Datong Juqiang's known input, or under the less specific wood charcoal encompassed by HS 4402.90.  Appx130.  However, none of the mandatory respondents (or their suppliers) reported using the other kind of charcoal covered

by HS 4402.90, *i.e.*, nut-based charcoal.  Appx107.  Thus, HS 4402.90 was less

specific to respondents' input.  Appx107-108, App130; *see also* Appx153

("Because Commerce needed to value coconut shell charcoal for at least one of the

respondents, and because Malaysia—and not Romania—was able to provide data

at that level of specificity, Commerce's discussion of coconut shell charcoal

supports its selection of Malaysia as the primary surrogate country.").

In addition, Carbon Activated has not identified any record evidence that the

Malaysian data under HS 4402.90.1000 are aberrational, not of commercial

quantity, or otherwise unreliable; Carbon Activated "simply disagree{s} with

Commerce's use of such data."  Appx153; Appx130.  *See Ancientree Cabinet Co.*

*v. United States*, 532 F. Supp. 3d 1241, 1254 (Ct. Int'l Trade 2021) (explaining that

when there is insufficient evidence to determine certain data aberrational or

unreliable, Commerce has no basis for rejecting the data (citing *QVD Food*, 658

F.3d at 1324)); *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1338 (Fed.

Cir. 2016) ("The burden of creating an adequate record lies with interested parties

and not with Commerce . . . {stemming from the fact that} the International Trade

Administration, the relevant agency within Commerce, has no subpoena power."

(citations and quotations omitted)).

Now on appeal, Carbon Activated further attempts to revisit an untimely

argument at the administrative level, that coal-based charcoal should not be valued

under any HS code for coconut-shell charcoal.  CA Br. at 60.  This argument was

untimely at the administrative level and based on information not properly part of

the administrative record.  *See* Appx112-113.  Moreover, since then, Carbon

Activated has not preserved an objection to Commerce's denial of reconsideration.

Even if it had, it makes no effort now to adhere to the standard of review, such as

to first establish that Commerce erred in refusing to consider the argument in the

first instance.  And arguments not raised in the opening brief are waived.

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).

　　　In any event, the fact that wood-based charcoal *can* be used to value coal-

based charcoal, *see* CA Br. at 62, is, again, a non-sequitur.  Carbon Activated's

disagreement with Commerce's analysis does not make that analysis unreasonable.

For example, Carbon Activated's lone citation to the fourth administrative review,

*see* CA Br. at 62, is largely irrelevant.  *See Xiamen Int'l Trade & Indus. Co. v.*

*United States*, 953 F. Supp. 2d 1307, 1325 n.11 (2013) (explaining prior or

subsequent administrative determinations are not binding on other reviews before

the court (citing *U.S. Steel Corp. v. United States*, 638 F. Supp. 2d 1199, 1218

(Fed. Cir. 2009)); *Rhodia, Inc. v. United States*, 185 F. Supp. 2d 1343, 1352 (Fed.

Cir. 2001) ("{A} surrogate value which is the best available information during

one investigation or review does not necessarily remain the best available

information during subsequent reviews." (citation and quotations omitted)).  In any

event, the citation to the fourth administrative review does not make a pattern or

practice and is easily countered by a citation to the third administrative review.  In

the third administrative review, Commerce relied on HS subheading 4402.90.1000

(*i.e.*, coconut-shell charcoal) as a viable proxy for coal-based carbonized material

in previous segments under this order.  *Certain Activated Carbon from the*

*People's Republic of China: Final Results and Partial Rescission of Third*

*Antidumping Duty Administrative Review*, 76 Fed. Reg. 67142 (October 31, 2011),

and accompanying IDM.  In sum, Commerce reasonably concluded that the

Malaysian data under HS 4402.99.1000 are superior to the Romanian data under

HS 4402.90 based on Datong Juqiang's known input in this review.

### B.    Commerce Reasonably Determined That Malaysian Data Are Contemporaneous With The Period Of Review

Commerce permissibly concluded that Malaysian data are contemporaneous

with the period of review (*i.e.*, April 2017-March 2018) and the Romanian data are

not (*i.e.*, 2016-2018).  Appx128; Appx130.  Carbon Activated argues that it did

submit Romanian data specific to the period of review, but the data are mistitled

due to a technical glitch.  CA Br. at 56-58.  As the trial court observed, however,

the Romanian data were presented to Commerce as covering the period "2016-

2018."  Appx153-154.  The fact that Carbon Activated now attempts to clarify, for

the first time in litigation, that the data encompassed a different time period is a

non-sequitur.  *See* CA Br. at 56.  "This additional information is not part of the

administrative record, which otherwise supports Commerce's finding that the

Malaysian surrogate value data is more contemporaneous with the {period of

review} than the Romanian data." Appx153-154. In any event, it is not incumbent

on Commerce to independently verify surrogate value data submitted by an

interested party, or to question representations that the data itself makes (*e.g.*, that

it covers "2016-2018"), as Carbon Activated seems to argue without citation to any

authority. *See* CA Br. at 56-57.

Carbon Activated further argues that neither Commerce nor the petitioners

questioned the contemporaneity of the Romanian data and that Commerce

allegedly "violates the statutory prohibition against making adverse findings in

response to a 'request for information' based on a perceived deficiency without

providing notice and an opportunity to cure." CA Br. at 57 (citing 19 U.S.C.

§ 1677m(d)). Section 1677m(d) is inapplicable. Appx154. "While its provisions

do allow for a party to correct infirm filings, {the statute} applies to insufficient

information that was submitted in 'response to a request for information.'" *Marvin*

*Furniture (Shanghai) Co. v. United States*, 867 F. Supp. 2d 1301, 1308 (Ct. Int'l

Trade 2012), *aff'd*, 744 F. 3d 1319 (Fed. Cir. 2014) (affirming the trial court's

holding that section 1677m was inapplicable because Marvin's request for new

shipper review was filed on its own accord); *see generally Mukand, Ltd. v. United*

*States*, 767 F.3d 1300, 1304–06 (Fed. Cir. 2014). In contrast, Carbon Activated

provided the data on its own initiative, not in response to a request.  In any event,

even if the statute could apply in this context, which it does not, it would only

apply if there was a deficiency.  "There was no apparent deficiency in the

Romanian data; Commerce accepted the data as presented."  Appx154.

"Commerce {then} evaluated the quality of that data in comparison to the quality

of the Malaysian."  *Id.*

Additionally, Carbon Activated goes too far in suggesting that Commerce

drew an adverse inference, or made an adverse action, in simply selecting data other

than the data favored by Carbon Activated.  *See* CA Br. at 57-58.  There was no

resort to facts otherwise available or imposition of adverse inference against Carbon

Activated in this context.  *See Mukand*, 767 F.3d at 1304 (explaining that section

1677m(d) may apply before Commerce may resort to facts otherwise available with

an adverse inference).  The agency's conclusion regarding the greater

contemporaneity of the Malaysian data is supported by substantial evidence.

Now on appeal, Carbon Activated continues to press its argument based on

section 1677m(d), insisting that a surrogate value solicitation constitutes a "request

for information" and, because the dataset was submitted "before the *Preliminary*

*Results*," Commerce should have notified it that its dataset was deficient and

permitted it to remedy or explain.  CA Br. at 57-58.  However, Carbon Activated

presses this argument without citation to *any* authority, and without responding to

the authority cited by the trial court.  As explained in *Shenzhen Xinboda Industrial Company v. United States*, relied on by the trial court (Appx154), Commerce's invitation to submit surrogate value data is not the same as a response to a specific "request for information."  357 F. Supp. 3d 1295, 1304-05 & nn.24-25 (Ct. Int'l Trade 2018).

"Read in context, {} section 1677m(d) applies to a respondent's questionnaire responses, which are distinct from the voluntary submission of surrogate value data." *Id.* at 1304-05 (citing *Qingdao Sea-Line Trading Co., Ltd. v. United States*, Case No. 10-00304, Slip Op. No. 12-39, 2012 WL 990904, at *7 n.9 (Ct. Int'l Trade Mar. 21, 2012)).  There are distinct differences in the nature of an invitation to submit surrogate value data and its deadline, 19 C.F.R. § 351.301(c)(3), and a questionnaire response and its deadline, *id.* § 351.301(c)(1). *Shenzhen*, 357 F. Supp. 3d at 1305 n.25.  Moreover, the language of the statute further supports interpreting the statute as limited in application to deficient questionnaire responses.  *Id.*  The second sentence of 1677m(d) refers to an obligation for Commerce to accept submitted information only if interested parties satisfy all five enumerated requirements under 19 U.S.C. § 1677m(e), including that the information can be "verified" and is "necessary to the determination." *Id.* at 1305 n.24 (quoting section 1677m(e)).  However, while Commerce "need{s} surrogate value to establish normal value, *see* 19 U.S.C. § 1677b(c)(1), the

surrogate value proposed by a particular interested party is not 'verified.'"
*Shenzhen*, 357 F. Supp. 3d at 1305 n.25.  Nor is any particular surrogate
information "'necessary to the determination' because Commerce may simply
decide that other, non-deficient, surrogate information is the 'best available.'"  *Id.*
(quoting 19 U.S.C. § 1677m(e), 1677b(c)(1)).  *Cf. Papierfabrik Aug. Koehler SE v.
United States*, 843 F.3d 1373, 1378, 1382-84 (Fed. Cir. 2016) (explaining
Commerce did not violate section 1677m in refusing to consider evidence that did
not meet all five criteria).

Moreover, it bears repeating, even if section 1677m could apply to surrogate
data, which it does not, there were no apparent deficiencies in this data that could
have triggered the statute; respondents represented the data to encompass 2016-
2018 and Commerce evaluated the data on that basis.  The trial court agrees.
Appx154.  Based on the administrative record before the agency, Commerce
reasonably determined that Malaysian data are more contemporaneous with the
period of review than the Romanian data.

## C.    Surrogate Value Selection Is Made On A Case-by-Case Basis; There Is No Hierarchy In Selection Criteria

Carbon Activated argues that selection of the primary surrogate country
should be weighted toward the country from which Commerce draws data for
financial ratios and/or a main input, because both represent a significant portion of
the respondents' normal value.  *See* CA Br. at 51-55, 59, 63.

It cites no law requiring Commerce to weight its analysis in this fashion.  To the contrary, it is well-established that there is no hierarchy for applying the surrogate value selection criteria, which include product specificity, contemporaneity, public availability, tax and duty exclusivity, and representativeness of a broad market average.  *See* Policy Bulletin 04.1; *Fine Furniture (Shanghai) Ltd. v. United States*, 321 F. Supp. 3d 1282, 1293 (Ct. Int'l Trade 2018), *amended*, 521 F. Supp. 3d 1337 (Ct. Int'l Trade 2021); *Xiamen*, 953 F. Supp. 2d at 1313 ("Commerce has not identified a hierarchy among these factors, and the weight accorded to a factor varies depending on the facts of each case); *Heze Huayi Chem. Co., Ltd. v. United States*, No. 17-00032, 2018 WL 2328183, at *2 (Ct. Int'l Trade May 22, 2018) ("There is no hierarchy for applying the {surrogate value} selection criteria; rather, Commerce . . . make{s} a product-specific and case-specific decision as to what is the 'best' {surrogate value} for each input.").

Furthermore, when Commerce is presented with two imperfect datasets, as here, Commerce is within its statutory discretion to choose between reasonable alternatives for surrogate value sources.  *See Taian Ziyang*, 783 F. Supp. 2d at 1329 ("Even in situations where all potential sources of data on the record have flaws (a not uncommon occurrence), the law requires Commerce to make a reasoned decision as to the source on which it chooses to rely . . . ."); *see also*

*Jiaxing II*, 822 F.3d at 1301 (explaining the data relied on need not be perfect (citing *Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014))); *Nation Ford*, 166 F.3d at 1377 (explaining Commerce is not required to duplicate the precise experience of the manufacturer in the non-market economy).

Carbon Activated nevertheless attempts to replace Commerce's discretion with a new standard of Carbon Activated's own making. Carbon Activated's position is untenable. As the courts have held, the selection of surrogate values is conducted on a case-by-case basis. *See Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1327 n. 2 (2006) (explaining that the statute's silence on the definition of "best available information" provides Commerce with "broad discretion" and, thus, "the statute does not require Commerce to follow any single approach"). Commerce simply "need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production as long as it was a reasonable way." *Brake Drum*, 44 F. Supp. 2d at 258.

### 1.    The Weight Of Financial Ratios In Surrogate Selection

Carbon Activated cites to several administrative decisions to demonstrate that Commerce has, on occasion, relied on the source for financial ratios in selecting the primary surrogate country. CA Br. at 51, 53-55. Carbon Activated goes so far as to state that these authorities are "compelling precedent" that would have required Commerce select Romania as the primary surrogate country in this

review. *Id.* at 54. These reviews, however, do little to advance Carbon Activated's argument and certainly do not create any "compelling precedent." None of these authorities stand for the proposition that Commerce must weigh the source for financial ratios more heavily than the sources for inputs.

In *Cased Pencils from China*, there was more to Commerce's analysis than a blanket preference for the Philippines based on use of its financial data. *Certain Cased Pencils From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Determination To Revoke Order In Part; 2010-2011,* 78 Fed. Reg. 42,932 (Dep't of Commerce Jul. 18, 2013), IDM at Cmt. 1. The Philippine producer was a producer of identical merchandise (cased pencils) while the alternative Thai producer was primarily in the business of comparable merchandise (pens). *Id.* "{W}e now have financial information from a producer of identical merchandise," Commerce reasoned, "which is a better source for the surrogate financial ratios," thereby tipping the balance to the Philippines in selecting a primary surrogate country. *Id.*

Similarly, in *Tianjin Wanhua Co., Ltd. v. United States*, the Court sustained Commerce's selection of Indonesia based on both the relatively superior Indonesian financial statement and the fact that the Indonesian producer made identical rather than just comparable merchandise. 253 F. Supp. 3d 1318, 1328 (Ct. Int'l Trade 2017). As the Court further explained, for a remand directing

Commerce to use other surrogate values, the respondent needed to establish that the requested values were "*the one and only reasonable surrogate selection on {the} administrative record*, not simply that {the requested value} may have constituted another possible reasonable choice." *Id*. (emphasis altered). Carbon Activated has not shown that Romania is the "one and only reasonable surrogate selection" for primary surrogate country.

Carbon Activated fares no better with *Ancientree Cabinet Co. v. United States*, 532 F. Supp. 3d 1241 (Ct. Int'l Trade 2021). In *Ancientree*, as here, Commerce declined to rely on Malaysian financial statements lacking discrete line items for raw material, labor, and energy. *Id*. at 1255-56. But that similarity does not compel Commerce to ultimately reject Malaysia as a primary surrogate country in this review, as it did in *Ancientree*. In both reviews, Commerce engaged in broader case-specific analyses of data and exercised its statutory discretion to choose between reasonable alternatives for surrogate value sources. As the trial court summarized, "{a}t most, these examples show that Commerce *may* consider the source of financial ratios to determine the primary surrogate country, not that Commerce *must*." Appx155. Carbon Activated failed to cite to any authority requiring Commerce rely on financial ratio sources in such a way.

Finally, Carbon Activated demands too much in arguing Commerce must do more than compare data within this review, but also compare data in this review to

other reviews of other products involving entirely different records. *See* CA Br. at 54 (alleging Commerce failed to explain a purported "deviation from practice"). First, Carbon Activated has not established a prior "practice" from which Commerce deviated in this review. As explained above, there is no "practice" of weighing the data source for financial ratios more heavily in selection of primary country than other data sources or criteria. Second, "antidumping proceedings are . . . independent proceedings . . . which lead to independent determinations." *Jiaxing Brother Fastener Co. v. United States*, 428 F. Supp. 3d 1364, 1379 n. 29 (Ct. Int'l Trade 2020)." Third, even if the agency was obligated to compare this review to all other reviews, which it is not, Carbon Activated has an obligation to have brought all of its arguments before Commerce in the first instance. Instead, Carbon Activated raised its multiple comparisons during litigation rather than before Commerce to allow response at the administrative stage. In any event, Commerce did explain why it was selecting Malaysia as the primary surrogate country, despite the fact that it would rely on a Romanian company's financial statement for financial ratios. *See, e.g.*, Appx100-107. Carbon Activated fails in its burden to demonstrate that Romania was purportedly, instead, the one and only one reasonable choice for primary surrogate country.

## 2.     The Weight Of A Main Input In Surrogate Selection

For the first time on appeal to this Court, Carbon Activated introduces a new argument that "only Romania qualifies as the surrogate country because it alone affords usable and reliable {surrogate value} data for 'the main input:' bituminous coal." CA Br. at 52. The Court should not consider this new argument because it is barred by the doctrine of administrative exhaustion.

With respect to the timeliness or propriety of certain arguments, Carbon Activated was required to exhaust all arguments before Commerce. 28 U.S.C. § 2637(d). This statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (quoting *Corus Staal BV v. United States*, 502 F.3d 1370, 1378–80 (Fed. Cir. 2007)).

Accordingly, the Court should "generally take{} a 'strict view' of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases." *Corus Staal*, 502 F.3d at 1379. And, in practice, a party must first present *all* arguments in its administrative case and rebuttal briefs before raising those issues in the trial court. *Dorbest*, 604 F.3d at 1375. Here, however, Carbon Activated has failed to exhaust with respect to this new argument and it should not be heard for the first time on appeal.

In any event, as already explained, Commerce is not required to give greater weight to the data source of a main input(s) in selection of primary surrogate country. Moreover, Commerce's selection of Romania to calculate financial ratios and bituminous coal with unknown calorific values does not diminish the selection of Malaysia as a primary surrogate country. *See Tianjin Wanhua*, 253 F. Supp. 3d at 1328 (respondent must establish that the requested values are "the one and only reasonable surrogate selection," not simply that Commerce could have, or should have (in respondent's view), made a different decision). Moreover, Commerce still had usable Malaysian data "covering nearly all of the bituminous coal input used by the mandatory respondents." Appx128. It simply did not use Malaysian data to value this one sub-set of one material input because the Malaysian data under applicable HS 2701.12 was aberrant and unusable. Appx127.

Commerce's selection of Malaysia, over Romania, as primary surrogate country is supported by substantial evidence and not contrary to law.

## III. Commerce's Valuation Of Bituminous Coal, Of Known And Unknown Calorific Values, Is Supported By Substantial Evidence And In Accordance With Law

The Court should affirm the trial court's decision sustaining Commerce's valuation of Carbon Activated's bituminous coal of an unknown calorific value under Romanian HS 2701.12 ("Bituminous Coal") and bituminous coal of a known calorific value under Malaysian HS 2701.19 ("Other Coal"). *See* Appx141-150.

The trial court correctly held that substantial evidence supported Commerce's use of a combination of Malaysian and Romanian data sets to value bituminous coal, depending on whether the calorific value was known to be less than 5,833 kcal/kg. *Id*. Commerce's decision was based on several factors, including:  (i) the lack of record evidence regarding the heat value for Carbon Tianjin's Supplier C and Carbon Tianjin's uncooperative supplier, (ii) the failure of exporters, when asked, to provide a detailed description of smoke coal and explain the difference between smoke coal and bituminous coal, and (iii) the lack of record evidence to substantiate the claim that Malaysian data for "Other Coal" was aberrant or unreliable.  *See* Appx94-100, Appx113-122.

Carbon Activated argues that Commerce should have (i) valued bituminous coal of both known and unknown calorific values using Romanian HS 2701.19, or (ii) alternatively, applied Romanian HS 2701.19 for bituminous coal with known calorific values and an average of Romanian HS 2701.12 and HS 2701.19 for bituminous coal with unknown calorific values.  CA Br. at 37-49.  Carbon Activated further asserts that Commerce's interpretation of HS 2701.12 and HS 2701.19 are unlawful.  *Id*.  For the reasons that follow, Carbon Activated is not persuasive.

**A.    Commerce Lawfully Selected Malaysian HS 2701.19 ("Other Coal") To Value Bituminous Coal Of Known Calorific Value**

On remand, Commerce redetermined to use Malaysian data under HS 2701.19 (Other Coal) to value bituminous coal input with a known calorific value (under 5,833 kcal/kg).  Appx95-100; Appx116-122.

As Commerce explained, its practice when selecting the best available information is to consider product specificity among other criteria.  Appx117.  Commerce has also long required any interested party arguing data to be aberrational or unreliable, to support its argument with sufficient evidence.  Appx117.  If there is sufficient evidence, Commerce "will assess all relevant price information on the record, including any appropriate benchmark data, in order to accurately value the input in question." *Id.*  If there is insufficient evidence, "Commerce does not discard the data." *Id.*  Finally, the agency has a "strong preference to value all {factors of production} in a single surrogate country, . . . as well as a practice 'to only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable.'" *Id.*; *see also* 19 C.F.R. § 351.408(c)(2).

Commerce determined that Malaysian data under HS 2701.19 was the best available information to value bituminous coal with known calorific value less than 5,388 kcal/kg.  Appx117-118.  Commerce acknowledged its preference for Malaysian data because Commerce was continuing its selection of Malaysia as the

primary surrogate country.  Appx118.  Additionally, the Malaysian import data

under HS 2701.19 are publicly available and contemporaneous with the period of

review.  The data are also product specific to the heat value of the bituminous coal

(under 5,833 kcal/kg) reported to have been used by Datong Juqiang, its supplier,

and one of Carbon Activated's suppliers.[5]  Commerce further concluded that the

Malaysian HS 2701.19 data are "reliable, as there is no indication that the {data

are} unusable as a result of being, for example, aberrantly high or based on a

limited amount of imports."  Appx99.

There was no reason to depart from Malaysia for those entities reporting use

of bituminous coal with calorific values under 5,833 kcal/kg.  Commerce

reasonably rejected the argument that Malaysian data under HS 2701.19 (Other

Coal) must be aberrant and unreliable simply because Commerce previously

concluded that Malaysian data under a different HS code (HS 2701.12 (Bituminous

Coal)) was aberrant and unreliable.  Appx118.  *But see* CA Br. at 47-48 (arguing

an interested party's unsupported allegation that there was a "likelihood" of

aberrancy was not a sufficient justification to disregard data).  As Commerce

reasonably explained, there is "no evidentiary basis" to impute its conclusion

regarding the quality of data under Malaysian HS 2701.12 to data under Malaysian

---

[5]  Commerce has redetermined that the HS chapter notes apply to all
countries in the World Customs Organization (WCO) based on additional evidence
Commerce placed on the record during the remand proceeding.  Appx97-99.

HS 2701.19 data.  Appx118.  "Respondents do not identify any record information to support their claim . . . and the record lacks any appropriate benchmark data or other price information to support their contention."  *Id.*  In addition, it is Commerce's longstanding practice not to reject data without an evidentiary basis for doing so.  *Id.*

The trial court agreed.  Appx148-150 (citing *Jinan Farmlady Trading Co. v. United States*, 228 F. Supp. 3d 1351, 1356-57 (Ct. Int'l Trade 2017) (finding Commerce's determination that data were not aberrational to be reasonable when respondent had not provided demonstrative evidence)).  Absent such record evidence, Malaysian HS 2701.19 data are presumed to be reliable.  *Id.*

Carbon Activated attempts to distinguish the trial court's reliance on *Jinan Farmlady*.  CA Br. at 48.  Carbon Activated argues that *Jinan Farmlady* "involved a different issue," "whether a partner country's AUV was unreliable when it was significantly higher or lower than the overall AUV."  *Id.*  But Carbon Activated reads *Jinan* too narrowly.  The decision persuasively demonstrates that Commerce need not, and should not, discard data based on unsupported assertions of aberrancy.  As such, the case further supports, rather than detracts, from Commerce's determination in this case.

Lastly, while Carbon Activated does not dispute Commerce's preference to value bituminous coal with *known* calorific value under HS 2701.19, it argues that

Commerce should favor Romanian data rather than Malaysian data under that code. CA Br. at 49. It reasons that doing so would allegedly minimize distortions vis-à-vis the agency's use of Romanian HS 2701.12 for valuation of bituminous coal with unknown heat value. *Id*. Carbon Activated's argument again ignores the standard of review. Commerce acknowledged its regulatory preference to value data from a single source where appropriate. Appx121. Commerce reasonably determined, however, that the preference applied in favor of the Malaysian data because Malaysia was the primary surrogate country. Carbon Activated fails to establish how that was unreasonable, rather than just an exercise of agency discretion with which Carbon Activated disagrees.

### B. Commerce Lawfully Selected Romanian HS 2701.12 ("Bituminous Coal") To Value Bituminous Coal Of Unknown Calorific Value

Commerce determined to use a different dataset for valuation of bituminous coal with unknown calorific values. On remand, Commerce reasonably determined to continue relying on Romanian HS 2701.12 (Bituminous Coal) as the best available information on which to value the input with unknown calorific values reported to have been used by Carbon Activated's Supplier C and Carbon Activated's uncooperative supplier. Appx95-100; Appx118-122. First, there was no record evidence (*i.e.*, test reports) regarding the heat value of this input for these suppliers as would support valuing their bituminous coal under HS 2701.19 (Other

Coal), which is limited to a calorific value under 5,833 kcal/kg. Appx97. Second, the plain language description of HS 2701.12 matched the mandatory respondents' description of the input. Appx120. Third, without record evidence demonstrating that the input that respondents described as "bituminous coal" was actually of a "kind and grade more appropriately classified under HS 2701.19" (*i.e.*, Other Coal, with a calorific value limit of less than 5,833 kcal/kg), Commerce could not reject HS 2701.12 in favor of HS 2701.19 for valuation of bituminous coal with unknown calorific value. Appx120.

As the trial court recognized, "{w}hile Plaintiffs argued that Commerce impermissibly speculated that bituminous coal should be classified as 'bituminous coal' under HS 2701.12, . . . any basis for Commerce to apply HS 2701.19 was equally speculative." Appx145. Accordingly, the trial court "decline{d}," as this Court should as well, "to reweigh the record evidence." *Id.* Commerce provided a reasoned explanation for how it had exercised its discretion to weigh that evidence. Specifically, neither Supplier C nor Carbon Activated's uncooperative supplier had documented the heat value of the bituminous coal they used. Appx120. In the absence of that information, Commerce reasonably relied on the plain meaning of the HS description to determine the best available information to value a specific input. Appx146 (citing *Mid Continent Steel & Wire, Inc. v. United States*, 321 F.

Supp. 3d 1313, 1325 (2018) (sustaining use of a surrogate value based on the HS

description that best matched the description provided by the respondent)).

Carbon Activated attempts to distinguish this review from *Mid Continent*,

which sustained Commerce's use of an HS description that best matched a

respondent's description of its own input.  CA Br. at 41.  Again, Carbon Activated

reads a trial court decision too narrowly.  *Mid Continent* supports, rather than

detracts from, Commerce's determination in this case.  Commerce's "practice,

when selecting the best available information . . . is to select, to the *extent*

*practicable*, {surrogate values} which are input-specific, representative of a broad-

market average, publicly available, contemporaneous with the {period of review},

and tax- and duty-exclusive."  Appx117.  As Commerce reasonably determined,

the plain meaning of HS 2701.12 matches what the entities reported regarding their

use of "bituminous coal" and in the absence of any record evidence of specific heat

content.  Appx118.  Commerce had no record basis supporting the entities' use of

some other coal, covered by HS 2701.19 ("Other Coal").  *Id.*

Carbon Activated further argues that Commerce impermissibly speculated

that bituminous coal with unknown calorific values should be classified as

"bituminous coal" under HS 2701.12.  CA Br. at 42.  However, Commerce is not

precluded from making inferences based on the evidence presented on the record.

*See Fuwei Films (Shandong) Co. v. United States*, 837 F. Supp. 2d 1347, 1351 (Ct.

Int'l Trade 2012) (explaining that "Commerce's surrogate value decision or data choice is not rendered unreasonable because an alternative inference or conclusion could be drawn from the administrative record").  It is also well-established that the Court will not upset the agency's surrogate valuation unless "no reasonable mind could conclude that Commerce calculated the surrogate value as accurately as possible."  *Id*. (quoting *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011)).  Here, Carbon Activated has failed to demonstrate that no reasonable mind could choose between the two imperfect datasets in the manner Commerce chose in this case.

Moreover, Carbon Activated insists that the solution to a choice between imperfect datasets must be averaging the information obtained from both datasets. CA Br. at 42.  But there is no record evidence supporting use of HS 2701.19 for bituminous coal of unknown calorific values.  In any event, there is no law, rule, or policy that *requires* Commerce average data in this context.  For example, the averaging discussed in *Xanthan Gum from China* occurred under different circumstances.  *Xanthan Gum From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, Final Partial Rescission; 2014-2015*, 82 Fed. Reg. 11,434 (Feb. 23, 2017), IDM at Cmt 11.  In that review, Commerce explained its practice of calculating weighted averages reported under all subcategories for a specific HS

category, not simple averages.  Because the proportion of concentration levels

required for the two potential HS categories were unknown, Commerce selected

the 6-digit Thai HS 2815.12 "as the category most closely matching the input

consumed by the respondents." *Id*.  Here, however, Commerce selected the 6-digit

Romanian HS 2701.12 based on Carbon Activated's description of the input which

matched the HS category.

Carbon Activated does not cite authority that would require averaging here.

*Cf. Calgon Carbon Corp. v. United States*, 35 C.I.T. 234, 243 (2011) (*Calgon

Carbon AR1*) (rejecting Calgon's request to remand for Commerce to average

surrogate value data because Commerce had already reasonably determined to use

a single dataset); *Zhejiang Native Produce Animal By-Products Imp. & Exp. Grp.

Corp., et al. v. United States*, Slip Op. 09-61, 2009 WL 1726360, at *5 (Ct. Int'l

Trade 2009) (Commerce has discretion to select or average equally reliable

datasets).  This is true even if one considers the authorities that Carbon Activated

inappropriately incorporated by reference from administrative briefs, in disregard

of the Federal Rules of Appellate Procedure 28, *see, e.g.*, *Graphic Controls Corp.

v. Utah Medical Prods., Inc.*, 149 F.3d 1382, 1385 (Fed. Cir. 1998); *Monsanto Co.

v. Scruggs*, 459 F.3d 1328, 1335 (Fed. Cir. 2006), as well as Federal Circuit

Rule 32(b)(1) (limiting brief length), and without also first addressing, let alone

establishing, that Commerce abused its discretion in refusing to consider them. *See* CA Br. at 43 & 43 n. 14.

Carbon Activated also presents a series of allegations and inapposite precedent in an attempt to undermine Commerce's reliance on HS 2701.12 to value bituminous coal with unknown calorific values. *See* CA Br. at 45-47. First, Carbon Activated accuses Commerce of employing a *de minimis* exception, citing to Commerce's statement that unknown heat coal "comprises a small percentage of the volume of subject merchandise reported in {Carbon Tianjin's} FOP database." *Id.* at 45. Carbon Activated misunderstands Commerce's analysis. Commerce made this statement in the context of explaining Commerce's rationale for selecting the Malaysian data (*i.e.*, data from the primary surrogate country) over Romanian data. *See* Appx128 ("Because the {factors of production (FOPs)} reported for Supplier C's CONNUMs comprise a small percentage of the volume of subject merchandise reported in Carbon {Tianjin's} FOP database, it is appropriate to use data from the primary {surrogate country}.")

Next, Carbon Activated unfairly accuses Commerce of "impos{ing} a de facto adverse fact available {(AFA)} rate." CA Br. at 45-46. In the absence of the input specificity that Carbon Activated failed to report, Commerce accepted the respondent's own representation that it used "bituminous coal," which matched the description of HS 2701.12 (Bituminous Coal). This was not unreasonable. Again,

Carbon Activated carried the burden of creating an accurate record. *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002).

Third, Carbon Activated misplaces reliance on the first administrative review. *See* CA Br. at 46. In AR1, a respondent provided supplemental information during verification concerning hydrochloric acid's purity, which Commerce had not asked for but accepted. *Calgon Carbon AR1*, 35 C.I.T. at 244. The trial court held that Commerce was not required to accept the information but once it did, the agency should have given the other respondent a similar opportunity to provide that information. *Id.* Failure to have done so "led to arbitrary and unfair treatment of competitors responding to Commerce's inquiries to the best of their abilities." *Id.* In this review (AR11), however, Commerce determined that "similar circumstances do not exist here." Appx119. Carbon Activated had simply failed to substantiate its own claim that smoke coal and bituminous coal were similar. *Id.*

The trial court agreed. Appx146 ("Unlike the respondent in *Calgon Carbon*, Carbon Activated had an opportunity to substantiate its claim that smoke coal and bituminous coal had similar calorific values, but failed to do so."). Again, the burden is on the interested parties, not Commerce, to create the record. *See Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1335 (Ct. Int'l Trade 2020) ("{Q}uestionnaire answers are critical as respondents have the burden of creating

an accurate administrative record . . . because they control the information that Commerce needs to complete its review."); *see also Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production {belongs} to the party in possession of the necessary information."). Yet neither Supplier C nor Carbon Tianjin's uncooperative supplier documented the heat value of the bituminous coal they had used in the production of activated carbon. Commerce further explained: "Although {it} did not ask Supplier C to provide test reports," the agency did "ask {} Supplier C to 'provide a detailed description of 'smoke coal' and explain the difference between smoke coal and bituminous coal.'" Appx99; Appx118. In response, Supplier C provided test reports only for smoke coal and failed to provide evidentiary support for "its claim that {b}oth bituminous coal and smoke coal belong to the same technical grade of bituminous coal . . . ." Appx118-119. Because Supplier C failed to provide such information, Commerce reasonably found "that HS 2701.12, based on the description of the input{,} was the best available information to value Supplier C and the uncooperative supplier's bituminous coal input." Appx120-121.

Carbon Activated further argues Commerce should have used HS 2701.19 for bituminous coal with unknown heat value because the agency used HS 2701.19.20 in the second administrative review. CA Br. at 47 (citing *Certain Activated Carbon from the People's Republic of China: Final Results and Partial*

*Rescission of Second Antidumping Duty Administrative Review*, 75 Fed. Reg.

70,208 (Nov. 17, 2010), and IDM at Cmt. 4b (Activated Carbon AR2)).  However,

Carbon Activated fails to establish an evidentiary basis to extend Commerce's

selection of HS codes in that review (nine reviews ago) on that record, to this

review on this record.  In any event, the final results of the second administrative

review ultimately lends further support for, rather than detracts from, Commerce's

approach here.  In that review, as here, Commerce similarly relied on different

datasets for different respondents based on differences in specificity of the steam

coal reported by the respondents.  Appx100 (discussing same).

## IV.    Commerce's Valuation of Coal Tar Pitch Based On Malaysian Import Data Under HS 2708.10 Is Supported By Substantial Evidence And In Accordance With Law

The Court should affirm the trial court's decision sustaining Commerce's

determination to value Carbon Activated's coal tar pitch, a material input, using

Malaysian import data under HS 2708.10 (Pitch From Coal And Other Mineral

Tars).  Appx87-89 (503 F. Supp. 3d at 1291-94).  As the trial court held,

Commerce lawfully exercised its discretion to identify HS 2708.10 instead of HS

2706.00 (Tar From Distilled Coal, Lignite Or From Peat) as the best available

information—a departure from the prior administrative review.  *Id.*

Carbon Activated argues that Commerce's analysis in this AR11

unreasonably contradicts prior and subsequent administrative reviews (AR 10 and

AR12).  CA Br. at 22-37.  It further argues that it did not fail to exhaust

administrative remedies when it failed to raise before Commerce the arguments

regarding the alleged relevance of the Explanatory Notes (EN) to Malaysian HS

2706.00 and the alleged aberrancy of Malaysian import data under HS 2708.10.

*Id.*  Following this rationale, Carbon Activated further argues that Malaysian data

under HS 2706.00 should be rejected and Russian import data under HS 2706.00

should be used to value coal tar pitch instead.  *Id.*  Carbon Activated's arguments

lack merit and should be rejected by the Court.

First, Commerce did value inputs of coal tar pitch using in HS 2706.00 in

AR10.  Appx88 (503 F. Supp. 3d at 1292-93) (citing *Calgon Carbon (AR10)*, 443

F. Supp. 3d at 1343).  But this fact alone is not sufficient to undermine

Commerce's different approach in this case.  As the trial court explained, "each

administrative review is a separate exercise of Commerce's authority that allows

for different conclusions based on different facts in the record."  Appx88 (305 F.

Supp. 3d at 1293) (quoting *Jiaxing Brother II*, 822 F.3d at 1299 (quoting *Qingdao

Sea–Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014)).

"Thus, the question is whether Commerce has offered an explanation 'for treating

similar situations differently.'"  *Id.* (quoting *SKF USA Inc. v. United States*, 263

F.3d 1369, 1382 (Fed. Cir. 2001)).

Commerce offered an adequate explanation in this review. Commerce's change in approach was a result of plaintiffs' submissions. Respondents had each reported the input as "coal tar pitch" and not "coal tar" for certain suppliers. Appx87 (503 F. Supp. 3d at 1292) (citing Appx21). One of the mandatory respondents, Carbon Tianjin, reported that the input used by its supplier "is commonly known as 'pitch' in the industry, which is solid at normal temperatures." *Id.* (citing Appx21). The record further reflected that coal tar is a by-product of the coke production process, whereas the reported coal tar pitch was derived from the fractionated distillation process of coal tar. *Id.* (citing Appx21). In turn, further distillation of coal tar pitch yields higher grades of pitch. *See* Appx88 (503 F. Supp. 3d at 1293). Finally, respondents had failed to support their assertion that HS 2708.10 (pitch) covers only 100 percent pure pitch distilled in a tar workshop and HS 2706.00 (coal tar) covers both coal tar and coal tar pitch with less than 100 percent pitch content. Appx87-89 (503 F. Supp. 3d at 1292-93) (citing Appx21).

Second, Carbon Activated's attempt to undermine Commerce's reliance on HS 2708.10, by distancing itself from its own representations regarding its own input during the administrative review, is not persuasive. *See* CA Br. at 22-23 (objecting to Commerce's reliance on its own representations). This argument

ignores the well-established fact of which these experienced respondents[6] are well aware:  the burden of establishing an accurate record lies with them.  *E.g.*, *Nan Ya Plastics*, 810 F.3d at 1338.

Third, Carbon Activated argues that the label it ascribed to its own input should be ignored in favor of the actual pitch content.  CA Br. at 23-24.  This argument gets Carbon Activated nowhere in this review.  As the trial court explained, Carbon Activated's pitch content distinction—that "HS 2706.00 covers coal tar and coal tar pitch with less than 100 percent pitch content and HS 2708.10 covers 100 percent pure pitch"—is unsupported by record evidence.  Appx88-89 (503 F. Supp. 3d at 1293).  *Cf.* CA Br. at 26 (assigning specific pitch content thresholds to HS codes based on attorney argument, not evidence).  Thus, regardless of the pitch content of respondents' input, Commerce was well within its discretion to value inputs described as pitch, and containing pitch, under the HS code 2708.10 ascribed for pitch, rather than the HS code 2706.00 ascribed for tar. As Commerce reasoned:  "There is no information on the record that substantiates

---

[6] Mandatory respondent Datong Juqiang has participated in administrative reviews for activated carbon since the fourth administrative review.  Mandatory respondent Carbon Tianjin has participated since the seventh administrative review.  *See Certain Activated Carbon From the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*; 77 Fed. Reg. 67337 (Dep't of Commerce Nov. 9, 2012); *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013–2014*; 80 Fed. Reg. 61172 (Dep't of Commerce Oct. 9, 2015).

the mandatory respondents' assertion that HS 2708.10 covers 100 percent pure pitch distilled in a tar workshop." Appx21. Or, conversely, that coal tar pitch with some lesser percentage of pitch is not encompassed by the HS code for "pitch" (*i.e.*, HS 2708.10) but rather by the HS code for "coal tar" (*i.e.*, HS 2706.00)). *Id.*

Fourth, although Carbon Activated argues that Commerce's determination is speculation not amounting to substantial evidence, *see* CA Br. at 26-28, what Commerce actually did was to make reasonable inferences based on the record evidence actually before it. *See Fuwei Films*, 837 F. Supp. 2d 1347. As the trial court explained, Commerce was within Commerce's statutory "discretion to identify HS 2708.10 instead of HS 2706.00 as the best available information" based on questionnaire responses referencing "coal tar pitch" as "pitch" in commercial parlance, that the reported coal tar pitch was derived from the fractionated distillation process of coal tar, and that each exporter reported their material input as coal tar pitch, not coal tar. *See* Appx87-88 (503 F. Sup.. 3d at 1292-93); *QVD Food Co.*, 658 F.3d at 1323.

Fifth, Carbon Activated raises a new argument—for the first time before this Court—that Commerce's determination in this AR11 inappropriately contradicts Commerce's subsequent determination in AR12. CA Br. at 25. Notwithstanding this new argument made to this Court (without exhaustion before Commerce), and the fact that each administrative review is considered a separate exercise of

Commerce's statutory authority, the subsequent review is based on a different administrative record developed for that review. *See Certain Activated Carbon From the People's Republic of China 2018–2019*, 86 Fed. Reg. 10,539 (Dep't of Commerce Feb. 22, 2021) and accompanying IDM at Cmt. 3 (Activated Carbon AR 12).

Sixth, Commerce is not "compelled" to interpret HS 2706.00 in the manner proffered by Carbon Activated based on purported tariff language and ENs. *See* CA Br. at 28-32. As an initial matter, the trial court held that Carbon Activated was precluded from making these arguments based on a failure to first exhaust the arguments before Commerce. Appx89 (503 F. Supp. 3d at 1293-94) (citing 28 U.S.C. § 2637(d); *Weishan Hongda*, 917 F.3d at 1362). Whether the ENs are "useful{} as a legal reference for purposes of tariff classification," *see Jiangsu Senmao Bamboo and Wood Indus. Co., Ltd. v. United States*, 322 F. Supp. 3d 1308, 1324 (Ct. Int'l Trade 2018), the trial court reasoned, "{r}espondents fail to argue the relevance of the ENs before Commerce." *Id.* "A remand to the agency to consider the ENs in the first instance would undermine the interest of judicial efficiency that administrative exhaustion is intended to protect." *Id.* (citing *Corus Staal*, 502 F.3d at 1379).

Now on appeal to this Court, Carbon Activated fails to establish that the trial court's refusal to consider these arguments was an abuse of discretion. *See Corus*

*Staal*, 502 F.3d at 1381 (holding that the trial court did not abuse its discretion in its application of the exhaustion doctrine).[7]  While Carbon Activated summarily asserts that tariff language and ENs are publicly-available and judicially-noticeable, that is a non-sequitur.  What Carbon Activated seeks is for this Court to apply its interpretation of the tariff language and ENs to the facts of this review.  Contrary to its argument, that is not a pure question of law.  A pure question of law exists "where an issue "{} does not . . . require the application of any special . . . expertise {by Commerce} or the development of a special factual record either before or after the Court's consideration of the issue." *Consol. Bearings Co. v. United States*, 166 F. Supp. 2d 580, 587 (Ct. Int'l Trade 2001), *rev'd and remanded on related but other grounds*, 348 F.3d 997, 999-1000 (Fed. Cir. 2003).

That cannot be said of this instance given that what one would need to understand, as a factual matter, what constitutes coal, coal tar, coal tar pitch, and other materials, independently, and in relation to the tariff code and respondents' input.  Carbon Activated, however, had ample opportunity to assert the notes relevancy before Commerce but failed to afford Commerce "the opportunity to

---

[7] "A court abuses its discretion when: (1) the court's decision is clearly unreasonable, arbitrary or fanciful; (2) the decision is based upon an erroneous construction of the law; (3) the trial court's factual findings are clearly erroneous; or (4) the record contains no evidence upon which the {trial} court could have rationally based its decision." *Hi-Shear Technology Corp. v. United States*, 356 F.3d 1372, 1378 (Fed. Cir. 2004) (citation and quotations omitted).

rectify its own mistakes {if any} (and thus to moot controversy and obviate the need for judicial intervention)." *See Gerber Food (Yunnan) Co. v. United States*, 601 F. Supp. 2d 1370, 1379 (Ct. Int'l Trade 2009) (citing *Ta Chen Stainless Steel Pipe, Ltd.*, 342 F.Supp.2d 1191, 1206 (Ct. Int'l Trade 2004)).

Seventh, as the trial court further held, Carbon Activated "likewise failed to exhaust {its} arguments regarding the aberrancy Malaysian import data under HS 2708.10 based on the predominance of Spanish exports in the average unit values." Appx89 (503 F. Supp. 3d at 1294). Now on appeal, Carbon Activated offers similar arguments in asserting that Malaysian import data under HS 2708.10 are unreliable because the AUV is less than what respondents would expect it to be relative to the AUV of import data under HS 2706.00. CA Br. at 32-34. Albeit reframed, at least on its face, the argument remains essentially the same as the argument raised before the trial court and, in any event, is still barred by the doctrine of administrative exhaustion.

Carbon Activated speciously argues that it should be excused from exhaustion requirements because Commerce only selected HS 2708.10 for the first time in the *Final Results*. CA Br. at 34. But, as evidenced by the *Preliminary Results*, datasets under HS 2706.00 and HS 2708.10 were under consideration throughout the administrative proceeding. *See* Appx4469. Yet, at no point did Carbon Activated raise these arguments before Commerce, although it had every

opportunity to do so.  Instead, it raised other arguments, including aberration for other reasons; but it did not raise any argument with respect to Spanish exports tainting Malasian value or, relatedly, being distorted or unreliable (as Carbon Activated argues now before this Court).  As such, Carbon Activated failed to exhaust administrative remedies and, because no exceptions apply, it may not raise these arguments now before this Court.  *See Boomerang Tube*, 856 F.3d at 910; *Dorbest*, 604 F.3d at 1375; *Corus Staal*, 502 F.3d at 1378-80.  As the trial court succinctly recognized, "{r}espondents {} had ample opportunity to present this argument to Commerce and cannot now seek{} a new 'bite at the apple.'"  Appx89 (citing 503 F. Supp. 3d at 1294) (citing *Calgon Carbon* (*AR10*), 443 F. Supp. 3d at 1353–54).

In any event, the record does not establish that the Malaysian values are aberrational.  As Commerce explained in the context of its valuation of another input (Bituminous Coal), Commerce assesses whether a particular surrogate value is aberrational based on appropriate benchmark data.  Appx16.  Appropriate benchmark data can be historical import data for the potential surrogate countries or data from the same HS category over multiple years.  *Id.*  Carbon Activated, however, does not base its argument for aberration on either benchmark.  Rather, it invites this Court to compare the values of imports under different HS codes.  *See* CA Br. at 34.  It offers no authority for judging aberration on this matrix.

Further, Carbon Activated's argument for aberration is dependent on the factual premise that coal tar pitch under HS 2708.10 *should* have a higher AUV than coal tar under HS 2706.00, but does not. There is no record evidence to support the premise that coal tar pitch must be higher; Carbon Activated offers only its own subjective view on the subject. Moreover, even if it was true that the AUV should be higher, which Carbon Activated has not established, the fact that coal tar pitch has a lower AUV does not necessarily mean that both values are tainted, or that coal tar pitch is the tainted value rather than coal tar. By way of comparison, Commerce consistently has determined that data merely appearing on the low or high end of a range of values is not sufficient to find that such data is aberrational. *E.g., Jacobi Carbons AR4*, 992 F. Supp. 2d at 1375-76; *Camau Frozen Seafood Processing Import Export Corp. v. United States,* 929 F. Supp. 2d 1352, 1358 n.9 (Ct. Int'l Trade 2013) ("On this record, the Bangladeshi data is not aberrational, it is merely the lowest price in a range of prices.").

Finally, Carbon Activated contends Commerce should have relied, instead, on Russian data under HS 2706.00 because that data "{a}ffords the most reliable {surrogate value}." CA Br. at 35 (capitalization altered). In support, Carbon Activated stress its view that the Russian dataset "represents the broadest market average," and then implies that this criteria should weigh more heavily than other criteria. *See id.* at 35-36. However, Carbon Activated again ignores the standard

of review.  *See Tianjin Wanhua*, 253 F. Supp. 3d at 1324 (respondent must establish that the requested values are "the one and only reasonable surrogate selection on {the} administrative record, not simply that {the requested value} may have constituted another possible reasonable choice.")

Through the lens of this standard of review, Commerce's determination to rely on Malaysian HS 2708.10, rather than Russian HS 2706.00, is supported by substantial evidence and not contrary to law.  The Malaysian dataset under HS 2708.10 was publicly-available, contemporaneous, tax and duty exclusive, and product-specific because respondents reported using coal tar pitch (HS 2708.10) not coal tar (HS 2706.00) in their production processes.  Furthermore, Commerce has a strong regulatory preference to value all factors of production in a single surrogate country pursuant to 19 C.F.R. § 351.408(c)(2).  Appx15.  Accordingly, Commerce would resort to alternative data sources (*e.g.*, possibly Russian data) only if usable data from Malaysia are not available on the record.  *Id*.  That was not the case here.  The record reflects reliable and usable data from the primary surrogate country, Malaysia.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court affirm the judgment of the Court of International Trade.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

*/s/Claudia Burke*
CLAUDIA BURKE
Assistant Director

*Of Counsel*:

*/s/Mollie L. Finnan*
MOLLIE L. FINNAN
ASHLANDE GELIN                      Senior Counsel for Management
Attorney                                    U.S. Department of Justice
Office of Chief Counsel for Trade      Commercial Litigation Branch
  Enforcement & Compliance        P.O. Box 480, Ben Franklin Station
U.S. Department of Commerce       Washington, DC 20044
Washington, D.C.                         Tel: (202) 353-0897
                                            Email:  mollie.l.finnan@usdoj.gov

May 31, 2022                           *Attorneys for Defendant-Appellee,
                                           United States*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(B), I certify that the foregoing brief contains <u>12,775</u> words, excluding the parts of the brief exempted by the rule.  The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.

*/s/Mollie L. Finnan*
MOLLIE L. FINNAN
